# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## No. 10-15387

SAMUEL MICHAEL KELLER,

*Plaintiff and Appellee*,

v.

ELECTRONIC ARTS INC.,

*Defendant and Appellant*.

On Appeal from an Order of the United States District Court
for the Northern District of California,
The Honorable Claudia A. Wilken
Case No. 3:09-CV-01967-VRW

### APPELLANT'S OPENING BRIEF

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER - #120162
ALONZO WICKERS IV - #169454
KAREN A. HENRY - #229707
LISA J. KOHN - #260236
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST - #84065
STEVEN A. HIRSCH - #171825
R. JAMES SLAUGHTER - #193813
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant/Appellant
Electronic Arts Inc.

## CORPORATE DISCLOSURE STATEMENT

Defendant Electronic Arts Inc. ("EA"), a nongovernmental corporate party, provides the following statement to comply with Federal Rule of Appellate Procedure 26.1:

EA has no parent corporation or publicly held corporation that owns 10% or more of its shares.

# TABLE OF CONTENTS

Page

I.    SUMMARY OF ARGUMENT ..................................................................... 1

II.   JURISDICTION ........................................................................................ 8

III.  ISSUES PRESENTED .............................................................................. 9

IV.   STATEMENT OF THE CASE ................................................................. 9

V.    STATEMENT OF FACTS ...................................................................... 10

      A.    EA's Works ................................................................................... 10

      B.    Keller's Lawsuit ........................................................................... 12

      C.    EA's Anti-SLAPP Motion ............................................................ 12

VI.   STANDARD OF REVIEW ..................................................................... 13

VII.  THE DISTRICT COURT SHOULD HAVE GRANTED EA'S
      ANTI-SLAPP MOTION AND STRICKEN KELLER'S
      CLAIMS. ................................................................................................. 14

      A.    Keller's Claims Against EA Are Subject To An Anti-
            SLAPP Motion. .............................................................................. 14

            1.    EA Established That Keller's Claims Arise From
                  EA's Exercise Of Its Free-Speech Rights. ......................... 15

            2.    EA's Games Relate To An Issue Of Public
                  Interest. ............................................................................... 18

      B.    Keller Failed To Meet His Burden Of Demonstrating A
            Probability Of Prevailing Because The First Amendment
            Bars His Right-Of-Publicity And Related Claims. ....................... 20

            1.    To Protect Free Speech, Courts Have Recognized
                  Strict Constitutional Limitations On Right-Of-
                  Publicity Claims That Target Expressive Works. ............... 22

            2.    Under California's Transformative-Use Test, EA
                  Has A Complete First Amendment Defense To
                  Keller's Right-Of-Publicity Claims. .................................. 24

i

a.      The Transformative-Use Test Must Consider The Defendant's Entire Creative Work. ...............................24

b.      The District Court Misapplied The Transformative-Use Test................................................................................26

c.      Proper Application Of The Transformative-Use Test Results In A Finding That Keller Failed to Carry His Burden Under The Anti-SLAPP Statute........................36

3.      The Rogers Test Would Provide An Alternative Grounds For Striking Keller's Right-Of-Publicity Claims Against EA. ..............................................................38

a.      This Court Should Apply The Rogers Test To Right-Of-Publicity Cases, As It Already Has Done In Lanham Act Cases. ............................................................................38

b.      Under The Rogers Test, Keller Cannot Establish The Required Probability Of Prevailing On His Right-Of-Publicity Claims...........................................................44

4.      The District Court Should Have Found That The Public-Interest Test Defeated Keller's Right-Of-Publicity Claims.........................................................................46

5.      Keller's Statutory Right-Of-Publicity Claim Should Have Been Stricken Under California Civil Code Section 3344(d)'s Public-Affairs Exemption.................49

6.      Keller's Ancillary Claims Also Must Be Stricken. .................50

VIII.   CONCLUSION...............................................................................51

DWT 15286237v1 0058278-000014

# TABLE OF AUTHORITIES

Page

## Cases

*American Amusement Machine Ass'n v. Kendrick,*
244 F.3d 572 (7th Cir. 2001) ........................................................... 17, 49

*Batzel v. Smith,*
333 F.3d 1018 (9th Cir. 2003) ..............................................................9

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605 (2d Cir. 2006) ...............................................................34

*Briggs v. Eden Council for Hope & Opportunity,*
19 Cal. 4th 1106 (1999)......................................................................15

*Brown v. Electronic Arts,*
No. 2:09-cv-1598 FMC (RZx) (C.D. Cal. Sept. 23 2009) .......................... passim

*Burnett v. Twentieth Century Fox Film,*
491 F. Supp. 2d 962 (C.D. Cal. 2007)..................................................36

*C.B.C. Distribution v. Major League Baseball Advanced
Media,*
505 F.3d 818 (8th Cir. 2007) ............................................... 19, 20, 48, 49

*Campbell v. Acuff-Rose Music,*
510 U.S. 569 (1994) ...........................................................................34

*CBS Interactive v. National Football League Players Ass'n,*
Civil No. 08-5097 ADM/SRN, 2009 WL 1151982 (D. Minn.
April 28, 2009) ......................................................................... 48, 49

*Cher v. Forum Int'l,*
692 F.2d 634 (9th Cir. 1982) ...............................................................23

*Club Members for an Honest Election v. Sierra Club,*
45 Cal. 4th 309 (2008)........................................................................15

*Comedy III Productions v. Gary Saderup, Inc.,*
25 Cal. 4th 387 (2001)................................................................. passim

*Cooper v. Aaron,*
358 U.S. 1 (1958) ...............................................................................39

DWT 15286237v1 0058278-000014

*Curtis Publishing v. Butts,*
   388 U.S. 130 (1967) .......................................................................20

*Daly v. Viacom,*
   238 F. Supp. 2d 1118 (N.D. Cal. 2002) ...........................................36

*Dombrowski v. Pfister,*
   380 U.S. 479 (1965) .......................................................................36

*Dora v. Frontline Video,*
   15 Cal. App. 4th 536 (1993).................................................... passim

*E.S.S. Entertainment 2000 v. Rock Star Videos,*
   547 F.3d 1095 (9th Cir. 2008)................................................. passim

*Entertainment Software Ass'n v. Granholm,*
   426 F. Supp. 2d 646 (E.D. Mich. 2006) ..................................... 17, 49

*Equilon Enterprises v. Consumer Cause,*
   29 Cal. 4th 53 (2002)......................................................................53

*Erie R.R. v. Tompkins,*
   304 U.S. 64 (1938) .........................................................................40

*ETW Corp. v. Jireh Publishing,*
   332 F.3d 915 (6th Cir. 2003)...........................................................30

*Gionfriddo v. Major League Baseball,*
   94 Cal. App. 4th 400 (2001)................................................... passim

*Gooding v. Wilson,*
   405 U.S. 518 (1972) .......................................................................51

*Guglielmi v. Spelling-Goldberg Productions,*
   25 Cal. 3d 860 (1979).............................................................. passim

*Hicks v Casablanca Records,*
   464 F. Supp. 426 (S.D.N.Y. 1978) ..................................................33

*Hilton v. Hallmark Cards,*
   599 F.3d 894 (9th Cir. 2010)................................................... passim

*Hoffman v. Capital Cities/ABC,*
   255 F.3d 1180 (9th Cir. 2001).........................................................36

*Ingels v. Westwood One Broadcasting,*
   129 Cal. App. 4th 1050 (2005).........................................................20

iv

*Interactive Digital Software Ass'n v. St. Louis County*,
329 F.3d 954 (8th Cir. 2003) ................................................................17

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ...............................................................................9

*Kearney v. Foley & Lardner, LLP*,
590 F.3d 638 (9th Cir. 2009) ................................................................14

*Kirby v. Sega of America, Inc.*,
144 Cal. App. 4th 47 (2006) ........................................................ passim

*Ludwig v. Superior Court*,
37 Cal. App. 4th 8 (1995) .....................................................................53

*Mattel v. MCA Records*,
296 F.3d 894 (9th Cir. 2002) ....................................................... passim

*Mattel v. Walking Mountain Productions*,
353 F.3d 792 (9th Cir. 2003) ................................................................34

*McKell v. Washington Mutual, Inc.*,
142 Cal. App. 4th 1457 (2006) .............................................................52

*Montana v. San Jose Mercury News*,
34 Cal. App. 4th 790 (1995) ........................................... 8, 20, 49, 51

*Navellier v. Sletten*,
106 Cal. App. 4th 763 (2003) ...............................................................22

*Navellier v. Sletten*,
29 Cal. 4th 82 (2002) ................................................................... 15, 16

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
468 U.S. 85 (1984) ...............................................................................20

*New Kids on the Block v. News America Publishing*,
971 F.2d 302 (9th Cir. 1992) ........................................... 8, 36, 50, 51

*Nygard v. Uusi-Kerttula*,
159 Cal. App. 4th 1027 (2008) ...................................................... 19, 20

*Parks v. LaFace Records*,
329 F.3d 437 (6th Cir. 2003) ......................................................... 44, 45

*Perfect 10, Inc. v. Amazon.com*,
508 F.3d 1146 (9th Cir 2007) ...............................................................34

v

*Polydoros v. Twentieth Century Fox Film Corp.*,
  67 Cal. App. 4th 318 (1998) ............................................................. 3, 36

*RAR, Inc. v. Turner Diesel*,
  107 F.3d 1272 (7th Cir. 1997) ...............................................................39

*Robertson v. Rodriguez*,
  36 Cal. App. 4th 347 (1995) ...................................................................21

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ......................................................... passim

*Romantics v. Activision Publishing*,
  574 F. Supp. 2d 758 (E.D. Mich. 2008) ................................. 17, 19, 45

*Ruffin-Steinback v. dePasse*,
  267 F.3d 457 (6th Cir. 2001) .................................................................33

*Seale v. Gramercy Pictures*,
  949 F. Supp. 331 (E.D. Pa. 1996).........................................................33

*Seelig v. Infinity Broadcasting*,
  97 Cal. App. 4th 798 (2002)...................................................................20

*Simmons v. Allstate*,
  92 Cal. App. 4th 1068 (2001).................................................................22

*Stewart v. Rolling Stone LLC*,
  181 Cal. App. 4th 664 (2010).................................................................22

*Suzuki Motor Corp. v. Consumers Union*,
  330 F.3d 1110 (9th Cir. 2003) ...............................................................36

*Tyne v. Time Warner Entertainment*,
  425 F.3d 1363 (11th Cir. 2005)..............................................................33

*Video Software Dealers Ass'n v. Schwarzenegger*,
  556 F.3d 950 (9th Cir. 2009), *cert. granted*, 130 S. Ct. 2398
  (U.S. Apr. 26, 2010) ..............................................................................17

*Washington Post Co. v. Keogh*,
  365 F.2d 965 (D.C. Cir. 1966) ..............................................................36

*White v. Samsung Electronics*,
  971 F.2d 1395 (9th Cir. 1992)...............................................................35

*Wilson v. Midway Games*,
  198 F. Supp. 2d 167 (D. Conn. 2002) ...................................................17

DWT 15286237v1 0058278-000014

*Winter v. DC Comics*,
  30 Cal. 4th 881 (2003) ............................................................... passim

*Zacchini v. Scripps-Howard*,
  433 U.S. 562 (1977) .................................................................. 24, 25

*Zamani v. Carnes*,
  491 F.3d 990 (9th Cir. 2007) ....................................................... 9, 14

## **Statutes**

17 U.S.C. § 107 .......................................................................... 33

28 U.S.C. § 1332(a) ...................................................................... 9

28 U.S.C. § 1332(d) ...................................................................... 9

California Business and Professions Code § 17200 ................................... 13

California Civil Code § 3344 ..................................... 22, 35, 50, 51

California Civil Code § 3344(d) ............................................... passim

California Code of Civil Procedure § 425.16 ............................... passim

California Code of Civil Procedure § 425.16(a) .................................... 15

California Code of Civil Procedure § 425.16(b)(1) ................................ 15, 19, 21

California Code of Civil Procedure § 425.16(e) .................................... 16

California Code of Civil Procedure § 425.16(e)(4) .............................. 16, 19

*Restatement (Third) of Unfair Competition*, § 47, cmt. c. ......................... 7

## **Other Authorities**

D. Kelley & L. Jordan, *Twenty Years of Rogers v. Grimaldi:
  Balancing the Lanham Act with the First Amendment Rights
  of Creators of Artistic Works*, 99 Trademark Rep. 1360
  (2009) ............................................................................... 42

E. Volokh, *Freedom of Speech and the Right of Publicity*,
  40 Hous. L. Rev. 903 (2003) ..................................................... passim

DWT 15286237v1 0058278-000014

F. Jay Dougherty, *All the World's Not a Stooge:  The 'Transformativeness' Test for Analyzing a First Amendment Defense to a Right of Publicity Claim Against Distribution of a Work of Art*, 27 Colum. J. L. & Arts 1 (2003) ........................................... 26, 40

J. Thomas McCarthy, *The Rights of Publicity and Privacy*, § 8:65, at 220-222 ..................................................................... 7, 33, 40, 44

P. Felcher & E. Rubin, *Privacy, Publicity, and the Portrayal of Real People by the Media*, 88 Yale L. J. 1577 (1979) ........................................37

*Restatement (Third) of Unfair Competition*, § 46 ............................................ 23, 44

## Rules

Federal Rule of Appellate Procedure (4)(a)(1)(A) ....................................................9

Federal Rule of Evidence 1006 ....................................................................................5

Federal Rule of Evidence 201 .....................................................................................5

## Constitutional Provisions

United States Constitution, First Amendment ................................................. passim

United States Constitution, Fourteenth Amendment ...............................................24

DWT 15286237v1 0058278-000014

# I.    SUMMARY OF ARGUMENT

In this case and in *Brown v. Electronic Arts*, No. 09-56675,[1] individuals seek to restrict the ability of content providers like Electronic Arts Inc. ("EA") to exercise their First Amendment right to free expression, by dramatically expanding the economic rights protected by right-of-publicity and trademark laws.  Here, former collegiate quarterback Samuel Keller alleges that EA violated his statutory and common-law rights of publicity by using his likeness as one of the thousands of virtual athletes in three editions of its *NCAA Football* video game.[2]  In *Brown*, former NFL star Jim Brown alleges that EA violated Section 43(a) of the Lanham Act by using his likeness in several editions of its *Madden NFL* video game.  Although Keller's and Brown's claims are practically indistinguishable, the district courts reached contradictory results.  The court in *Brown* granted EA's motion to dismiss the former NFL star's Lanham Act claim, *Brown v. Electronic Arts*, No. 2:09-cv-1598 FMC (RZx) (C.D. Cal. Sept. 23 2009), while the court in this case denied EA's special motion to strike Keller's right-of-publicity claims.[3]

If Keller had sued a filmmaker who used his photograph in a documentary about college football, or a screenwriter who depicted Keller as a character in a

---

[1] In response to a request by the appellant in *Brown*, this Court has ordered that this appeal and *Brown* "will be assigned to the same panel if practicable."  Excerpts of Record ("ER") at 23.

[2] ER 130-140.

[3] The special motion to strike, which was brought under California anti-SLAPP statute, Code of Civil Procedure Section 425.16, was denied by the Honorable Claudia A. Wilken.  ER 20-22.  Keller's lawsuit against EA then was consolidated with another case brought against EA and others, and the consolidated case was assigned to the Honorable Vaughn R. Walker.

1

fictional movie about one of his college teams, the First Amendment would defeat any right-of-publicity claim.[4]  That result should not change simply because EA's highly creative works are embodied in a different medium.  As courts have recognized in other right-of-publicity and Lanham Act cases, video games "are expressive works entitled to as much First Amendment protection as the most profound literature."  *Kirby v. Sega of America, Inc.*, 144 Cal. App. 4th 47, 58 (2006).  *See also E.S.S. Entertainment 2000 v. Rock Star Videos*, 547 F.3d 1095, 1098-1099 (9th Cir. 2008) (same).

The district court failed to extend the required level of protection to EA's games, however, because it misapplied the transformative-use test that the California Supreme Court has adopted to determine whether the First Amendment protects the use of a person's name or likeness in an expressive work.  *Comedy III Productions v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 406 (2001); *Winter v. DC Comics*, 30 Cal. 4th 881, 888 (2003).  The test requires a court to decide "whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction … of the celebrity is the very *sum and substance* of the work in question."  *Winter*, 30 Cal. 4th at 888 (emphasis added).  "[I]n other words," the court must evaluate whether "*a product containing a celebrity's likeness is so transformed* that it has become primarily the defendant's own expression rather than the celebrity's likeness."  *Id.* (emphasis added).  The

---

[4] *See, e.g., Dora v. Frontline Video*, 15 Cal. App. 4th 536, 542-543 (1993) (dismissing right-of-publicity claim targeting use of plaintiff's image in documentary about surfing); *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 325 (1998) (same; use of plaintiff's persona in movie about sandlot baseball).

dispositive question is not whether the *plaintiff's image* has been transformed, but whether the *defendant's work* contains enough other creative elements so that the work, *as a whole*, is something more than simply a depiction of the plaintiff. *Winter*, 30 Cal. 4th at 888; *Comedy III*, 25 Cal. 4th at 406.

But instead of evaluating whether the content of EA's work was transformative – that is, whether the video game "contain[s] significant creative elements that transform [it] into something more than mere celebrity likeness[]," *Winter*, 30 Cal. 4th at 885 – the district court mistakenly held that its exclusive "focus must be on the *depiction of Plaintiff ..., not the game's other elements*."[5] Finding that EA's game "does not depict Plaintiff in a different form; he is represented as what he was:  the starting quarterback for Arizona State University," the court erroneously concluded that the First Amendment did not defeat Keller's claims.[6]

If affirmed, the district court's interpretation of the test would have perverse results.  As applied by the district court, the test arguably would not protect *any* expressive works that use a person's actual name or realistic likeness, including films like *Forrest Gump*, *The Aviator*, and *Boys Don't Cry*, novels like *L.A. Confidential* and *Ragtime*, songs like *Candle in the Wind* and *Mrs. Robinson*, and plays like *Picasso at the Lapin Agile*.  Such a test would shield only highly fanciful or surreal works – contrary to the California Supreme Court's admonition that "[n]o author should be forced [by threat of a right-of-publicity claim] into creating

---

[5] ER 10 (emphasis added).

[6] *Id.*

DWT 15286237v1 0058278-000014

mythological worlds or characters wholly divorced from reality." *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 3d 860, 869 (1979) (Bird, C.J., concurring). Consequently, it would be much too narrow to provide the necessary breathing room for free expression.

If the district court had applied this test properly after reviewing the editions of *NCAA Football* and *NCAA Basketball/March Madness* that were included in the record, it would have found that EA's games are highly transformative. As discussed below, Keller's likeness is hardly the "sum and substance" of EA's game. Indeed, he is only one among thousands of virtual players in *NCAA Football*, and the game contains thousands of other audio, visual, software, and engineering elements that allow users to experience an interactive virtual environment in which they control college-football players and teams and effectively create their own story of a team's development and performance.[7] On that basis alone, the district court should have stricken Keller's right-of-publicity and ancillary claims.

But this Court need not rely on the transformative-use test to find in favor of EA. As suggested in this Court's amended decision in *Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010), the transformative-use test may not be the best mechanism for resolving the conflict between a plaintiff's publicity rights and a

---

[7] At EA's request, the district court took judicial notice of the games' contents and summaries of the games, pursuant to Federal Rules of Evidence 201 and 1006. *See* ER 9, 63-73, 89-99, 114, 117-118. EA respectfully requests that this Court similarly take judicial notice of the content of the works and their summaries. Because Keller alleges that his likeness appears in *NCAA Football*, EA will focus on that game in its statement of facts and argument; however, the discussion applies equally to the content of *NCAA Basketball/NCAA March Madness*.

4

content publisher's First Amendment protections.  Reviewing an order denying an anti-SLAPP motion in another right-of-publicity case, the Court in *Hilton* took "no position on whether there is a First Amendment defense to misappropriation of the right of publicity that is distinct from the [transformative-use test] the California Supreme Court has articulated," "*leav[ing] for another day the question of whether the First Amendment furnishes a defense to misappropriation of publicity that is broader than the transformative use or public interest defenses*."  *Id.* at 909 n.11 (emphasis added).

This appeal offers the Court an opportunity to answer that question affirmatively, and to apply the two-part test from *Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989), which provides a more straightforward and more predictable test for determining whether the First Amendment defeats right-of-publicity claims that target expressive works.  Under *Rogers*, the First Amendment bars right-of-publicity claims arising from the use of a plaintiff's name or likeness in an expressive work, unless the use is "wholly unrelated" to the work or is "simply a disguised commercial advertisement for the sale of goods or services." *Id.*  This Court already has "agree[d] with the Second Circuit's analysis and adopt[ed] the *Rogers* standard as [its] own" for deciding whether the First Amendment protects expressive works against Lanham Act claims.  *Mattel v. MCA Records*, 296 F.3d 894, 902 (9th Cir. 2002).[8]  The *Restatement* also echoes

---

[8] The two-part test, as articulated for Lanham Act claims, is:  (1) whether the use has "no artistic relevance whatsoever" to the underlying work; and (2) whether the use "explicitly misleads" as to the source or content of the work.  *E.S.S.*, 547 F.3d at 1100.

5

the *Rogers* test,[9] and leading commentators have recognized that the

*Rogers*/*Restatement* approach affords the necessary breathing room for free

expression.[10]

If the district court had applied the *Rogers* test to Keller's right-of-publicity

claims, it would have found that he could not establish the probability of prevailing

required to defeat EA's anti-SLAPP motion.  EA's alleged use of a former

collegiate quarterback's likeness certainly is not "wholly unrelated" to the content

of a video game about college football.  Nor could EA's use be characterized as "a

disguised advertisement" for the sale of that work.  The record is clear that EA

*never* used Keller in any advertising, and that his alleged likeness appeared *only* as

one of thousands of virtual players within a game that includes thousands of other

creative features.[11]  Consequently, under the *Rogers* test, the district court should

have granted EA's motion to strike Keller's right-of-publicity and related claims,

which would have harmonized the results in this case and *Brown*, and would have

promoted the public's interest in the "speedy resolution" of right-of-publicity cases

that target expressive works.  *Winter*, 30 Cal. 4th at 891.

---

[9] *Restatement (Third) of Unfair Competition*, § 47, cmt. c.

[10] *See, e.g.,* E. Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903, 908 & n.20 (2003) (noting that "courts have consistently held – correctly, in my view – that that the right of publicity may not restrict … movies, novels, plays, or songs that use people's names or likeness"; citing *Rogers* with approval); J. Thomas McCarthy, *The Rights of Publicity and Privacy*, § 1:35 at 76 (2d ed. 2010) (observing that with respect to entertainment and works of non-fiction, "liability [for violation of the right of publicity] could arise in this otherwise exempt category of uses only in the highly unusual situation that the work had nothing to do with the plaintiff and the plaintiff's identity was inserted solely to attract attention to the work").

[11] ER 63-73, 89-99.

DWT 15286237v1 0058278-000014

Finally, the district court could have, and should have, granted EA's anti-SLAPP motion on another independent basis. In its motion, EA raised two other defenses to Keller's claims: the constitutional "public-interest" defense, and the "public-affairs" exemption under California's right-of-publicity statute, Civil Code Section 3344(d). These defenses are similar, but "not co-extensive"; as this Court has recognized, the statutory exemption "provid[es] extra breathing space for the use of a person's name in connection with matters of public interest." *New Kids on the Block v. News America Publishing*, 971 F.2d 302, 310 n.10 (9th Cir. 1992). The district court rejected these defenses, saying that EA's game was too creative and interactive and did not use Keller's image strictly for the purpose of "reporting."[12] As a threshold matter, this finding is difficult to reconcile with the district court's simultaneous finding that the transformative-use defense did not apply to EA's game because the game depicted Keller too realistically.[13] Even more importantly, the district court's conclusion is inconsistent with case law applying the public-interest and public-affairs defenses to protect the use of a person's name and likeness on posters, baseball game programs, and surf documentaries,[14] and with the fundamental rule that free-speech protections apply

---

[12] ER 15.

[13] ER 9-10.

[14] *Montana v. San Jose Mercury News*, 34 Cal. App. 4th 790, 797 (1995) (poster); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 405, 411 (2001) (game programs); *Dora*, 15 Cal. App. 4th at 543 (surf documentary).

7

with equal force both to news reporting and to entertainment.[15]  Accordingly, the district court's order should be vacated on these additional grounds as well.[16]

For each of these reasons, EA respectfully requests that this Court reverse the district court's order denying EA's anti-SLAPP motion, and dismiss all of Keller's claims against EA with prejudice.

## II.    JURISDICTION

**1.    District court jurisdiction.**  The district court properly exercised diversity jurisdiction under 28 U.S.C. § 1332(a).[17]  EA reserves the right to contest class-action jurisdiction under 28 U.S.C. § 1332(d).

**2.    Appellate jurisdiction.**  An order denying a special motion to strike filed under California's anti-SLAPP statute is immediately appealable.  *See, e.g., Batzel v. Smith*, 333 F.3d 1018, 1024-1026 (9th Cir. 2003); *Zamani v. Carnes*, 491 F.3d 990, 994 (9th Cir. 2007).

**3.    Timeliness of appeal.**  The district court denied EA's anti-SLAPP motion on February 8, 2010.  EA filed its notice of appeal from that order on February 18, 2010.[18]  *See* Fed. R. App. P. (4)(a)(1)(A).

---

[15] *See, e.g., Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-502 (1952).

[16] If this Court determines that any of these constitutional defenses bar Keller's right-of-publicity claims, then his ancillary claims for conspiracy, unfair competition, and unjust enrichment also must be dismissed.  *See, e.g., E.S.S.*, 547 F.3d at 1101.

[17] *See* ER 128.

[18] ER 24-48.

8

### III.   ISSUES PRESENTED

1.      Should the district court have granted EA's special motion to strike Keller's right-of-publicity and related claims on the grounds that EA's alleged use of his likeness in its games was constitutionally protected under the transformative-use test?

2.      Should the district court have applied the *Rogers* test and granted EA's special motion to strike on the grounds that EA's alleged use of Keller's likeness was not "wholly unrelated" to its games, and was not "simply a disguised commercial advertisement for the sale of goods"?

3.      Should the district court have granted EA's special motion to strike these claims under the constitutional public-interest test?

4.      Should the district court have granted EA's special motion to strike Keller's statutory right-of-publicity claim under Civil Code Section 3344(d)'s exemption for works that relate to "public affairs"?[19]

### IV.   STATEMENT OF THE CASE

Keller filed a putative class-action complaint in the Northern District of California alleging various claims against EA arising from its alleged inclusion of his and other athletes' likenesses in EA's *NCAA Football* and *NCAA Basketball/NCAA March Madness* video games.[20]  The complaint also alleges causes of action against the National Collegiate Athletic Association ("NCAA")

---

[19] The text of pertinent constitutional provisions and statutes is set forth in an addendum to this brief.

[20] ER 144-147.

DWT 15286237v1 0058278-000014

and the Collegiate Licensing Company ("CLC").[21]  EA filed a motion to dismiss Keller's claims, as well as a special motion to strike under California's anti-SLAPP statute.  On February 8, 2010, the district court denied EA's motions.[22]

## V.     STATEMENT OF FACTS

### A.     EA's Works

Defendant/appellant Electronic Arts Inc. is a leading developer and publisher of video games, including *NCAA Football* and *NCAA Basketball*/*NCAA March Madness*.  Combining technically advanced computer and software engineering and highly creative audiovisual elements, the games allow users to experience the excitement and challenge of college football and college basketball.[23]  Users may compete against an opponent controlled by the game itself, against a person connected to the same game system, or against a person connected over the Internet.[24]

The virtual world in *NCAA Football* is constructed from an array of video graphics, audio features, and data.  After a user chooses two college teams to compete against each another, the game assigns a stadium for the match-up and populates it with players, coaches, referees, mascots, cheerleaders, and fans – all designed and rendered by EA's graphic artists.  Although the virtual players' personal characteristics (such as height, weight, athletic ability, and experience)

---

[21] ER 143-146.  Keller alleges that EA acted in concert with the NCAA and CLC. ER 145.

[22] ER 22.

[23] ER 63-73, 89-99.

[24] ER 114.

DWT 15286237v1 0058278-000014

and other variables (including crowd noise and weather) affect the teams'
performances, the individual users most directly influence the game's outcome
through their play-calling and their ability to use hand-held controllers to
manipulate the virtual players' actions on the field.  In addition, users may alter the
abilities, appearances, and biographical information of the virtual players already
assigned to teams, or even create entirely new virtual players for their teams.[25]

The results of the game are presented audio-visually through real-time,
television-like animation and action-specific, play-by-play commentary.  The game
also includes realistic original sounds, such as the crunch of players' pads as
contact is made, the audible of a quarterback changing a play at the line of
scrimmage, and the roar of the crowd.[26]

The game offers users more than just the opportunity to simulate single
games.  In "Dynasty" mode, for example, the user controls a college program for
up to thirty seasons, creating her own story of the program's development.  The
user not only simulates games, but also assumes the head coach's responsibilities,
including recruiting from a randomly-generated pool of virtual high-school
athletes.  And in "Campus Legend" mode, the user controls a single virtual player
from high school through college, making choices regarding practices, academics,
and social activities – all of which potentially impact the virtual player's
performance in game simulations.[27]

---

[25] ER 63, 89.

[26] ER 64, 90.

[27] ER 114.

11

**B.    Keller's Lawsuit**

Plaintiff Samuel Keller filed this putative class-action lawsuit against EA, the NCAA, and the CLC.  Keller is a former collegiate athlete who played quarterback for Arizona State University from 2003 to 2005, and for the University of Nebraska in 2007.[28]

Keller's complaint alleges that EA included his and other athletes' "likenesses" in *NCAA Football* and *NCAA Basketball/NCAA March Madness* without the athletes' consent.[29]  By likeness, Keller refers only to the athletes' "height, weight, build, home state," "skin tone," and statistics.[30]  Keller also alleges that his likeness was used to "market" the games, although no facts were pled (or presented in opposition to EA's anti-SLAPP motion) to support that allegation.[31] His complaint asserts five causes of action against EA:  (1) violation of his right of publicity under California Civil Code Section 3344; (2) violation of his California common-law right of publicity; (3) civil conspiracy; (4) violation of California Business and Professions Code Section 17200; and (5) unjust enrichment.[32]

**C.    EA's Anti-SLAPP Motion**

In response to the complaint, EA filed a motion to dismiss and a special motion to strike under California's anti-SLAPP statute, Code of Civil Procedure

---

[28] ER 137.

[29] ER 129.

[30] ER 130.  Keller concedes that the athletes' names do not appear in *NCAA Football* or *NCAA Basketball/NCAA March Madness*  ER 134.

[31] ER 127, 144.

[32] ER 144-147.

Section 425.16. The district court denied both motions on February 8, 2010, rejecting EA's reliance on the transformative-use test, the *Rogers* test, the public-interest test, and the public-affairs exemption under Civil Code Section 3344(d).[33] With respect to the anti-SLAPP motion, the court assumed that EA met its initial burden under Section 425.16, but concluded that Keller had satisfied his burden of establishing a probability of prevailing on his claims.[34] In applying the transformative-use test, the court declined to consider EA's work as a whole, and instead focused exclusively on the game's depiction of Keller.[35] Because he was depicted "as what he was" – a collegiate quarterback – the court found that EA's game was not protected under the transformative-use test.[36] The court did not address the *Rogers* test, and held that neither the public-interest nor public-affairs defense applied because EA's game was not traditional news "reporting."[37] This appeal followed.

## VI.    STANDARD OF REVIEW

This Court reviews *de novo* the district court's denial of a special motion to strike under California's anti-SLAPP statute. *See, e.g., Zamani*, 491 F.3d at 994; *cf. Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643 (9th Cir. 2009) (applying same standard of review to order granting anti-SLAPP motion).

---

[33] ER 6-15, 22.

[34] ER 20-22.

[35] ER 9-10.

[36] ER 10.

[37] ER 10-15.

13

## VII.   THE DISTRICT COURT SHOULD HAVE GRANTED EA'S ANTI-SLAPP MOTION AND STRICKEN KELLER'S CLAIMS.

### A.    Keller's Claims Against EA Are Subject To An Anti-SLAPP Motion.

In 1992, the Legislature enacted the California anti-SLAPP statute, Code of Civil Procedure Section 425.16, to provide for the "early dismissal of unmeritorious claims" that are filed "to interfere with the valid exercise of the constitutional rights of freedom of speech and petition." *Club Members for an Honest Election v. Sierra Club*, 45 Cal. 4th 309, 315 (2008).  Under the statute, any "cause of action against a person arising from any act … in furtherance of the person's right of … free speech … in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  Cal. Civ. Proc. Code § 425.16(b)(1).

Reacting to court rulings that interpreted the statute too narrowly and did not go far enough to quash lawsuits that targeted the exercise of free speech, the Legislature amended Section 425.16 to ensure that it "shall be construed broadly.*"* *Id*., § 425.16(a).  The California Supreme Court subsequently declared that the "broad construction expressly called for in [Section 425.16] is desirable from the standpoint of judicial efficiency," and cautioned that a narrow construction "would serve Californians poorly."  *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1121-1122 (1999).

The California Supreme Court has set forth a two-step process for determining whether a cause of action must be stricken under Section 425.16. *Navellier v. Sletten*, 29 Cal. 4th 82, 88 (2002).  "First, the court decides whether

14

the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." *Navellier*, 29 Cal. 4th at 88. To make this showing, the defendant must demonstrate that the plaintiff's causes of action arise from actions by the defendant that "fit[] one of the categories spelled out in … section 425.16, subdivision (e)." *Id.* Under subdivision (e)(4), the statute protects "any … conduct [by the defendant] in furtherance of the exercise of the constitutional right … of free speech in connection with … an issue of public interest." Second, if the defendant meets this threshold showing, it becomes the plaintiff's burden to establish, with competent evidence, "a probability that [he] will prevail on the claim[s]." Cal. Civ. Proc. Code § 425.16(b)(1). If the plaintiff cannot meet that burden, his causes of action must be dismissed with prejudice. *Id.*

In this case, the district court assumed, without deciding, that EA satisfied its burden of showing that Keller's claims arise from protected activity.[38] In Sections VII.A.1-2, below, EA explains why that assumption was correct. The district court also held, however, that Keller carried his burden of proving a probability of prevailing on his claims – despite EA's assertion of four different free-speech defenses. In Part VII.B, below, EA explains why that holding was wrong and should be reversed.

### 1.    EA Established That Keller's Claims Arise From EA's Exercise Of Its Free-Speech Rights.

EA met its initial burden of showing that Keller's claims targeted EA's speech or acts in furtherance of its speech. In *Hilton*, this Court observed that "the

---

[38] ER 21.

courts of California have interpreted this piece of the defendant's threshold showing rather loosely." 599 F.3d at 904. Although this Court noted that the "California Supreme Court has not drawn the outer limits of activity that furthers the exercise of free speech rights [under the anti-SLAPP statute,]" *id.* at 903-904, "[i]t seems to suffice … that the defendant's activity is communicative[.]" *Id.* at 904. To meet its initial burden under Section 425.16, therefore, a defendant thus must show that the plaintiff's claims arise from the defendant's "communicative" or speech activity, or from acts in furtherance of that activity.

Keller's right-of-publicity and related claims arise from the alleged use of his likeness in EA's *NCAA Football* video game.[39] *NCAA Football* (and *NCAA Basketball/NCAA March Madness*) indisputably are "communicative" – indeed, they are  expressive works that are "entitled to as much First Amendment protection as the most profound literature." *Kirby*, 144 Cal. App. 4th at 58.[40]

These First Amendment protections are not lessened by the games' interactive aspects. In *American Amusement*, the Seventh Circuit rejected claims that a video game's interactivity should diminish its constitutional protection,

_____

[39] ER 144-147.

[40] This Court and many others have recognized that video games enjoy the same constitutional protections as other expressive works. *See, e.g., E.S.S.,* 547 F.3d at 1098-1101; *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 957 (8th Cir. 2003); *American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572, 577-579 (7th Cir. 2001); *Romantics v. Activision Publishing*, 574 F. Supp. 2d 758, 766 (E.D. Mich. 2008); *Entertainment Software Ass'n v. Granholm*, 426 F. Supp. 2d 646, 650-651 (E.D. Mich. 2006); *Wilson v. Midway Games*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002). *See also Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 958 (9th Cir. 2009) (observing that the State did "not contest that video games are a form of expression protected by the First Amendment"), *cert. granted*, 130 S. Ct. 2398 (U.S. Apr. 26, 2010).

16

declaring that "[a]ll literature (here broadly defined to include movies, television, and the other photographic media, and popular as well as highbrow literature) is interactive; the better it is, the more interactive."  244 F.3d at 577.  The district court in *Entertainment Software Ass'n* agreed:

> The interactive, or functional aspect, in video games can be said to enhance the expressive elements even more than other media by drawing the player closer to the characters and becoming more involved in the plot of the game than by simply watching a movie or television show. … [V]ideo games are becoming more open ended and more possibilities [exist] to interact with other players and control the fate of the characters and the worlds they inhabit.  It would be impossible to separate the functional aspects of a video game from the expressive, inasmuch as they are so closely intertwined and dependent on each other in creating the virtual experience.  For these reasons, this Court finds that video games contain creative, expressive free speech, inseparable from their interactive functional elements, and are therefore protected by the First Amendment.

426 F. Supp. 2d at 651.

Courts also have made clear that video games and other expressive works need not have scripted story lines or dialogue to qualify for constitutional protection.  In *Romantics*, for example, the court concluded that the First Amendment protected *Guitar Hero*, a video game that allows users to pretend that they are guitarists in a rock band.  574 F. Supp. 2d at 766.  The court dismissed the plaintiffs' contention that the First Amendment did not apply because *Guitar Hero* "'involv[ed] no complex story line'" and had "'no script, … no character development and no dialogue.'"  *Id.* (citation omitted).  Instead, the court held that the game was "an expressive artistic work that is entitled to First Amendment protection" because it allowed users to select a character, costumes, and model of guitar to be used by the character on screen; allowed users to start off playing small

17

venues and to advance to progressively larger ones, just like an up-and-coming rock band; and contained a "stylized display of a rock concert" with an audience, stage, band, lighting, and stage effects. *Id.* Similarly, in *C.B.C. Distribution v. Major League Baseball Advanced Media*, 505 F.3d 818, 823 (8th Cir. 2007), the Eighth Circuit held that "fantasy baseball" games that used the "'names, nicknames, likenesses, signatures, pictures, playing records, and/or biographical data of each player' in an interactive form" constituted "speech entitled to first amendment protection," even though the games had no story line or script.

Like the games in *E.S.S.*, *Kirby*, *Romantics*, and *C.B.C.*, EA's *NCAA Football* and *NCAA Basketball/NCAA March Madness* are expressive works entitled to full First Amendment protection. *See* Section V.A, above. Because Keller's claims target EA's alleged use of his likeness in *NCAA Football*, they arise from EA's free speech within the meaning of Section 425.16.

### 2. EA's Games Relate To An Issue Of Public Interest.

To carry its burden under the anti-SLAPP statute, a defendant also must show that it exercised its speech rights "in connection with a public issue" or an "issue of public interest." Cal. Civ. Proc. Code § 425.16(b)(1), (e)(4). In *Hilton*, this Court instructed that courts "must construe … 'issue of public interest' … broadly" to include any "topic of widespread, public interest" or "person … in the public eye." 599 F.3d at 906-907. Applying those definitions, this Court held that a birthday greeting card poking fun at Paris Hilton's reality-television persona met the statute's public-interest requirement. *Id.* Similarly, in *Nygard v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (2008), the California Court of Appeal held

18

that statements about a Finnish designer related to an issue of "public interest" within the meaning of anti-SLAPP statute because the Finnish public – the primary audience for the defendant's publication – took an interest in him.  The court in *Nygard* reiterated that "the issue need not be 'significant' to be protected by the anti-SLAPP statute – it is enough that it is one in which the public takes an interest."  *Id.*[41]

In analogous contexts, courts consistently have recognized the significant public interest in sports – both because of their broad impact on popular culture and because of the particular attention paid to sporting events and athletes' performances.  *See, e.g., Dora*, 15 Cal. App. 4th at 546 (finding that a documentary about surfing in Southern California was a matter of public interest); *Montana*, 34 Cal. App. 4th at 795-796 (same; poster relating to professional football); *Gionfriddo*, 94 Cal. App. 4th at 416 (same; professional baseball game programs); *C.B.C.*, 505 F.3d at 823 (observing that professional baseball players' "names, nicknames, likenesses, signatures, pictures, playing records, and/or biographical data … 'command a substantial public interest'").[42]

---

[41] *See also Seelig v. Infinity Broadcasting*, 97 Cal. App. 4th 798, 807-808 (2002) (finding that deejay's on-air criticism of reality-show contestant related to issue of public interest under anti-SLAPP statute); *Ingels v. Westwood One Broadcasting*, 129 Cal. App. 4th 1050, 1064 (2005) (holding that exchange on talk-radio show about dating related to an issue of public interest under anti-SLAPP statute).

[42] *See also Curtis Publishing v. Butts*, 388 U.S. 130, 154-155 (1967) (plurality opinion) (discussing "the public interest" in article concerning college football); *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 117 (1984) (discussing "public interest in intercollegiate athletics").

Here, this issue cannot be seriously contested:  indeed, Keller's complaint acknowledges the significant public interest in collegiate sports, noting that "[t]he annual revenues for the NCAA in fiscal year 2007-08 were $614 million," with "almost 90%" of the revenues coming from "marketing and television rights."[43]  If a greeting card about Paris Hilton, a deejay's rant about a reality-show contestant, and an article about a Finnish designer concerned matters of public interest under Section 425.16, then EA's video games about college football and basketball easily fall within the broad scope of the statute.

Accordingly, EA carried its initial burden of showing that Keller's claims are covered by the anti-SLAPP statute.

## B.    Keller Failed To Meet His Burden Of Demonstrating A Probability Of Prevailing Because The First Amendment Bars His Right-Of-Publicity And Related Claims.

Because EA satisfied its threshold burden, the burden shifted to Keller to demonstrate a probability of success on the merits of his claims.  Cal. Civ. Proc. Code § 425.16(b)(1).  The district court, however, misstated the burden that Keller was required to meet.  According to the district court, Keller could defeat EA's anti-SLAPP motion merely by "sufficiently *stat[ing]* his claims against EA."[44]  In fact, Keller was obligated to "'state *and substantiate* a legally sufficient claim,'" *Hilton*, 599 F.3d at 908 (emphasis added; citations omitted), and to "meet [EA's] constitutional defenses."  *Robertson v. Rodriguez*, 36 Cal. App. 4th 347, 359 (1995).  This "requires an evidentiary showing[,]" "like a summary judgment

---

[43] ER 128.

[44] ER 22 (emphasis added).

DWT 15286237v1 0058278-000014

motion." *Simmons v. Allstate*, 92 Cal. App. 4th 1068, 1073 (2001). *See also Hilton*, 580 F.3d at 882 ("anti-SLAPP inquiry … is similar to the one courts make on summary judgment, though not identical"). In a recent right-of-publicity case, the California Court of Appeal reaffirmed that the "plaintiff's showing of facts [in opposition to an anti-SLAPP motion] must consist of evidence that would be admissible at trial," and that the court "must determine whether the evidence is sufficient to support a judgment in the plaintiff's favor as a matter of law, as on a motion for summary judgment." *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 679 (2010).

Keller, however, presented no evidence whatsoever; the only evidence before the district court was submitted by EA, including copies of the video games in question.[45] As those games and other materials in the record make clear, Keller did not – and could not – establish a probability of prevailing because EA's First Amendment defenses bar his right-of-publicity and related claims.[46]

---

[45] For purposes of this appeal, any argument Keller made below or might make now must be based on only – and may not go beyond – the existing evidentiary record. *See Navellier v. Sletten*, 106 Cal. App. 4th 763, 775-776 (2003) (on remand).

[46] As used here, "right-of-publicity" encompasses both Keller's common-law right-of-publicity claim and his statutory misappropriation claim. Under California common law, a right-of-publicity plaintiff must prove: "'(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.'" *Stewart*, 181 Cal. App. 4th at 679 (citation omitted). The statutory claim requires a plaintiff to prove "'all the elements of the common law cause of action'" plus "'a knowing use by the defendant'" and "'a direct connection between the alleged use and the commercial purpose.'" *Id.* at 680 (citing Cal. Civ. Code § 3344).

21

**1.    To Protect Free Speech, Courts Have Recognized Strict Constitutional Limitations On Right-Of-Publicity Claims That Target Expressive Works.**

The right of publicity is not of constitutional dimension; it arises either by statute or under the common law. "[E]ssentially [it is] an economic right … to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity." *Comedy III*, 25 Cal. 4th at 403 (citations omitted). The *Restatement* explains that the right of publicity protects against "appropriat[ing] the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity *for purposes of trade*." *Restatement (Third) of Unfair Competition*, § 46 (emphasis added). "[T]he rationales underlying recognition of a right of publicity are generally less compelling than those that justify rights in trademarks or trade secrets." *Id.*, § 46, cmt. c.

Courts long have cautioned that "[t]he right of publicity has a potential for frustrating" constitutionally protected speech. *Comedy III*, 25 Cal. 4th at 397. Countless expressive works, including biographies, novels, magazine articles, movies, plays, songs, paintings, documentaries, and video games, incorporate the names or likenesses of real-life individuals. *See* Volokh, 40 Hous. L. Rev. at 904, 908. To protect such works, the California Supreme Court "has subjected the 'right of publicity' under California law to a narrowing interpretation which accords with First Amendment values." *Cher v. Forum Int'l*, 692 F.2d 634, 638 (9th Cir. 1982).

22

Despite the tension between the First Amendment and the right of publicity, the United States Supreme Court has provided little guidance on this issue. In its only right-of-publicity decision, *Zacchini v. Scripps-Howard*, 433 U.S. 562, 574-575 (1977), the Court considered whether the First Amendment categorically defeated a right-of-publicity claim based on a television station's broadcast of the plaintiff's entire human-cannonball act. In allowing the claim to survive, the Court declined to promulgate any specific balancing test; it merely held that "[w]herever the line in particular situations is to be drawn between media reports that are protected [against right-of-publicity claims] and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast *a performer's entire act* without his consent." *Id.* (emphasis added.)

In subsequent right-of-publicity cases, courts have pointed out the limited nature of *Zacchini*'s holding. As the California Supreme Court explained, "*Zacchini* was not an ordinary right of publicity case: the defendant television station had appropriated the plaintiff's entire act, a species of common law copyright violation." *Comedy III*, 25 Cal. 4th at 401. Similarly, Professor Volokh has observed that "*Zacchini* focused only on the unusual right of publicity scenario where a defendant broadcasts the plaintiff's entire act, a claim that the Court pointed out is much like a copyright claim, though applicable under state law to unfixed works." Volokh, 40 Hous. L. Rev. at 906. "The Court twice stressed that it was not deciding the broader question of when a plaintiff may sue the defendant

23

for using plaintiff's name, likeness, or other attributes of identity – the standard right of publicity claim." *Id.*, citing *Zacchini*, 433 U.S. at 573 n.10, 576.

In the absence of direction from the United States Supreme Court, various tests have arisen to ensure that right-of-publicity claims do not chill speech, including the transformative-use test, the *Rogers* test, the public-interest test, and the public-affairs exemption discussed here. Under any of these tests, EA's motion should have been granted.

> **2.    Under California's Transformative-Use Test, EA Has A Complete First Amendment Defense To Keller's Right-Of-Publicity Claims.**
>
> > **a.    The Transformative-Use Test Must Consider The Defendant's Entire Creative Work.**

The California Supreme Court articulated the transformative-use test in *Comedy III*. In that case, the owner of all rights to The Three Stooges sued an artist who sold t-shirts and prints featuring literal images of the trio. 25 Cal. 4th at 393-394. The California Supreme Court upheld a judgment against the artist, finding that the First Amendment did not bar liability. *Id*. at 409-410.

In reaching its decision, the court formulated "what is essentially a balancing test between the First Amendment and the right of publicity based on whether *the work in question* adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." *Id*. at 391 (emphasis added). The court explained that "when an artist is faced with a right of publicity challenge to his or her work, he or she may raise an affirmative defense that *the work* is protected by the First Amendment inasmuch as *it contains significant transformative elements* or that the value of the work does not derive primarily

24

from the celebrity's fame." *Id.* at 407 (emphases added). The court emphasized that "the inquiry is whether the celebrity likeness is *one of* the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very *sum and substance of the work* in question." *Id.* at 406 (emphasis added). "We ask, in other words, whether *a product containing a celebrity's likeness is so transformed* that it has become primarily the defendant's own expression rather than the celebrity's likeness." *Id.* (emphasis added). Applying its test to the case at hand, the court found that since the defendant's t-shirts contained only a literal representation of The Three Stooges – no other creative elements or expression – the First Amendment did not foreclose liability. *Id.* at 410.[47]

The California Supreme Court revisited the transformative-use test two years later in *Winter*, 30 Cal. 4th 881. There, musicians Johnny and Edgar Winter sued a publisher of comic books that featured characters named "Johnny and Edgar Autumn," whose faces resembled the Winters. *Id.* at 886. But the characters were depicted as "half-worm, half-human offspring" fathered "by a supernatural worm creature[.]" *Id.* Citing *Comedy III*, the court reaffirmed that the crucial issue is

---

[47] The "balancing" mentioned by the California Supreme Court in *Comedy III* was "definitional" – a policy-based appellate formulation of a test for lower courts to apply in deciding whether a defendant has a valid First Amendment defense to a right-of-publicity claim. The trial courts that subsequently apply that test do not engage in discretionary "balancing"; they must apply the test formulated by the appellate court, and their application of the test is reviewed *de novo*. *See* F. Jay Dougherty, *All the World's Not a Stooge: The 'Transformativeness' Test for Analyzing a First Amendment Defense to a Right of Publicity Claim Against Distribution of a Work of Art*, 27 Colum. J. L. & Arts 1, 41-43 (2003) (distinguishing between definitional and *ad hoc* balancing) ("Dougherty").

DWT 15286237v1 0058278-000014

whether the *defendant's work* "contain[s] significant creative elements that transform [it] into something more than merely celebrity likenesses." *Id.* at 885. To underscore the breadth of this protection, the court pointed out that transformative works "can take many forms, from factual reporting to fictionalized portrayal, from heavy-handed lampooning to subtle social criticism." *Id.* (citations omitted). Turning to the defendants' comic books, the court stated that "[a]pplication of the test to this case is not difficult." *Id.* at 890. While the comic book's phantasmagoric physical transformation of the plaintiffs' likenesses may have been sufficient by itself to entitle the works to First Amendment protection, it was not necessary to the court's holding. The transformative-use test shielded the works because the plaintiffs' likenesses were "merely part of the raw materials from which the comic books were synthesized." *Id.*

> **b.     The District Court Misapplied The Transformative-Use Test.**

In applying *Comedy III* and *Winter*, the district court confused the focus of the transformative-use inquiry. Relying heavily on this Court's original, unmodified decision in *Hilton*, the district court mistakenly declared that its "focus must be on *the depiction of Plaintiff* in 'NCAA Football,' *not the game's other elements*."[48] Working from this erroneous premise, the district court then found that EA's game was "not sufficiently transformative" because "EA does not depict Plaintiff in a different form; he is represented as what he was: the starting quarterback for Arizona State University[,]" and because "the game's setting is

---

[48] ER 10 (emphases added).

identical to where the public found Plaintiff during his collegiate career: on the football field."[49] In effect, the district court replaced the transformative-use test, which focuses on the defendant's work as a whole, with an "altered-likeness" test that focuses only on the plaintiff's depiction. The court's interpretation of the test was erroneous and should not stand.

First, the district court's analysis is flatly inconsistent with the California Supreme Court's decisions in *Comedy III* and *Winter.* In those cases, the court instructed that the transformative-use test does *not* turn on whether the plaintiff's likeness, viewed in isolation from the rest of the work, is physically transformed. The court made clear that the transformative-use "inquiry is in a sense more quantitative than qualitative, asking whether the literal and imitative or the creative elements predominate *in the work*." *Comedy III*, 25 Cal. 4th at 407 (emphasis added). In *Winter*, the court reiterated that "[w]hat matters is whether *the work* is transformative[.]" 30 Cal. 4th at 891 (emphasis added). Properly applied, the test asks "*whether a product containing* a celebrity's likeness is so transformed that it has become primarily the defendant's own expression," and protects expressive works when the celebrity likeness is "*one of the 'raw materials' from which an original work is synthesized*." *Comedy III*, 25 Cal. 4th at 406 (emphases added). And the Supreme Court expressly defined "expression" as concerning "something *other than the likeness of the celebrity*," *id.* (emphasis added), underscoring that a court cannot focus on the plaintiff's depiction in isolation.

---

[49] ER 22.

DWT 15286237v1 0058278-000014

Yet the district court did precisely that. By considering *only* whether Keller's likeness was transformed, the district court effectively excised the words "a product containing" from the test articulated by the California Supreme Court, and misstated the controlling question as "*whether … a celebrity's likeness* is so transformed[.]" Because of that fundamental error, the court refused to even consider whether "the video game, taken as a whole" was transformative.[50]

Second, the district court's analysis is not supported by other cases that have applied the transformative-use test. In *Kirby*, for example, where the plaintiff sued Sega for allegedly using her likeness in a video game, the California Court of Appeal did not, as the district court suggests, focus solely on whether the plaintiff's likeness was transformed in the game. 144 Cal. App. 4th at 59-61. Although it is true that the state appellate court observed that the video-game character that allegedly infringed the plaintiff's right of publicity was portrayed in a different profession and a different setting than the plaintiff, the court did not state or suggest that those factors were dispositive of its finding that the use was transformative. *Id.* at 59. Instead, as the California Court of Appeal correctly pointed out, the test "requires the court to examine and compare the allegedly expressive work with the images of the plaintiff to discern if the defendant's work contributes significantly distinctive and expressive content." *Id.* Thus, the game's theme music, story lines, and different levels of difficulty all were relevant to the court's conclusion that the plaintiff's image was not the "sum and substance" of the game, and that the use thus was transformative. *Id.*

---

[50] ER 22.

*ETW Corp. v. Jireh Publishing*, 332 F.3d 915 (6th Cir. 2003), also is instructive. There, Tiger Woods' licensing agent sued the publisher of a painting by artist Rick Rush. The painting showed Woods in three different poses at the 1997 Masters Tournament, flanked by two caddies, with the likenesses of famous golfers of the past looking down on him. *Id.* at 918. Although Rush painted Woods realistically, without any fanciful alterations to his likeness, the Sixth Circuit held that the painting was entitled to First Amendment protection. The court explained that "Rush's work does not capitalize solely on a literal depiction of Woods. Rather, Rush's work consists of *a collage of images in addition to Woods's image* which are combined to describe, in artistic form, a historic event in sports history and to convey a message about the significance of Woods's achievement in that event." *Id.* at 938 (emphasis added). "Because Rush's work has substantial transformative elements," the court concluded that "Woods's right of publicity must yield to the First Amendment." *Id.* at 938. This decision, which the district court failed to address in its order, further discredits the view that the transformative-use test does not protect the use of a plaintiff's realistic likeness in an expressive work.

As *Comedy III*, *Winter*, *Kirby* and *ETW* demonstrate, the transformative-use inquiry does not turn on the plaintiff's depiction viewed in isolation; the proper focus is on whether the defendant's work, as a whole, is transformative. And while the transformation of a plaintiff's image alone may suffice to satisfy the test in some cases, it never is a requirement for constitutional protection against right-of-publicity claims.

29

Third, the district court's interpretation cannot be reconciled with the California Supreme Court's decision in *Guglielmi*, 25 Cal. 3d 860, or with the public policies underlying that decision. In rejecting a right-of-publicity claim against the producer of a docudrama about Rudolph Valentino, the court observed that "[n]o author should be forced into creating mythological worlds or characters wholly divorced from reality." *Id.* at 869 (Bird, C.J., concurring). But that is exactly what the district court would require EA to do to qualify for constitutional protection – EA could not depict Keller "as what he was; the starting quarterback for Arizona State" or place him in the "setting … where the public found [him] during his collegiate career: on the field," and instead would be required to make him a half-man, half-snake, or to concoct some fictional world or mythical beasts as part of the game. No support exists for such a requirement under California law or under the First Amendment.[51]

Indeed, such a restrictive interpretation of the transformative-use test effectively would limit its application to cases involving non-literal representations of individuals, notwithstanding the illogical results. For example, under this interpretation, a Cubist painting that included a real-life individual's image might be protected, but a Realist painting that included the same person's image might not. Or a distorted caricature of that individual might be protected, while a

---

[51] The district court's analysis echoes the argument made below by the appellant in *Brown*, who claimed that EA's *Madden NFL* game would be constitutionally protected only if it had "used images of women, children, animals or fictional characters playing football – such as a bear playing an eagle." Excerpts of Record, *Brown v. Electronic Arts*, 2:182.

realistically-rendered cartoon might not.  Constitutional protections for free speech cannot turn on such stylistic (and legally immaterial) distinctions.

Documentarians, biographers, filmmakers, novelists, photographers, songwriters, and many others do exactly what the district court said is not protected:  they create expressive works that realistically depict individuals and/or refer to them by their actual names.  For example, in James Ellroy's novel *L.A. Confidential*, Mickey Cohen was depicted "as what he was" in real life – a gangster – and in the "setting … where the public found him during his career" – Los Angeles.  In the upcoming film *The Social Network*, Mark Zuckerberg is depicted as what he is – the founder of the social-networking website Facebook, who allegedly cut friends out of the company en route to becoming the youngest billionaire in America.  As applied by the district court, however, the transformative-use test would not protect those uses.  Nor would it appear to protect works films like *Forrest Gump*, *Zelig*, *The Aviator*, *Hoosiers*, or *Boys Don't Cry,* novels like E.L. Doctorow's *Ragtime*, Thomas Pynchon's *Gravity's Rainbow*, or Don DeLillo's *Libra,* songs like Elton John's *Candle in the Wind*, Don McLean's *American Pie*, Simon and Garfunkel's *Mrs. Robinson*, or Adam Sandler's *The Hanukkah Song*, or plays like Steve Martin's *Picasso at the Lapin Agile*, all of which feature the names or likenesses of real-life individuals, or even the cover of The Beatles' *Sergeant Pepper's* album, which was festooned with unaltered images of historical figures and celebrities, living and dead.  This result would contravene a long line of cases recognizing that the First Amendment

DWT 15286237v1 0058278-000014

protects the use of real-life figures as characters in works such as historical fiction and docudrama.[52]

Not surprisingly, the California Supreme Court previously rejected the district court's suggestion that the transformative-use test protects only non-literal depictions of a celebrity.  In *Comedy III*, the court explained that "the transformative elements or creative contributions that require First Amendment protection *are not confined to parody and can take many forms*," from "factual reporting," to "fictionalized portrayal," to "subtle social criticism."  25 Cal. 4th at 406 (emphasis added).  Because those forms of expression often do not involve *any* physical transformation of an individual's name or likeness, the district court plainly erred by making such transformation an essential element of the defense.

Fourth, the district court's interpretation of the transformative-use test overlooks its origins in copyright's fair-use defense.  *See Comedy III*, 25 Cal. 4th at 404-405; 17 U.S.C. § 107.  In determining whether a defendant's use of a plaintiff's copyrighted work is transformative within the meaning of the fair-use doctrine, the court does not consider simply whether the plaintiff's work was physically altered or a portion of it was literally copied; the focus instead is on the *defendant's work*.  In its seminal fair-use decision, the United States Supreme Court announced that the "central purpose" of this analysis "is to see … whether

---

[52] *See, e.g., Guglielmi*, 25 Cal.3d at 865-868 (Bird, C.J., concurring); *Tyne v. Time Warner Entertainment*, 425 F.3d 1363, 1364 (11th Cir. 2005); *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 461-462 (6th Cir. 2001); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 338 (E.D. Pa. 1996); *Hicks v Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978); J. Thomas McCarthy, *The Rights of Publicity and Privacy*, § 8:65, at 220-222 (collecting decisions protecting expressive works that include real-life individuals) ("McCarthy").

DWT 15286237v1 0058278-000014

the [defendant's] work merely 'supersede[s] the objects' of the original creation …
or instead adds something new, with a further purpose or different character,
altering the first with new expression, meaning, or message[.]"  *Campbell v. Acuff-
Rose Music*, 510 U.S. 569, 579 (1994) (citation omitted).  Indeed, fair use
commonly involves the use of the plaintiff's unaltered work, such as "a book
review quoting the copyrighted material criticized," or 2 Live Crew's use in its
own song of the opening line of Roy Orbison's *Pretty Woman*.  *Id.* at 581, 588.

    This Court's precedents confirm that the fair-use analysis focuses on the
defendant's allegedly infringing work.  In *Mattel v. Walking Mountain
Productions*, 353 F.3d 792, 802 (9th Cir. 2003), for example, the Court held that an
artist's use of actual Barbie dolls was transformative under the fair-use doctrine, in
part because he placed the doll in "ridiculous and apparently dangerous situations"
and used "lighting, background, props, and camera angles … to create a context for
Mattel's copyrighted work that transform[ed] Barbie's meaning."  Surrounding the
doll with expressive elements thus contributed to the finding that the work was
"transformative."  *Id.*  The Second Circuit similarly has emphasized that the fair-
use analysis focuses on "the 'transformative' nature of the [allegedly infringing]
work."  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d
Cir. 2006).  In *Bill Graham*, the court held that the defendant's use of exact copies
of Grateful Dead concert posters in a book about the band was transformative,
even though the posters were unaltered.  *Id.*  at 609.  *See also Perfect 10, Inc. v.
Amazon.com*, 508 F.3d 1146, 1164-1165 (9th Cir 2007) (finding that search
engine's use of thumbnail copies of plaintiff's copyrighted photographs was

DWT 15286237v1 0058278-000014

transformative).  The district court's interpretation of the transformative-use test cannot be squared with these copyright cases.

Fifth, the district court's application of the test fails to account for the different attributes that may fall within the statutory or common-law right of publicity.  As the district court acknowledged, Civil Code Section 3344 covers the use of a person's "name, voice, signature, photograph, or likeness,"[53] and the common-law right of publicity in California has been applied even more broadly.  *See White v. Samsung Electronics*, 971 F.2d 1395, 1397-1399 (9th Cir. 1992) (extending common-law right of publicity to apply to defendant's depiction of robot that evoked plaintiff Vanna White).  But if the test requires the plaintiff's likeness or other attribute to be altered, how could it ever apply in cases arising from a defendant's use of a celebrity's *name* in an expressive work?  The use of someone's actual name, considered in isolation as the district court suggests, *always* would be actionable under this interpretation, and never would enjoy First Amendment protection.  This is not, and cannot be, the law.  *See, e.g., Guglielmi*, 25 Cal. 3d at 869 (Bird, C.J., concurring).  *See also* cases cited above in fn. 52.

Finally, the district court's narrow interpretation of the transformative-use test, if affirmed, would encourage the filing of meritless, but costly, right-of-publicity lawsuits against the creators of expressive works, and thus would impermissibly chill expression.  As the United States Supreme Court has recognized, "[t]he chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution [of a lawsuit], unaffected by the prospects

---

[53] ER 5.

DWT 15286237v1 0058278-000014

of its success or failure." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

Because "the costs of a successful defense can be the same or greater than what the

damage awards would have been," *Suzuki Motor Corp. v. Consumers Union*, 330

F.3d 1110, 1143 (9th Cir. 2003), publishers of expressive works "will tend to

become self-censors" unless they "are assured freedom from the harassment of

lawsuits[.]" *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966).

Right-of-publicity lawsuits pose an especially acute threat to publishers of

expressive works; in California alone, these claims have been used to target

newspaper and magazine publishers,[54] motion-picture studios,[55] television

networks,[56] comic-book publishers,[57] documentary filmmakers,[58] and video-game

publishers,[59] among others.

 Recognizing that "unnecessarily protracted litigation would have a chilling

effect upon the exercise of First Amendment rights," the California Supreme Court

has encouraged the "speedy disposition" of right-of-publicity claims. *Winter*, 30

Cal. 4th at 892. The court has instructed that right-of-publicity claims against

publishers of expressive works "can *often* [be] resolve[d] … *as a matter of law*

simply by viewing the [defendant's] work in question" and applying the

---

[54] *New Kids*, 971 F.2d 302 (newspapers); *Hoffman v. Capital Cities/ABC*, 255 F.3d 1180 (9th Cir. 2001) (magazine).

[55] *Guglielmi*, 25 Cal. 3d 860; *Polydoros*, 67 Cal. App. 4th 318.

[56] *Burnett v. Twentieth Century Fox Film*, 491 F. Supp. 2d 962 (C.D. Cal. 2007) (animated television program); *Daly v. Viacom*, 238 F. Supp. 2d 1118 (N.D. Cal. 2002) (reality television program).

[57] *Winter*, 30 Cal. 4th 881.

[58] *Dora*, 15 Cal. App. 4th 536.

[59] *Kirby*, 144 Cal. App. 4th 47.

35

transformative-use test.  *Id.* (emphases added).  In such cases, the court has declared that right-of-publicity claims are "often properly resolved on summary judgment or … even on demurrer" (or, presumably, on an anti-SLAPP motion). *Id.*

The district court's restrictive interpretation of the transformative-use test would deny expeditious relief to the publishers of expressive works that incorporate realistic images of persons.  The ensuing "chilling effect … upon portrayals of real people by the media is not merely a metaphor, but a very real threat," given the financial investments that such productions often entail.  P. Felcher & E. Rubin, *Privacy, Publicity, and the Portrayal of Real People by the Media*," 88 Yale L. J. 1577, 1595 (1979).

Because the district court's application of the transformative-use test was inconsistent with established law, and would be contrary to public policy, it should be rejected.

### c.    Proper Application Of The Transformative-Use Test Results In A Finding That Keller Failed to Carry His Burden Under The Anti-SLAPP Statute.

Properly applied, the transformative-use test would have required the district court to consider whether *NCAA Football* contains "significant transformative elements," so that it is primarily EA's own creative expression rather than merely a depiction of Keller's likeness.  *Comedy III*, 25 Cal. 4th at 407.  A review of each annual edition of EA's games confirms that they are transformative.  As discussed above, EA's *NCAA Football* and *NCAA Basketball/NCAA March Madness* games feature an array of original graphics, videos, sound effects, and game scenarios, all

36

keyed to the users' strategic decisions and manipulation of the game controls. These elements are synchronized to deliver television-quality images and realistic sounds, such as the crunch of football pads, the audible of the quarterback, and play-by-play commentary.[60]  In *NCAA Football*, users may choose from among more than 100 collegiate teams, with thousands of virtual athletes.  The game allows the user to become the storyteller by directing strategy decisions and controlling individual athlete's movements in real time.  Users can operate a team as initially configured in EA's games, or can customize the team based on their own preferences, altering the characteristics of individual players.  The interactive environment extends beyond single games, allowing users to control a collegiate football program for up to thirty years and, in effect, to create an original narrative of that program's history.  Likewise, users may control not only an athlete's performance in a single game, but the arc of his entire college career.[61]

These creative elements easily satisfy the transformative-use test.  As the California Supreme Court explained, the test examines "whether *the work in question* adds significant creative elements so as to be transformed into something more than a mere celebrity likeness of imitation."  *Comedy III*, 25 Cal. 4th at 391 (emphasis added).  Stated another way, "the inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance *of the work in question*."  *Id.* at 406 (emphasis added).  Even assuming that some

---

[60] ER 63, 89-90.

[61] ER 114.

form of Keller's likeness appears in *NCAA Football*, that virtual likeness would be only a single virtual player among thousands, and would be surrounded by innumerable other creative elements – in other words, one of the countless "raw materials" from which EA creates its expressive work.  As discussed above, the game contains so many other creative audiovisual, software, and computer-engineering elements that a single athlete's alleged likeness cannot even remotely be considered the "sum and substance" of the game.

Because EA's alleged use of Keller's likeness in its game is transformative, the district court should have concluded that the game is protected under the First Amendment.  Thus, this Court should reverse the district court's ruling, grant EA's anti-SLAPP motion, and dismiss this action with prejudice.

### 3. The Rogers Test Would Provide An Alternative Grounds For Striking Keller's Right-Of-Publicity Claims Against EA.

#### a. This Court Should Apply The Rogers Test To Right-Of-Publicity Cases, As It Already Has Done In Lanham Act Cases.

Although EA should prevail under the transformative-use test, this Court is not bound to apply that test here, and may adopt a different test that is less prone to misinterpretation and more protective of free expression.  Indeed, it is well-settled that "the federal judiciary is supreme in the exposition of the law of the Constitution[.]"  *Cooper v. Aaron*, 358 U.S. 1, 18 (1958).  Where, as here, a federal court is called upon to decide a federal constitutional issue, it is not bound by state-court authority.  *See RAR, Inc. v. Turner Diesel*, 107 F.3d 1272, 1276 & n.1 (7th Cir. 1997) (emphasis omitted).  This Court implicitly noted that principle in *Hilton*, when it deferred "for another day" the question of whether the First Amendment

38

affords broader protection against right-of-publicity claims than is provided by the tests set forth by California state courts. *Hilton*, 599 F.3d at 909 n.11.[62]

That question is directly raised here, and this Court should answer it by applying the *Rogers* test to Keller's right-of-publicity claims.[63] The limitations of the transformative-use test are apparent. Just two years after *Comedy III*, the California Supreme Court had to intervene in *Winter* (notwithstanding its belief that under the circumstances, "[a]pplication of the test … [wa]s not difficult") to reverse an appellate court's unanimous holding that the test did not protect a comic-book publisher's phantasmagoric depiction of the plaintiffs as a matter of law. *Winter*, 30 Cal. 4th at 890, 892. The district court in this case likewise misapplied the transformative-use test. Thus, it is not surprising that leading commentators have criticized it. McCarthy, for example, observed that the test is "extremely difficult to predict and apply because it requires a court to make an aesthetic judgment" about "the degree of the artistic transformation" required for a work to qualify for First Amendment protection. 2 McCarthy § 8:72, at 248, 269.[64]

In contrast, the *Rogers* test is clearer, more predictable, and more protective of expressive works that are targeted by overreaching right-of-publicity claims. *See* Volokh, 40 Hous. L. Rev. at 908 & n.20. Importantly, this Court already has

---

[62] The *Erie* doctrine does not extend to "matters governed by the Federal Constitution." *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Federal courts sitting in diversity therefore "are under no obligation to defer to state court interpretations of federal [constitutional] law." *RAR*, 107 F.3d at 1276.

[63] *See Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). EA raised *Rogers* as a defense below. ER 125.

[64] For additional criticisms of the test, *see* Volokh, 40 Hous. L. Rev. at 916-925; Dougherty, 27 Colum. J. L. & Arts 1, at 35-71.

39

adopted *Rogers'* nearly identical test for determining whether the First Amendment protects expressive works against Lanham Act claims.  *Mattel*, 296 F.3d at 902; *E.S.S.*, 547 F.3d at 1099.

In *Rogers*, Ginger Rogers brought Lanham Act, right-of-publicity, and other claims against the producers of the film *Ginger and Fred* – a title that alluded to Rogers' collaboration with Fred Astaire.  875 F.2d at 996-997.  The film was not about the iconic American performers, but about two fictional Italian cabaret singers who once earned their livings by imitating the real Ginger and Fred.  *See id.* at 996-997.

Addressing the Lanham Act claim first, the *Rogers* court reasoned that "[t]itles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion."  *Id.* at 998.  Consumers of artistic works therefore "have a dual interest" in "not being misled" and in "enjoying the results of the author's freedom of expression."  *Id.*  Accordingly, "the expressive element of titles requires more protection than the labeling of ordinary commercial products."  *Id.*  The court concluded that, "[b]ecause overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict," and allow Lanham Act claims to proceed "only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."  *Id.* at 998-999.  That balance, the court held, must favor the First Amendment "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work."  *Id.*

40

at 999.  Applying that two-part test, the court dismissed Rogers' Lanham Act claim.  *Id.* at 1001-1002.

Turning to Rogers' right-of-publicity claim, the court cautioned that such claims pose even greater dangers to free speech.  "Because the right of publicity, unlike the Lanham Act, has no likelihood of confusion requirement," the court warned that "it is potentially more expansive than the Lanham Act."  *Id.* at 1004.  "Perhaps for that reason, courts delineating the right of publicity, more frequently than in applying the Lanham Act, have recognized the need to limit the right to accommodate First Amendment concerns."  *Id.*  Borrowing heavily from its Lanham Act analysis, the court predicted that state law would not "permit the right of publicity to bar the use of a celebrity's name in a movie title unless the title was '*wholly unrelated*' to the movie or was '*simply a disguised commercial advertisement* for the sale of goods or services."  *Id.* at 1004 (emphases added; citation omitted).  Applying that test, the court held that Rogers' right-of-publicity claim also was barred by the First Amendment.  *Id.* at 1004-1005.

The *Rogers* test has become the test that most federal courts apply when adjudicating a First Amendment defense to a Lanham Act claim.[65]  In *Mattel*, this Court expressly "agree[d] with the Second Circuit's analysis and adopt[ed] the *Rogers* standard as our own."  *Mattel,* 296 F.3d at 902.  More recently, this Court made clear that it would apply the *Rogers* test to *any* use of a mark within an expressive work.  *E.S.S.*, 547 F.3d at 1098-1101.

---

[65] *See* D. Kelley & L. Jordan, *Twenty Years of Rogers v. Grimaldi: Balancing the Lanham Act with the First Amendment Rights of Creators of Artistic Works*, 99 Trademark Rep. 1360, 1373-1374 (2009).

41

In *E.S.S.*, the plaintiff operated a strip club called the "Play Pen" in East Los Angeles. *Id*. at 1097. The defendant's video game *Grand Theft Auto: San Andreas* featured a virtual strip club called "the Pig Pen" located in a virtual neighborhood called "East Los Santos." *Id.* The game's designers "took some inspiration" from photographs they had made of the real-world Play Pen, although the two establishments (one real, one virtual) were not identical in appearance. *Id*. at 1097-1098.

Applying the *Rogers* test, this Court concluded that the video-game publisher's First Amendment rights defeated the strip club's Lanham Act claim because the virtual Pig Pen club was part of an artistic attempt "to develop a cartoon-style parody of East Los Angeles," and a "reasonable way" to do that is to "recreate a critical mass of the businesses and buildings" in that area, and because the use did not explicitly mislead the public into believing that the plaintiff endorsed the game. *Id*. at 1100.[66]

Following *E.S.S.*, the district court in *Brown v. Electronic Arts* applied the *Rogers* test to dismiss former NFL star Jim Brown's Lanham Act claim arising from EA's alleged use of his likeness in its *Madden NFL* video game – a claim that, given the factual record, is functionally indistinguishable from Keller's right-of-publicity claims. *Brown v. Electronic Arts*, Case No. 09-56675, Slip Op. at 7-9 (C.D. Cal. Sept. 23, 2009). The district court in *Brown* found that even assuming that EA had used Brown's likeness as a virtual player on one of the teams in the

---

[66] Although this Court described the game as a parody, its analysis did not turn on that characterization.

game, the use had artistic relevance to the game, and that "the mere use of [Brown's] likeness in the game, without more, is insufficient to make the use explicitly misleading." *Id.* at 8.

This Court similarly should adopt the *Rogers* test for right-of-publicity claims. Doing so would accomplish what this Court did when it adopted the *Rogers* test for Lanham Act claims – provide a straightforward, predictable standard that would prevent right-of-publicity claims from "encroach[ing] upon the zone protected by the First Amendment." *Mattel*, 296 F.3d at 900. Whether it is applied to Lanham Act or right-of-publicity claims, the *Rogers* test affords creative expression the breathing space it needs to flourish, and avoids the chilling effect potentially caused by more subjective legal standards like the transformative-use test. *See* 2 McCarthy § 8:9 at 104-105. And it does so without preventing celebrities from suing over uses of their names or likenesses that are "wholly unrelated" to the content of the defendant's work (*see, e.g., Parks v. LaFace Records*, 329 F.3d 437, 461 (6th Cir. 2003)), or that are merely disguised advertisements for goods or services.[67]

---

[67] The *Rogers* test is consistent with the *Restatement* approach, which limits liability for violating the right of publicity to the unauthorized appropriation of the commercial value of a person's identity "for purposes of trade." *Restatement (Third) of Unfair Competition*, § 46. The term "for purposes of trade" does not ordinarily include the use of a person's identity in "news reporting, commentary, *entertainment*, works of fiction or nonfiction, or in advertising that is incidental to such uses." *Id.* § 47 (emphasis added). Specifically, the Restatement presumes that "use in entertainment and other creative works is permitted," unless "the name or likeness is used solely to attract attention to a work that is not related to the identified person." *Id.*, § 47, cmt. c.

43

#### b. Under The Rogers Test, Keller Cannot Establish The Required Probability Of Prevailing On His Right-Of-Publicity Claims.

The *Rogers* test already has been applied to right-of-publicity claims arising from video games. In *Romantics*, the district court relied on the test to dismiss the plaintiffs' right-of-publicity claims arising from the alleged use of their band's "distinctive sound" in the video game *Guitar Hero*. 574 F. Supp. 2d at 764. The court held that, even if Michigan law recognized a right-of-publicity claim based on a "distinctive sound," the claim could not survive First Amendment scrutiny under the *Rogers* test. *Id.* at 755-756. The court observed that "[t]he First Amendment protects expressive works from right of publicity actions unless the use of the plaintiff's identity … is wholly unrelated to the content of the work or was simply a disguised commercial advertisement for the sale of goods." *Id*. at 765 (*quoting Parks*, 329 F.3d at 461) (internal quotation marks omitted). "Given that the purpose of the Game is to allow [users] to pretend they are in a rock band," the court concluded that "the Song is not wholly unrelated to the content of the work. And as discussed above, neither the song nor Plaintiffs are referenced in the Game's advertising and it is possible to play the Game and never encounter the Song. Thus, the Song cannot be 'a disguised commercial advertisement.'" *Id.* at 766 (citation omitted). Accordingly, the First Amendment barred the plaintiffs' right-of-publicity claim as a matter of law.

Under the *Rogers* test, Keller's right-of-publicity claims clearly fail. First, since Keller played football for both Arizona State University and the University

of Nebraska,[68] EA's alleged inclusion of his likeness is not "wholly unrelated" to the content of *NCAA Football*, a game that (as the district court noted) is set "on the football field"[69] and allows users to experience the sport in an interactive, virtual environment.[70]

Second, EA's use of Keller's image is not "simply a disguised commercial advertisement" for the sale of EA's games. Even crediting his allegations, Keller is only one of thousands of virtual players in the game, and he did not, and could not, allege any facts or submit any evidence that EA used his likeness in its advertising.[71] Applying the *Rogers* test to dismiss the Lanham Act claim in *Mattel*, this Court noted that "[t]he only indication that Mattel might be associated with the song is the use of Barbie in the title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity." 296 F.3d at 902. Discussing application of the test to a trademark claim in *E.S.S.*, this Court again observed that "a trademark infringement claim presupposes a use of the mark. If that necessary element in every trademark case vitiated a First Amendment defense, the First Amendment would provide no defense at all." 547 F.3d at 1099. Here, the only indication that Keller might be associated with EA's video game is the alleged use of his likeness within the game (not even in the title).[72] That use alone cannot be

---

[68] ER 137.

[69] ER 10.

[70] ER 63, 89.

[71] ER 63-73, 89-99.

[72] ER 127.

sufficient to satisfy the second prong of the *Rogers* test in right-of-publicity cases either.

Because there is no other "use" by EA here – and certainly none that would satisfy the *Rogers* test – this Court should reverse the district court's ruling, grant EA's anti-SLAPP motion, and dismiss Keller's claims.

### 4. The District Court Should Have Found That The Public-Interest Test Defeated Keller's Right-Of-Publicity Claims.

Courts in California and elsewhere have held that the public's interest in information about sports and athletes justifies full First Amendment protection for expressive works that incorporate athletes' names, statistics, and other biographical information. This constitutional public-interest defense is yet another barrier to Keller's right-of-publicity claims.

*Gionfriddo* is on point. 94 Cal. App. 4th at 410-415. In that case, the defendant used baseball players' names, photographs, and biographical information, as well as video clips of their on-the-field performances, in game programs, videos, and online features, all without the players' permission. *Id.* at 410. Dismissing the players' right-of-publicity claim, the court held that "[t]he recitation and discussion of factual data concerning the athletic performance of these plaintiffs command a substantial public interest, and, therefore, [are] a form of expression due substantial constitutional protection." *Id.* at 411. The court concluded that "the public interest favoring the free dissemination of information regarding baseball's history far outweighs any proprietary interests at stake," and that the plaintiffs' right-of-publicity claim thus failed as a matter of law. *Id.* at 415.

46

Similarly, in *C.B.C.*, the plaintiff marketed fantasy online baseball games that incorporated the actual names, statistics, and other biographical data of Major League Baseball players. 505 F.3d at 823. The plaintiff initially licensed this information from the Major League Baseball Players' Association. But when the association declined to renew the license, the plaintiff sought a judicial declaration of its First Amendment right to use the players' information without a license. *See id.* at 821. The Eighth Circuit agreed that the First Amendment protected the plaintiff's use of the athletes' names and other information. As the court explained, "the information used in [the plaintiff's] fantasy baseball games is all readily available in the public domain, and it would be strange law that a person would not have a first amendment right to use information that is available to everyone." *Id.* at 823. The court emphasized that "fantasy baseball games depend on the inclusion of all players and thus cannot create a false impression that some particular player with 'star power' is endorsing [the plaintiff's] products." *Id.* at 824. On those grounds, the court held that the First Amendment "trump[ed]" the players' right of publicity. *Id.* at 822-824.[73]

As in *Gionfriddo*, *C.B.C.*, and these other cases, the district court should have found that the First Amendment protects EA's alleged use in its games of players' names, likenesses, statistics, and biographical data. Keller's complaint

---

[73] *See also CBS Interactive v. National Football League Players Ass'n*, Civil No. 08-5097 ADM/SRN, 2009 WL 1151982, at *19 (D. Minn. April 28, 2009) (same; First Amendment protects use of players' names, statistics, and other information in fantasy football game); *Montana*, 34 Cal. App. 4th at 795 (dismissing NFL quarterback's right-of-publicity claims based on sale of posters featuring his likeness; posters were "'a form of public interest presentation to which protection must be extended'") (citations omitted).

47

recognizes the vast popularity of NCAA athletics,[74] confirming that college football and basketball are "closely followed by a large segment of the public." *C.B.S. Interactive*, 2009 WL 1151982, at *21. This factual, public-domain information about college athletes commands a substantial public interest, just as information about professional athletes does. *See C.B.C.*, 505 F.3d at 823-824; *Gionfriddo*, 94 Cal. App. 4th at 411; *Montana*, 34 Cal. App. 4th at 794-796.

The district court took a different view, however, and insisted that the public-interest defense applies only to traditional "reporting."[75] That premise was incorrect and not supported by case law; neither the fantasy baseball games in *C.B.C.* nor the game programs in *Gionfriddo* nor the poster in *Montana* were traditional "reporting," yet they were deemed to be protected under the public-interest defense. The district court also distinguished EA's game because it is interactive and "enables consumers to control the virtual players on a simulated football field."[76] But as discussed above, the game's interactivity is not a legitimate basis for restricting its constitutional protections. Indeed, the contrary is true. *American Amusement*, 244 F.3d at 577; *Entertainment Software Ass'n*, 426 F. Supp. 2d at 651.

Ultimately, the district court overlooked the key point of *Gionfriddo* and *C.B.C.*: the public's interest in, and right to know about, information about sports bars right-of-publicity claims arising from the use of an athlete's name and

---

[74] ER 128-129. *See also* cases cited in fn. 42 above.

[75] ER 15.

[76] ER 13.

biographical information in works ranging from baseball programs to fantasy games.  EA's video games are entitled to the same protection.  Thus, the district court should have found that the public-interest test defeats Keller's claims.

### 5. Keller's Statutory Right-Of-Publicity Claim Should Have Been Stricken Under California Civil Code Section 3344(d)'s Public-Affairs Exemption.

Civil Code Section 3344(d) exempts from liability the "use of a name … or likeness in connection with any … public affairs, or sports broadcast or account." This exemption affords even broader protection against statutory misappropriation claims than the First Amendment does.  As this Court has recognized, "the section 3344(d) defense is not coextensive with the First Amendment.  Rather, it is designed to avoid First Amendment questions in the area of misappropriation by providing extra breathing space for the use of a person's name in connection with matters of public interest."  *New Kids*, 971 F.2d at 310 n.10.

Keller did not dispute, nor could he, that college athletics are "public affairs" within the meaning of Section 3344(d).[77]  Instead, the district court adopted Keller's argument that Section 3344 only protects "reporting," even though the court noted the absence of any "direct authority" on the issue.[78]  The district court's interpretation of the statute was too narrow; as the courts in *Dora*,

---

[77] ER 14.  *See, e.g., Dora*, 15 Cal. App. 4th at 546 (holding that surfing satisfies "public affairs" test because it "has created a life-style that influences speech, behavior, dress, and entertainment, among other things" and "has also had a significant influence on the popular culture"); *Montana,* 34 Cal. App. 4th at 796 (holding that "the same public interest considerations applicable to surfing apply with equal force to professional football"); *Gionfriddo*, 94 Cal. App. 4th at 416 (same; professional baseball).

[78] ER 14.

*Montana*, and *Gionfriddo* recognized, "public affairs" includes much more than just news reports.  In *Dora*, the exempt work was a documentary, 15 Cal. App. 4th at 1540; in *Gionfriddo*, the exempt works included baseball game programs, 94 Cal. App. 4th at 406; and in *Montana*, the exempt work was a poster, 34 Cal. App. 4th at 792.  If those works were exempt under Section 3344(d), then, so, too, are EA's games about college football and college basketball.

The district court overlooked that the public-affairs exemption was designed to create "extra breathing space" for the use of a person's name in connection with matters of public interest.  *New Kids*, 971 F.2d at 310 n.10.  In other contexts, the United States Supreme Court has instructed that laws regulating speech must be "authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression."  *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).  In other words, courts must err on the side of free expression when construing legislation that purports to regulate speech.

Here, this principle dictated a narrow construction of the liability-creating parts of Section 3344 and a broad construction of its public-affairs exemption.  But the district court did just the opposite, narrowly limiting the exemption to strictly factual "reporting" despite acknowledging the absence of any authority compelling it to do so.  The Court, therefore, should reverse the district court's ruling and dismiss the statutory misappropriation claim for this additional reason.

### 6.    Keller's Ancillary Claims Also Must Be Stricken.

Because Keller cannot demonstrate a probability of overcoming any of these defenses to his right-of-publicity claims, his ancillary conspiracy, unfair-

competition, and unjust-enrichment claims also must be dismissed. Each of these other claims challenges EA's alleged use of Keller's likeness in its video games, and is subject to the same defenses as the right-of-publicity claims. *See, e.g.*, *E.S.S.*, 547 F.3d at 1101; *see also Gionfriddo*, 94 Cal. App. 4th at 407.[79]

## VIII. CONCLUSION

One commentator has observed that, although "[t]he notion that my name and likeness are my property seems to make sense," when it comes to freedom of expression, "'my property' is another way of saying 'legally forbidden to be another's speech.'" Volokh, 40 Hous. L. Rev. at 929. That is why right-of-publicity claims present such a serious threat to free expression. *See Comedy III*, 25 Cal. 4th at 397.

To curb that threat, courts routinely have rejected right-of-publicity claims arising from the use of real-life individuals' names and likenesses in expressive works. And as the California Supreme Court emphasized in *Winter*, right-of-publicity claims against publishers of expressive works "can *often* [be] resolve[d] … *as a matter of law* simply by viewing the [defendant's] work in question" and applying the transformative-use (or other applicable) test. *Winter*, 30 Cal. 4th at 891 (emphasis added). By doing so, such claims are "*often* properly resolved on summary judgment or … *even on demurrer*[,]" or, by logical extension, on an anti-SLAPP motion. *Id.* at 892 (emphasis added).

---

[79] Keller's unjust-enrichment claim fails for the additional reason that there is no such claim under California law, absent independent grounds for imposing an implied contract or a constructive trust on the defendant, which Keller did not plead or seek. *See McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1490 (2006).

51

This policy applies with particular force here.  The anti-SLAPP statute was enacted to provide a "fast and inexpensive unmasking and dismissal" of lawsuits targeting the exercise of free-speech rights.  *Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 15 (1995).  To that end, the California Supreme Court has emphasized that the "early resolution" of anti-SLAPP cases is "consistent with the statutory design 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target[.]"  *Equilon Enterprises v. Consumer Cause*, 29 Cal. 4th 53, 65 (2002) (citation omitted).

No matter which test is applied in this case – the transformative-use test, the *Rogers* test, the public-interest test, or the public-affairs exemption – Keller's claims should be dismissed.  Accordingly, EA respectfully requests that this Court reverse the district court's ruling, grant EA's anti-SLAPP motion, and dismiss Keller's claims against EA with prejudice.

RESPECTFULLY SUBMITTED this 30th day of August, 2010,

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ALONZO WICKERS IV
KAREN A. HENRY
LISA J. KOHN

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST
STEVEN A. HIRSCH
R. JAMES SLAUGHTER

By: _____/s/_____
         Kelli L. Sager

Attorneys for Defendant/Appellant
ELECTRONIC ARTS INC.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1, I certify that the attached Appellant's Brief is proportionately spaced in 14-point Times New Roman typeface and contains 13,967 words (as calculated by Microsoft Word 2003), excluding the Excerpts of Record, Corporate Disclosure Statement, Statement of Related Case, Addendum of Pertinent Constitutional Provisions and Statutes, and this Certificate of Compliance.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ALONZO WICKERS IV
KAREN A. HENRY
LISA J. KOHN

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST
STEVEN A. HIRSCH
R. JAMES SLAUGHTER


By: _____/s/_____
        Kelli L. Sager

Attorneys for Defendant/Appellant
ELECTRONIC ARTS INC.

53

## STATEMENT OF RELATED CASES

The appeal in *Brown v. Electronic Arts, Inc.* (No. 09-56675) is related to this appeal.  On April 30, 2010, this Court ordered that the two appeals "will be assigned to the same panel, if practicable."  ER 23.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ALONZO WICKERS IV
KAREN A. HENRY
LISA J. KOHN

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST
STEVEN A. HIRSCH
R. JAMES SLAUGHTER


By: _____/s/_____
        Kelli L. Sager

Attorneys for Defendant/Appellant
ELECTRONIC ARTS INC.

# ADDENDUM OF PERTINENT CONSTITUTIONAL PROVISIONS AND STATUTES

### First Amendment to the United States Constitution

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

### Art. I, Sec. 2(a) of the California Constitution

Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.

### California Civil Code Section 3344

(a) Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent, or, in the case of a minor, the prior consent of his parent or legal guardian, shall be liable for any damages sustained by the person or persons injured as a result thereof. In addition, in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a

DWT 15286237v1 0058278-000014

result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages. In establishing such profits, the injured party or parties are required to present proof only of the gross revenue attributable to such use, and the person who violated this section is required to prove his or her deductible expenses. Punitive damages may also be awarded to the injured party or parties. The prevailing party in any action under this section shall also be entitled to attorney's fees and costs.

(b) As used in this section, "photograph" means any photograph or photographic reproduction, still or moving, or any videotape or live television transmission, of any person, such that the person is readily identifiable.

(1) A person shall be deemed to be readily identifiable from a photograph when one who views the photograph with the naked eye can reasonably determine that the person depicted in the photograph is the same person who is complaining of its unauthorized use.

(2) If the photograph includes more than one person so identifiable, then the person or persons complaining of the use shall be represented as individuals rather than solely as members of a definable group represented in the photograph. A definable group includes, but is not limited to, the following examples: a crowd at any sporting event, a crowd in any street or public building, the audience at any theatrical or stage production, a glee club, or a baseball team.

(3) A person or persons shall be considered to be represented as members of a definable group if they are represented in the photograph solely as a result of

56

being present at the time the photograph was taken and have not been singled out as individuals in any manner.

(c) Where a photograph or likeness of an employee of the person using the photograph or likeness appearing in the advertisement or other publication prepared by or in behalf of the user is only incidental, and not essential, to the purpose of the publication in which it appears, there shall arise a rebuttable presumption affecting the burden of producing evidence that the failure to obtain the consent of the employee was not a knowing use of the employee's photograph or likeness.

(d) For purposes of this section, a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under subdivision (a).

(e) The use of a name, voice, signature, photograph, or likeness in a commercial medium shall not constitute a use for which consent is required under subdivision (a) solely because the material containing such use is commercially sponsored or contains paid advertising. Rather it shall be a question of fact whether or not the use of the person's name, voice, signature, photograph, or likeness was so directly connected with the commercial sponsorship or with the paid advertising as to constitute a use for which consent is required under subdivision (a).

(f) Nothing in this section shall apply to the owners or employees of any medium used for advertising, including, but not limited to, newspapers, magazines, radio and television networks and stations, cable television systems, billboards, and

DWT 15286237v1 0058278-000014

transit ads, by whom any advertisement or solicitation in violation of this section is published or disseminated, unless it is established that such owners or employees had knowledge of the unauthorized use of the person's name, voice, signature, photograph, or likeness as prohibited by this section.

(g) The remedies provided for in this section are cumulative and shall be in addition to any others provided for by law.

### California Code of Civil Procedure Section 425.16

(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

(b) (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

(2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

58

(3) If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding.

(c) In any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5.

(d) This section shall not apply to any enforcement action brought in the name of the people of the State of California by the Attorney General, district attorney, or city attorney, acting as a public prosecutor.

(e) As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance

59

of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

(f) The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper. The motion shall be scheduled by the clerk of the court for a hearing not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing.

(g) All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision.

(h) For purposes of this section, "complaint" includes "cross-complaint" and "petition," "plaintiff" includes "cross-complainant" and "petitioner," and "defendant" includes "cross-defendant" and "respondent."

(i) An order granting or denying a special motion to strike shall be appealable under Section 904.1.

(j) (1) Any party who files a special motion to strike pursuant to this section, and any party who files an opposition to a special motion to strike, shall, promptly upon so filing, transmit to the Judicial Council, by e-mail or facsimile, a copy of the endorsed, filed caption page of the motion or opposition, a copy of any related notice of appeal or petition for a writ, and a conformed copy of any order issued

60

pursuant to this section, including any order granting or denying a special motion to strike, discovery, or fees.

(2) The Judicial Council shall maintain a public record of information transmitted pursuant to this subdivision for at least three years, and may store the information on microfilm or other appropriate electronic media.

61