# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## No. 10-15387

SAMUEL MICHAEL KELLER,

*Plaintiff and Appellee,*

v.

ELECTRONIC ARTS INC.,

*Defendant and Appellant.*

On Appeal from an Order of the United States District Court
for the Northern District of California,
The Honorable Vaughn R. Walker
Case No. 3:09-CV-01967-VRW

## MOTION FOR LEAVE TO SUBMIT VIDEO-GAME CONSOLE, CONTROLLERS AND VIDEO GAMES AT ISSUE IN APPEAL

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER - #120162
ALONZO WICKERS IV - #169454
KAREN A. HENRY - #229707
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST - #84065
R. JAMES SLAUGHTER - #193813
R. ADAM LAURIDSEN - #243780
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant/Appellant
Electronic Arts Inc

509997.01

**Motion for Leave to Submit Video-Game Console, Controllers, and**

**Video Games at Issue in Appeal**

Pursuant to Federal Rule of Appellate Procedure 27, defendant-appellant Electronic Arts Inc. ("EA") respectfully moves for leave to submit a Sony Playstation 2 video-game console, memory card and controllers, as well as the 2006, 2007, 2008, and 2009 editions of EA's *NCAA Football* and *NCAA Basketball/March Madness* video games, to the Clerk of Court for the Court of Appeals for the Ninth Circuit for distribution to the assigned panel in this appeal. Alternatively, pursuant to Circuit Rule 11-4, EA respectfully requests that the Court request transfer of these materials from the district court, where they were submitted as part of EA's request for judicial notice in connection with its special motion to strike under California's anti-SLAPP statute.

This appeal arises from the district court's February 8, 2010 Order on Defendants' Motion to Dismiss and Electronic Arts' Anti-SLAPP Motion to Strike.[1]  In support of its special motion to strike under California's anti-SLAPP statute, Code of Civil Procedure Section 425.16, EA submitted to the district court copies of the video games that are referred to and form the basis of plaintiff-appellee Samuel Keller's complaint, including *NCAA Football 2006*, *NCAA Football 2007*, *NCAA Football 2008*, *NCAA Football 2009*, *NCAA March Madness 2006*, *NCAA March Madness 2007*, *NCAA March Madness 2008*, and *NCAA Basketball 2009*.  EA also provided the district court with a Sony Playstation 2 video-game console, a memory card and two controllers, so that the

---

[1] A copy of the district court's order is attached as Exhibit A.

court could review the contents of these video games.  *See* Ex. A at n.2; *see also*
*E.S.S. Entm't 2000, Inc. v. Rock Star Videos*, 444 F. Supp. 2d 1012, 1016 n.10
(C.D. Cal. 2005) (declining to take judicial notice of content of video game that
formed basis of plaintiff's complaint because defendant failed to provide court
with video-game console and controllers for viewing games).  EA provided the
district court with a Sony Playstation 2 video-game console because it is the
gaming platform compatible with all annual editions of the games identified in
Plaintiff's complaint.

The district court granted EA's Request for Judicial Notice of the video
games.  *See* Ex. A at n.2 ("[b]ecause Plaintiff refers to the video games in his
complaint, the Court GRANTS EA's request for judicial notice of them").
Moreover, the district court's Order relies upon and specifically discusses the
content of the video games submitted by EA.  *See id.* at 9-10, 12, 13.

Accordingly, EA respectfully requests leave to submit to this Court the same
materials that it submitted to the district court, which are part of the record on
appeal:  namely, the video-game console, controllers, and video games described
above and in the district court's Order.  EA proposes to package these materials
with the standard manufacturer's instructions for use of the game console and
controllers, and to deliver them to the Clerk's Office in San Francisco.

Alternatively, EA respectfully requests pursuant to Circuit Rule 11-4 that the Court request transfer of these materials from the district court.[2]

Respectfully submitted,

KEKER & VAN NEST LLP
ROBERT VAN NEST
R. JAMES SLAUGHTER
R. ADAM LAURIDSEN

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ALONZO WICKERS IV
KAREN A. HENRY

By:  s/R. James Slaughter
          R. James Slaughter

Attorneys for Defendant/Appellant
ELECTRONIC ARTS INC.

---

[2]     If this Court would like two additional sets of the materials, EA would be happy to provide them.  EA also is willing to provide the Court with technicians to set up the consoles and/or to demonstrate the game.

509997.01

# EXHIBIT A

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAMUEL MICHAEL KELLER, on behalf of
himself and all others similarly
situated,

        Plaintiff,

    v.

ELECTRONIC ARTS, INC.; NATIONAL
COLLEGIATE ATHLETICS ASSOCIATION; and
COLLEGIATE LICENSING COMPANY,

        Defendants.

_____/

No. C 09-1967 CW

ORDER ON DEFENDANTS'
MOTIONS TO DISMISS
(Docket Nos. 34, 47,
48) AND ELECTRONIC
ARTS' ANTI-SLAPP
MOTION TO STRIKE
(Docket No. 35)

    Defendants Electronic Arts, Inc. (EA), the National Collegiate
Athletics Association (NCAA) and the Collegiate Licensing Company
(CLC) move separately to dismiss Plaintiff Samuel Michael Keller's
claims against them. EA also moves to strike Plaintiff's claims
against it pursuant to California Civil Code section 425.16 (Docket
No. 35). Plaintiff opposes the motions. As amici curiae, James
"Jim" Brown and Herbert Anthony Adderley filed a brief in
opposition to EA's motion to dismiss. The motions were heard on
December 17, 2009. Having considered all of the papers submitted
by the parties, the Court DENIES EA's Motion to Dismiss (Docket No.
34), GRANTS NCAA's Motion in part and DENIES it in part (Docket No.
48), DENIES CLC's Motion (Docket No. 47) and DENIES EA's Motion to
Strike (Docket No. 35).

BACKGROUND

    Plaintiff is a former starting quarterback for the Arizona

United States District Court
For the Northern District of California

1  State University and University of Nebraska football teams.

2     EA, a Delaware corporation with a principal place of business

3  in California, develops interactive entertainment software.  It

4  produces, among other things, the "NCAA Football" series of video

5  games.  In the games, consumers can simulate football matches

6  between college and university teams.  Plaintiff alleges that, to

7  make the games realistic, EA designs the virtual football players

8  to resemble real-life college football athletes, including himself.

9  He claims that these virtual players are nearly identical to their

10 real-life counterparts: they share the same jersey numbers, have

11 similar physical characteristics and come from the same home state.

12 To enhance the accuracy of the player depictions, Plaintiff

13 alleges, EA sends questionnaires to team equipment managers of

14 college football teams.  Although EA omits the real-life athletes'

15 names from "NCAA Football," Plaintiff asserts that consumers may

16 access online services to download team rosters and the athletes'

17 names, and upload them into the games.  Plaintiff claims that, in

18 recent iterations, EA has included features that facilitate the

19 upload of this information.

20    Plaintiff alleges that EA uses his likeness without his

21 consent.  He asserts that NCAA, an unincorporated association based

22 in Indiana, and CLC, a Georgia corporation headquartered in

23 Atlanta, facilitated this use.  Plaintiff claims that EA, NCAA and

24 CLC met at NCAA's Indiana headquarters and EA's California

25 headquarters to negotiate the agreements that underlie the alleged

26 misconduct.

27    Plaintiff alleges other misconduct by NCAA and CLC, related to

28 NCAA's amateurism rules.  Plaintiff maintains that NCAA's approval

of EA's games violates NCAA's "duty to NCAA athletes to honor its
own rules prohibiting the use of student likenesses . . . ."
Compl. ¶ 15. He cites NCAA Bylaw 12.5, which prohibits the
commercial licensing of the "name, picture or likeness" of athletes
at NCAA-member institutions. Compl. ¶ 13. Plaintiff asserts that
CLC must honor NCAA's prohibitions on the use of student
likenesses.

Plaintiff charges NCAA with violations of Indiana's right of
publicity statute, civil conspiracy and breach of contract. He
charges CLC with civil conspiracy and unjust enrichment. Against
EA, he pleads claims for violations of California's statutory and
common law rights of publicity, civil conspiracy, violation of
California's Unfair Competition Law and unjust enrichment. He
intends to move to certify his case as a class action and seeks,
among other things, damages and an injunction prohibiting the
future use of his and putative class members' likenesses.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the
claim showing that the pleader is entitled to relief." Fed. R.
Civ. P. 8(a). Dismissal under Rule 12(b)(6) for failure to state a
claim is appropriate only when the complaint does not give the
defendant fair notice of a legally cognizable claim and the grounds
on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555
(2007). In considering whether the complaint is sufficient to
state a claim, the court will take all material allegations as true
and construe them in the light most favorable to the plaintiff. NL
Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).
However, this principle is inapplicable to legal conclusions;

3

United States District Court
For the Northern District of California

1  "threadbare recitals of the elements of a cause of action,

2  supported by mere conclusory statements," are not taken as true.

3  Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009)

4  (citing Twombly, 550 U.S. at 555).

5                              DISCUSSION

6  I.   Indiana Right of Publicity Claim

7       Plaintiff alleges that NCAA violated his Indiana right of

8  publicity.  He argues that Indiana law applies to NCAA because its

9  headquarters are located in Indiana and the alleged violation

10 occurred in Indiana.  NCAA argues that Plaintiff's claim fails as a

11 matter of law because he does not allege that it used his image or

12 likeness.  Plaintiff responds that NCAA used his likeness because

13 it "expressly reviewed and knowingly approved each version of each

14 NCAA-brand videogame . . . ."  Opp'n to NCAA's Mot. to Dismiss at

15 4.

16      Under Indiana law, personalities have a property interest in,

17 among other things, their images and likenesses.  Ind. Code § 32-

18 36-1-7.  A personality is a living or deceased person whose image

19 and likeness have commercial value.  Id. § 32-36-1-6.  Indiana Code

20 section 32-36-1-8 provides,

21           A person may not use an aspect of a
             personality's right of publicity for a
22           commercial purpose during the personality's
             lifetime or for one hundred (100) years after
23           the date of the personality's death without
             having obtained previous written consent from a
24           person . . . .

25 (emphasis added).

26      Although the parties do not offer controlling authority on

27 this point, the plain language of the statute favors NCAA's

28 position.  Plaintiff argues that NCAA's liability under Indiana law

                                   4

1  arises from its knowing approval of EA's use of his likeness.  This

2  interpretation expands liability under the Indiana statute to

3  include persons who enable right of publicity violations.  However,

4  Plaintiff does not offer any authority to show that section 32-36-

5  1-8 encompasses this type of misconduct.  The Court declines to

6  adopt Plaintiff's interpretation.

7      Plaintiff makes a related argument that NCAA should be held

8  liable under Indiana's right of publicity statute as a co-

9  conspirator of EA, which used his likeness.  He cites cases that

10 provide that co-conspirators can be held liable as joint

11 tortfeasors for damages caused by another co-conspirator.  See,

12 e.g., Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th

13 503, 511 (1994); Boyle v. Anderson Fire Fighters Ass'n Local 1262,

14 497 N.E.2d 1073, 1079 (Ind. Ct. App. 1986).  However, these cases

15 are inapposite because Plaintiff has not alleged that either EA or

16 CLC, NCAA's alleged co-conspirators, violated Indiana's right of

17 publicity statute.

18     Plaintiff's Indiana right of publicity claim against NCAA is

19 dismissed with leave to amend to allege that NCAA used his likeness

20 or conspired with others to violate his right of publicity under

21 Indiana law.

22 II.  California Right of Publicity Claims

23     California's right of publicity statute provides,

24         Any person who knowingly uses another's name,
           voice, signature, photograph, or likeness, in
25         any manner, on or in products, merchandise, or
           goods, or for purposes of advertising or
26         selling, or soliciting purchases of, products,
           merchandise, goods or services, without such
27         person's prior consent . . . shall be liable
           for any damages sustained by the person or
28         persons injured as a result thereof.

5

United States District Court
For the Northern District of California

Cal. Civ. Code § 3344(a). The statutory right of publicity complements the common law right of publicity, which arises from the misappropriation tort derived from the law of privacy. See Comedy III Prods., Inc. v. Saderup, 25 Cal. 4th 387, 391 (2001). To state a claim under California common law, a plaintiff must allege "'(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.'" Hilton v. Hallmark Cards, 580 F.3d 874, 889 (9th Cir. 2009) (quoting Downing v. Abercrombie & Fitch, 265 F.3d 994, 1001 (9th Cir. 2001)). Although the statutory and common law rights are similar, there are differences. For example, to state a claim under section 3344, a plaintiff must prove knowing use in addition to satisfying the elements of a common law claim. Kirby v. Sega of Am., Inc., 144 Cal. App. 4th 47, 55 (2006).

EA does not contest the sufficiency of Plaintiff's claims. It asserts, however, that his right of publicity claims are barred by the First Amendment and California law. The Court considers and rejects each of these defenses in turn.

A.    Transformative Use Defense[1]

A defendant may raise an affirmative defense that the challenged work is "protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of

---

[1] Amici invite the Court to adopt another standard to assess right of publicity claims. Because the Court finds that the transformative test is sufficient for the purposes of this motion, it does not address amici's arguments.

6

the work does not derive primarily from the celebrity's fame." Hilton, 580 F.3d at 889 (quoting Comedy III, 25 Cal. 4th at 407) (internal quotation marks omitted). The defense "poses what is essentially a balancing test between the First Amendment and the right of publicity." Hilton, 580 F.3d at 889 (quoting Winter v. DC Comics, 30 Cal. 4th 881, 885 (2003)) (internal quotation marks omitted).

To determine whether a work is transformative, a court must inquire into

> whether the celebrity likeness is one of the "raw materials" from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question. We ask, in other words, whether a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness. And when we use the word "expression," we mean expression of something other than the likeness of the celebrity.

Comedy III, 25 Cal. 4th at 406. "An artist depicting a celebrity must contribute something more than a merely trivial variation, but create something recognizably his own, in order to qualify for legal protection." Winter, 30 Cal. 4th at 888 (quoting Comedy III, 25 Cal. 4th at 408) (internal quotation and editing marks omitted). The analysis "simply requires the court to examine and compare the allegedly expressive work with the images of the plaintiff to discern if the defendant's work contributes significantly distinctive and expressive content." Kirby, 144 Cal. App. 4th at 61. "If distinctions exist, the First Amendment bars claims based on appropriation of the plaintiff's identity or likeness; if not, the claims are not barred." Id.

7

United States District Court
For the Northern District of California

1    Two California Supreme Court cases "bookend the spectrum" used

2  to measure a work's transformative nature.  Hilton, 580 F.3d at

3  890-91.  On one end, Comedy III provides an example of a non-

4  transformative work.  There, the defendant's "literal, conventional

5  depictions of The Three Stooges," drawn in charcoal and printed on

6  tee-shirts, did not contain transformative elements that warranted

7  protection by the First Amendment.  Comedy III, 25 Cal. 4th at 409.

8  Interpreting Comedy III, the Ninth Circuit stated that "it is clear

9  that merely merchandising a celebrity's image without that person's

10  consent . . . does not amount to a transformative use."  Hilton,

11  580 F.3d at 890.

12    Winter offers the opposite bookend.  There, a comic book

13  publisher depicted two musicians, Johnny and Edgar Winter, as half-

14  human, half-worm cartoon characters.  Winter, 30 Cal. 4th at 890.

15  The court affirmed summary judgment in favor of the defendant,

16  holding that the images were sufficiently transformative.  The

17  court stated,

18           Although the fictional characters Johnny and
             Edgar Autumn are less-than-subtle evocations of
19           Johnny and Edgar Winter, the books do not
             depict plaintiffs literally.  Instead,
20           plaintiffs are merely part of the raw materials
             from which the comic books were synthesized.
21
     Id.
22
23    Using Comedy III and Winter as guideposts, Kirby applied the

24  transformative use analysis to a video game.  There, the court held

25  that the main character in the defendant's video game was

26  transformed.  The plaintiff was a musician and dancer, known for

27  saying the phrase "ooh la la."  Kirby, 144 Cal. App. 4th at 50-51.

28  Ulala, the main character in the defendant's game, worked as a news

8

United States District Court
For the Northern District of California

1    reporter in the twenty-fifth century, "dispatched to investigate an
2    invasion of Earth." Id. at 52. Although there were similarities
3    between the two, the court held Ulala to be "more than a mere
4    likeness or literal depiction of Kirby." Id. at 59. "Ulala
5    contains sufficient expressive content to constitute a
6    'transformative work' under the test articulated by the
7    [California] Supreme Court." Id. In particular, Ulala was
8    extremely tall and wore clothing that differed from the plaintiff's
9    and the setting for the game was unlike any in which she had
10   appeared. Id.

11       Here, EA's depiction of Plaintiff in "NCAA Football" is not
12   sufficiently transformative to bar his California right of
13   publicity claims as a matter of law.[2] In the game, the quarterback
14   for Arizona State University shares many of Plaintiff's

15   _____

16       [2] EA asks the Court to take judicial notice of the content of
     the video games "NCAA Football 2006" through "NCAA Football 2009,"
17   "NCAA March Madness 2006" through "NCAA March Madness 2008," and
     "NCAA Basketball 2009;" paragraphs four of the Strauser and O'Brien
18   Declarations summarizing the content of these video games; various
     press releases announcing the release date of the video games; a
19   United States Copyright Office document indicating the date of
     first publication for "NCAA March Madness 2007;" an August 15, 2008
20   order from Kent v. Universal Studios, Inc., Case No. 08-2704 (C.D.
     Cal.); and the content of the CBSSports.com Fantasy College
21   Football game. (Docket No. 36.) Generally, in ruling on a motion
     to dismiss, a court cannot consider material outside of the
22   complaint. Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994),
     overruled on other grounds in Galbraith v. County of Santa Clara,
23   307 F.3d 1119, 1127 (9th Cir. 2002). However, a court may consider
     exhibits submitted with the complaint and those documents "whose
24   contents are alleged in a complaint and whose authenticity no party
     questions, but which are not physically attached to the pleading."
25   Id. at 453-54.
         Because Plaintiff refers to the video games in his complaint,
26   the Court GRANTS EA's request for judicial notice of them.
     Plaintiff does not mention the press releases or other materials
27   proffered by EA. Therefore, the Court DENIES EA's request as to
     the other materials.
28

                                    9

1  characteristics.  For example, the virtual player wears the same
2  jersey number, is the same height and weight and hails from the
3  same state.  EA's depiction of Plaintiff is far from the
4  transmogrification of the Winter brothers.  EA does not depict
5  Plaintiff in a different form; he is represented as he what he was:
6  the starting quarterback for Arizona State University.  Further,
7  unlike in Kirby, the game's setting is identical to where the
8  public found Plaintiff during his collegiate career: on the
9  football field.

10     EA asserts that the video game, taken as a whole, contains
11 transformative elements.  However, the broad view EA asks the Court
12 to take is not supported by precedent.  In Winter, the court
13 focused on the depictions of the plaintiffs, not the content of the
14 other portions of the comic book.  The court in Kirby did the same:
15 it compared Ulala with the plaintiff; its analysis did not extend
16 beyond the game's elements unrelated to Ulala.  These cases show
17 that this Court's focus must be on the depiction of Plaintiff in
18 "NCAA Football," not the game's other elements.

19     Accordingly, at this stage, EA's transformative use defense
20 fails.

21     B.    Public Interest Defense

22     "Under California law, 'no cause of action will lie for the
23 publication of matters in the public interest, which rests on the
24 right of the public to know and the freedom of the press to tell
25 it.'"  Hilton, 580 F.3d at 892 (quoting Montana v. San Jose Mercury
26 News, Inc., 34 Cal. App. 4th 790, 793 (1995)).  "'Public interest
27 attaches to people who by their accomplishments or mode of living
28 create a bona fide attention to their activities.'"  Hilton, 580

United States District Court
For the Northern District of California

10

United States District Court
For the Northern District of California

1  F.3d at 892 (quoting Dora v. Frontline Video, Inc., 15 Cal. App.

2  4th 536, 542 (1993)).

3      In Gionfriddo v. Major League Baseball, the court held that

4  the defendants were entitled to the public interest defense.  94

5  Cal. App. 4th 400, 415 (2001).  There, the plaintiffs, four former

6  baseball players, claimed that the defendants' use of their names

7  and statistics violated their rights of publicity.  Id. at 405-07.

8  Their information appeared on a website, which reported historical

9  team rosters and listed names of players who won awards during each

10 season.  Id. at 406.  The defendants also included still

11 photographs of the plaintiffs from their playing days in video

12 documentaries.  Id.  The court characterized these uses as "simply

13 making historical facts available to the public through game

14 programs, Web sites and video clips."  Id. at 411.  Because the

15 public had an interest in the plaintiffs' athletic performance, the

16 First Amendment protected the "recitation and discussion of [their]

17 factual data."  Id.

18      The public interest defense also applied in Montana.  There,

19 the defendant newspaper sold posters containing reproductions of

20 newspaper pages reporting on the San Francisco 49ers' win in the

21 1990 Super Bowl; these pages contained images of the plaintiff.  34

22 Cal. App. 4th at 792.  The plaintiff conceded that the original

23 newspaper accounts were protected by the First Amendment, but

24 challenged their reproduction as posters.  Id. at 794.  The court

25 held that the posters were entitled to the same First Amendment

26 protection as the original news stories.  The court stated,

27      Montana's name and likeness appeared in the posters
       for precisely the same reason they appeared on the
28     original newspaper front pages: because Montana was

11

United States District Court
For the Northern District of California

> a major player in contemporaneous newsworthy sports
> events. Under these circumstances, Montana's claim
> that SJMN used his face and name solely to extract
> the commercial value from them fails.

Id. (emphasis in original). Citing Montana, the Ninth Circuit stated that the public interest defense "is about . . . publication or reporting." Hilton, 580 F.3d at 892.

"NCAA Football" is unlike the works in Gionfriddo and Montana. The game does not merely report or publish Plaintiff's statistics and abilities. On the contrary, EA enables the consumer to assume the identity of various student athletes and compete in simulated college football matches. EA is correct that products created for entertainment deserve constitutional protection. See, e.g., Gionfriddo, 94 Cal. App. 4th at 410 ("Entertainment features receive the same constitutional protection as factual news reports."). But it does not follow that these protections are absolute and always trump the right of publicity.

EA cites cases in which courts held that the public interest exception protected online fantasy baseball and football games. Although these games are more analogous to "NCAA Football," the cases are nonetheless distinguishable. In C.B.C. Distribution and Marketing v. Major League Baseball Advanced Media, a declaratory judgment action, the plaintiff sold "fantasy baseball products" that included the names and statistics of major league baseball players. 505 F.3d 818, 820-21 (8th Cir. 2007). Through these products, consumers could form fantasy baseball teams and compete with other users. Id. at 820. "A participant's success . . . depend[ed] on the actual performance of the fantasy team's players on their respective actual teams during the course of the major

12

United States District Court
For the Northern District of California

1  league baseball season." Id. at 820-21. The defendant

2  counterclaimed, arguing that these products violated players'

3  rights of publicity. The court disagreed. It analogized the case

4  to Gionfriddo, and held that the use of the players' information in

5  the fantasy game was a "'recitation and discussion'" of the

6  players' information. Id. at 823-24 (quoting Gionfriddo, 94 Cal.

7  App. 4th at 411).

8      C.B.C. Distribution is inapplicable here. Success in "NCAA

9  Football" does not depend on updated reports of the real-life

10  players' progress during the college football season. Further,

11  EA's game provides more than just the players' names and

12  statistics; it offers a depiction of the student athletes' physical

13  characteristics and, as noted, enables consumers to control the

14  virtual players on a simulated football field. EA's use of

15  Plaintiff's likeness goes far beyond what the court considered in

16  C.B.C. Distribution.

17      EA is not entitled to the public interest defense on this

18  motion.

19      C.    Section 3344(d) Exemption

20      California Civil Code section 3344(d) provides a public

21  affairs exemption to the statutory right of publicity. It exempts

22  from liability under section 3344 "a use of a name . . . or

23  likeness in connection with any news, public affairs, or sports

24  broadcast or account, or any political campaign." Cal. Civ. Code

25  § 3344(d). This exemption is not coextensive with the public

26  interest defense; it "is designed to avoid First Amendment

27  questions in the area of misappropriation by providing extra

28  breathing space for the use of a person's name in connection with

13

United States District Court
For the Northern District of California

1   matters of public interest." <u>New Kids on the Block v. News Am.</u>

2   <u>Pub., Inc.</u>, 971 F.2d 302, 310 n.10 (9th Cir. 1992) (citing <u>Eastwood</u>

3   <u>v. Superior Court</u>, 149 Cal. App. 3d 409, 421 (1983)).

4       In <u>Dora v. Frontline Video, Inc.</u>, a California court held that

5   section 3344(d) barred a plaintiff's statutory right of publicity

6   claim.  15 Cal. App. 4th at 546.  The defendant's documentary on

7   surfing contained, among other things, the plaintiff's name and

8   likeness.  <u>Id.</u> at 540.  The court held that this use was exempted

9   by section 3344(d) because the plaintiff's name and likeness were

10  used in connection with public affairs.  In doing so, the court

11  addressed the meaning of "public affairs."  The court distinguished

12  "public affairs" from "news," stating that "'public affairs' was

13  intended to mean something less important than news." <u>Dora</u>, 15

14  Cal. App. 4th at 545.  Thus, the subject matter encompassed by

15  public affairs is not limited "to topics that might be covered on

16  public television or public radio." <u>Id.</u> at 546.

17      Here, Plaintiff does not dispute EA's contention that college

18  athletics are "public affairs."  He asserts, however, that

19  section 3344(d) only applies to factual reporting.[3]  In essence, he

20  asserts that section 3344(d) applies to the same type of

21  "reporting" as does the public interest defense.

22      Neither party offered direct authority on the type of use for

23  which the section 3344(d) exemption applies.  However, <u>Montana</u> is

24

25      [3] EA understands Plaintiff to argue that reporting implicates
    newsworthy information.  So interpreted, EA claims, Plaintiff's
26  argument must fail because <u>Dora</u> draws a distinction between "news"
    and "public affairs."  The Court does not construe Plaintiff's
27  argument in the same way.  Instead, the Court reads Plaintiff to
    argue that "NCAA Football" does not constitute "reporting" and, as
28  a result, EA does not use his name and likeness in a manner that is
    exempted by section 3344(d).

instructive.  There, the court stated that "the statutory cause of
action specifically exempts from liability the use of a name or
likeness in connection with the <u>reporting</u> of a matter in the public
interest."  34 Cal. App. 4th at 793 (emphasis added).  Thus,
without authority requiring otherwise, the Court construes
section 3344(d) to require the same type of activity as the public
interest defense discussed above, namely reporting.[4]  Although
"NCAA Football" is based on subject matter considered "public
affairs," EA is not entitled to the statutory defense because its
use of Plaintiff's image and likeness extends beyond reporting
information about him.

Accordingly, Plaintiff's California statutory and common law
right of publicity claims are not barred as a matter of law.

III. Civil Conspiracy Claims

Defendants move separately to dismiss Plaintiff's civil
conspiracy claims.  All challenge the sufficiency of Plaintiff's
claims, arguing that he does not plead an underlying tort, which is
a necessary element.  CLC separately asserts the agent immunity
defense.

Plaintiff did not specify the state law under which his civil
conspiracy claims arise.  For the purposes of this motion, the
Court assumes that his claims arise under California law.

A.    Sufficiency of the Claims

Civil conspiracy "is not a cause of action, but a legal

---

[4] Although section 3344(d) and the public interest defense
implicate the same type of activity, they are nonetheless not
coextensive because section 3344(d) defines safe harbors for
reporting in particular contexts.  <u>See</u> <u>New Kids on the Block</u>, 971
F.2d at 310 n.10.

United States District Court
For the Northern District of California

doctrine that imposes liability on persons who, although not
actually committing a tort themselves, share with the immediate
tortfeasors a common plan or design in its perpetration." Applied
Equipment Corp., 7 Cal. 4th at 510 (citing Wyatt v. Union Mortgage
Co., 24 Cal. 3d 773, 784 (1979)). "Standing alone, a conspiracy
does no harm and engenders no tort liability.  It must be activated
by the commission of an actual tort." Applied Equipment Corp., 7
Cal. 4th at 511.

A claim for civil conspiracy consists of three elements:
"(1) the formation and operation of the conspiracy, (2) wrongful
conduct in furtherance of the conspiracy, and (3) damages arising
from the wrongful conduct." Kidron v. Movie Acquisition Corp., 40
Cal. App. 4th 1571, 1581 (1995). "The conspiring defendants must
. . . have actual knowledge that a tort is planned and concur in
the tortious scheme with knowledge of its unlawful purpose." Id.
at 1582 (citing Wyatt, 24 Cal. 3d at 784-86).  This knowledge must
be combined with an intent to aid in achieving the objective of the
conspiracy. Kidron, 40 Cal. App. 4th at 1582; Schick v. Bach, 193
Cal. App. 3d 1321, 1328 (1987).  A claim of unlawful conspiracy
must contain "enough fact to raise a reasonable expectation that
discovery will reveal evidence of illegal agreement." Twombly, 550
U.S. at 556.  A bare allegation that a conspiracy existed does not
suffice. Id.

Plaintiff alleges that there were meetings among Defendants in
California and Indiana.  Compl. ¶¶ 54-56.  He asserts that
Defendants knew of NCAA principles barring the licensing of
student-athlete identities, but nonetheless approved EA's games
containing the athletes' likenesses without their consent.  Compl.

16

¶¶ 12-15.  Finally, he claims that EA's actions violated his

California statutory and common law rights of publicity.[5]  These

factual allegations sufficiently support liability under

Plaintiff's civil conspiracy claim.[6]

　　　B.　CLC's Agent Immunity Defense

　　CLC maintains that the agent immunity defense bars Plaintiff's

conspiracy claim against it.  This defense provides that no

liability shall lie "if the alleged conspirator, though a

participant in the agreement underlying the injury, was not

personally bound by the duty violated by the wrongdoing and was

acting only as the agent or employee of the party who did have that

duty."  Doctors' Co. v. Superior Court, 49 Cal. 3d 39, 44 (1989).

　　CLC maintains that Plaintiff's allegations that its role as a

licensing company entering into agreements on behalf of NCAA

establishes, as a matter of law, that it is NCAA's agent.  These

allegations are not sufficient at this early stage to establish

CLC's entitlement to this defense.

---

　　[5] Plaintiff alleges that Defendants conspired to deprive
"class members of their right to protect their names, likenesses
and rights to publicity and their contractual, property rights."
Compl. ¶ 80.  For the purposes of this motion, the Court construes
this allegation to refer to EA's alleged violation of Plaintiff's
California right of publicity because he does not state a claim
based on the tortious conduct of any other Defendant.

　　[6] Citing Everest Investors 8 v. Whitehall Real Estate Limited
Partnership XI, 100 Cal. App. 4th 1102 (2002), CLC also argues that
it cannot accrue tort liability under a civil conspiracy theory
because Plaintiff has not alleged that it can make video games.
This argument is unavailing.  Everest Investors 8 states that "tort
liability from a conspiracy presupposes that the conspirator is
legally capable of committing the tort -- that he owes a duty to
the plaintiff recognized by law and is potentially subject to
liability for the breach of that duty."  Id. at 1106.  Nothing in
the record indicates that CLC is legally incapable of violating
Plaintiff's rights of publicity.

17

IV.   Section 17200 Claim

     EA maintains that Plaintiff fails to state a claim under
California Business and Professions Code section 17200 because he
does not allege an underlying wrong or seek available relief.
However, as discussed above, Plaintiff sufficiently asserts right
of publicity and civil conspiracy claims.  With regard to relief,
he seeks an injunction, which EA concedes is available under
section 17200.  Thus, Plaintiff has stated a section 17200 claim
against EA.

V.   Breach of Contract Claim

     NCAA argues that Plaintiff does not state a breach of contract
claim because he has not identified an enforceable contract.
Because Plaintiff does not specify the state law under which his
claim arises, the Court assumes that California law applies.

     To assert a cause of action for breach of contract in
California, a plaintiff must plead: (1) existence of a contract;
(2) the plaintiff's performance or excuse for non-performance;
(3) the defendant's breach; and (4) damages to the plaintiff as a
result of the breach.  Armstrong Petrol. Corp. v. Tri-Valley Oil &
Gas Co., 116 Cal. App. 4th 1375, 1391 n.6 (2004).

     Plaintiff has not identified a contract that he is seeking to
enforce.  Although he refers to an NCAA document as a contract, he
does not attach the document to his complaint.  Instead, he states
that by signing the document, the athletes agree that "they have
'read and understand' the NCAA's rules" and that "to the best of
[their] knowledge [they] have not violated any amateurism rules."
Compl. ¶ 14.  These phrases, on their own, do not indicate that the
document is a contract.  Plaintiff's breach of contract claim

1  against NCAA is dismissed with leave to amend to allege or attach

2  an enforceable contract.

3  VI.  Unjust Enrichment Claims

4       Plaintiff claims that EA and CLC were unjustly enriched

5  through the sale of video games that use his likeness.  EA and CLC

6  argue that his claim is barred because California law does not

7  provide a cause of action for unjust enrichment.  Even if it did,

8  EA and CLC argue, Plaintiff's allegations regarding the existence

9  of a contract with NCAA would independently bar an unjust

10  enrichment claim.

11       California courts appear to be split on whether there is an

12  independent cause of action for unjust enrichment.  <u>Baggett v.</u>

13  <u>Hewlett-Packard Co.</u>, 582 F. Supp. 2d 1261, 1270-71 (C.D. Cal. 2007)

14  (applying California law).  One view is that unjust enrichment is

15  not a cause of action, or even a remedy, but rather a general

16  principle, underlying various legal doctrines and remedies.

17  <u>McBride v. Boughton</u>, 123 Cal. App. 4th 379, 387 (2004).  In

18  <u>McBride</u>, the court construed a "purported" unjust enrichment claim

19  as a cause of action seeking restitution.  <u>Id.</u>  There are at least

20  two potential bases for a cause of action seeking restitution:

21  (1) an alternative to breach of contract damages when the parties

22  had a contract which was procured by fraud or is unenforceable for

23  some reason; and (2) where the defendant obtained a benefit from

24  the plaintiff by fraud, duress, conversion, or similar conduct and

25  the plaintiff chooses not to sue in tort but to seek restitution on

26  a quasi-contract theory.  <u>Id.</u> at 388.  In the latter case, the law

27  implies a contract, or quasi-contract, without regard to the

28  parties' intent, to avoid unjust enrichment.  <u>Id.</u>

United States District Court
For the Northern District of California

Case4:09-cv-01967-CW Document150-1 Filed01/19/11 Page 25 of 27

1   Another view is that a cause of action for unjust enrichment

2   exists and its elements are receipt of a benefit and unjust

3   retention of the benefit at the expense of another.  Lectrodryer v.

4   SeoulBank, 77 Cal. App. 4th 723, 726 (2000); First Nationwide

5   Savings v. Perry, 11 Cal. App. 4th 1657, 1662-63 (1992).

6   Even under the more restrictive analysis of McBride, Plaintiff

7   sufficiently pleads claims for restitution against EA and CLC on

8   the theory that they obtained a benefit from him through their

9   alleged wrongful conduct.  His breach of contract claim against

10  NCAA does not bar these claims.  Although EA and CLC correctly note

11  that the existence of such a contract could bar a restitutionary

12  claim against a contracting party, it is not clear that his alleged

13  contract with NCAA defined any rights between him and EA and CLC.

14  Cf. Cal. Med. Ass'n v. Aetna U.S. Healthcare of Cal., 94 Cal. App.

15  4th 151, 172 (2001) (holding that "as a matter of law, a

16  quasi-contract action for unjust enrichment does not lie where, as

17  here, express binding agreements exist and define the parties'

18  rights").  Thus, Plaintiff has adequately stated his unjust

19  enrichment claim for restitution against EA and CLC.

20  VII. EA's Anti-SLAPP Motion to Strike

21  Finally, EA moves under California Code of Civil Procedure

22  section 425.16 to strike all of Plaintiff's claims against it.

23  Section 425.16(b)(1), which addresses Strategic Lawsuits Against

24  Public Participation (SLAPP), provides,

25      A cause of action against a person arising from any act of
        that person in furtherance of the person's right of petition
26      or free speech under the United States or California
        Constitution in connection with a public issue shall be
27      subject to a special motion to strike, unless the court
        determines that the plaintiff has established that there is a
28      probability that the plaintiff will prevail on the claim.

20

California anti-SLAPP motions are available to litigants proceeding in federal court. Thomas v. Fry's Elecs., Inc., 400 F.3d 1206, 1206 (9th Cir. 2005). California courts analyze anti-SLAPP motions in two steps. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." Equilon Enter. v. Consumer Cause, Inc., 29 Cal. 4th 53, 67 (2002). Second, the court "determines whether the plaintiff has demonstrated a probability of prevailing on the claim." Id.

Assuming that the challenged causes of action arise from protected activity, Plaintiff makes a sufficient showing of his probability of success on the merits. EA incorrectly argues that Plaintiff has a substantial burden to show probability of success. It maintains that the Court must apply "the same standard governing motions for summary judgment, nonsuit, or directed verdict." EA's Mot. to Strike at 12. However, this standard does not apply in federal court.

"At the second step of the anti-SLAPP inquiry, the required probability that [a party] will prevail need not be high." Hilton, 580 F.3d at 888-89. The "statute does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning; it subjects to potential dismissal only those actions in which the plaintiff cannot state and substantiate a legally sufficient claim." Id. at 888 (quoting Navellier v. Sletten, 29 Cal. 4th 82, 93 (2002)) (quotation marks omitted). In Thomas v. Fry's Electronics, the case that provides that anti-SLAPP motions are available to litigants proceeding in federal court, the court stated that "federal courts may not impose a heightened

United States District Court
For the Northern District of California

Case4:09-cv-01967-CW Document150 Filed02/08/10 Page22 of 22

United States District Court
For the Northern District of California

pleading requirement in derogation of federal notice pleading rules." 400 F.3d at 1207; see also Empress LLC v. City & County of S.F., 419 F.3d 1052, 1056 (9th Cir. 2005) (holding that "a heightened pleading standard should only be applied when the Federal Rules of Civil Procedure so require"); Verizon, Inc. v. Covad Commc'ns. Co., 377 F.3d 1081, 1091 (9th Cir. 2004) (holding that procedural "state laws are not used in federal court if to do so would result in a direct collision with a Federal Rule of Civil Procedure" and noting that federal courts have "accordingly refused to apply certain discovery-limiting provisions of the anti-SLAPP statute because they would conflict with Fed. R. Civ. P. 56").

Under Federal Rule of Civil Procedure 8, Plaintiff has sufficiently stated his claims against EA. Accordingly, the Court denies EA's special motion to strike Plaintiff's claims as a SLAPP.

CONCLUSION

For the foregoing reasons, the Court DENIES EA's Motion to Dismiss (Docket No. 34), GRANTS NCAA's Motion in part and DENIES it in part (Docket No. 48), DENIES CLC's Motion (Docket No. 47) and DENIES EA's Motion to Strike (Docket No. 35). Plaintiff's claims for violation of his Indiana right of publicity and breach of contract against NCAA are dismissed with leave to amend. In accordance with this Court's Order of January 15, 2010 on consolidation, Plaintiff has thirty days from the date of this Order to file a consolidated amended complaint. A case management conference is scheduled for April 27, 2010 at 2:00 p.m.

IT IS SO ORDERED.

Dated: February 8, 2010

CLAUDIA WILKEN
United States District Judge