No. 10-15387

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**SAMUEL MICHAEL KELLER,**

*Plaintiff/Appellee,*

v.

**ELECTRONIC ARTS, INC.,**

*Defendant/Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:09-CV-01967-VRW
The Honorable Claudia Wilken, District Judge

**MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF AND *AMICUS CURIAE* BRIEF OF THE MOTION PICTURE ASSOCIATION OF AMERICA, INC. IN SUPPORT OF DEFENDANT AND APPELLANT ELECTRONIC ARTS, INC.**

LOEB & LOEB LLP
Douglas E. Mirell (SBN 094169)
W. Allan Edmiston (SBN 228246)
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
(310) 282-2000

Attorneys for *Amicus Curiae*
MOTION PICTURE ASSOCIATION OF AMERICA, INC.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), *amicus curiae* Motion Picture Association of America, Inc. ("MPAA") discloses the following:

1.  MPAA is a not-for-profit trade association;

2.  MPAA does not have any parent companies; and

3.  There are no publicly held companies that own ten (10) percent or more of the stock of the MPAA.

RESPECTFULLY SUBMITTED this 7th day of September, 2010.

LOEB & LOEB LLP
DOUGLAS E. MIRELL
W. ALLAN EDMISTON

By: /s/ W. Allan Edmiston
    W. ALLAN EDMISTON
    Attorneys for *Amicus Curiae*
    MOTION PICTURE ASSOCIATION
    OF AMERICA, INC.

## MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF

Pursuant to Federal Rule of Appellate Procedure 29(b), the Motion Picture Association of America, Inc. ("MPAA") hereby requests leave to file the accompanying *amicus curiae* brief in support of defendant and appellant Electronic Arts, Inc.

The MPAA is a not-for-profit trade association founded in 1922 to address issues of concern to the United States motion picture industry. Its members[1] and their affiliates are the leading producers and distributors of audiovisual entertainment in the theatrical, television and DVD/home video markets. Accordingly, among other things, the MPAA advocates for the protection of its members' creative works, fights copyright theft around the world, and provides leadership in meeting new and emerging industry challenges.

The right of publicity creates an inherent and undeniable tension with fundamental First Amendment freedoms. Because of this tension, the MPAA has long worked to ensure that the right of publicity evolves in a manner which protects the individual right of self-expression and safeguards the free marketplace

---

[1] The members of the MPAA are: Paramount Pictures Corporation; Sony Pictures Entertainment Inc.; Twentieth Century Fox Film Corporation; Universal City Studios LLLP; Walt Disney Studios Motion Pictures; and Warner Bros. Entertainment Inc.

of ideas.[2]  For example, in *Winter v. DC Comics*, 30 Cal.4th 881 (2003) – a case involving the alleged use of the names and likenesses of two well-known musicians in an expressive work – the MPAA sought and obtained leave to file an *amicus* brief addressing the impact of the California Supreme Court's "transformative use" test upon motion pictures and other traditionally protected expressive works.

Likewise, the MPAA filed an *amicus* brief in *Tyne v. Time Warner Entm't Co., L.P.*, 901 So.2d 802 (Fla. 2005) – a case involving the expressive use of the names and alleged likenesses of real persons in a motion picture entitled *The Perfect Storm* – urging the Supreme Court of Florida to affirm that motion pictures and other expressive works are categorically exempt from Florida's publicity rights statute.

More recently, the MPAA filed an *amicus curiae* brief in *Christoff v. Nestlé USA, Inc.*, 47 Cal.4th 468 (2009).  In that case, the MPAA advocated for application of the single-publication rule – which prevents a "single integrated

---

[2] In California, the right of publicity is both a statutory and a common law right. The statutory right originated in California Civil Code Section 3344, effective in 1972.  In 1979, the California Supreme Court recognized a common law "right of publicity," which it described as a "complement" to the statutory cause of action. *Lugosi v. Universal Pictures*, 25 Cal.3d 813, 819 n.6 (1979).  A key difference between the common law and statutory actions is that Section 3344 requires a knowing use of the plaintiff's name or likeness.  *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal.App.4th 318, 322 n.2 (1997).

publication" from resulting in recurring, potentially endless litigation – to publicity rights claims.

Although this case involves video games, not motion pictures, the MPAA is nevertheless interested in and affected by its outcome. Like motion pictures,[3] video games have been held to be constitutionally protected expressive works. Because all expressive works – irrespective of their medium or message – are entitled to the same high-level First Amendment protection, any ruling which abridges that protection in connection with video games risks being broadly and adversely applied, beyond video games, to more traditional works of audiovisual expression.

In this case, the District Court appears to have recognized that defendant Electronic Arts, Inc.'s ("EA") video games (the "EA Games") are expressive works entitled to First Amendment protection, and it purported to apply the "transformative use" test – created by the California Supreme Court in *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 406 (2001) – to determine whether, in the circumstances of this case, plaintiff Samuel Keller's commercial right of publicity in certain of his public "characteristics" should trump EA's constitutional freedom of speech.

---

[3] The U.S. Supreme Court first recognized motion pictures as protected speech in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952).

Focusing solely on the likeness alleged by plaintiff (the "Alleged Likeness"), the District Court observed that the Alleged Likeness was "far from the transmogrification of the Winter brothers." (Order on Defendants' Motion to Dismiss ("Order") [Docket No. 150], 10:3-4.) Based on this unduly limited focus, *and without considering the expressive context and creative manner in which the Alleged Likeness was used in the EA Games as a whole*, the District Court determined that the Alleged Likeness was "not sufficiently transformative to bar [plaintiff's] right of publicity claims as a matter of law." (*Id.* at 9:11-13.)

As further explained in the accompanying amicus brief, the District Court misapplied the "transformative use" test and gave unconstitutionally short shrift to basic First Amendment freedoms, by viewing the Alleged Likeness in isolation from its context, and by specifically declining to take account of the manner in which the Alleged Likeness was used within the EA Games as a whole. This unduly limited focus gives rise to a serious risk that a motion picture containing the name and/or "realistic" likeness of a public person who has not authorized that usage – whether in the form of a photograph, archival footage or a dramatic portrayal – may be subjected to publicity rights liability. To prevent such a speech-chilling result, this Court should affirm that filmmakers, authors and artists are undeniably free – within the traditional bounds of defamation and privacy law

– to draw on the lives and likenesses of public persons in furtherance of their valid

creative expression.

     RESPECTFULLY SUBMITTED this 7th day of September, 2010.

                 LOEB & LOEB LLP
                 DOUGLAS E. MIRELL
                 W. ALLAN EDMISTON

              By: /s/ W. Allan Edmiston
                   W. ALLAN EDMISTON
                   Attorneys for *Amicus Curiae*
                   MOTION PICTURE ASSOCIATION
                   OF AMERICA, INC.

## TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT     1

ARGUMENT     5

I.     THE "TRANSFORMATIVE USE" TEST IS FOCUSED ON THE EXPRESSIVE WORK AS A WHOLE AND NOT SIMPLY THE NAME OR LIKENESS ALLEGEDLY USED THEREIN.     5

II.     THE DISTRICT COURT'S HOLDING UNDERSCORES THE NEED FOR A BRIGHT-LINE RULE EXEMPTING WORKS FOUND TO BE EXPRESSIVE FROM PUBLICITY RIGHTS LIABILITY     13

III.     ABSENT A CATEGORICAL EXEMPTION FOR EXPRESSIVE WORKS, THIS COURT SHOULD RECOGNIZE AN ADDITIONAL "ARTISTIC RELEVANCE" DEFENSE TO RIGHT OF PUBLICITY CLAIMS     21

IV.     NEITHER THE "PUBLIC AFFAIRS" DEFENSE NOR THE "PUBLIC INTEREST" DEFENSE IS CONFINED TO TRADITIONAL "REPORTING."     25

CONCLUSION     28

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

CASES

*Aligo v. Time-Life Books, Inc.*,
   1994 U.S. Dist. LEXIS 21559
   (N.D. Cal. Dec. 19, 1994) ................................................................9

*Am. Amusement Machine Ass'n v. Kendrick*,
   244 F.3d 572 (7th Cir. 2001)............................................................7

*Ann-Margret v. High Society Magazine, Inc.*,
   498 F.Supp. 401 (S.D.N.Y. 1980) ............................................18, 25

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001).......................................................................16

*Baugh v. CBS, Inc.*,
   828 F.Supp. 745 (N.D. Cal. 1993)..................................................27

*Blatty v. New York Times Co.*,
   42 Cal.3d 1033 (1986) ...................................................................19

*Bleistein v. Donaldson Lithographing Co.*,
   188 U.S. 239 (1903).......................................................................15

*Cardtoons, L.C. v. Major League Baseball Players' Ass'n*,
   95 F.3d 959 (10th Cir. 1996)............................................................6

*Cliffs Notes, Inc. v. Bantam Doubleday
   Dell Publ'g Group, Inc.*,
   886 F.2d 490 (2d Cir. 1989)...........................................................23

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
   25 Cal.4th 406 (2001) ............................................................ *Passim*

*Daly v. Viacom, Inc.*,
   238 F.Supp.2d 1118 (N.D. Cal. 2002)............................................17

*Dora v. Frontline Video*,
   15 Cal.App.4th 536 (1993)....................................................4, 26-28

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
  547 F.3d 1095 (9th Cir. 2008)................................................................. *Passim*

*Eastwood v. Superior Ct.*,
  149 Cal.App.3d 409 (1983)...................................................................26

*Entm't Software Ass'n v. Blagojevich*,
  404 F.Supp.2d 1051 (N.D. Ill. 2005)....................................................7

*ETW Corp. v. Jireh Publ'g, Inc.*,
  332 F.3d 915 (6th Cir. 2001)...................................................12-13, 23

*Gionfriddo v. Major League Baseball*,
  94 Cal.App.4th 400 (2001)....................................................................27

*Guglielmi v. Spelling-Goldberg Prods.*,
  25 Cal.3d 860 (1979) ................................................................. *Passim*

*Hicks v. Casablanca Records*,
  464 F.Supp. 426 (S.D.N.Y. 1978) ..................................................11, 18

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010)............................................................9, 20-21

*Hoffman v. Capital Cities/ABC Inc.*,
  255 F.3d 1180 (9th Cir. 2001).......................................................6, 10, 17

*Hurley v. Irish-Amer. Gay, Lesbian
  and Bisexual Group of Boston, Inc.*,
  515 U.S. 557 (1995)..............................................................................15

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988)................................................................................15

*Interactive Digital Software Ass'n v. St. Louis Cty., Missouri*,
  329 F.3d 954 (8th Cir. 2003).................................................................7

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952)................................................................................1

*Kirby v. Sega of Am., Inc.*,
  144 Cal.App.4th 47 (2006)........................................................... *Passim*

*Mattel, Inc. v. MCA Records, Inc.*,
    296 F.3d 894 (9th Cir. 2002)....................................................................23, 25

*Matthews v. Wozencraft*,
    15 F.3d 432 (5th Cir. 1994)........................................................................17

*Michaels v. Internet Entm't Group*,
    5 F.Supp.2d 823 (C.D. Cal. 1998)..............................................................27

*Miller v. California*,
    413 U.S. 15 (1973)......................................................................................10

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)....................................................................................10

*Parks v. LaFace Records*,
    329 F.3d 437 (6th Cir. 2003)....................................................................6, 24

*Paulsen v. Personality Posters, Inc.*,
    299 N.Y.S.2d 501 (Sup. Ct. 1968) .............................................................27

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986)....................................................................................19

*Polydoros v. Twentieth Century Fox Film Corp.*,
    67 Cal.App.4th 318 (1997).......................................................................2, 18

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)....................................................................................17

*Red Lion Broad. Co. v. F.C.C.*,
    395 U.S. 367 (1969)......................................................................................6

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989)............................................................. *Passim*

*Rosemont Enterprises, Inc. v. Random House, Inc.*,
    294 N.Y.S.2d 122 (1968) ...........................................................................18

*Ruffin-Steinback v. De Passe*,
    82 F.Supp.2d 723 (E.D. Mich. 2000) .........................................................18

*Sable Communications v. F.C.C.*,
   492 U.S. 115 (1989)..................................................................................17, 19

*Sanders v. Acclaim Entm't, Inc.*,
   188 F.Supp.2d 1264 (D. Colo. 2002) ...............................................................5

*Seale v. Gramercy Pictures*,
   949 F.Supp. 331 (E.D. Pa. 1997)....................................................................18

*Stern Elcs., Inc. v. Kaufman*,
   523 F. Supp. 635 (E.D.N.Y. 1981),
   aff'd, 669 F.2d 852 (2d Cir. 1982) ....................................................................7

*Stern v. Delphi Internet Servs. Corp.*,
   626 N.Y.S.2d 694 (1995) ...................................................................................9

*Taylor v. National Broadcasting Co.*,
   22 Media L. Rep. (BNA) 2433,
   1994 WL 780690 (Sept. 12, 1994) ..................................................................11

*The Romantics v. Activision Publ'g, Inc.*,
   574 F.Supp.2d 758 (E.D. Mich. 2008) ...................................................... 23-24

*Turner Broad. Sys. v. F.C.C.*,
   512 U.S. 622 (1994).........................................................................................17

*Tyne v. Time Warner Entm't Co., L.P.*,
   901 So.2d 802 (Fla. 2005).........................................................................6, 8, 11

*Video Software Dealers Ass'n v. Maleng*,
   325 F.Supp.2d 1180 (W.D. Wash. 2004) .........................................................7

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
   529 U.S. 205 (2000).........................................................................................20

*Winter v. DC Comics*,
   30 Cal.4th 881 (2003) ......................................................................... *Passim*

*Winters v. New York*,
   333 U.S. 507 (1948).............................................................................................6

*Zacchini v. Scripps-Howard Broadcasting Co.*,
   433 U.S. 562 (1977).........................................................................................10

STATUTES

Cal. Civ. Code § 3344(a) .........................................................................5

Cal. Civ. Code § 3344(d) ............................................................4, 26-28

Cal. Civ. Code § 3344.1(a)(2)-(3) ..........................................................6

OTHER AUTHORITIES

F. Jay Dougherty, *All the World's a Stooge:*
    *The "Transformativeness" Test for Analyzing*
    *a First Amendment Defense to a Right of*
    *Publicity Claim Against Distribution of a Work of Art,*
    27 Colum. J.L. & Arts 1 (2003) ......................................................16

J. Thomas McCarthy,
    *The Rights of Publicity and Privacy*
    (2d ed. 2010) ...............................................................................3, 13

Restatement (Third), *Unfair Competition* § 47 (1995) ...................5, 6-7

Rodney A. Smolla,
    *Smolla and Nimmer on Freedom of Speech*
    (3d ed. 2010)...................................................................................16

U.S. Const. Amend. I................................................................... *Passim*

## SUMMARY OF ARGUMENT

The real world is a wellspring of inspiration and ideas for filmmakers, authors and artists. The expressive use of the names, lives and likenesses of public persons is, accordingly, entitled to broad protection:

> Contemporary events, symbols and people are regularly used in [audio-visual and literary works] . . . . [Filmmakers, authors and artists] may be able to more persuasively, or more accurately, express themselves by weaving into the tale persons or events familiar to their [viewers or] readers. The choice is theirs. No author should be forced into creating mythological worlds or characters wholly divorced from reality. The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire. Rather, prominence invites creative comment. Surely, the range of free expression would be meaningfully reduced if prominent persons in the present and recent past were forbidden topics for the imaginations of authors.

*Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal.3d 860, 869 (1979).

"[M]otion pictures are a significant medium for the communication of ideas." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). In furtherance of this expressive purpose, filmmakers regularly use the names, lives and likenesses of public persons for creative comment and artistic effect. Over time, this use has taken many forms.

Sometimes it is *literal*, as in *Forrest Gump* (1994), where the filmmakers employed archival newsreel footage of prominent public figures to create the backdrop for the title character's fictionalized encounters with those figures.[1]

---

[1] Other examples include: *JFK* (archival footage of various public persons); *Nixon* (biographical story of former president Richard Nixon)*; Fahrenheit 911* (news

Sometimes it is *representational*, as in *Frost/Nixon* (2008), where actors dramatized journalist David Frost's famous televised interviews of Richard Nixon. And sometimes it is *allusive*, as in *Citizen Kane* (1941), where the fictional character Charles Foster Kane appears to have been modeled, at least in part, on newspaper magnate William Randolph Hearst.

Under the First Amendment and California law, each of these uses is entirely expressive and fully protected. *See*, *e.g.*, *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal.App.4th 318, 325 (1997) (rejecting publicity rights claim, based on use of plaintiff's name and likeness in motion picture, on First Amendment grounds). Unfortunately, the District Court's holding threatens to significantly undercut that robust constitutional protection.

Video games have been found to be fully protected First Amendment speech.[2] Since all expressive speech – regardless of its medium or message – is entitled to the same constitutional protection, the District Court's holding risks being adversely applied, beyond video games, to proscribe the creative or artistic use of the names and/or likenesses of public persons in more traditional works of audiovisual expression, like motion pictures.

---

footage of various public persons); and *Bowling for Columbine* (interviews with individuals connected to the Columbine school shooting).

[2] See footnote 4, *infra*.

The MPAA does not seek to reiterate the arguments asserted by Electronic Arts, Inc. ("EA") in its opening brief. Rather, the MPAA affirms four principal points:

*First*, the District Court plainly misapplied the "transformative use" test. As conceived by the California Supreme Court, the focus of the "transformative use" inquiry is *not* limited to whether the specific name or likeness at issue has been in some way "transmogrified" or even "transformed." Rather, the proper inquiry is whether *the work as a whole* is in some way "transformative," such that *the work's* creative elements predominate over any allegedly literal ones. Accordingly, even the most literal depictions of a celebrity likeness may be "transformative," where analyzed *in context* to discern the expressive effect that the filmmaker, author or artist has achieved, or sought to achieve, *in the work as a whole*.

*Second*, the District Court's erroneous holding underscores the fact that the "transformative use" test is "subjective in application" and "unpredictable in outcome." 2 J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 8:72, p. 269 (2d ed. 2010) [hereinafter "McCarthy"]. Indeed, application of the "transformative use" test to traditionally protected expressive works runs the risk of constricting the necessarily broad range of permissible comment, criticism, satire, parody and dramatization. To promote continued creativity, as well as the free and open exchange of ideas, this Court should affirm that, under the First

Amendment, all works found to be expressive – including motion pictures – are categorically exempt from publicity rights liability.  Otherwise, filmmakers, authors and artists may hesitate to create new works that draw on the persona of a public person, for fear that doing so could give rise to litigation and liability based on unpredictable, subjective, and ad hoc judgments concerning "transformativeness."

*Third*, absent categorical constitutional protection for expressive works, the MPAA believes that the "artistic relevance" defense – first articulated in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) and subsequently adopted by this Circuit – should be recognized, *in addition to "transformative use*," as a complete defense to right of publicity claims, particularly where those claims involve the use of the actual name or the "realistic" depiction of a personality in an expressive work.

The "artistic relevance" test makes only two limited inquiries: (1) whether the alleged likeness bears some minimal "artistic relevance" to the work as a whole; and (2) if so, whether, the use of the alleged likeness is "explicitly misleading" as to its source or sponsorship.  By thus limiting its focus, the "artistic relevance" test gives clear, reliable definition to the scope of the right of publicity.

*Finally*, the use of a public person's name or likeness in an expressive work relating to matters of "public interest" or "public affairs" is plainly immune to publicity rights liability under California law.  Cal. Civ. Code § 3344(d); *Dora v.*

*Frontline Video*, 15 Cal.App.4th 536 (1993). The scope of these exceptions is not, as the District Court concluded, confined to traditional "reporting." Rather, these exceptions cover a broad range of material, including, for example, documentary films.

As set forth more fully below, the MPAA fears that the District Court's decision may be used by publicity rights plaintiffs to censor, prohibit or otherwise chill valid creative expression that utilizes the names and/or likenesses of public persons. Because expressive works – including motion pictures – are "an integral component of a society dedicated to the principle of free expression," *Sanders v. Acclaim Entm't, Inc.*, 188 F.Supp.2d 1264, 1273 (D. Colo. 2002), no such result can or should be tolerated.

## ARGUMENT

### I. THE "TRANSFORMATIVE USE" TEST IS FOCUSED ON THE EXPRESSIVE WORK AS A WHOLE AND NOT SIMPLY THE NAME OR LIKENESS ALLEGEDLY USED THEREIN.

The right of publicity is a *commercial* right that protects the *commercial* value of a person's identity, and seeks to prevent the unauthorized exploitation of a person's identity "for purposes of trade." *See* Cal. Civ. Code § 3344(a) (limiting application of the statutory right of publicity to "products, merchandise, or goods"); Restatement (Third), *Unfair Competition* § 47 (1995) (limiting application of right of publicity to "use[s] for purposes of trade") [hereinafter

["Restatement"].[3]  Given the commercial interests it serves, the right of publicity

cannot be allowed to trample upon First Amendment freedoms.  Restatement § 47,

cmt. c  ("The right of publicity . . . is fundamentally constrained by the public and

constitutional interest in freedom of expression").

     The First Amendment promotes expression, preserves an "uninhibited

marketplace of ideas . . . .[, and does not] countenance monopolization of that

market."  *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969).  To further the

"high purposes" of the First Amendment, all speech – regardless of its medium or

message – is entitled to broad constitutional protection.  *See, e.g., Winters v. New*

*York*, 333 U.S. 507, 510 (1948) (confirming that "[s]peech that entertains, like

---

[3] Although expressive works are plainly not "products, merchandise, or goods" created "for purposes of trade," *see Hoffman v. Capital Cities/ABC Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001) (explaining that commercial speech does nothing more than propose a commercial transaction), some courts have unfortunately analyzed publicity rights claims as though they might be applied to expressive, as well as commercial, speech.  *E.g., Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) (song); *Cardtoons, L.C. v. Major League Baseball Players' Ass'n*, 95 F.3d 959 (10th Cir. 1996) (trading cards); *Comedy III Prods., Inc.*, 25 Cal.4th at 406 (lithographed drawing); *Winter v. DC Comics*, 30 Cal.4th 881 (2003) (series of comic books); *Kirby v. Sega of Am., Inc.*, 144 Cal.App.4th 47, 58 (2006) (video games).  *But cf.* Restatement § 47, cmt. c (1995) ("use of a person's identity primarily for the purpose of communicating information or expressing ideas is not generally actionable as a violation of the person's right of publicity"); Cal. Civ. Code § 3344.1(a)(2)-(3) (expressly excluding plays, books, magazines, newspapers, musical compositions, and audiovisual works, among other works, from the scope of California's post-mortem right of publicity – except when they constitute a commercial advertisement); *Tyne v. Time Warner Entm't Co., L.P.*, 901 So.2d 802 (Fla. 2005) (reasoning that motion pictures and other expressive works are categorically exempt from Florida's publicity rights statute because they do not promote a product or service).

speech that informs, is protected by the First Amendment . . ."); *Comedy III*, 25

Cal.4th at 399 (noting that the First Amendment "does not disfavor nontraditional

media of expression" and that expressive works are protected even if they convey

"no discernable message"); Restatement §47, cmt. c (noting that "freedom of

expression also extends to use in entertainment and other creative works, including

both fiction and nonfiction").

In this case, the District Court apparently recognized that the EA Games are

expressive works entitled to First Amendment protection (Order, at 9:11-13),[4] and

---

[4] Video games have evolved into highly complex, extremely ambitious works of
creativity and imagination. When video games first emerged, they were nothing
more than simple diversions. Now, they include detailed narratives, character
definition and development, voice acting, sound effects, cinematography, music,
animation, and art, making them appear more like motion pictures with an
interactive element. *See Stern Elcs., Inc. v. Kaufman*, 523 F.Supp. 635, 639
(E.D.N.Y. 1981) ("In essence, the [video game] is a movie in which the viewer
participates in the action as a fearless pilot controlling the spaceship."), aff'd, 669
F.2d 852, 853-54 (2d Cir. 1982). Numerous courts, including this Circuit, have
affirmed that video games are constitutionally-protected expressive speech. *See*,
*e.g.*, *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1101 (9th
Cir. 2008) (video game protected by First Amendment); *Interactive Digital
Software Ass'n v. St. Louis Cty., Missouri*, 329 F.3d 954, 957 (8th Cir. 2003) (First
Amendment is "versatile enough" to protect "the pictures, graphic design, concept
art, sounds, music, stories, and narrative present in video games"); *Am. Amusement
Machine Ass'n v. Kendrick*, 244 F.3d 572, 579 (7th Cir. 2001) (video games do not
lose protection simply because they are interactive); *Kirby*, 144 Cal.App.4th at 58
("Video games are expressive works entitled to as much First Amendment
protection as the most profound literature."); *Entm't Software Ass'n v. Blagojevich*,
404 F.Supp.2d 1051, 1056 (N.D. Ill. 2005) (video games are "one of the newest
and most popular forms of artistic expression" and are "protected . . . under the
First Amendment"); *Video Software Dealers Ass'n v. Maleng*, 325 F.Supp.2d
1180, 1184 (W.D. Wash. 2004) (video games are "expressive and qualify as

purported to apply the "transformative use" test – created by the California

Supreme Court in *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 406

(2001) – to determine whether plaintiff Samuel Keller's *commercial* right of

publicity in certain of his public "characteristics" should trump EA's *constitutional*

freedom of expression.

Focusing solely on the likeness alleged by plaintiff (the "Alleged Likeness"),

the District Court specifically declined to consider the expressive context or

creative manner in which the Alleged Likeness was used within the EA Games as a

whole.  Instead, the District Court observed that plaintiff "is represented as . . .

what he was: the starting quarterback for Arizona State University"; noted that "the

[Alleged Likeness] wears the same jersey number, is the same height and weight

and hails from the same state" as plaintiff; and concluded that, for these reasons,

the Alleged Likeness did not come close to being "the transmogrification of the

Winter brothers."  (Order at 10:3-4.)  Based on these findings, the District Court

held that the Alleged Likeness was "[in]sufficiently transformative to bar

[plaintiff's] right of publicity claims as a matter of law."  (*Id.* at 9:11-13.)

The District Court's holding is inconsistent with *Comedy III* and its progeny.

As conceived by the California Supreme Court, the focus of the "transformative

use" inquiry is not limited to whether the plaintiff's likeness has been in some way

---

speech for purposes of the First Amendment").  *Compare Tyne*, 901 So.2d 802
(motion pictures are categorically exempt from Florida's publicity rights statute).

"transmogrified" or "transformed."  Indeed, in *Comedy III*, the California Supreme

Court clearly "emphasize[d] that the transformative elements or creative

contributions that require First Amendment protection *are not confined to parody*

*and can take many forms, from factual reporting to fictionalized portrayal, from*

*heavy-handed lampooning to subtle social criticism*."  25 Cal.4th at 406 (emphasis

added).  More recently, this Court clarified that a "work need not be

phantasmagoric as in *Winter* or fanciful as in *Kirby* . . ." in order to be

"transformative."  *Hilton v. Hallmark Cards*, 599 F.3d 894, 911 (9th Cir. 2010).

Rather, the proper inquiry is "whether the celebrity likeness is *one of the*

*'raw materials' from which an original work is synthesized*, or whether the

*depiction or imitation of the celebrity is the very sum and substance of the work in*

*question*."  *Comedy III*, 25 Cal.4th at 406 (emphasis added).[5]  Stated differently,

the dispositive question is whether *the work as a whole*, and not simply the alleged

likeness contained therein, *is in some way transformative, such that the creative*

---

[5] This is consistent with the "incidental use" doctrine, under which the "incidental
use" of a name or likeness may not support a right of publicity claim.  *See, e.g.*,
*Aligo v. Time-Life Books, Inc.*, 1994 U.S. Dist. LEXIS 21559 (N.D. Cal. Dec. 19,
1994) (use of plaintiff's picture in infomercial is "incidental" and, therefore, cannot
support a right of publicity claim); *Stern v. Delphi Internet Servs. Corp.*, 626
N.Y.S.2d 694 (1995) (use of name and photograph of talk-show host Howard Stern
an "incidental" use in marketing new bulletin board established to discuss Stern's
candidacy for public office).

elements predominate over the literal ones.[6]  *Id.* at 407; *see also Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 575-76 (1977) (publicity rights violation predicated upon wholesale appropriation of a performer's *entire act*).

The "transformative use" test "requires the court to examine and compare the allegedly expressive work with the images of the plaintiff to discern if the ***defendant's work*** contributes significantly distinctive and expressive content[.]" *Kirby*, 144 Cal.App.4th at 61 (emphasis added).  Thus, even the most literal depictions of a celebrity likeness can be "transformative," where those depictions are analyzed in context to discern the expressive effect the artist has achieved, or sought to achieve, in the work as a whole.  *See Comedy III*, 25 Cal.4th at 405 ("when a ***work*** contains significant transformative elements, it is . . . especially worthy of First Amendment protection), *id.* at 407 ("The inquiry is in a sense more

---

[6] First Amendment jurisprudence has long instructed courts to consider the entire publication for purposes of determining constitutional protection.  *See*, *e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 265-66 (1964) (editorial advertisements in newspaper are entitled to constitutional protection); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185 (9th Cir. 2001) (noting that "[w]e must go beyond the altered photograph itself and examine the 'totality of [defendant's] presentation'"); *see also Miller v. California*, 413 U.S. 15, 24 (1973) (requiring determination of "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value" in assessing "obscenity").

quantitative than qualitative, asking whether the literal and imitative or the creative elements predominate in the ***work***") (emphases added).[7]

Were it otherwise, the "transformative use" test would lead to absurd results. For example, an unauthorized biography of Keller, which included photographs of him wearing his college football uniform or playing college football, would be strictly prohibited. So too would a motion picture about a fictional college football player that incorporated historical footage of actual college football games and named actual college football players. The First Amendment cannot be read to permit such speech-limiting results. *See*, *e.g.*, *Guglielmi*, 25 Cal.3d at 862 (Bird, C.J., concurring) (fictionalized television biography of actor Rudolph Valentino); *Hicks v. Casablanca Records*, 464 F.Supp. 426 (S.D.N.Y. 1978) (fictionalized book and movie about mystery writer Agatha Christie); *Taylor v. Nat'l Broad. Co.*, 22 Media L. Rep. (BNA) 2433, 1994 WL 780690 (Sept. 12, 1994) (unauthorized biography and television docudrama about actress Elizabeth Taylor); Restatement § 47, cmt. c ("[T]he right of publicity is not infringed by the dissemination of an unauthorized print or broadcast biography. Use of another's identity in a novel, play or motion picture is . . . not ordinarily an infringement"); *Tyne*, 901 So.2d 802

---

[7] *See also Winter*, 30 Cal.4th at 890 (finding that the characters are part of a "larger story, which is itself quite expressive"), *id.* at 891 ("What matters is whether ***the work*** is transformative"), and *id.* at 891 ("Here, as we have explained, ***the comic books*** are transformative and entitled to First Amendment protection") (emphases added).

(right of publicity claim brought by heirs of persons depicted in motion picture *The Perfect Storm*, and construing Florida's right of publicity statute to avoid encroaching on the First Amendment).

*ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915 (6th Cir. 2001) provides a useful analysis. In that case, artist Rick Rush created a painting prominently featuring the photorealistic image of Tiger Woods and several other professional golfers to commemorate Woods' historic victory at the 1997 Masters Tournament. Applying the "transformative use" test to Rush's painting, the Sixth Circuit concluded that, *viewed as an expressive whole*, Rush's painting was much more than a mere literal likeness of Woods:

> It is a panorama of Woods's victory at the 1997 Masters Tournament, with all of the trappings of that tournament in full view, including the Augusta clubhouse, the leader board, images of Woods's caddy, and his final round partner's caddy. *These elements in themselves are sufficient to bring Rush's work within the protection of the First Amendment.* The Masters Tournament is probably the world's most famous golf tournament and Woods's victory . . . was a historic event in the world of sports. *A piece of art that portrays a historic sporting event communicates and celebrates the value our culture attaches to such events. It would be ironic indeed if the presence of the image of the victorious athlete would deny the work First Amendment protection.* Furthermore, Rush's work includes not only images of Woods and the two caddies, but also carefully crafted likenesses of six past winners of the Masters Tournament: Arnold Palmer, Sam Snead, Ben Hogan, Walter Hagen, Bobby Jones, and Jack Nicklaus, a veritable pantheon of golf's greats. Rush's work conveys the message that Woods himself will someday join that revered group.

*Id.* at 936 (emphasis added).

Based on this conclusion, the Sixth Circuit distinguished Saderup's portrait in *Comedy III,* and held that Rush's painting, *when viewed as an expressive whole*, contained "substantial transformative elements":

> Unlike the unadorned, nearly photographic reproduction of the faces of The Three Stooges in *Comedy III*, Rush's work does not capitalize solely on a literal depiction of Woods. Rather, Rush's work consists of a collage of images *in addition to Woods's image* which are combined to describe, in artistic form, a historic event in sports history and to convey a message about the significance of Woods's achievement in that event. *Because Rush's work has substantial transformative elements, it is entitled to the full protection of the First Amendment. In this case, we find that Woods's right of publicity must yield to the First Amendment.*

*Id.* at 938 (emphasis added).

In this case, the District Court specifically declined to evaluate or even consider the context and manner in which the Alleged Likeness was used in the EA Games. By thus limiting its inquiry, the District Court misapplied the "transformative use" test and gave unconstitutionally short shrift to fundamental First Amendment freedoms.

## II.    THE DISTRICT COURT'S HOLDING UNDERSCORES THE NEED FOR A BRIGHT-LINE RULE EXEMPTING WORKS FOUND TO BE EXPRESSIVE FROM PUBLICITY RIGHTS LIABILITY.

The "transformative use" test is "subjective in application" and "unpredictable in outcome." McCarthy, § 8:72, p. 269. The District Court's holding exemplifies the problem, which originated with *Comedy III* itself.

In *Comedy III*, the defendant, Gary Saderup, sold lithographs and t-shirts bearing a likeness of the Three Stooges, which he had reproduced from one of his own charcoal drawings. The plaintiff sued under California's right of publicity statute, and Saderup defended on First Amendment grounds.

Rather than draw a dispositive distinction between "merchandise" (like the t-shirt at issue) and expressive works (like Saderup's original drawing), the California Supreme Court developed and applied its "transformative use" test. Under the Court's "transformative use" test, derived from the fair use doctrine in copyright law, the trier of fact must determine whether "the work in question adds significant creative elements so as to be *transformed* into something more than a mere celebrity likeness or imitation." *Id.* at 391 (emphasis added).

Rejecting Saderup's argument that "all portraiture involves artistic choices and creative decisions," the Court concluded that Saderup's drawing was "literal," "conventional" and, in the final analysis, "non-transformative." Based on this subjective artistic judgment, the California Supreme Court held that the plaintiff's right of publicity trumped Saderup's freedom of expression.

The Court was quick, however, to qualify its holding by observing that not all "celebrity portraiture" would be denied constitutional protection. By way of example, the Court cited Andy Warhol's famous portraits of celebrities such as Marilyn Monroe, Elizabeth Taylor and Elvis Presley. According to the Court,

Warhol's portraits would very likely qualify for protection because, despite their photorealism, they conveyed "a message that went beyond the commercial exploitation of celebrity images and became a form of ironic social commentary on the dehumanization of celebrity itself." *Comedy III*, 25 Cal.4th at 405.

While the distinctions between a Warhol portrait and a Saderup lithograph may be obvious to some, constitutional protection should not turn on those distinctions. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) (noting impossibility of drawing principled distinctions between a *Hustler* parody and other satire, and concluding that a *Hustler* parody was protected by First Amendment, even if it was low-brow or offensive); *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569 (1995) ("a narrow, succinctly articulable message is not a condition of constitutional protection"). The First Amendment broadly applies to all expressive works, without regard to the perceived quality of those works or to the reputations of their creators. It also applies regardless of whether a work may be adjudged "prosaic," "imaginative," "insipid," or "inspired."[8] By investing judges and juries with responsibility for making contested, ad hoc judgments regarding aesthetic merit, creative value, artistic purpose and/or "transformativeness," the "transformative use" test upends

---

[8] As Justice Holmes warned in *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251-52 (1903), it is a "dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits."

the First Amendment's objective neutrality, and provides filmmakers, artists and authors with little meaningful guidance about when they may use a "realistic" depiction of a public person in furtherance of their creative expression.  This uncertainty cannot help but cause self-censorship, and "deter all but the most courageous (not necessarily the most rational) from entering the marketplace of ideas."  Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* § 2:60 (3d ed. 2010).

Beyond its inherent subjectivity and fundamental unpredictability, the "transformative use" test is not sufficiently speech-protective.  *See* F. Jay Dougherty, *All the World's a Stooge: The "Transformativeness" Test for Analyzing a First Amendment Defense to a Right of Publicity Claim Against Distribution of a Work of Art*, 27 Colum. J.L. & Arts 1, 32 (2003) (characterizing the "transformative use" test as a "slender, effervescent wall to protect freedom of expression") [hereinafter "Dougherty"].

The right of publicity is a content-based regulation of speech.  *Bartnicki v. Vopper*, 532 U.S. 514, 521 (2001) (a speech regulation is content-based when it cannot be "justified without reference to the content of the speech"); *see* Dougherty, pp. 46-47 (the right of publicity "clearly regulates speech with full First Amendment protection" when it is "applied to prohibit the dissemination of

expressive works not used as advertisements").  It is thus subordinate to, and

fundamentally constrained by, the First Amendment.[9]

Under the First Amendment, all restrictions on expressive speech must be

subjected to "heightened scrutiny."  *See R.A.V. v. City of St. Paul*, 505 U.S. 377,

382 (1992) (statutes regulating content of speech are subject to the highest level of

scrutiny); *Sable Communications v. F.C.C.*, 492 U.S. 115, 126 (1989) (content-

based restrictions must be narrowly drawn to serve a compelling government

interest); *Guglielmi*, 25 Cal.3d at 866 (speech should be "free of government

restraint . . . unless there is a compelling reason to the contrary").[10]  Consistent

with this stringent standard of review, numerous courts have concluded that

expressive works are entitled to *full First Amendment protection* where they are

challenged by a publicity rights plaintiff.  *See, e.g.*, *Hoffman*, 255 F.3d at 1185-86

(First Amendment permits magazines to use celebrity names and likenesses in

feature articles); *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994) (use of

a person's name, features or life story in a literary work or motion picture is

absolutely protected by the First Amendment); *Daly v. Viacom, Inc.*, 238

F.Supp.2d 1118, 1123 (N.D. Cal. 2002) (dismissing publicity rights claim because

---

[9] The right of publicity is not enshrined in the Constitution; accordingly, it cannot reduce the scope of protection for expressive works under the First Amendment.

[10] Even content-neutral speech restrictions must meet intermediate scrutiny – the restriction must be narrowly tailored to further a substantial government interest. *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 642 (1994).

television program was expressive work subject to First Amendment); *Ruffin-Steinback v. De Passe*, 82 F.Supp.2d 723, 730 (E.D. Mich. 2000) (right of publicity does not prohibit depictions of a person's life story); *Seale v. Gramercy Pictures*, 949 F.Supp. 331, 337 (E.D. Pa. 1997) (permitting use of plaintiff's name and likeness in a documentary); *Guglielmi*, 25 Cal.3d at 866 (permitting use of Rudolph Valentino's name and likeness in a fictional television program); *Hicks v. Casablanca Records*, 464 F.Supp. 426, 430 (S.D.N.Y. 1978) (right of publicity does not prohibit the fictionalization of an event in the life of a public figure); *Polydoros*, 67 Cal.App.4th at 325 (rejecting publicity rights claim on ground that motion picture was constitutionally protected); *Ann-Margret v. High Society Magazine, Inc.*, 498 F.Supp. 401 (S.D.N.Y. 1980) (First Amendment transcends right of publicity; magazine reprint of a photograph taken from a movie scene was fully protected); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 294 N.Y.S.2d 122, 129 (1968) (publication of a biography is "clearly outside the ambit of" the right of publicity).

Notwithstanding the constitutional deference typically given to expressive works, in *Comedy III*, the Court did not mention, much less consider, the First Amendment's traditional content-based standards of review. Instead, the Court created and applied its novel "transformative use" test.

While the "transformative use" test is no doubt well-intended, the MPAA believes that it significantly undermines the broad protection historically accorded to expressive works. First, under the "transformative use" test, publicity rights defendants are specifically required to prove how the plaintiff's persona has been "transformed." *See Comedy III*, 25 Cal.4th at 407 (noting that "transformativeness" is an affirmative defense). Plaintiffs, by contrast, have no corresponding obligation to justify the restrictions they seek to impose on the defendant's speech. This is a potentially dangerous inversion of the typical First Amendment analysis, *see Sable Commun.*, 492 U.S. at 126; *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) (affirming that party seeking to restrict speech bears the burden of justifying that restriction, and noting that, if it were otherwise, speech would be deterred "because of the fear that liability will unjustifiably result"); *see also Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1042 (1986) (plaintiff is required to plead and prove a falsehood in defamation actions), and it could frustrate the early resolution of publicity rights litigations. *See Winter*, 30 Cal.4th at 891-92 ("'unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights'" (citation omitted)); *Kirby*, 144 Cal.App.4th at 50 ("[i]n cases involving free speech, a speedy resolution is desirable . . .").

Second, due to its inherent indeterminacy, the "transformative use" test may be misunderstood by some courts to require publicity rights defendants to establish something more than a minimum amount of new expression, artistic meaning, or creative purpose *before an action can be dismissed as a matter of law*.[11]  Any such requirement is plainly inconsistent with the "high purposes" of the First Amendment.  More practically though, it potentially increases the cost of defending publicity rights litigation, however meritless the plaintiff's claim may be.  As the U.S. Supreme Court noted in another context, speech is not simply chilled by successful litigation; it is likewise chilled by the threat and conduct of protracted litigation, even if the publicity rights plaintiff may ultimately lose.  *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 214 (2000) ("Competition is deterred . . . not merely by successful suit but by the plausible threat of successful suit").

The MPAA believes that the time has come for a clearly defined categorical exemption protecting expressive works.  In *Hilton*, this Court recently asked, but did not answer, the question of "whether the First Amendment furnishes a defense to misappropriation of publicity that is *broader than the transformative use or*

---

[11] The quantum of "transformativeness" that may prove necessary to avoid protracted litigation is a conundrum.  That uncertainty is compounded by the fact that the California Supreme Court's two "transformative use" cases fall at or near the outer edges of its test – *i.e.*, the realistic likeness in *Comedy III* and the half-worm, half-human creatures in *Winter*.

*public interest defenses*." *Hilton*, 599 F.3d at 909 n.11 (emphasis added). To promote continued creativity, as well as a free and open exchange of ideas, this Court should affirm that the *constitutional freedom of speech* trumps the *commercial right of publicity* in cases involving an expressive work.[12] It should also affirm that all works found to be expressive *are categorically exempt from publicity rights liability*. This will re-align publicity rights law with bedrock constitutional principles, and restore the First Amendment to its rightful predominance and historic breadth.

## III. ABSENT A CATEGORICAL EXEMPTION FOR EXPRESSIVE WORKS, THIS COURT SHOULD RECOGNIZE AN ADDITIONAL "ARTISTIC RELEVANCE" DEFENSE TO RIGHT OF PUBLICITY CLAIMS.

Absent categorical constitutional protection for expressive works, the MPAA believes that the "artistic relevance" defense should be recognized, *in addition to the "transformative use" test*, as a complete defense to right of publicity claims, particularly where those claims involve the actual name or the "realistic" depiction of a personality.

The "artistic relevance" test was first articulated in *Rogers*. It was subsequently adopted by this Circuit, most recently in *E.S.S.*, 547 F.3d at 1099.

---

[12] Importantly, a categorical exemption will not leave public personalities without recourse for the misuse of their identity. Other causes of action – including defamation, false light invasion of privacy and public disclosure of private facts – would remain available in California in appropriate cases.

In *Rogers*, 875 F.2d at 996-97, Ginger Rogers claimed that the title of a movie called "Ginger and Fred" gave rise to a false impression that it depicted her famous collaboration with dancer Fred Astaire, when in fact it portrayed two fictional cabaret performers who imitated, and were thus nicknamed, Rogers and Astaire. Alleging a misappropriation of her identity, Rogers asserted both Lanham Act and right of publicity claims. *Id.*

As a threshold matter, the Second Circuit noted that "[m]ovies, plays, books, and songs are all indisputably works of artistic expression and deserve protection." *Id.* at 997. It then rejected Rogers' contention that the First Amendment applies only where an author has no alternative avenues of expression, before resolving to construe the Lanham Act narrowly to avoid any undue trespass on First Amendment freedoms. *Id.* at 998-99.

To strike a balance between Rogers' commercial rights and the filmmakers' freedom of speech, the Second Circuit articulated the "artistic relevance" test:

> We believe that in general the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, *that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.*

*Id.* at 999 (emphasis added).[13]

Applying the "artistic relevance" test to Rogers' claims, the Second Circuit determined that the film's title bore an "ironic meaning that is relevant to the film's content," and concluded that whatever source confusion the film's title might generate was outweighed by competing First Amendment interests. *Id.* at 999-1001. Based on these findings, the Second Circuit summarily adjudicated Rogers' claims in favor of the defendant filmmakers. *Id.* at 1000-05.

Following *Rogers*, the "artistic relevance" test has been applied by this Court and others to the use of names, likenesses and other source identifiers in the body, as well as the title, of expressive works. *See*, *e.g.*, *E.S.S.*, 547 F.3d at 1099 (applying "artistic relevance" test to video game); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (applying "artistic relevance" test to song); *ETW Corp.*, 332 F.3d at 928 (applying "artistic relevance" test to painting); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F.2d 490, 495 (2d Cir. 1989) (applying "artistic relevance" test to study guide); *The Romantics v.*

---

[13] In *Rogers*, the Second Circuit found support for its "artistic relevance" test in *Guglielmi*. *Rogers*, 875 F.2d at 1004. In *Guglielmi*, the court concluded that a television broadcast, entitled "Legend of Valentino: A Romantic Fiction," was not "wholly unrelated to the individual," but cautioned that "[a] different result may follow if, for example, respondents had published Rudolph Valentino's Cookbook and neither the recipes nor the menus described in the book were in any fashion related to Rudolph Valentino." 25 Cal.3d at 865 n.6.

*Activision Publ'g, Inc.*, 574 F.Supp.2d 758 (E.D. Mich. 2008) (applying "artistic relevance" test to video game).

Although the "artistic relevance" test has been most often applied in the Lanham Act context, several courts, including the Second and the Sixth Circuits, have applied the "artistic relevance" test to publicity rights claims as well. *See, e.g., Rogers*, 875 F.2d at 1004-05 (applying "artistic relevance" test to right of publicity claim); *Parks*, 329 F.3d at 460 (same); *The Romantics*, 574 F.Supp.2d 758 (same).[14]

The MPAA believes that the "artistic relevance" test presents a useful *additional* defense in publicity right cases, particularly those involving the name or the "realistic" depiction of a public person in an expressive work.

The "artistic relevance" test is confined to two simple, straightforward inquiries. As applied by this Court, the "artistic relevance" test does not require any judgments about whether the depiction at issue was *absolutely necessary* to the goals of the artist. *See E.S.S.*, 547 F.3d at 1100; *Rogers*, 875 F.2d at 999 (rejecting "no alternative avenues" test). A court need only determine whether that depiction bears *some minimal* artistic relevance – *i.e.*, greater than "no relevance

---

[14] *See also Parks*, 329 F.3d at 460 (observing that "a right of publicity claim is similar to a [Lanham Act] false advertising claim in that it grants a celebrity the right to protect an economic interest in his or her name"); *Kirby*, 144 Cal.App.4th at 57 (noting that the Lanham Act is the "federal equivalent" of a right of publicity claim).

whatsoever" – to the underlying work. "In other words, the level of relevance merely must be above zero." *E.S.S.*, 547 F.3d at 1100.

With respect to the second prong of the "artistic relevance" test, the key inquiry is whether the work at issue "explicitly misleads" the public as to the source or sponsorship of the work. Importantly, the mere use of a name or likeness, *standing alone*, is insufficient to make that use "explicitly misleading." *Id.* at 1100. Indeed, this Court has affirmed that if "mere use" were enough, *Rogers* would become a "nullity." *Mattel*, 296 F.3d at 902.

Under the "artistic relevance" test, expressive works should be protected from publicity rights liability unless the name or likeness at issue bears *zero relevance* to the content of the work, or unless the use is so *explicitly misleading* as to represent a disguised commercial advertisement for the sale of goods. By focusing on these two limited inquiries, the "artistic relevance" test gives clear, reliable and objective definition to the scope of the right of publicity.

## IV. NEITHER THE "PUBLIC AFFAIRS" DEFENSE NOR THE "PUBLIC INTEREST" DEFENSE IS CONFINED TO TRADITIONAL "REPORTING."

Once a celebrity, like plaintiff, enters the limelight, the First Amendment dictates that the expressive use of that celebrity's likeness should be given broad scope. *See Comedy III*, 25 Cal.4th at 403; *Ann-Margret*, 498 F.Supp. at 405 ("use of a person's name or picture in the context of an event within 'the orbit of public

interest and scrutiny' . . . can rarely form an actionable claim under the [right of publicity]"); *Eastwood v. Superior Ct.*, 149 Cal.App.3d 409, 421 (1983) ("[p]ublication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it, cannot ordinarily be actionable").

Under California law, speech rights transcend publicity rights where the expression concerns "newsworthy" events or topics of "public interest." *E.g.*, *Dora*, 15 Cal.App.4th at 545-46. The public interest defense extends "to almost all reporting of recent events," as well as to publications about "people who, by their accomplishments, mode of living, professional standard or calling, create a legitimate and widespread attention to their activities." *Eastwood*, 149 Cal.App.3d at 422.

California Civil Code Section 3344(d) codifies and expands the "public interest" or "newsworthiness" defense. It provides that the "use of a name, voice, signature, photograph, or likeness in connection with any news, *public affairs*, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required . . . ." Cal. Civ. Code § 3344(d); *Dora*, 15 Cal.App.4th at 545 (noting distinction between "news" and "public affairs" and presuming that the "Legislature intended that the category of public affairs would include things that would not necessarily be considered news").

"California courts have indicated that § 3344(d) should be interpreted to cover a broad range of material." *Baugh v. CBS, Inc.*, 828 F.Supp. 745, 754 (N.D. Cal. 1993); *see also Paulsen v. Personality Posters, Inc.*, 299 N.Y.S.2d 501, 506 (Sup. Ct. 1968) ("[t]he scope of the subject matter which may be considered of 'public interest' or 'newsworthy' has been defined in the most liberal and far-reaching terms").

To fall within the "public affairs" or "public interest" exceptions to the right of publicity, the information at issue does not need to be "news" in the strict sense of the word – "entertainment features receive the same constitutional protection as factual news reports." *Gionfriddo v. Major League Baseball*, 94 Cal.App.4th 400, 410 (2001). Indeed, courts have held that newsworthy matters encompass almost anything, including "the accomplishments, everyday lives, and romantic involvements of famous people." *Michaels v. Internet Entm't Group*, 5 F.Supp.2d 823, 839 (C.D. Cal. 1998); *Dora*, 15 Cal.App.4th at 543 ("matters in the public interest are not 'restricted to current events; magazines and books, radio and television may legitimately inform and entertain the public with the reproduction of past events, travelogues and biographies'") (citation omitted).

Neither the "public interest" defense nor the "public affairs" defense is limited to traditional reporting. (*Cf.* Order, pp. 10-15.) These defenses also cover

documentaries and docudramas, both of which seek to represent or depict some aspect of reality.

 *Dora* is instructive. That case involved the unauthorized use of the plaintiff's name and likeness in a surfing documentary, *not a news publication or broadcast*. Reasoning that "public interest attaches to people who by their accomplishments or mode of living create a bona fide attention to their activities," (*id.*, 15 Cal.App.4th at 542), the court construed the "public affairs" defense broadly. Based on this broad construction, the court held that the defendant's use of the plaintiff's name and likeness was fully protected by Section 3344(d):

> [W]e find that surfing is of more than passing interest to some. It has created a lifestyle that influences speech, behavior, dress, and entertainment, among other things.
>
> \*    \*    \*
>
> Surfing has also had a significant influence on the popular culture, and in that way touches many people. It would be difficult to conclude that a surfing documentary does not fall within the category of public affairs.

*Id.* at 546.

## CONCLUSION

 The real world is a wellspring of inspiration and ideas for filmmakers, authors and artists. To promote continued creativity, as well as the free and open exchange of ideas, this Court should affirm that all expressive works, including

motion pictures, are fully protected from publicity rights liability under the First

Amendment.

     RESPECTFULLY SUBMITTED this 7th day of September, 2010.

                    LOEB & LOEB LLP
                    DOUGLAS E. MIRELL
                    W. ALLAN EDMISTON

               By: /s/ W. Allan Edmiston
                    W. ALLAN EDMISTON
                    Attorneys for *Amicus Curiae*
                    MOTION PICTURE ASSOCIATION
                    OF AMERICA, INC.

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 29(d) and Ninth Circuit Rule 32-1, I certify that this *Amicus* brief complies with the type-volume limitation of Rule 29(d) and Rule 32(a)(7)(B).  The text of this brief is proportionally spaced, has type face of 14-points, and contains 6,931 words, excluding the motion, table of contents, table of authorities and certificates of compliance and service.

RESPECTFULLY SUBMITTED this 7th day of September, 2010.

LOEB & LOEB LLP
DOUGLAS E. MIRELL
W. ALLAN EDMISTON


By: /s/ W. Allan Edmiston
   W. ALLAN EDMISTON
   Attorneys for *Amicus Curiae*
   MOTION PICTURE ASSOCIATION
   OF AMERICA, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 7, 2010, I caused the foregoing *Amicus* brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  September 7, 2010        */s/* Valent Manssourian