No. 10-15387

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SAMUEL MICHAEL KELLER, on behalf of
himself and all others similarly situated,

*Plaintiff-Appellee*

v.

ELECTRONIC ARTS, INC.; NATIONAL
COLLEGIATE ATHLETICS ASSOCIATION;
and COLLEGIATE LICENSING COMPANY,

*Defendants-Appellants*

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
Dist. Ct. No. C 09-1967 CW

BRIEF *AMICUS CURIAE* IN SUPPORT OF APPELLANTS BY
ADVANCE PUBLICATIONS, A&E TELEVISION NETWORKS,
ALLIED DAILY NEWSPAPERS OF WASHINGTON, ASSOCIATION OF
AMERICAN PUBLISHERS, ACTIVISION, CALIFORNIA NEWSPAPER
PUBLISHERS ASSOCIATION, CAPCOM USA, COMIC BOOK LEGAL DEFENSE
FUND, E! ENTERTAINMENT TELEVISION, ESPN, FIRST AMENDMENT
COALITION, FIRST AMENDMENT PROJECT, FREEDOM COMMUNICATIONS,
THE GANNETT COMPANY, GAWKER MEDIA, HYBRID FILMS, ITV STUDIOS,
KONAMI DIGITAL ENTERTAINMENT, THE LOS ANGELES TIMES,
THE MCCLATCHY COMPANY, NAMCO BANDAI GAMES AMERICA,
ORIGINAL PRODUCTIONS, THE PRESS-ENTERPRISE COMPANY,
RADIO TELEVISION DIGITAL NEWS ASSOCIATION, SIRENS MEDIA,
TAKE TWO INTERACTIVE SOFTWARE, THQ, VIACOM, THE WASHINGTON
NEWSPAPER PUBLISHERS ASSOCIATION, AND WENNER MEDIA

*Counsel for Amici:*

Nathan Siegel
Lee Levine
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, Northwest, Suite 800
Washington, District of Columbia 20036
Telephone: (202) 508-1100

*(list of additional counsel continued inside)*

*Of Counsel:*

Richard A. Bernstein
Neil M. Rosenhouse
Sabin, Bermant & Gould LLP
Four Times Square, 23rd Floor
New York, New York 10036
*Counsel for Advance*
  *Publications, Inc.*

Darci J. Bailey
A&E Television Networks
235 East 45th Street
New York, New York 10017
*Counsel for A&E*
  *Television Networks*

Jonathan Bloom
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for Association of*
  *American Publishers, Inc.*

George Rose
Activision Blizzard, Inc.
3100 Ocean Park Boulevard
Santa Monica, CA 90405
*Counsel for Activision*
  *Blizzard, Inc.*

Thomas W. Newton
California Newspaper
Publishers Association
708 10th Street
Sacramento, CA  95814
*Counsel for California Newspaper*
  *Publishers Assn.*

Hiro Tachibana
Capcom U.S.A., Inc.
800 Concar Drive, Suite 300
San Mateo, California 94402
*Counsel for Capcom U.S.A., Inc.*

David Pahl
Eleanor Devane
ESPN, Inc.
ESPN Plaza
Bristol, CT 06011
*Counsel for ESPN, Inc.*

Peter Scheer
First Amendment Coalition
534 4th Street, Suite B
San Rafael, CA 9490
*Counsel for First*
  *Amendment Coalition*

Rachel Sagan
Freedom Communications, Inc.
17666 Fitch
Irvine, CA 92614-6022
*Counsel for Freedom*
  *Communications, Inc.*

Barbara W. Wall
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA  22107
*Counsel for Gannett Co., Inc.*

Cameron Stracher
One Park Avenue, 3rd Fl.
New York, NY 10016
*Counsel for Hybrid Films, Inc.*

Ivan Garel-Jones
ITV Studios, Inc.
15303 Ventura Blvd., Bldg. C,
Suite 800
Sherman Oaks, CA 91403
*Counsel for ITV Studios, Inc.*

Peter Steckelman
Konami Digital Entertainment, Inc.
2381 Rosecrans Avenue, Suite 200
El Segundo, CA  90245
*Counsel for Konami Digital*
  *Entertainment, Inc.*

Karlene W. Goller
Los Angeles Times
Communications LLC
202 West First Street, Fifth Floor
Los Angeles, California 90012
*Counsel for L.A. Times*
  *Communications LLC*

Stephen J. Burns
The McClatchy Company
2100 Q Street
Sacramento, California  95816
*Counsel for The McClatchy*
  *Company*

Janna Smith
Namco Bandai Games America Inc.
4555 Great America Parkway,
Second Floor
Santa Clara, CA 95054
*Counsel for Namco Bandai Games*
  *America, Inc.*

Laura Icken
Original Productions
308 W. Verdugo Avenue
Burbank, CA 91502
*Counsel for Original Productions*

Kathleen Kirby
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
*Counsel for The Radio Television*
  *Digital News Assn.*

Seth Krauss
Take-Two Interactive Software, Inc.
622 Broadway
New York, NY 10012
*Counsel for Take-Two Interactive*
  *Software, Inc.*

Edward L.  Kaufman
David Anderson
THQ Inc.
29903 Agoura Road
Agoura Hills, CA 91301
*Counsel for THQ Inc.*

Mark C. Morril
Viacom Inc.
1515 Broadway
New York, NY  10036
*Counsel for Viacom Inc.*

Dana J. Rosen
Wenner Media
1290 Avenue of the Americas
New York, New York  10104
*Counsel for Wenner Media*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

CORPORATE DISCLOSURE STATEMENT ......................................vi

STATEMENT OF THE INTERESTS OF *AMICI* ..................................1

SUMMARY OF ARGUMENT ............................................................1

ARGUMENT ..................................................................................3

I.     THE DISTRICT COURT'S APPLICATION OF THE "TRANSFORMATIVE USE" TEST VIOLATES WELL-SETTLED PRINCIPLES PROTECTING FREEDOM OF EXPRESSION ....................................................3

II.    THE LAW GOVERNING THE RELATIONSHIP BETWEEN THE FIRST AMENDMENT AND THE RIGHT OF PUBLICITY NEEDS TO BE CLARIFIED ..............................7

III.   THIS COURT SHOULD ADOPT THE *ROGERS* TEST ..........................12

     A.    The *Rogers* Test Recognizes that the Right of Publicity Raises First Amendment Issues More Akin to Those Created by Trademark Law than Copyright Law..................................................................12

     B.    The *Rogers* Test Recognizes that the Right of Publicity Is a Content-Based Restriction On Speech ............................................................21

     C.    The *Rogers* Test Is Clearer and More Widely Applied..........................................................................25

CONCLUSION ..............................................................................29

# TABLE OF AUTHORITIES

## CASES

*20th Century Music Corp. v. Aiken*, 422 U.S. 151 (1975) ........................... 13

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605
    (2d Cir. 2006) ...................................................................... 5

*C.B.C. Distribution & Marketing v. Major League Baseball
    Advanced Media,* 505 F.3d 818 (8th Cir. 2007) .........10, 12, 14, 19, 22

*CBS Interactive Inc. v. National Football League Players
    Association*, 259 F.R.D. 398 (D. Minn. 2009) ................................... 10

*Cardtoons, L.C. v. Major League Baseball Players
    Association*, 95 F.3d 959 (10th Cir. 1996) ...............................*passim*

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984) ........ 21

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*,
    25 Cal. 4th 387 (2001) ..............................................................*passim*

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*,
    600 F.2d 1184 (5th Cir. 1979) .......................................................... 13

*Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003) .............................. 8, 9

*ETW Corp. v. Jireh Public, Inc.*, 332 F.3d 915 (6th Cir. 2003) ......... 9, 14, 19

*Eastwood v. Superior Court*, 149 Cal. App. 3d 409 (1983) ......................... 28

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.,*
    547 F.3d 1095 (9th Cir. 2008) ................................................... 11, 20

*Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986) ............................................. 13

*Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001) ........... 13

*Glendale Associates, Ltd. v. NLRB*, 347 F.3d 1145 (9th Cir. 2003) ............. 21

*Goldstein v. California*, 412 U.S. 546 (1973) ............................................ 18

*Guglielmi v. Spelling-Goldberg Productions*,
    25 Cal. 3d 860 (1979) .......................................................... 4, 7, 8, 22

*Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*,
    202 F.2d 866 (2d Cir. 1953) ............................................................ 13

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985) ........................................................................ 13

*Hicks v. Casablanca Records*, 464 F. Supp. 426 (S.D.N.Y. 1978) ............... 4

*Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010) ............... 3, 8, 9, 11

*Hoepker v. Kruger*, 200 F. Supp. 2d 340 (S.D.N.Y. 2002) .......................... 16

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) ............ 8

*International News Service v. Associated Press*, 248 U.S. 215 (1918) ........ 18

*Knievel v. ESPN, Inc.*, 393 F.3d 1068 (9th Cir. 2005) ................................. 26

*Los Angeles News Service v. Tullo*, 973 F.2d 791 (9th Cir. 1992) ............... 15

*Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792
    (9th Cir. 2003) .................................................................................. 5

*New York Times Co. v. Sullivan*, 276 U.S. 254 (1964) ................................ 23

*Palmer v. Schonhorn Enterprises*, 232 A.2d 458
    (N.J. Super. Ct. 1967) ..................................................................... 10

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) ....................... 25, 26

*Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007),
    *amended on other grounds by* 508 F.3d 1146 (9th Cir. 2007) ............. 5

*Reed v. Town of Gilbert, Ariz.*, 587 F.3d 966 (9th Cir. 2009) ..................... 22

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)................................*passim*

*Romantics v. Activision Publishing, Inc.*, 574 F. Supp. 2d 758
    (E.D. Mich. 2009)............................................................................ 10

*Ruffin-Steinback v. dePasse*, 267 F.3d 457 (6th Cir. 2001) ........................... 4

*Seale v. Grammercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996)............ 4, 25

*Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200 (1998) ........... 23, 26

*Solano v. Playgirl, Inc.*, 292 F.3d 1078 (9th Cir. 2002) .............................. 28

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ............................................................................ 5

*Tyne v. Time Warner Entertainment Co.*, 901 So. 2d 802 (Fla. 2005)... 3, 4, 8

*Uhlaender v. Henricksen*, 316 F. Supp. 1277 (D. Minn. 1970) ................... 10

*Valentine v. CBS, Inc.*, 698 F.2d 430 (11th Cir. 1983) ................................. 4

*Winter v. D.C. Comics*, 30 Cal. 4th 881 (2003)........................................ 6, 9

*Zacchini v. Scripps-Howard Broadcasting Co.*, 351 N.E.2d 454
    (Ohio 1976) .............................................................................. 16, 17

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977)16. 18, 19

## STATUTES

Cal. Civ. Code 3344(d)................................................................................ 15

Cal. Civ. Code 3344.1(a)(2)......................................................................... 16

# MISCELLANEOUS

D. Zimmerman*, Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights,* 50 B.C. L. Rev. 1503 (Dec. 2009) ........................................................................ 9, 14

*Restatement (Third) of the Law of Unfair Competition* §§ 46, 47 ....... 2, 9, 14

S. Dogan & M. Lemley*, What the Right of Publicity Can Learn from Trademark Law,* 58 Stan. L. Rev. 1161 (2006)............ 12, 14, 18

T. Cotter & I. Dmietrieva, *Integrating the Right of Publicity with First Amendment and Copyright Preemption Analysis*, 33 Colum. J. L. & Arts 165 (Winter 2010) ............................................................ 18

Thomas J. McCarthy, *The Rights of Publicity & Privacy*, §§ 8:34, 8:38 (2010) ..................................................................................... 12

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29(c) and 26.1 of the Federal Rules of Appellate Procedure, *amici* provide the following disclosures of corporate identity:

**Advance Publications, Inc.**, directly and through its subsidiaries, publishes over 18 magazines with nationwide circulation, daily newspapers in over 20 cities (including *The Oregonian* in Portland, Oregon), and weekly business journals in over 40 cities throughout the United States.  It also owns, directly or through its subsidiaries, many internet sites and has interests in cable systems serving over 2.3 million subscribers. Advance Publications, Inc. has no parent corporations, and no publicly held corporation owns 10% or more of its stock.

**A&E Television Networks ("AETN")** is an award-winning, international media company offering consumers a diverse communications environment ranging from television programming, to home videos/DVDs and music CDs, to Web sites, as well as supporting nationwide educational initiatives.  AETN's properties include A&E Network, HISTORY, Crime & Investigation Network, BIO: The Biography Channel, Lifetime, Lifetime Movie Network, A&E IndieFilms, and AETN Consumer Products, among others.  AETN is a Delaware LLC and is owned by Hearst Communications,

Inc., Disney/ABC International Television, Inc., and NBC A&E Holding, Inc.

**Allied Daily Newspapers of Washington, Inc.** is a not-for-profit association representing 24 daily newspapers serving the state of Washington and the Washington bureaus of the Associated Press.

**The Association of American Publishers, Inc.** ("AAP") is the national trade association of the U.S. book publishing industry. AAP's members include most of the major commercial book publishers in the United States, as well as smaller and non-profit publishers, university presses, and scholarly societies. AAP members publish hardcover and paperback books in every field, educational materials for the elementary, secondary, postsecondary, and professional markets, scholarly journals, computer software, and electronic products and services. AAP represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

**Activision Blizzard, Inc.** ("Activision") is a worldwide pure-play online and console game publisher whose portfolio includes best-selling video games such as Call of Duty, Guitar Hero, Tony Hawk, Spider-Man, and James Bond, as well as leading on-line franchises such as Worlds of Warcraft and Starcraft. Activision is a publicly-traded company which is

majority owned and controlled by Vivendi S.A., a publicly held company based in Paris, France.

**The California Newspaper Publishers Association** ("CNPA") is a non-profit trade association representing more than 800 daily, weekly and student newspapers in California. CNPA has defended the First Amendment rights of publishers to disseminate and the public to receive news and information for well over a century.

**Capcom U.S.A., Inc.** ("Capcom USA") is a leading developer, publisher and distributor of interactive entertainment for game consoles, PCs, handheld and wireless devices for the North American, European and Latin American markets. Capcom USA is a wholly owned subsidiary of Capcom Co. Ltd., a publicly traded company in Japan.

**The Comic Book Legal Defense Fund** ("CBLDF") is a non-profit organization dedicated to the protection of the First Amendment rights of the comics art form and its community of retailers, creators, publishers, librarians and readers. With a membership that includes comic book creators, publishers, retailers, and aficionados, the CBLDF has defended dozens of First Amendment cases in courts across the United States, and led important education initiatives promoting comics literacy and free expression.

**E! Entertainment Television, Inc.** is one of the world's largest producers and distributors of entertainment news and lifestyle-related programming. E! Entertainment Television operates E!, a television network with programming dedicated to the world of entertainment; The Style Network, dedicated to style, beauty, fashion and home design; and E! Online and Mystyle.com. E! is currently available to more than 97 million cable and satellite subscribers in the United States, and The Style Network currently counts more than 65 million subscribers. The ultimate parent company of E! Entertainment Television is Comcast Corporation, a publicly-traded company.

**ESPN, Inc.** ("ESPN") is the largest sports media company in the world. In the United States, it owns and operates multiple cable television networks, a radio network, multiple sports internet sites, a broadband network, multiple magazines, and a program syndication business. ESPN produces news, documentaries, and fantasy sports games among many other forms of content. The Walt Disney Company is one of two ultimate parent companies of ESPN, and it issues shares of stock to the public. ESPN's second ultimate parent company, The Hearst Corporation, is privately held.

**The First Amendment Coalition** is a non-profit public interest organization dedicated to advancing free speech and open-government

rights.  A membership organization, the Coalition's activities include educational and informational programs, strategic litigation to enhance First Amendment and access rights for the largest number of citizens, legal information and consultation services, and legislative oversight of bills affecting free speech.  The Coalition's members are newspapers and other news organizations, bloggers, libraries, civic organizations, academics, freelance journalists, community activists—and ordinary individuals seeking help in asserting rights of citizenship.  The Coalition's offices are in San Rafael, California.

**First Amendment Project** ("FAP") is a nonprofit organization dedicated to providing free legal services on public interest free speech and free press matters.  FAP represents activists, journalists and artists who do not have the means to hire qualified private counsel and who seek to champion these fundamental civil liberties.  In this role, FAP has represented clients who have sought to use the persona of noteworthy persons for the purposes of political commentary, advocacy and artistic expression.  In such cases, the threat of a misappropriation lawsuit is a powerful deterrent to protected speech.  FAP has an interest on behalf of its clients in ensuring that right of publicity is interpreted narrowly so as to minimize the chill to protected speech.

**Freedom Communications**, headquartered in Irvine, California, is a national privately owned information and entertainment company of print publications, broadcast television stations and interactive businesses. The company's print portfolio includes more than 100 publications, including the *Orange County Register* and 27 daily newspapers, weekly newspapers, magazines and other specialty publications. The broadcast stations – five CBS, two ABC network affiliates and one CW affiliate – reach more than 3 million households across the country.

**Gannett Company, Inc.** ("Gannett") is an international news and information company that publishes 81 daily newspapers in the United States, including *USA Today*, as well as hundreds of non-daily publications. In broadcasting, the company operates 23 television stations in the United States with a market reach of more than 21 million households. Each of Gannett's daily newspapers and TV stations operate Internet sites offering news and advertising that is customized for the market served and integrated with its publishing or broadcasting operations. Gannett is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. JP Morgan Chase & Company owns more than 10% of Gannett stock.

**Gawker Media** is the publisher of some of the web's best loved titles, including *Gawker* (for news and entertainment), *Deadspin* (for sports), and

*Kotaku* (a gamer's guide), among others. With a readership in excess of 20 million monthly uniques, Gawker Media marries a traditional publishing model and an all-star editorial masthead with the audience engagement borne out of the candor, frequency and hyper-linking of the blog format. Gawker Media is a privately-held company.

**Hybrid Films, Inc.** is a New York-based independent production company that, since 1995, has produced award-winning reality, character-driven documentary, and factual, entertainment programming. Its recent programs include *Dog the Bounty Hunter* (currently in its sixth season), which portrays the life of legendary bounty hunter Duane "Dog" Chapman as he hunts down fugitives with the help of his wife and family, and *Parking Wars* (currently in its third season), which follows the Philadelphia and Detroit Parking Authorities as they come face to face with the citizens they ticket, boot and tow. Hybrid Films, Inc. is a privately-held company.

**ITV Studios, Inc.** is one of the largest international producers for the U.S. market and a major force in acquiring, developing and producing reality and scripted programming for U.S. networks. Its programs include *Hell's Kitchen* and *Kitchen Nightmares* for Fox, *I'm a Celebrity Get Me Out of Here* for NBC, *Nanny 911* for CMT, *WCG Ultimate Gamer* for Sci-Fi, *Celebrity Fit Club* for VH1, *First 48 and Steven Seagal – Lawman* for A&E,

*First Love Second Chance* for TV Land, and *Four Weddings* for TLC.  The parent company of ITV Studios, Inc. is ITV plc, a publicly-traded British corporation.  No publicly-held company holds more than 10% of the stock in ITV plc.

**Konami Digital Entertainment, Inc.** develops, publishes, and distributes entertainment content, including interactive entertainment software, for video game systems, personal computers, wireless devices, and the Internet in North America, Central America and South America. Konami Digital Entertainment, Inc. is 100% owned by Konami Corporation of America, which is 100% owned by Konami Corporation, a publicly-traded company.  No publicly-traded company holds 10% or more of the stock in Konami Corporation.

**The Los Angeles Times** is the largest metropolitan daily newspaper in the country, with a daily readership of 2 million and 3 million on Sunday, and a combined print and interactive local weekly audience of 4.5 million. The *Los Angeles Times* is published by Los Angeles Times Communications LLC, a wholly owned subsidary of Tribune Company, a privately held company.  Its Times Community News division publishes the *Newport Beach-Costa Mesa Daily Pilot*, *Coastline Pilot*, *Huntington Beach Independent*, *Glendale News-Press*, *Burbank Leader*, *Valley Sun*, *Brand X*,

and *Hoy*, which together with the *Los Angeles Times*, reach approximately 5.9 million or 44% of all adults in the Southern California marketplace. The Times maintains a number of websites including www.latimes.com, a leading source of national and international news, that draws over 10 million unique visitors monthly.

**The McClatchy Company** owns 30 daily newspapers in 29 U.S. markets, including *The Sacramento Bee*, *The Fresno Bee*, and *The Merced Sun-Star*, as well as *The Miami Herald*, *The Star-Telegram* of Fort Worth, *The Charlotte Observer*, and about 45 non-daily papers.  In each of its daily newspaper markets, McClatchy operates the leading local website, offering readers information, comprehensive news, advertising, e-commerce and other services.  More than 10% of the stock in the McClatchy Company is owned by Bestinver Gestion, a Spanish company.

**Namco Bandai Games America Inc.** ("Namco Bandai") is a leading interactive entertainment software publisher and developer based in Santa Clara, California.  The company is a part of the Namco Bandai group of companies known for creating and publishing many of the industry's top video game franchises including the Pac-Man, SoulCaliber, Naruto, and Tekken brands.  Namco Bandai is a wholly owned subsidiary of Namco

Bandai (USA) Inc., which is wholly owned by Namco Bandai Holdings Inc., a public company traded on the Tokyo Stock Exchange.

**Original Productions** is one of television's leading creators of unscripted reality programming. With award-winning shows like *Deadliest Catch*, *Ice Road Truckers*, and *Monster Garage*, Original Productions celebrates unheralded heroes in high risk, high reward situations. Original Productions is owned by FremantleMedia, a unit of Bertelsmann's RTL Group.

**The Press-Enterprise Company** publishes *The Press-Enterprise*, a daily newspaper published in Riverside, California that has won a Pulitzer Prize, as well as two U.S. Supreme Court cases recognizing the public's right of access to court proceedings. It has the largest circulation of any newspaper in Southern California's Inland Empire. The Press-Enterprise Company also publishes www.pe.com, an online source of news and information. The Press-Enterprise Company is wholly owned by A.H. Belo Corporation, which is a publicly-traded company. Belo Corporation owns ten percent or more of the shares of A.H. Belo Corporation.

**The Radio Television Digital News Association** ("RTDNA"), based in Washington, D.C., is the world's largest professional organization devoted exclusively to electronic journalism. RTDNA represents local and

network news directors and executives, news associates, educators and students in broadcasting, cable and other electronic media in over 30 countries.  RTDNA is committed to encouraging excellence in electronic journalism, and upholding First Amendment freedoms.

**Sirens Media** is an award-winning production company that specializes in reality television programs and documentaries, including *The Real Housewives of New Jersey* and *Stolen Voices, Buried Secrets*.  Sirens' works incorporate literal and realistic likenesses of individuals to tell compelling stories.  Sirens Media has no parent company and is not publicly traded.

**Take-Two Interactive Software, Inc.** ("Take-Two") is a leading worldwide publisher and developer of interactive entertainment software. Its Rockstar Games label develops the world famous Grand Theft Auto series and the best selling Max Payne, Midnight Club, and Red Dead Redemption series.  The 2K label develops games under the Irrational, 2K Games, 2K Sports, and 2K Play brands, including the famous Civilization, Bioshock, Borderlands, NBA2K, NHL2K, and Major League Baseball video game series.  Take-Two is a publicly-held company.  Oppenheimer Funds, Inc. currently holds slightly more than 10% of its stock as does Icahn Capital, LP.

**THQ Inc.** is a leading worldwide developer and publisher of interactive entertainment software. The company develops its products for all popular game systems, personal computers and wireless devices. Headquartered in Los Angeles County, California, THQ sells products through its global network of offices located throughout North America, Europe and Asia Pacific. THQ Inc. is a publicly-held corporation and no public corporation owns 10% or more of its stock.

**Viacom Inc.** is a leading global entertainment media company that delivers entertainment content around the globe through television, motion pictures and a wide range of digital media, including mobile platforms and video games. Its family of prominent and respected brands includes MTV Networks (comprised of the MTV, VH1, Nickelodeon, Comedy Central, CMT and TV Land channels, among others), BET Networks, and Paramount Pictures. Viacom Inc. is a publicly-traded company, and no publicly held corporation owns 10% or more of its stock.

**Washington Newspaper Publishers Association** ("WNPA"), represents 110 community newspapers in Washington state. WNPA is an advocate for community newspapers, freedom of the press and open government. The association is dedicated to helping members advance

editorial excellence, financial viability, professional development, and a high standard of publication quality and community leadership.

**Wenner Media** publishes *Rolling Stone*, which has been honored with 15 National Magazine awards and is one of the country's premiere sources for music information and pop culture trends. Wenner Media also publishes *Us Weekly* and *Men's Journal*, and together the company's three titles reach more than 29 million readers. Wenner Media is privately held.

## STATEMENT OF THE INTERESTS OF *AMICI*

*Amici* are organizations that create and disseminate expressive speech to the public, including news, documentaries, films, television programs, fantasy sports games, video games, and many other types of content.  All *amici* expend considerable resources in an effort to comply with the vague and unpredictable legal standards that presently govern the right of publicity, and ask this Court to use this opportunity to clarify the law to be applied whenever personality-related rights are alleged to be violated by an expressive work.

Pursuant to Fed. R. App. P. 29, this brief is submitted together with a motion for leave to file it.  In addition, *amici* will also move for leave to file this brief in *Brown v. Electronics Arts* ("*Brown*"), because it addresses issues pertinent to that matter as well.

## SUMMARY OF ARGUMENT

It would be difficult to invent two related cases that more starkly illustrate the troubled state of the law concerning the relationship between the right of the publicity, the Lanham Act, and the First Amendment.  At bottom, these cases raise two primary concerns for *amici*, both of which support reversal of the district court's decision in this case ("*Keller*").  First, *amici* are deeply troubled by the district court's interpretation of the "transformative use" test, which seriously undervalues the First Amendment rights of content producers.  The transformative

use test does not, and constitutionally may not, solely consider how a plaintiff's identity literally appears in isolation, but rather evaluates the totality of the expressive work at issue.

Second, the district court's unprecedented application of the transformative use test illustrates why that test, and others that have been used within this jurisdiction, sow unnecessary confusion in the law and do not appropriately balance the right of publicity and the First Amendment. *Amici* respectfully suggest that this case presents a welcome opportunity for this Court to recognize an overriding First Amendment-based test applicable any time a plaintiff alleges that an expressive work violates the right of publicity, just as this Court has already done with respect to the Lanham Act. The most appropriate test is the one first articulated in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), and largely adopted by the *Restatement (Third) of the Law of Unfair Competition* ("Restatement"). The *Rogers* test best appreciates the relationship between the right of publicity and intellectual property law, most appropriately balances the right of publicity, the Lanham Act and the First Amendment, and would bring much-needed clarity to this important area of the law.

2

# ARGUMENT

## I. THE DISTRICT COURT'S APPLICATION OF THE "TRANSFORMATIVE USE" TEST VIOLATES WELL-SETTLED PRINCIPLES PROTECTING FREEDOM OF EXPRESSION

The district court held that California's "transformative use" defense to right of publicity actions only considers the extent to which a plaintiff's likeness is literally altered, regardless of the broader work in which the likeness appears. Slip Op. at 6-10. This was error. Indeed, the combination of the district court's interpretation of the "transformative use" and "public interest" tests, with the latter limited to "publication and reporting," *see Hilton v. Hallmark Cards*, 599 F.3d 894, 912 (9th Cir. 2010), would potentially call into question decades of well-settled law that is essential to the creation of many genres of expressive works. For example, in *Tyne v. Time Warner Entertainment Co.,* 901 So. 2d 802 (Fla. 2005), the Florida Supreme Court rejected a right of publicity claim challenging *The Perfect Storm*, a film loosely based on the story of a group of sailors lost at sea. Citing First Amendment concerns, *Tyne* held that the state's right of publicity statute only properly applies to works that "directly promote a product or service." *Id*. at 810.

If that case were brought in California, however, under the district court's logic, it could turn on whether the ship captain's identity (whose heirs were the plaintiffs) had been sufficiently altered or whether imaginative docudramas can be

said to involve "publication or reporting." Construing the law in this manner is counter-intuitive, since many works of this type strive to portray their subjects as realistically as possible within the context of a larger creative work. Indeed, the most realistic portrayals often receive the most critical acclaim, like Jamie Foxx's Academy Award-winning portrayal of Ray Charles in the movie *Ray* or Ben Kingsley's performance in *Gandhi*. In fact, it is clear that the California Supreme Court never intended for the "transformative use" test to be applied in this manner, since *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001), expressly confirmed the virtually absolute constitutional protection accorded to the use of names and likenesses in fictional and non-fictional works such as films, books and docudramas previously recognized in *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 3d 860 (1979) (Bird, C.J. concurring). *See Comedy III*, 25 Cal. 4th at 398-99. *See also Ruffin-Steinback v. dePasse*, 267 F.3d 457 (6th Cir. 2001); *Valentine v. CBS, Inc.*, 698 F.2d 430 (11th Cir. 1983); *Hicks v. Casablanca Records*, 464 F. Supp. 426 (S.D.N.Y. 1978); *Seale v. Grammercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996); *Tyne*, 901 So. 2d 802. It is important that this Court swiftly close the door on the kind of speech-chilling lawsuits that the district court's reasoning invites.

Indeed, the district court's interpretation of the transformative use test would effectively provide more legal protection for names and likenesses than

copyrighted expression receives, a position that no court has ever adopted and cannot be squared with the First Amendment. *Comedy III* borrowed the "transformative use" test from the fair use doctrine in copyright law, *Comedy III*, 25 Cal. 4th at 404, but the law of copyright has rejected the proposition that the test merely examines the plaintiff's protected expression in isolation. Rather, in copyright law, the test focuses on the purpose and context of the larger work which incorporates that expression. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 721 (9th Cir. 2007), *amended on other grounds by* 508 F.3d 1146 (9th Cir. 2007); *Mattel, Inc. v. Walking Mtn. Prods.*, 353 F.3d 792, 802 (9th Cir. 2003). For example, the test may assess the extent to which a work created as one genre of expression (such as a film) has been "transformed" by virtue of its inclusion in some other genre (such as a news report, or in this case, a video game). *Id.* In fact, many "fair use" disputes involve situations in which a work such as a photograph or video clip has not been changed at all, but rather has been incorporated in whole or in part into some other larger work. Yet courts have found that such uses may be transformative. *See, e.g., Perfect 10, Inc.* 508 F.3d. at 1164-66; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006). Even non-transformational uses of copyrighted materials may sometimes be fair when other fair use factors are considered. *See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). The California Supreme Court has never

suggested that it intended to apply a more restrictive test than does the law of copyright.

Indeed, the district court's logic suggests that the First Amendment would permit states to bar entirely the literal or near-literal replication of celebrity names and likenesses, regardless of the context or expressive value of the work in which that name or likeness appears. Such a presumptive *per se* ban on speech is not a balancing test at all, as the First Amendment plainly requires and the transformative use test is intended to be. *See Comedy III*, 25 Cal. 4th at 391; *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996).

Finally, the district court's reasoning also raises myriad practical concerns, because it encourages pointless gamesmanship to alter celebrities' appearances in expressive works. The court's logic suggests that if Appellant had only made athletes look "half human, half worm," *see Winter v. D.C. Comics*, 30 Cal. 4th 881 (2003), or some other fantastical construct, a closer First Amendment question would be presented. Indeed, it is ironic that the plaintiffs in both the *Keller* and *Brown* cases criticize Electronic Arts ("EA") for allegedly taking measures to "scramble" the likenesses of athletes, when the very construction of the law plaintiffs advocate effectively demands that EA or any other content producer do exactly that. For example, the putative class in this case excludes all athletes

whose alleged virtual equivalents are "not within one inch of the players' roster height and . . . . within 10% of the player's roster weight," Compl. ¶ 59, which implies that the First Amendment might protect EA's expression if only it had made its virtual avatars slightly shorter or thinner. The California Supreme Court long ago recognized that any construction of the right of publicity that encourages the artificial manipulation of expression merely to satisfy some abstract legal formula serves no one's interests and is repugnant to the First Amendment. *See, e.g., Guglielmi,* 25 Cal. 3d at 869 (Bird, J., concurring) ("No author should be forced into creating mythological worlds or characters wholly divorced from reality.").

The Appellant's brief persuasively sets forth all the myriad other reasons why the district court's understanding of the "transformative use" test was erroneous, and *amici* will not burden the Court by repeating them here. For all these reasons, EA's video games are "transformative" and the district court's decision in *Keller* should be reversed on that ground alone.

## II.   THE LAW GOVERNING THE RELATIONSHIP BETWEEN THE FIRST AMENDMENT AND THE RIGHT OF PUBLICITY NEEDS TO BE CLARIFIED

While this Court may choose to resolve these appeals by properly applying the transformative use test, it is no accident that application of that test has produced such confusion here. The present state of the law governing the

relationship between rights of publicity and free expression is highly fractured and unpredictable, perhaps more so than in any other area of contemporary First Amendment jurisprudence.  In this jurisdiction alone, courts have employed at least four different approaches in an effort to balance the First Amendment and the right of publicity:  the "transformative use" test; the "public interest" test, *Hilton*, 599 F.3d at 912; the "actual malice" test, *Hoffman v. Capital Cities/ABC, Inc.,* 255 F.3d 1180 (9th Cir. 2001); and ad hoc balancing that eschews any specific test, *Guglielmi,* 25 Cal. 3d 860.  Other jurisdictions employ yet more tests, *e.g., Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003) (recognizing the "predominant use" test) or appear to recognize essentially absolute First Amendment protection for expressive speech, *see, e.g., Tyne,* 901 So. 2d 802.

More importantly, the lack of coherent doctrine produces results that often seem difficult to reconcile, thus providing little guidance to creators of expressive works.  For example, with respect to pictorial works, *Comedy III* held that images of the Three Stooges were not transformative, but that similar images created by Andy Warhol would be, *see* 25 Cal. 4th at 408-09, a conclusion that would have been disputed by many art critics who once viewed Warhol as the quintessential knock-off artist.  *See, e.g.,* Hilton Kramer, *Art: Warhol Show at Jewish Museum*, The New York Times, Sept. 19, 1980 (1980 WLNR 181285).  Similarly, although this Court held that a greeting card might not be transformative because "the basic

setting [was] the same" as a scene in Paris Hilton's television show, *Hilton*, 599 F.3d at 911, the Sixth Circuit found that a painting of Tiger Woods surrounded by other famous golfers was protected by the First Amendment, even though the dissent argued that the image of Woods was "nearly identical" to a famous Nike poster. *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 959 (6th Cir. 2003) (Clay, J., dissenting).

Similarly, while the California Supreme Court applied the transformative use test to dismiss a claim concerning two comic book characters whose names ("Johnny and Edgar Autumn") evoked the plaintiff musicians "Johnny and Edgar Winter"), *see Winter*, 30 Cal. 4th 881, the Missouri Supreme Court applied the "predominant use" test to uphold a $15 million verdict in favor of a hockey player ("Tony Twist") who objected to a minor comic book character with a similar name ("Tony Twistelli"), *see TCI Cablevision*, 110 S.W.3d 363. This verdict drove a publisher of popular comic books into bankruptcy, a stark example of the very real impact on free expression such jurisprudence can create. *See* D. Zimmerman, *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503, 1507 (Dec. 2009).

The landscape is the same with respect to the expressive genre directly at issue in this case, as another district court applied a different test to dismiss right of publicity claims brought by musicians against an interactive music video game.

*See Romantics v. Activision Publ'g, Inc.,* 574 F. Supp. 2d 758 (E.D. Mich. 2009).

Courts have also recently applied the First Amendment to dismiss right of publicity

claims asserted by athletes challenging computer-based fantasy sports games, *see*

*C.B.C. Distribution & Marketing v. Major League Baseball Advanced Media, L.P.*,

505 F.3d 818 (8th Cir. 2007); *CBS Interactive Inc. v. National Football League*

*Players Ass'n*, 259 F.R.D. 398 (D. Minn. 2009), though several decades ago a

number of fantasy sports games in the pre-computer age were deemed actionable,

with little discussion of the First Amendment.  *See Uhlaender v. Henricksen*, 316

F. Supp. 1277 (D. Minn. 1970); *Palmer v. Schonhorn Enters.*, 232 A.2d 458 (N.J.

Super. Ct. 1967).

The current fractured state of the law has a substantial impact on expressive

speech related to popular figures.  Legal uncertainty inevitably incentivizes

litigation regardless of its merit, a phenomenon *amici* have collectively

experienced in the past decade.  Moreover, various tests originally formulated in

one particular context, such as the sale of t-shirts, inevitably bleed over into other

genres of speech and therefore call into question previously well-settled doctrine.

While only the Supreme Court can assure national uniformity, this Court's

decisions are especially influential because California is the epicenter of disputes

between public figures and creators of expressive works.  This Court recently

recognized that whether a broader First Amendment defense to right of publicity

actions exists presents an open question, *see Hilton*, 599 F.3d at 909, and *amici* submit that these cases provide a welcome opportunity to answer it.

If this Court reaches these broader First Amendment issues, *amici* join the Appellant in urging adoption of the test first articulated in *Rogers v. Grimaldi* and later ratified by the *Restatement*.  The *Rogers* test provides that the right of publicity is violated only where the use of the plaintiff's identity is either (1) "wholly unrelated" to the content of the underlying work or (2) is otherwise "simply a disguised commercial advertisement for the sale of goods or services." 875 F.2d at 1005.  Its adoption would be a logical extension of this Court's recent decision to embrace the slightly different test that *Rogers* applied to claims brought under the Lanham Act and correctly applied by the district court in *Brown*.  *See E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008).

The remainder of this brief compares the *Rogers* test to other existing tests, and demonstrates why (1) *Rogers* strikes the most appropriate balance between the right of publicity and the First Amendment, and (2) provides far more clarity and predictability than current law.

## III.  THIS COURT SHOULD ADOPT THE *ROGERS* TEST

### A.  The *Rogers* Test Recognizes that the Right of Publicity Raises First Amendment Issues More Akin to Those Created by Trademark Law than Copyright Law

The premise of the "transformative use" test is that names and likenesses are analogous to copyrighted expression.  *See Comedy III*, 25 Cal. 4th at 404. However, as a number of courts and commentators have pointed out, this premise is fundamentally flawed.  *See, e.g., C.B.C. Distribution & Mktg.*, 505 F.3d 818; *Cardtoons*, 95 F.3d at 976 ("The justifications for the right of publicity are not nearly as compelling as those offered for other forms of intellectual property"); S. Dogan & M. Lemley, *What the Right of Publicity Can Learn from Trademark Law*, 58 Stan. L. Rev. 1161, 1163-64 (2006).  As a result, legal standards borrowed from copyright law necessarily undervalue the First Amendment interests at stake in right of publicity cases and also share the practical difficulties that have always plagued the fair use doctrine in copyright law.  *See* Thomas J. McCarthy, *The Rights of Publicity & Privacy*, §§ 8:34, 8:38 (2010) (fair use is one of the most "nebulous" doctrines know to the law).  By contrast, the *Rogers* test implicitly and correctly treats trademark law as the closest cousin of the right of publicity, and balances the right of publicity and the First Amendment accordingly.

1.    **The "Transformative Use" Test Improperly Equates Copyright Law and the Right of Publicity**

Copyright law exists because it has been well-settled for centuries that the creation of certain categories of original expression has especially important social value and requires specific incentives to flourish. *See 20th Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). These principles are embodied in Article I, Section 8 of the Constitution itself, so restrictions on the use of copyrighted expression inherently do not trigger the First Amendment scrutiny applied to other statutory and common-law causes of action. *See Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187 (5th Cir. 1979). Moreover, copyright disputes inherently involve speech-protective interests on both sides of the scales because copyright law exists to facilitate new expression. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985). As a result, the balance copyright law strikes between the rights of copyright holders and others seeking to use copyrighted materials favors copyright holders, so exceptions are comparatively limited. *See Fisher v. Dees*, 794 F.2d 432, 435 (9th Cir. 1986).

By contrast, the right of publicity was first recognized in 1953, *see Haelan Labs, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866 (2d Cir. 1953), and does not protect expression at all. Rather, it exists primarily to maximize the economic rewards of celebrity, fame and achievement. *Comedy III*, 25 Cal. 4th at 400; *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 403 (2001). While

those interests undoubtedly have value, they are surely not as compelling or time-tested as those underlying copyright law.  *See C.B.C. Distribution & Mktg.,* 505 F.3d at 825; *Cardtoons*, 95 F.3d at 976.  Most importantly, they are not interests protected by the Constitution.

Moreover, as many courts and commentators have pointed out, there is scant evidence to suggest that broadly defined rights of publicity are necessary to incentivize people, including athletes, to undertake those activities that produced their fame.  *See Cardtoons*, 95 F.3d at 973 ("the analogy to the incentive effect of other intellectual property protections is strained"); *C.B.C. Distrib. & Mktg*., 505 F.3d at 824; *ETW Corp.,* 332 F.3d 915; *Restatement* § 46, cmt. c.; Zimmerman, 50 B.C. L. Rev. at 1521-22; Dogan & Lemley, 58 Stan. L. Rev. at 1186-90.  And in many right of publicity cases, incentives are already provided by copyright law.  For example, the Court in *Comedy III* emphasized the effort expended by the Three Stooges to create their own comedic brand, *see* 25 Cal. 4th at 399-400, but the fruits of those efforts are likely already rewarded by the protection copyright law affords to the films and television programs they created.

In short, the right of publicity and copyrights are not materially equivalent, and applying a virtually identical level of First Amendment scrutiny to both is a fundamentally flawed exercise.  Indeed, the relevant statutes make this clear.  California's right of publicity statute, for example, exempts all "news accounts"

from its reach, Cal. Civ. Code 3344(d), but news stories have been found to have infringed on the rights of copyright holders, *see, e.g., Los Angeles News Service v. Tullo,* 973 F.2d 791 (9th Cir. 1992).

Because the two doctrines are not materially equivalent, borrowing copyright law concepts such as a "transformative use" also creates the kind of practical enigmas evident in this case.  Copyright law deters physical copying of tangible expression, so the "transformative use" concept, along with many of the other fair use factors, is simply a quantitative and/or qualitative measure of copying forms of expression like a stanza of music or an excerpt of a novel. However, a person's name or likeness is not "expression" that can reasonably be equated to music or literature, so attempting to apply a test designed to measure whether someone gave new meaning to a song will necessarily produce the kind of conceptual conundrums that permeate this case – such as what does it mean to "transform" an athlete's name, weight, or jersey number.

At most, the "transformative use" test might be more defensible if it were limited to the facts of *Comedy III* and other so-called "merchandising" cases, which by definition involve little more than a stand-alone "copy" of a celebrity's

picture on products like t-shirts.[1]  In fact, with respect to deceased celebrities like the Three Stooges, the California legislature has since effectively limited the transformative use test to the facts of *Comedy III,* and adopted the *Rogers* test for virtually all other expressive works, including video games.[2]  The same logic supports the broader adoption of that test in all cases in which the right of publicity is allegedly violated by an expressive work.

### 2.    Borrowing from Copyright Law Is also Premised on Misreading the *Zacchini* Case

Analogies between the right of publicity and copyrights frequently begin with *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977), which was the starting point for the California Supreme Court's analysis in *Comedy III. Zacchini* posited a strong relationship between the ends of copyright law and the "right to the publicity value of his performance" claim asserted in that particular case.  *Id.* at 562.  However, as the Supreme Court expressly recognized, *Zacchini* was an unusual case quite unlike most right of publicity cases.  *See id.* at 574 n.10

---

[1] Even in that limited context the test would still raise troubling questions regarding whether establishing a preference for, as one court labeled it, "transformative art," *Hoepker v. Kruger*, 200 F. Supp. 2d 340, 349 (S.D.N.Y. 2002), as opposed to more realistic art is a constitutionally legitimate distinction.

[2] Cal. Civ. Code 3344.1(a)(2) now exempts any "audiovisual work" that is "fictional or non-fictional entertainment," unless "the claimant proves that this use is so directly connected with a product, article of merchandise, good, or service as to constitute an act of advertising, selling, or soliciting purchases of that product, article of merchandise, good or service." *Id.* at 3344.1(a)(3).

("the case before us is more limited than the broad category of lawsuits that may arise under the heading of 'appropriation'").

In most right of publicity cases, including this one, the plaintiff challenges the defendant's use of his or her persona to enhance the value of the defendant's expressive work.  The plaintiff in *Zacchini*, however, was not really complaining about the use of his name and likeness in the defendant's news broadcast; as the Court put it, he "[did] not merely assert that some general use, such as advertising, was made of his name or likeness."  *Id.*  Rather, he "relie[d] on the much narrower claim that respondent televised an entire act that he ordinarily gets paid to perform," thus threatening his livelihood.  *Id.*

Those facts presented a claim that was much like any claim for copyright infringement involving the literal reproduction of an entire copyrighted work or performance.  Acts of copyright infringement may also include the attendant disclosure or use of a copyright holder's name or likeness, but that is not an "injury" that copyright law recognizes or deems significant.  Indeed, as *Zacchini* made its way through the Ohio judiciary, the state courts there disagreed about whether the claim should even be denominated one for "right of publicity" or, instead, a claim for conversion and common-law copyright infringement.  *Zacchini v. Scripps-Howard Broad. Co.*, 351 N.E.2d 454 (Ohio 1976).  As some commentators have pointed out, *see* Zimmerman, 50 B.C. L. Rev. at 1520, the case

17

therefore does not really belong in the "right of publicity" category at all. Rather, it is one of a small genre of cases in which the Court has permitted state laws to fill gaps in copyright law to protect expressive activities that are very close to what copyright law is designed to incentivize. *See, e.g., Int'l News Service v. Associated Press*, 248 U.S. 215 (1918) (sustaining a common-law claim for the taking of "hot news"); *Goldstein v. California*, 412 U.S. 546 (1973) (sustaining a state law criminalizing the pirating of sound recordings).

Thus, while the Court's analogy to copyright fit the specific claim at issue in *Zacchini*, its reasoning has no relevance to the vast majority of right of publicity cases. *See, e.g.,* T. Cotter & I. Dmietrieva, *Integrating the Right of Publicity with First Amendment and Copyright Preemption Analysis*, 33 Colum. J. L. & Arts 165, 202-04 (Winter 2010); Dogan & Lemley, 58 Stan. L. Rev. at 1186-87. Neither *Comedy III* nor the vast majority of such cases involve the alleged reproduction of an actual, entire performance in a manner that may substitute for the original, and these cases are no exception. EA has not created animated versions of the actual college football games in which Appellees played, thus potentially discouraging fans from watching their actual performances. Rather, hearkening again to the facts of *Zacchini*, there is an obvious difference between airing Zacchini's actual entire performance on television and creating a hypothetical video game in which members of the public can choose to control any of thousands of avatar

cannonballers, just one of whom allegedly resembles Zacchini in some respects, to compete in their own highly creative, mock human cannonball contest.[3] Accordingly, extending *Zacchini* to treat all assertions of a right of publicity as quasi-copyright actions, which the "transformative use" test does, seriously undervalues the First Amendment interest in protecting the use of names and likenesses in expressive speech.  *See Cardtoons,* 96 F.3d at 973.

### 3.    The *Rogers* Test More Accurately Reflects Any Relationship Between the Right of Publicity and Intellectual Property Law

Unlike copyright law, federal trademark law is primarily concerned with the misuse of names, titles and brands, much like the right of publicity.  *See ETW Corp.*, 332 F.3d at 924.  The principal difference between the two is that the Lanham Act also requires proof that consumers have been misled or confused by the use of a trademark.  *See Restatement* § 46, cmt. b; *Rogers*, 875 F.2d at 1004.

---

[3] Even with respect to *solo* performances, the *Restatement* warns against extending *Zacchini* to situations in which a plaintiff complains not that his or her actual performance was rebroadcast, but rather that it was imitated in some respects as part of an entirely original genre of expression.  *See Restatement* § 47, cmt. d ("[i]n cases of imitation, the public interest in competition and in avoiding the monopolization of successful styles, together with the interest in the production of new works including parody and satire, will ordinarily outweigh any adverse effect on the plaintiff's market."). This logic applies all the more to games depicting *team* performances that allegedly try to imitate some aspects of the performance styles of thousands of athletes, any one of which is largely incidental within the context of the entire expressive work and in any event is completely subject to being altered by the choices of game players.  Granting each of those athletes the individual right to bargain for and potentially veto their inclusion in every video game could place an enormous practical burden on the development of such expressive works, a burden that far outweighs any individual athlete's publicity interests. *C.B.C. Distribution & Mktg.,* 505 F.3d at 822-24.

For that reason, many authorities recognize both that trademark law is really the closer intellectual property doctrine, *see* Dogan & Lemley, *supra,* and that between the two, trademark law reflects more significant governmental interests since protecting consumers nationwide is more important than providing marginally greater rewards to individual celebrities. *See, e.g., Restatement* § 46 ("The rationales underlying recognition of a right of publicity are generally less compelling than those that justify rights in trademarks or trade secrets"); *Rogers*, 875 F.2d at 1004. At a minimum, therefore, balancing the respective interests suggests that any First Amendment test applied to the right of publicity should not be less protective of speech than those applied to trademark claims.

This Court has already held that the First Amendment test articulated in *Rogers* applies to claims under the Lanham Act appropriately balances the competing interests presented in that context. *See E.S.S. Entm't 2000,* 547 F.3d at 1009. In *Rogers* itself, the Second Circuit independently analyzed the Lanham Act and the right of publicity and articulated related, but slightly different, tests for each. These tests appropriately reflect the close relationship between these two doctrines. The *Rogers* test is therefore the only one that most accurately reflects the appropriate relationship between the right of publicity, intellectual property law, and the First Amendment.

**B.    The *Rogers* Test Recognizes that the Right Of Publicity Is a Content-Based Restriction On Speech**

At bottom, the right of publicity is a content-based restriction on speech. *See Cardtoons*, 95 F.3d at 972 ("Restrictions on the words or images that may be used by a speaker, therefore, are quite different than restrictions on the time, place, or manner of speech."); *see also* Cotter & Dmietrieva, 33 Colum. J. L. & Arts at 190-95.  Its very purpose is to give people control over how their names or likeness are represented to the public, and therefore it cannot be "justified without reference to the content of the regulated speech."  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  These cases are no exception.  Appellees' claim is defined by reference to specific content in EA's video games, and they contend that EA could only have avoided liability either by obtaining a license or changing the content of its games.[4]

Content-based restrictions on non-commercial speech necessarily trigger the most significant First Amendment scrutiny, *see Glendale Associates, Ltd. v. NLRB*,

_____

[4] In the district court, Mr. Brown filed an *amicus* brief which argued that the right of publicity is merely a content-neutral restriction on speech.  He argued that, because the right is personal "property," it is like any law restricting the use of private property, such as trespass.  Whatever status publicity rights may have within property law, which presumably falls far short of real estate, this argument wholly lacks merit.  First Amendment scrutiny is always triggered when expressive speech is the medium that allegedly uses or otherwise causes injury to private property – as the *Rogers* test applicable to alleged trademark infringement exemplifies.  For example, the state may bar trespass onto private land to hold a demonstration, but a cause of action directed at publishing a picture of the same land or impugning its quality or value would receive the same First Amendment scrutiny applied to any other allegedly injurious speech.

347 F.3d 1145, 1156 (9th Cir. 2003), and the *Rogers* test better reflects the level of

scrutiny appropriate in this context.  The only expressive works that will be

actionable under the test are those where a plaintiff's name or likeness is being

used solely for purposes of commercial exploitation and/or is materially false or

misleading.  It is well-established that such speech is less worthy of First

Amendment protection.  *See Reed v. Town of Gilbert, Ariz.*, 587 F.3d 966, 981 (9th

Cir. 2009).

By contrast, other First Amendment tests applied to the right of publicity

suffer from the same fundamental weakness as the "transformative use" test – *i.e.,*

they all attempt to borrow First Amendment standards from other contexts that

present quite different considerations, and therefore undervalue the First

Amendment interests that should be weighed against the right of publicity.  Each

of these tests is analyzed in turn below.

### 1.    Ad Hoc Balancing

Some courts that have considered right of publicity claims apply no

particular test at all and engage instead in ad hoc balancing.  *E.g., C.B.C.*

*Distribution & Mktg*, 505 F.3d at 823-24; *Cardtoons,* 95 F.3d at 972-76;

*Guglielmi,* 25 Cal. 3d at 864-65 (Byrd, C.J., concurring).  Though ad hoc balancing

may often produce the right result, it effectively applies a lower level of scrutiny

than is applied to  torts like defamation, even though that tort protects more

compelling and time-tested state interests.  No court may resolve a defamation case by engaging in an ad hoc determination of whether a person's reputation was "fairly" impugned; rather, the tort is cabined by more strict and specific First Amendment standards.  *See, e.g., New York Times Co. v. Sullivan*, 276 U.S. 254 (1964).  The same should be true for the right of publicity.  Moreover, by definition ad hoc balancing provides no guidance to content producers and produces unnecessary self-censorship.

### 2.    The "Public Interest" Test

The "public interest" test presents some of the same difficulties.  The test is borrowed from the common and constitutional law of privacy, which provides that the publication of a "matter of legitimate public concern" is an absolute defense to claims for the publication of private, intimate facts.  *See Shulman v. Group W Prods., Inc.,* 18 Cal. 4th 200, 214 (1998).  Yet the economic interests the right of publicity protects are plainly less compelling than those supporting restrictions on the dissemination of a person's most intimate concerns.  *See Cardtoons,* 95 F.3d at 972 ("[w]hile the right [of publicity] was originally intertwined with the right of privacy, courts soon came to recognize a distinction between the personal right to be left alone and the business right to control use of one's identity in commerce.").  While the test does appropriately and categorically protect news and other content concerning public affairs, a presumption that should remain, a test permitting a

23

greater variety of expressive speech should be applied to the right of publicity, which the *Rogers* test does.

### 3.     The "Actual Malice" Test

This test once again borrows from yet another area of jurisprudence, defamation law, which is premised on balancing quite different, stronger, and time-tested state interests than those at issue in right of publicity cases.  Moreover, using this test simply transforms the right of publicity into a statutory cause of action providing for statutory damages and attorneys' fees for any allegedly intentionally false speech about the plaintiff in the media, thus eliminating the need to prove any of the other elements that have traditionally limited the reach of the torts of defamation and false light.  The resulting cause of action is therefore either duplicative of other torts or is constitutionally suspect because the concept of "actual malice" as a First Amendment test was developed in the context of torts which also require proof that the speech at issue was, for example, injurious to reputation or highly offensive to a reasonable person.  This is not an abstract concern; many of these *amici* have expended considerable resources defending claims brought pursuant to Section 3344 that were obviously asserted in an effort to avoid the obligation to prove all the elements of a defamation or false light claim.  Indeed, the application of this test appears to be unique to California and is widely criticized elsewhere.  *See, e.g., Restatement* § 47, cmt. c.

24

In short, the *Rogers* test reflects a far more appropriate balance between the right of publicity and the First Amendment than any existing alternative.

### C.     The *Rogers* Test Is Clearer and More Widely Applied

The *Rogers* test also offers significant practical advantages when compared to other tests.  It has already been expressly adopted by both the Second (in *Rogers*) and Sixth Circuits, *see Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003), which like this Court also apply *Rogers* to claims arising under the Lanham Act.  Perhaps more importantly, the *Restatement* has effectively adopted it. Specifically, the *Restatement* presumes that "use in entertainment and other creative works is permitted," unless "the name or likeness is used solely to attract attention to a work that is not related to the identified person."  *Restatement* § 47, cmt. c.  *See also Seale*, 949 F. Supp. 331.

Moreover, the *Rogers* test has proved to be much clearer, thus reducing the enormous amount of unpredictability that plagues this area of the law.  It functions as a single test applicable to all works of expression, thus eliminating the need to consider multiple overlapping tests as California law currently appears to require. More significantly, *Rogers* less readily invites subjective judgments about the aesthetic or informational value of expression, as the "transformative use" and "public interest" tests expressly require.  This both avoids troubling First

Amendment issues and reduces the unpredictability inherent in any ad hoc exercise.

To be sure, *amici* do not mean to imply that applying the *Rogers* test is like pushing a button on a vending machine. The application of any test requires the exercise of judgment, and there will always be hard cases and disagreement about the results reached in them. *See, e.g., Parks*, 329 F.3d at 444. Nonetheless, the *Rogers* test provides the most cogent, well-reasoned, and tested approach to resolving conflicts between the right of publicity and the First Amendment.

Equally important, it is a test that typically has been and should be applied as a threshold question of law for the Court. The law governing speech-based torts typically recognizes threshold legal tests to weed out meritless claims, such as whether words are capable of a defamatory meaning, state actual facts, *see Knievel v. ESPN, Inc.,* 393 F.3d 1068 (9th Cir. 2005), or involve matters of public concern. *Shulman,* 18 Cal. 4th at 214. These tests all reflect the recognition that the litigation of even meritless claims imposes a heavy price on the development of expression. With respect to the right of publicity, it is even more important that any First Amendment test – be it *Rogers*, "transformative use," or anything else – present a threshold question of law because on its face the right of publicity sweeps so broadly. In this case, the *Rogers* test easily favors EA as a matter of law. The use of any college or professional football player is obviously relevant to a game

about those sports, and there is nothing about the use of the alleged Keller-like avatar that constitutes a stealth advertisement.

In this respect, we think it important to note that the arguments of the Appellee in *Brown* wholly misconstrue the *Rogers* test. His arguments suggest the test requires that every use of someone's identity in an expressive work be submitted to a fact-finder's judgments about the artistic value of and need for the use, a proposition that would effectively turn the First Amendment on its head. Thus, Mr. Brown argues that the first prong of the test is inherently an issue of fact by suggesting that the test actually assesses artistic *necessity* – i.e., whether EA could have made a video game without the plaintiff's likeness, App. Brief at 35 – rather than the minimal threshold of artistic *relevance* that *Rogers* actually requires. If necessity were really the test, the right of publicity and the Lanham Act would effectively restrict personality-related expression to biographies. With respect to the second prong of the test applied in Lanham Act cases, Mr. Brown argues that because some consumers may generally assume that celebrities grant permission when their likenesses are used, EA's use of an alleged Brown-like avatar is "explicitly misleading" under the *Rogers* test. This argument would, if accepted, swallow the rule in every case and is therefore expressly rejected by *Rogers*, which held that the fact that such a risk of consumer confusion may always exist cannot overcome First Amendment interests. *Rogers*, 875 F.2d at 1001.

27

Finally, while this brief has devoted much space to criticizing other existing tests, *amici* also fully recognize that they were adopted in response to genuine concerns raised by the facts of particular cases. However, adopting the *Rogers* test need not require abandoning those concerns; indeed, one of its advantages is that it is sufficiently flexible to accommodate them. For example, the "transformative use" test might better be viewed not as an all-purpose First Amendment test, but rather as one factor to consider when applying the second prong of the *Rogers* test to so-called "merchandising" cases, to help determine whether the use of a celebrity's image is just a disguised advertisement for a t-shirt or button.

Similarly, the "actual malice" test was originally developed to address efforts to sell magazines by creating a deliberately false impression about a celebrity on the cover. *See Eastwood v. Sup. Ct.*, 149 Cal. App. 3d 409 (1983). Depending on the facts, the *Rogers* test might produce the conclusion that such a cover was either "wholly unrelated" to the content of the underlying work, or was really a disguised advertisement. *See, e.g., Solano v. Playgirl, Inc.*, 292 F.3d 1078 (9th Cir. 2002). At the same time, it would surely be the extraordinarily rare case, if ever, in which a book or movie could be actionable under the *Rogers* test, thus confirming the broad protection such genres have traditionally enjoyed.

Finally, adopting the *Rogers* test would also harmonize the law applied to conflicts between the First Amendment and both the right of publicity and the

28

Lanham Act.  As these cases illustrate, both theories are frequently alleged when an expressive work is alleged to violate personality-based rights, and both exist to vindicate related interests.

## CONCLUSION

The law concerning the right of publicity was already a morass for content producers, but the district court's decision in *Keller* risks making it even worse. For the foregoing reasons, *amici* respectfully submit that the decision should be reversed and the law appropriately clarified.

Dated:   September 7, 2010

Respectfully submitted,

  s/ Nathan Siegel
Nathan Siegel
Lee Levine
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 17th St., N.W., Suite 800
Washington, D.C.  20036
202-508-1100
*Attorneys for Amici*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      I certify that this brief complies with the type-volume limitation of Rules 29(d) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6,936 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface – Times New Roman, 14-point – using Microsoft Word 2003.

Dated:   September 7, 2010

Respectfully submitted,

_ s/ Nathan Siegel_____
Nathan Siegel
Lee Levine
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 17th St., N.W., Suite 800
Washington, D.C.  20036
202-508-1100

*Attorneys for Amici*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 7, 2010.  Participants in the case who are registered CM/ECG users will be served by the appellate ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have dispatched the foregoing to a third party commercial carrier for delivery within 3 calendar days to the following non-CM-ECF participants:

Bryan Clobes, Esq.
Cafferty Faucher LLP
1717 Arch Street, Suite 3610
Philadelphia, PA 19103

Donald Scott Macrae, Esq.
Steyer, Lowenthal, Boodrookas,
Alvarez & Smith LLP
1 California Street, Suite 3300
Philadelphia, PA 19103

Joe Sibley, Esq.
Kiwi, Alejandro, Danao, Camara,
Camara & Sibley LLP
2339 University Blvd.
Houston, TX 70005

Jospeph C. Kohn, Esq.
Kohn, Swift & Graf, P.C.
1 South Broad Street
Philadelphia, PA 19107


 s/ Nathan Siegel
Nathan Siegel
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 17th St., N.W., Suite 800
Washington, D.C.  20036
202-508-1100

*Attorneys for Amici*