No. 10-15387

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

SAMUEL MICHAEL KELLER,

Plaintiff – Appellee,

v.

ELECTRONIC ARTS, INC.,

Defendant – Appellant.

_____

United States District Court, Northern District of California
Judge Vaughn R. Walker

_____

**APPELLEE'S BRIEF**

_____

Robert Carey
Leonard Aragon
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona  85003
Telephone:  (602) 840-5900
Facsimile:   (602) 840-3012

*Attorneys for Plaintiff-Appellee*

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF ISSUES AND SUMMARY OF ARGUMENT ............... 1

II.   STATEMENT OF JURISDICTION ................................................. 4

III.  STATEMENT OF THE CASE ........................................................ 5

      A.    Nature of the Case ................................................................ 5

      B.    Course of Proceedings and Disposition Below ..................... 6

IV.   STATEMENT OF FACTS ............................................................. 6

V.    STANDARD OF REVIEW ........................................................... 11

VI.   ARGUMENT ............................................................................... 11

      A.    California's Anti-SLAPP Statute Facilitates Dismissal of
            Meritless Strategic Suits .................................................... 11

      B.    Plaintiff Established a Probability of Prevailing on His Claims ......... 12

            1.    This second step imposes a minimal burden on Plaintiff ......... 12

            2.    EA does not dispute that Plaintiff sufficiently states and
                  can substantiate his claims ........................................ 13

            3.    EA has not proved its affirmative defenses will prevail
                  as a matter of law ...................................................... 14

                  a.    EA must establish its affirmative defenses as a
                        matter of law .................................................... 14

                  b.    EA's contractual agreement not to replicate
                        student-athletes' likenesses released any possible
                        First Amendment right ...................................... 18

c.    EA did not prove that its First Amendment defense will prevail as a matter of law ...........................25

    (1)    The transformative-use test does not require striking Plaintiff's claim .........................25

        (a)    The test shields celebrities from literal depictions or imitations for commercial gain.........................25

        (b)    The transformative-use test focuses on EA's depictions of student-athletes in context...................................27

        (c)    EA's contrary view is incorrect ................33

        (d)    EA has not proved that every reasonable juror would find the depictions transformative ...............................37

    (2)    There is no general public-interest exception for sports creating a right to pirate student-athletes' identities...................................42

    (3)    The *Rogers* test is inapplicable ...........................48

        (a)    There is no error because EA did not ask the district court to employ the *Rogers* test....................................48

        (b)    Judge Wilken did not err also because the *Rogers*' test is inapplicable ....50

        (c)    Even if *Rogers* applies, EA cannot demonstrate that Plaintiffs have no probability of prevailing ...........................55

d.    EA's use of student-athletes' likenesses does not fall within California Civil Code § 3344(d)'s public-affairs exemption.................................57

   e. Judge Wilken properly refused to strike Plaintiff's
    ancillary claims................................................................60

VII. CONCLUSION..................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Needle, Inc. v. NFL*,
  No. 08-661, 2008 U.S. Briefs 661 (Nov. 24, 2009)........................................9, 10

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................17

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ..................................................................11, 14

*Baugh v. CBS, Inc.*,
  828 F. Supp. 745 (N.D. Cal. 1993)..................................................................59

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) .............................................................................33

*Brown v. Electronic Arts*,
  Case No. 09-56675, Slip Op. (C.D. Cal. Sept. 23, 2009)..................................54

*Browne v. McCain*,
  611 F. Supp. 2d 1062 (C.D. Cal. 2009) ...........................................................15

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
  95 F.3d 959, 971-76 (10th Cir. 1996) ..............................................................52

*C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced Media, L.P.*,
  505 F.3d 818 (8th Cir. 2007) ....................................................................45, 46

*CBS Interactive, Inc. v. NFL Players Ass'n*,
  2009 U.S. Dist. LEXIS 36800, 2009 WL 1151982 (D. Minn. Apr. 28,
  2009) ..........................................................................................................45, 46

*Chapman v. Journal Concepts, Inc.*,
  528 F. Supp. 2d 1081 (D. Haw. 2007)..............................................................59

*Clark v. Capital Credit & Collection Servs.*,
   460 F.3d 1162 (9th Cir. 2006) ............................................................7

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
   25 Cal. 4th 387 (2001) .......................................................... *passim*

*D. H. Overmyer Co. v. Frick Co.*,
   405 U.S. 174 (1972)........................................................................23

*DaimlerChrysler Motors Co. v. Lew Williams, Inc.*,
   142 Cal. App. 4th 344 (2006) .................................................20, 21

*Dora v. Frontline Video, Inc.*,
   15 Cal. App. 4th 536 (1993) .............................................36, 58, 59

*Downing v. Abercrombie & Fitch*,
   265 F.3d 994 (9th Cir. 2001) ...........................................44, 59

*Dyer v. Childress*,
   147 Cal. App. 4th 1273 (2007) .......................................................59

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
   547 F.3d 1095 (9th Cir. 2008) .....................................................51, 54

*Eastwood v. National Enquirer*,
   123 F.3d 1249 (9th Cir. 1997) .......................................................17

*Eastwood v. Superior Ct.*,
   149 Cal. App. 3d 409 (1983) ...........................................................59

*Elvis Presley Enters. v. Capece*,
   950 F. Supp. 783 (S.D. Tex. 1996),
   *rev'd on other grounds*, 141 F.3d 188 (5th Cir. 1998) .......................52

*Erie Telecomms. v. Erie*,
   853 F.2d 1084 (3d Cir. 1988) .........................................................19

*ETW Corp. v. Jireh Publ'g, Inc.*,
   332 F.3d 915 (6th Cir. 2003) .....................................................36, 37

*Frantz v. Northeast Commuter Servs. Corp.*,
  1998 U.S. Dist. LEXIS 22764, 1998 WL 967561 (E.D. Pa. Nov. 17,
  1998) ................................................................................................................23

*Fuentes v. Shevin*,
  407 U.S. 67 (1972)..........................................................................................23

*Gallegos v. Parsons*,
  315 Fed. Appx. 659 (9th Cir. 2009)................................................................24

*Gieg v. DRR, Inc.*,
  407 F.3d 1038 (9th Cir. 2005) .......................................................................49

*Gionfriddo v. Major League Baseball*,
  94 Cal. App. 4th 400 (2001) .....................................................................44, 45

*Gridiron.Com, Inc. v. NFL*,
  106 F. Supp. 2d 1309 (S.D. Fla. 2000)......................................................43, 47

*Guglielmi v. Spelling-Goldberg Prods.*,
  25 Cal. 3d 860 (1979) (Byrd, J, concurring) ...................................................35

*Hilton v. Hallmark Cards*,
  580 F.3d 874 (9th Cir. 2009), *amended*, 599 F.3d 894 (9th Cir. 2010) ..... *passim*

*Honolulu Rapid Transit Co. v. Dolim*,
  459 F.2d 551 (9th Cir. 1972) .........................................................................19

*Kirby v. Sega of Am., Inc.*,
  144 Cal. App. 4th 47 (2006) .................................................................. *passim*

*Legal Aid Soc'y v. City of New York*,
  114 F. Supp. 2d 204 (S.D.N.Y. 2000) ...........................................................23

*Leonard v. Clark*,
  12 F.3d 885 (9th Cir. 1993) ...........................................................................19

*Maheu v. CBS*,
  201 Cal. App. 3d 662 (1988) .........................................................................59

*Mann v. Quality Old Time Serv., Inc.*,
 120 Cal. App. 4th 90 (2004) ...............................................................15, 16, 17

*Mattel, Inc. v. MCA Records, Inc.*,
 296 F.3d 894 (9th Cir. 2002) ("*MCA*")...............................................................50

*Mattel Inc. v. Walking Mountain Prods.*,
 353 F.3d 792 (9th Cir. 2003) .......................................................................32, 50

*Mindys Cosmetics, Inc. v. Dakar*,
 611 F.3d 590 (9th Cir. 2010) .................................................................. *passim*

*Montana v. San Jose Mercury News*,
 34 Cal. App. 4th 790 (1995) ...............................................................47, 48, 58

*Moore v. Czerniak*,
 574 F.3d 1092 (9th Cir. 2009) ...........................................................................49

*National Football League Prop., Inc. v. Wichita Falls Sportswear, Inc.*,
 532 F. Supp. 651 (W.D. Wash. 1982) .............................................................57

*Navellier v. Sletten*,
 29 Cal. 4th 82 (2002) ..................................................................................20, 24

*New Kids on the Block v. News Am. Pub., Inc.*,
 971 F.2d 302 (9th Cir. 1992) .............................................................................59

*New York Times Co. v. Sullivan*,
 376 U.S. 254 (1964).............................................................................................17

*Paragould Cablevision, Inc. v. Paragould*,
 930 F.2d 1310 (8th Cir. 1991) ...........................................................................19

*Parks v. LaFace Records*,
 329 F.3d 437 (6th Cir. 2003) .......................................................................51, 52

*Parrish v. National Football League Players, Inc.*,
 2009 U.S. Dist. LEXIS 4239 (N.D. Cal. Jan. 13, 2009)....................................43

*Payan v. Aramark Mgmt. Servs. L.P.*,
 495 F.3d 1119 (9th Cir. 2007) ...........................................................................17

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*,
    133 Cal. App. 4th 658 (2005) ....................................................................15, 16

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .............................................................................33

*Premier Med. Mgmt. Sys., Inc. v. California Ins. Guarantee Assn.*,
    136 Cal. App. 4th 464 (2006) .............................................................................15

*Price v. Stossel*,
    __ F.3d __, 2010 U.S. App. LEXIS 17671 (9th Cir. Cal. Aug. 24, 2010) ...11, 12

*Robertson v. Rodriguez*,
    36 Cal. App. 4th 347 (1995) .........................................................................17, 18

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) ................................................................... *passim*

*Romantics v. Activision Publ'g, Inc.*,
    574 F. Supp. 2d 758 (E.D. Mich. 2008) ......................................................53, 54

*Seale v. Gramercy Pictures*,
    949 F. Supp. 331 (E.D. Pa. 1996)........................................................................52

*Seltzer v. Barnes*,
    182 Cal. App. 4th 953 (2010) .............................................................................15

*Simmons v. Allstate Ins. Co.*,
    92 Cal. App. 4th 1068 (2001) .............................................................................17

*Snell v. Bell Helicopter Textron*,
    107 F.3d 744 (9th Cir. 1997) ..............................................................................17

*Solano v. Playgirl, Inc.*,
    292 F.3d 1078 (9th Cir. 2002) ............................................................................17

*Soukup v. Hafif*,
    39 Cal. 4th 260 (2006) .................................................................................11, 12

*Stewart v. Rolling Stone LLC*,
    181 Cal. App. 4th 664 (2010) .......................................................................18, 58

*Winter v. DC Comics*,
 30 Cal. 4th 881 (2003) ................................................................................. *passim*

## STATUTES

CAL. CIV. CODE ¶ 3344 ................................................................................. *passim*

CAL. CIV. PROC. CODE § 425.16(b) ............................................................... 1

CAL. CIV. PROC. CODE § 425.16(b)(1) ......................................................... 12

## I.     STATEMENT OF ISSUES AND SUMMARY OF ARGUMENT

1.     *To defeat a motion to strike under the California anti-SLAPP statute, must plaintiff establish more than a minimum level of legal sufficiency and triability?*

No.  A two-part analysis applies to any motion to strike under the California anti-SLAPP statute, CAL. CIV. PROC. CODE § 425.16(b).  The second part, called the "minimal merit prong," examines whether plaintiff can show a probability of success on the merits.  The required probability is not high.  Plaintiff need only state and substantiate a legally sufficient claim.  *See infra* at 12-13.

2.     *What are the parties' respective burdens on defendant Electronic Arts, Inc.'s ("EA") anti-SLAPP motion to strike?*

a.     *Where EA did not dispute that Plaintiff can substantiate his claims, did Plaintiff have any burden to submit evidence supporting his claims?*

No.  Plaintiff was not required to submit evidence substantiating his claims because EA did not dispute that Plaintiff can support his claims with a prima facie showing of facts.  EA asserts instead that its affirmative defenses render Plaintiff's claims meritless.  *See infra* at 13.

b.     *To prevail on its anti-SLAPP strike motion based on affirmative defenses, must EA establish those defenses as a matter of law?*

Yes.  EA must establish both that its defenses are available and prove that no trier of fact could reasonably conclude the defenses should not prevail.  It is EA's burden to submit evidence proving its defenses as a matter of law.  *See infra* at 14-18.

3.  *Did EA prove no trier of fact could reasonably conclude its defense under the First Amendment should not prevail?*

a.  *Did EA prove that its First Amendment defense will necessarily prevail where EA waived any potential right to use Plaintiffs and other players' likeness in its licensing contract with NCAA's licensing agent?*

No.  While EA insists that the First Amendment grants it a right to appropriate players' identities in its videogames, EA contracted away any conceivable First Amendment right by agreeing not to use players' likenesses in its NCAA videogames.  Where a party waives a First Amendment right by contract, the breach of that contract alone defeats an anti-SLAPP motion.  *See infra* at 18-24.

b.  *Did EA prove that its First Amendment defense will prevail as a matter of law under the transformative-use test?*

No.  EA asserts California's transformative-use test to invoke First Amendment protection of its videogame products.  Under that test, when a company is faced with a right-of-publicity challenge to a product, it can raise

as an affirmative defense that the First Amendment protects the product inasmuch as it contains significant transformative elements or that its value does not derive primarily from the celebrity's fame. This "transformative use" defense poses a balancing test between the First Amendment and the right of publicity. The balance tips to the right of publicity where, as here, the expressive work simply imitates or reproduces the image of another.

This test requires courts to focus on the depiction of the celebrity and the context in which it appears. Here, the district court considered EA's depictions of individual players in context. EA admits that, far from being transformative, its NCAA videogames replicate players' identities as closely and literally as possible and places them in a playing environment that likewise replicates the actual environment. The court properly rejected EA's invitation to examine instead videogame features that are unrelated to depictions of Plaintiff and other players and their contexts. *See infra* at 25-42.

c.      *Is there a general public-interest exception for sports under the First Amendment that grants EA a free license to use players' identities?*

No. While the right of publicity yields to free use of a public figure's likeness only to the extent reasonably required to *report* events to the public,

EA's videogames do not report sports information, so EA cannot show that this defense will prevail as a matter of law. *See infra* at 42-48.

> d. *Does the two-part test employed in Rogers v. Grimaldi to evaluate wrongful-advertising claims apply here to a right-of-publicity claim that does not allege wrongful advertising?*

No. First, EA did not ask the district court to adopt the *Rogers* test and has thus waived the issue. Second, the *Rogers* test asks whether the infringing use of a trademark or artist's identity is simply a disguised commercial advertisement for the sale of goods. Courts thus apply the *Rogers* test *only* to claims alleging infringing use in product titles and advertising. Plaintiff does not assert such a claim. *Rogers* does not apply. And even if it did, EA has not demonstrated that Plaintiffs have no probability of prevailing. *See infra* at 48-57.

> 4. *Is the California Civil Code § 3344(d) exemption for broadcasts or accounts of public affairs similarly limited to factual reporting and thus inapplicable here?*

Yes, courts apply this exemption only to factual reporting, which excludes EA's videogames. *See infra* at 57-60.

## II.   STATEMENT OF JURISDICTION

Plaintiff concurs with EA's statement of jurisdiction.

### III.    STATEMENT OF THE CASE

**A.    Nature of the Case**

EA produces collegiate and professional sports videogames so realistic it claims, "You're in the game!"  For the rights to digitally replicate professional football and basketball players' likenesses, EA pays the respective players associations tens of millions of dollars each year.  For rights to digitally replicate collegiate game environments in its NCAA videogames, EA similarly pays the NCAA and its licensing affiliate, Collegiate Licensing Company ("CLC").

Although EA's NCAA videogames digitally replicate collegiate players in detail, EA pays nothing and has no agreement with the students.  EA uses these images even though, consistent with NCAA rules protecting student-athletes' amateurism, EA's license to produce NCAA videogames expressly bars it from replicating players' likenesses.  EA replicates the likenesses anyway, down to their appearances, jersey numbers, playing styles, personal history and idiosyncratic gear.  As the party sought to be protected by the license prohibition (as well as a person whose image was used without authorization throughout his academic career), Mr. Keller, on behalf of other NCAA players, sues EA for this misappropriation on behalf of himself and a class of similarly situated student athletes.

Plaintiff assert claims against EA for depriving him of rights of publicity under California statute (CAL. CIV. CODE § 3344) and common law, civil conspiracy, violation of the Unfair Competition Act (CAL. CIV. CODE ¶ 17200 *et seq.*) and unjust enrichment. ER143-47. Plaintiff asserts additional claims against co-defendants NCAA and CLC, ER143, ER146, which are not before the Court on this interlocutory appeal.

## B.     Course of Proceedings and Disposition Below

Plaintiff concurs with EA's description of the case procedural history, App.Br. at 9-10, 1 n.3.

## IV.     STATEMENT OF FACTS

EA produces the NCAA Football, NCAA Basketball and NCAA March Madness video-game franchises. ER129. Videogame titles within these franchises simulate basketball and football games between NCAA member schools. Consumers demand that these games simulate actual college games in the most realistic manner possible. As a result, each year EA spends millions to ensure its games' realism, and advertises this realism to promote its products. Specifically, under a license with the CLC, the NCAA's licensing company, EA replicates team logos, uniforms, mascots, fight songs and even member school stadiums with almost photographic realism. *Id.*

EA, however, is not allowed to use player names or likenesses. *Id*. NCAA Bylaw 12.5 specifically prohibits commercial licensing of a NCAA athlete's "name, picture or likeness." ER130. NCAA student-athletes are strictly amateurs that, by NCAA rules, may not benefit economically from any success on the field. *Id*. The NCAA Division I Manual requires that "[s]tudent-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived." Supplemental Excerpts of Record ("SER") 12-13 (Principle 2.9). The principle continues, "[s]tudent participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises." *Id*. The NCAA Manual also provides that student-athletes' names, pictures and likenesses cannot be used in any commercial item (except for items sold at athletes' own schools). SER14 at 12.5.1.1(h)). Nor can NCAA student-athlete likenesses be reproduced in trading cards offered for sale. SER15 at 12.5.1.1.4.

Thus, before being allowed to compete each year, all Division I NCAA athletes sign a contract agreeing that they have "read and understand" the NCAA's rules on prohibitions on the commercial use of their name, picture or likeness and affirming that "to the best of [their] knowledge [they] have not violated any amateurism rules." ER130. Consistent with NCAA rules and player contracts, the

licensing agreements between EA and the CLC explicitly prohibit using NCAA athletes' names and/or likenesses in NCAA-branded videogames.  *Id*.  Indeed, "the NCAA has a duty to NCAA athletes to honor its own rules prohibiting the use of student athlete likenesses …."  *Id*.  NCAA athletes are the intended beneficiaries of the NCAA likeness prohibitions and the contractual provisions that incorporate them in contracts between and among the CLC, NCAA and EA.  *Id.*

But in reality, EA, with the knowledge, participation and approval of the NCAA and CLC, extensively uses actual player names and likenesses, including the name and likeness of Plaintiff Keller.  ER129; ER136.  Indeed, EA seeks to digitally replicate each school's entire roster.  ER130.  With rare exception, every real-life NCAA Division I football or basketball player for a particular year has a corresponding player in the EA videogame for that year with the same jersey number, and nearly identical height, weight, build, and home state.  In addition, EA matches the player's skin tone, hair color, and even hair style.  *Id.*  EA even matches players' idiosyncratic equipment preferences such as wristbands, headbands, facemasks and visors.  ER133.  In fact, to ensure it matches players' unique equipment preferences as accurately as possible, EA sends detailed questionnaires to NCAA team equipment managers to glean individual players' idiosyncratic details.  ER134.

In fact, as purchased, the only meaningful detail EA's videogames omit[1] is the player's name on the jersey. ER134. As one commentator observed, "the omission of players' names seems little more than a formality, done with a wink and a nudge." *Id.* Despite this omission, videogame players rarely if ever distinguish between the "real" player and the videogame version. ER134-35. In any case, this omission has little practical consequence because EA designed its games so that entire Division I rosters can be readily loaded into the videogame. ER135. Once loaded, players' names appear on jerseys and in-game announcers refer to players by their name. *Id*.

EA's motivation for digitally replicating players is to increase profits. ER129. As EA knows full well, heightened realism in NCAA videogames distinguishes EA games from competitors, spurring greater sales and revenues for EA (and increased royalties for the NCAA and CLC). *Id.* Indeed, EA argued this very point to the Supreme Court regarding its similar NFL football videogame, *Madden NFL Football*:

> These licenses allow EA to use … the names and likenesses of nearly all NFL players.
>
> EA relies on these licenses to create lifelike, interactive simulations of the NFL experience. The *Madden* titles are successful in part because they allow consumers to simulate play involving any of the 32 NFL teams, using

---

[1] Except for the players' home towns, which for whatever reason are routinely replaced with a nearby locale in the same state.

real NFL players and real NFL coaches. The simulations capture the nuances of NFL contests to the fullest extent technology allows ….

The success of *Madden NFL Football* vividly demonstrates how associating game play with attractive intellectual property can create and satisfy consumer demand and allow one to succeed in an intensely competitive industry. The degree of authentic sports experience helps differentiate sports simulations in much the same way that a license to Harry Potter or Spiderman intellectual property helps differentiate video games built around fantasy themes. Authentic simulation is an important part of competition in the video game market.

*American Needle, Inc. v. NFL*, No. 08-661, 2008 U.S. Briefs 661, at *2 (Nov. 24, 2009) (EA amicus brief).

Keller and putative Class Members have thus been deprived of valuable rights of publicity, specifically the rights to control the commercial use of their names and likenesses. ER136. EA's extraordinary efforts both to duplicate likenesses in its NCAA videogames and permit videogame players to instantaneously download player rosters amply demonstrates the commercial value of Keller and Class Members' names and likenesses. The fact that EA pays $35 million each year to license *NFL* football players' names and likenesses further confirms the value of Keller and Class Members' names and likenesses. *Id*.

## V.    STANDARD OF REVIEW

This Court reviews *de novo* the district court's order denying EA's motion to strike under California's anti-SLAPP statute.  *See Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010).

## VI.    ARGUMENT

### A.    California's Anti-SLAPP Statute Facilitates Dismissal of Meritless Strategic Suits

"SLAPP" is an acronym for "strategic lawsuit against public participation." *Soukup v. Hafif*, 39 Cal. 4th 260, 268 n.1 (2006); ER20.  The hallmark of a SLAPP suit is that it (i) lacks merit and (ii) is brought with the goal of obtaining economic advantage over a citizen party by increasing the litigation cost to the point that the citizen party's case will be weakened or abandoned.  *Price v. Stossel*, __ F.3d __, 2010 U.S. App. LEXIS 17671, at *14-15 (9th Cir. Cal. Aug. 24, 2010).

California's anti-SLAPP statute attempts to counteract the chilling effect of strategic suits by providing a procedure to dismiss such suits under a special motion to strike.  *Id*.  An anti-SLAPP motion's purpose is to determine whether defendant is being *forced to defend against a meritless claim*.  *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003).  "The statute was designed to allow courts to promptly expose and dismiss *meritless and harassing claims* seeking to chill protected expression."  *Mindys Cosmetics*, 611 F.3d at 595 (internal quotation marks omitted; emphasis added).  "Because these meritless lawsuits seek to deplete

-11-

the defendant's energy and drain his or her resources …, the Legislature sought to prevent SLAPPs by ending them early and without great cost to the SLAPP target." *Soukup*, 39 Cal. 4th at 278 (quotation marks and citations omitted). *See also Price*, 2010 U.S. App. LEXIS 17671, at *14-15.

A court considering a motion to strike under the anti-SLAPP statute engages in a two-part inquiry.  First, defendant must make a prima facie showing that plaintiff's suit arises from an act in furtherance of defendant's rights of petition or free speech.  Second, once defendant has made this showing, the burden shifts to plaintiff to demonstrate a probability of prevailing on the challenged claims. *Mindys Cosmetics*, 611 F.3d at 595; ER21.  This appeal focuses on the second step.

## B.     Plaintiff Established a Probability of Prevailing on His Claims

Plaintiff demonstrated a probability of success on the merits because (i) EA's license with the NCAA and CLC prohibited EA from replicating player's identities, and (ii) in any event, neither the First Amendment nor California statute protects EA's conduct as a matter of law.

### 1.     This second step imposes a minimal burden on Plaintiff

To meet his burden under this second step, Plaintiff must demonstrate a probability of prevailing on his claims.  *See* CAL. CIV. PROC. CODE § 425.16(b)(1). Quoting *Hilton v. Hallmark Cards*, 580 F.3d 874, 888-89 (9th Cir. 2009), *amended*, 599 F.3d 894 (9th Cir. 2010), the district court correctly explained that

"the required probability … need not be high." ER21. This Court recently confirmed that, because the statute focuses on meritless and harassing claims, this second step requires plaintiffs to show only a "minimum level of legal sufficiency and triability." *Mindys Cosmetics*, 611 F.3d at 595, 598. Indeed, the second step "is often called the 'minimal merit' prong." *Id*. at 598. Only a suit that lacks minimal merit will be unable to satisfy this step. *Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2010).

To establish "minimal merit," a plaintiff need only "state and substantiate a legally sufficient claim." *Mindys Cosmetics*, 611 F.3d at 598-99. Plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the court credits the plaintiff's evidence. *Id*. at 599. The Court does not weigh the credibility or comparative probative strength of competing evidence, but should grant the motion if, as a matter of law, defendant's evidence supporting the motion defeats plaintiff's attempt to establish evidentiary support for the claim. *Id*.

Accordingly, to defeat EA's anti-SLAPP motion Plaintiff must establish only some minimal merit to his claims.

### 2.    EA does not dispute that Plaintiff sufficiently states and can substantiate his claims

EA did not and does not now dispute that Plaintiff sufficiently pled his claims and can support them with a prima facie showing of facts. *See* ER6 ("EA

does not contest the sufficiency of Plaintiff's claims"); App.Br. at i-ii (table of contents).[2]  EA's motion hence did not require Plaintiff to demonstrate the requisite minimal merit by substantiating his claim with evidence.  Instead, like the defendant in *Hilton*, EA asserts that its affirmative defenses render Plaintiff's claims meritless.  *Cf. Hilton*, 599 F.3d at 909.

### 3.    EA has not proved its affirmative defenses will prevail as a matter of law

As did Hallmark, EA seeks dismissal under the anti-SLAPP statute based on affirmative defenses to Plaintiff's claims, in this instance, the First Amendment and California's § 3344(d) public-affairs exemption.

### a.    EA must establish its affirmative defenses as a matter of law

The mere availability of an affirmative defense to a right-of-publicity claim does *not* preclude a plaintiff from showing the minimal merit that defeats an anti-SLAPP motion.  *Hilton*, 599 F.3d at 910.  Rather, reflecting that the anti-SLAPP procedures protect a defendant only from meritless and harassing claims, *e.g.*, *Batzel,* 333 F.3d at 1025; *Mindys Cosmetics*, 611 F.3d at 595, this Court ruled:

> Only if [defendant] is entitled to the defense *as a matter of law* can it prevail on its motion to strike.

---

[2] EA did assert that Plaintiff did not sufficiently *allege* injury.  SER2.  But even that argument did not require Plaintiff to submit evidence, and EA does not re-assert that argument on appeal.

*Hilton*, 599 F.3d at 910 (emphasis in original). The Ninth Circuit thus constructed a two-part inquiry where, as here, defendant asserts an affirmative defense as ground for an anti-SLAPP motion. First, a court looks to whether the defense "is available at all," and second, if it is, whether, "no trier of fact could reasonably conclude" that the defense should not prevail. *Id.* at 910 n.14.

EA thus must do more than show it *can* assert a First Amendment affirmative defense – EA must establish the defense as a matter of law, which it cannot do. *See infra.*

EA tells the Court nothing of this standard. It also dissembles by linking Plaintiff's burden to substantiate his *claims* to EA's *affirmative defenses*. App.Br. at 20-21. Where, as here, defendant asserts an affirmative defense as ground for an anti-SLAPP motion, it is *defendant's burden* to submit evidence that defeats plaintiff's claim as matter of law. *E.g., Browne v. McCain*, 611 F. Supp. 2d 1062, 1071 (C.D. Cal. 2009); *Seltzer v. Barnes*, 182 Cal. App. 4th 953, 969 (2010); *Premier Med. Mgmt. Sys., Inc. v. California Ins. Guarantee Assn.*, 136 Cal. App. 4th 464, 477 (2006); *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal. App. 4th 658, 676 (2005); *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 108 (2004).

*Peregrine Funding* explained why the initial burden shifts to defendant in this context. As in the present appeal, the *Peregrine Funding* defendant did not

challenge plaintiffs' ability to state or support any substantive element of their claims; the anti-SLAPP motion focused instead on the moving defendants' three affirmative defenses. 133 Cal. App. 4th at 676. The court recognized that defendant may defeat a cause of action by showing plaintiff cannot establish an element of its cause of action *or* by showing there is a complete defense to the cause of action, and that defendant generally bears the burden of proving its affirmative defenses. *Id*. The court thus concluded that, although § 425.16 places the burden on plaintiff to substantiate its claims, "a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense." *Id.* (citing *Mann*).

The *Mann* decision illustrates how this burden shifts depending on whether the strike motion is based on (i) a deficiency of the claim or (ii) a complete defense. In *Mann*, the plaintiff former employer sued former employees, alleging that defendants formed a competing company and solicited plaintiff's customers with fraudulent statements. Defendants appealed from the denial of their anti-SLAPP motion.

As to plaintiff's defamation claim, defendants argued that plaintiff could not prevail because they had complete defenses. 120 Cal. App. 4th at 107. The court rejected the argument because defendants failed to submit supporting evidence for

their defenses.  *See id*. at 108 (absolute privilege and Noerr-Pennington defenses), 108-09 (conditional privilege).

EA's authorities, by contrast, all address plaintiffs' burden to substantiate *their own claims*, and are thus inapposite.  EA first cites *Simmons v. Allstate Ins. Co.*, 92 Cal. App. 4th 1068 (2001), and *Hilton*, 599 F.3d at 902,[3] which compare the anti-SLAPP motion inquiry to a summary-judgment motion.  App.Br. at 21. But EA fails to mention that a defendant seeking summary judgment on an affirmative defense bears the burden of proof.  *See, e.g.*, *Payan v. Aramark Mgmt. Servs. L.P.*, 495 F.3d 1119, 1122-23 (9th Cir. 2007); *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006); *Snell v. Bell Helicopter Textron*, 107 F.3d 744, 746 (9th Cir. 1997).

Consistent with this summary-judgment apportioning of burdens, EA cites two rulings in which plaintiffs submitted no evidence to substantiate an element of their claims, *i.e.*, that defendants acted with actual malice.[4]  App.Br. at 20-21.  In *Robertson v. Rodriguez*, 36 Cal. App. 4th 347, 358 (1995), for example, while

---

[3] EA actually cites the earlier, unamended decision at 580 F.3d 874 (9th Cir. 2009).

[4] In *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), the Supreme Court read into any claim by public figures for libel, defamation, false impression, *etc.* the element that plaintiff must prove by "clear and convincing evidence" that defendant acted with actual malice.  *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1084 (9th Cir. 2002); *Eastwood v. National Enquirer*, 123 F.3d 1249, 1251 (9th Cir. 1997).

plaintiff's libel claim required him to prove he was a public figure and that

defendant acted with actual malice, plaintiff failed to submit evidence of defen-

dant's actual malice and thus did not substantiate his claim.  *Id*. at 359.  Plaintiff in

*Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 680-81 (2010) (citing *New

York Times v. Sullivan*), was likewise required, but failed, to prove defendants

acted with actual malice as an element of this claim.

These authorities, focusing as they do on elements of plaintiffs' claims,

impose no burden on Plaintiff here for EA's affirmative defenses.  They are also

entirely consistent with Plaintiff's authorities, *supra* at 15, that it is EA's burden on

its strike motion to submit evidence, *and* that evidence cannot merely substantiate

its defenses but must establish as a matter of law that its defenses will prevail.  EA

prudently does not represent to this Court that it has met *this* burden.

> **b.    EA's contractual agreement not to replicate players'
> likenesses released any possible First Amendment right**

While EA insists the First Amendment grants it a right to use players' identi-

ties in its videogames, EA contracted away any conceivable First Amendment right

to digitally replicate players.  Plaintiff alleges EA's licensing agreement with CLC

prohibits "the use of NCAA athlete['s] names and/or likenesses in NCAA branded

videogames."  ER129-30; *see supra* at 7-8.

Accordingly, irrespective of free-speech rights it may have had, EA released

any right to replicate players' likenesses in its videogames by contracting not to do

so.  In *Leonard v. Clark*, 12 F.3d 885, 889-90 (9th Cir. 1993), this Court affirmed a

decision not to reach the issue of whether a labor union's free-speech rights were

violated where the district court had first determined that the union, in a collective-

bargaining agreement, waived its First Amendment protections.  The contractual

waiver rendered the assertion of a free-speech right superfluous.  The *Leonard*

district court reasoned that "even if it were to conclude that such rights were

violated, the Union voluntarily 'restricted or agreed to waive the full exercise of

those constitutional rights' by entering into its labor agreement …."  12 F.3d at

889.  The union was advised during negotiations by competent counsel and

voluntarily signed the agreement.  As this Court commented, "If the Union felt that

First Amendment rights were burdened by Article V [of the agreement], it should

not have bargained them away and signed the agreement."  *Id*. at 890.  *See also*

*Erie Telecomms. v. Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988); *Honolulu Rapid*

*Transit Co. v. Dolim*, 459 F.2d 551, 553 (9th Cir. 1972) (parties' agreement

granted city the right to acquire property at a certain price, so city's Fifth

Amendment power to take was not implicated).  EA, having waived in its contract

any possible free-speech right to use players' likenesses, cannot now turn to the

First Amendment to "recapture surrendered rights."  *See Paragould Cablevision,*

*Inc. v. Paragould*, 930 F.2d 1310, 1314 (8th Cir. 1991).

Nor does the anti-SLAPP statute aid EA in recovering a waived right. "[A] defendant who in fact has validly contracted not to speak or petition has in effect 'waived' the right to the anti-SLAPP statute's protection in the event he or she later breaches that contract." *Navellier v. Sletten*, 29 Cal. 4th 82, 94 (2002).

Accordingly, where a party waives a First Amendment right by contract, the party's breach of that contract "alone is likely sufficient minimum proof to over-come an anti-SLAPP motion." *See DaimlerChrysler Motors Co. v. Lew Williams, Inc.*, 142 Cal. App. 4th 344, 352 (2006). The court affirmed the denial of an anti-SLAPP motion where defendant asserted the motion based on its exercise of a potential constitutional right that it had relinquished by contract. The court blasted defendant's attempt to invoke the anti-SLAPP statute's protections for its contract breach:

> … Keil waived the very constitutional right it seeks to vindicate with this motion.… Keil waived its right to protest, then duplicitously protested. It should not be allowed to shield itself from liability under cloak of a statute designed to protect a right Keil voluntarily relinquished in return for economic benefits it now holds. [*Id*. at 354.]

This language applies here: EA's NCAA football, basketball and "March Madness" videogame franchises are made lucrative by EA's license to digitally replicate NCAA playing environments, putting videogamers "in the game." In exchange for that license, and as required by NCAA Bylaw 12.5, EA relinquished

by contract any conceivable free-speech right to replicate players' likenesses. *See supra* at 7-8, 18. But EA then did just that, asserting now that the constitution protects its right to use those likenesses. EA cannot now assert the statute to protect a possible right of expression that EA expressly and "voluntarily relinquished in return for economic benefits it now holds, " *DaimlerChrysler*, 142 Cal. App. 4th at 354.

Further, EA's actions demonstrate its own belief that licensing contracts, not the First Amendment, govern its rights to appropriate athletes' identities and other aspects of college and professional sports. EA pays millions each year for a license to replicate NCAA team logos, uniforms, mascots and member school stadiums. ER129. EA similarly pays the National Football League Players Union, through its licensing arm, nearly $35 million annually to use players' identities in EA's NFL videogames. ER136. EA thus comprehends it must purchase the right to replicate these central features of collegiate and professional sports by contract.

If, instead, the First Amendment grants EA free reign to replicate public images, irrespective of contractual arrangements, EA would dispense with costly contracts and freely replicate NFL, NBA and NCAA athlete identities and game environments, and *pay no one* for the rights to do so. Nor would this new right be confined to these sports. EA could sell videogames replicating Olympic venues, competitions and athletes; boxing and wrestling personalities; or NASCAR races,

without purchasing licenses.  EA thus seeks no less than wholesale revocation of long-established property rights, which the Court should reject.

In short, Plaintiff shows at least a probability that EA's affirmative defenses to their claims will fail.  The Court should affirm the denial of EA's motion to strike.

While EA declined to respond to Plaintiff's argument in its strike motion (*compare* SER9 *with* SER23-24), it may reply here that its licensing agreement with CLC/NCAA is not in the record and cannot be considered on this appeal.  *See* App.Br. at 21 n.45.  But such an argument would ignore EA's burden of proof.  As established above, it is EA's burden to submit evidence proving its affirmative defense will defeat Plaintiff's claim as matter of law.  *See supra* at 14-18.  Plaintiff had expressly alleged that EA's contract barred it from replicating players' likenesses and released any right to use student likenesses.  ER129-30; *see supra* at 7-8.  Yet EA's anti-SLAPP motion did not dispute these allegations nor submit evidence to rebut them.  If the agreement terms were contrary to Plaintiff's allegations and did not release EA's First Amendment rights, EA could simply have proffered the agreement as proof.[5]

---

[5] EA did, by contrast, submit its various videogames (and certain game consoles) to the district court, allowing the court to examine the games' player replications.  The court judicially noticed these evidentiary submissions.  ER9 n.2. The complaint similarly incorporated EA's licensing agreement, which thus would have been judicially noticed had EA submitted it.

EA did reply to Plaintiff's related argument in the context of its accompanying motion to dismiss. In its supporting reply brief, EA argued that Plaintiff incorrectly alleged the licensing agreement's terms. SER19. EA also asserted that Plaintiff did not explicitly allege that the agreement's prohibition against replicating players' likenesses was clear enough to function as a release of constitutional rights. But EA cited no authority that a complaint must allege such a waiver with particularity, SER18-19, and EA's own authorities establish that EA cannot show its agreement as a matter of law did not waive its First Amendment right.[6] EA proffered no evidence that, notwithstanding its own sophistication and experience in negotiating licensing rights with the likes of the NFL, NBA and their

---

[6] EA cited *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972) (SER18), which distinguished the contracts at issue from *D. H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 186 (1972), where the Supreme Court found that a contract negotiated between corporations represented by competent counsel, experienced in the type of contract at issue, and possessing equal bargaining power, could act to waive a contracting party's constitutional rights. *Fuentes*, on the other hand, concerned draconian terms buried in forms that were plainly adhesion contracts, so the Court found no knowing, voluntary and intelligent waiver of constitutional rights. 407 U.S. at 94-95. *D. H. Overmyer* is plainly more analogous than *Fuentes* to the facts here. *Fuentes* is distinguishable also because the contract there did not touch on the due-process procedure at issue. Here, by contrast, the agreement's prohibition directly concerned the asserted free-speech right. On its face, EA's agreement bars the very use EA now claims is constitutionally protected.

EA also cited *Legal Aid Soc'y v. City of New York*, 114 F. Supp. 2d 204, 226-27 (S.D.N.Y. 2000), and *Frantz v. Northeast Commuter Servs. Corp.*, 1998 U.S. Dist. LEXIS 22764, at *13-15, 1998 WL 967561 (E.D. Pa. Nov. 17, 1998), which similarly determined the existence of a waiver of rights from the unique facts before them.

respective players' associations, and that competent counsel advised EA during its negotiations with CLC, EA did not understand that the license prohibited replicating players' likenesses, notwithstanding any potential First Amendment right to do so. *Cf.* authorities discussed *supra* at 19. EA thus failed to substantiate in its Rule 12(b)(6) motion's reply brief that its defense will prevail as a matter of law.

Further, in refusing to submit the agreement, EA hid the ball from Judge Wilken and Plaintiff on this contract-waiver issue.[7] But because EA bore the burden of proof, this was a game EA could ill afford to play. *See Gallegos v. Parsons*, 315 Fed. Appx. 659, 660 (9th Cir. 2009) (defendants bear the burden of raising and proving affirmative defense, citing cases). The agreement, as alleged, defeats any possible showing by EA that its affirmative defense will prevail as a matter of law, and if its terms are not as Plaintiff alleges, it is too late for EA to submit the agreement here.

---

[7] True, the California supreme court in *Navellier v. Sletten* required plaintiffs to submit the contract as part of their submission of "facts upon which the defendant's liability is based." 29 Cal. 4th at 94. But plaintiffs there asserted (i) a breach-of-contract claim and (ii) were parties to the contract. *Id.* at 87. But *Navellier* is distinguishable. While Plaintiff and Class Members were intended beneficiaries, they were not parties to the agreement, they do not have copies, and they do not assert a breach-of-contract claim. ER130.

### c. EA did not prove that its First Amendment defense will prevail as a matter of law

EA insists Judge Wilken misapplied the transformative-use and public-interest tests for balancing free-speech protection against a plaintiff's publicity rights. EA also contends that Judge Wilken should have adopted a separate test set forth in a false-advertising case, *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). We show below that (i) EA did not prove its First Amendment defense will prevail as a matter of law under the two applicable tests and (ii) the *Rogers* standard does not apply here, nor did EA ask Judge Wilken to adopt it.

### (1) The transformative-use test does not require striking Plaintiff's claim

#### (a) The test shields celebrities from literal depictions or imitations for commercial gain

EA primarily asserts California's transformative-use test to invoke First Amendment protection of its videogames. Under California law, a defendant facing a right-of-publicity challenge to its product can raise as an affirmative defense that the First Amendment protects the product inasmuch as it contains significant transformative elements or that its value does not derive primarily from the celebrity's fame. *Hilton*, 599 F.3d at 909. This transformative-use defense essentially poses a balancing test between the First Amendment and the right of publicity. It shields celebrities from literal depictions or imitations for commercial gain by works that do not add significant new expression. *Id.*; ER7 (citing *Hilton*).

*Hilton* cited *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001), as the defense's source. 599 F.3d at 909-10. The *Comedy III* Court noted the tension between a celebrity's right to publicity and the First Amendment. 25 Cal. 4th at 396-97. The court described the degree of First Amendment protection for noncommercial speech about celebrities, but recognized that the right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility. *Id*. at 397-99. The court resolved this tension by adopting and defining the transformative-use test for determining when the First Amendment protects an expressive work incorporating a celebrity image without permission. To reconcile these opposing rights, the court followed authorities "concluding that depictions of celebrities amounting to little more than the appropriation of the celebrity's economic value are not protected expression under the First Amendment." *Id*. at 400. Protecting the right of publicity serves to prevent unjust enrichment by the theft of good will. Allowing defendant to get free some aspect of plaintiff that would have market value and for which it would normally pay serves no social purpose. *Id*. The state's interest in preventing piracy of others' intellectual property is not automatically trumped by the interest in free expression or dissemination of information. Rather, as in the case of defamation, the state-law interest and the interest in free expression must be balanced, according to the relative importance of the interests at stake. *Id*.

The balance tips in favor of the right of publicity where, as here, the expressive work simply imitates or reproduces the image of another. *Id.* While the "public interest in entertainment will support the sporadic, occasional and good-faith imitation of a famous person,… it does not give a privilege to appropriate another's valuable attributes on a continuing basis as one's own without the consent of the other." *Id.* at 402. The court thus adopted a test that reconciles these competing rights by whether the expressive work imitates or instead significantly transforms a public figure's image. *Id.* at 405.

On this appeal EA must, but cannot, prove that this transformative-use defense will necessarily prevail as a matter of law. Not only does EA ignore the proper standard, it overlooks that the test turns on a fact-specific inquiry, *see Hilton*, 599 F.3d at 910 (citing *Comedy III*, 25 Cal. 4th at 409). EA fails to argue – must less prove – that "no trier of fact could reasonably conclude that the [videogames were] not transformative." *See id*. at 910 n.14. The district court thus correctly rejected the transformative-use test as ground to grant EA's motion.

### (b) The transformative-use test focuses on EA's depictions of players in context

Judge Wilken correctly applied the transformative-use test to focus on EA's depictions of players in context. Realism is the key selling feature that distinguishes EA's games from countless other sports-related videogames. *E.g.,* ER129; *see supra* at 9. Far from being transformative, EA's games replicate

players' identities as closely and literally as possible, and places the virtual players in a digital environment that likewise closely and literally replicates the actual playing environment. For from disputing this, EA asserts instead that its videogames are transformative *only* because the test examines the entire product rather than plaintiff's depiction in context. App.Br. at 27-29, 36-38.

This Court's recent *Hilton* decision, together with the three California state authorities on which it relies, rebut EA's argument. Two factors were central to each of these authorities: (i) the product's depiction of the individual celebrity, including, where appropriate, its appearance, attire, voice and movements, and (ii) the setting in which the celebrity depiction appears. Where, as here, the depiction of these two factors mimick reality, the product was not sufficiently transformative to warrant First Amendment protection.

Reviewing the district-court denial of Hallmark Card's anti-SLAPP motion, this Court ruled in *Hilton* that a greeting card mimicking celebrity Paris Hilton and her role in a television reality show "Working Life" did not entitle Hallmark Cards to the transformative-use defense as a matter of law. 599 F.3d at 911. In the reality show, Hilton lived the life of an average person. In one episode, Hilton worked at a drive-through restaurant, cruising up to customers' cars on roller skates and serving them their orders. Hilton occasionally remarked that a person, thing or event is "hot." *Id.*

The card, drawn in a cartoon style using a photograph of Hilton's head, mimicked this episode. Examining *only* the depiction of Hilton and the setting, the Court found that the card was imitative. As the Court described the card, "we see Paris Hilton, born to privilege, working as a waitress." *Id.* Hilton, as a waitress delivering a plate of food to a diner in a restaurant, utters Hilton's catch-phrase, "that's hot." The Court also noted differences: her uniform, the restaurant format, the food, and Hilton's body drawn as a "generic female body." *Id.*[8]

Despite these differences, the court concluded "the card falls far short of the level of new expression" deemed sufficient in two landmark California state-court decisions finding in favor of the transformative defense, leaving "enough doubt as to whether Hallmark's card is transformative under our case law that we cannot say Hallmark is entitled to the defense as a matter of law." *Id.*

*Hilton* cited three California decisions as establishing the range of expression from imitative to transformative. *See id.* at 909-11. In each, the court limited its inquiry only to plaintiff's image and its setting. *Hilton* first discussed *Comedy III*, which addressed whether an artist's sketch of "The Three Stooges" comedy team reproduced onto tee-shirts was entitled to First Amendment protection from plaintiff's right-of-publicity claims. The owner of the rights to the

---

[8] Images of the card are available on the Internet, for example, at http://cache.daylife.com/imageserve/02ir5GbcfGfoL/610x.jpg (last viewed October 29, 2010).

former comedy act objected to the sale of the tee-shirts and filed suit for violating its rights of publicity.  The artist asserted First Amendment rights in defense, invoking the transformative-use test.

*Comedy III* affirmed plaintiff's right of publicity over defendant's First Amendment right arising from defendant's sketch.  While recognizing that "all portraiture involves the making of artistic choices," the court balanced artistic skill against commercial exploitation:  "when an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame, then the artist's right of free expression is outweighed by the right of publicity."  *Id*. at 408.  The court found that the sketch reflected defendant's "goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame."  *Id*. at 409.

The *Hilton* Court next looked to the California supreme court's application of the transformative test to cartoon figures evoking, but significantly departing from, the images of rock-musician brothers John and Edgar Winter.  *See Winter v. DC Comics*, 30 Cal. 4th 881 (2003), *discussed in Hilton*, 599 F.3d at 910.  The cartoon characters did not "depict plaintiffs literally…. To the extent the drawings … resemble plaintiffs at all, they are distorted for purposes of lampoon, parody, or caricature.  And the Autumn brothers are but cartoon characters – half-human and half-worm …."  *Winter*, 30 Cal. 4th at 890.  Further, these fanciful caricatures

appeared as central characters in a fantastical story alien to the plaintiffs' public personas as musical performers. *See id*.[9]  As this Court described the decision, "[t]he court held the *cartoon characters were sufficiently transformative* to defeat a right of publicity action brought by the entirely human persons on which they were based." *Hilton*, 599 F.3d at 910 (emphasis added).

*Hilton* characterized *Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47 (2006), as "[f]alling somewhere between these two ends of the spectrum ...."  599 F.3d at 910.  *Kirby* applied the transformative test to determine whether a videogame character that borrowed features of an entertainer's image enjoyed First Amendment protection.  Plaintiff, the lead singer of a musical group, sued a videogame distributor for breaching her right to publicity.  The game featured a female lead character resembling plaintiff in many respects.  Relying on *Winter*, the *Kirby* court described the test as requiring it "to examine and compare the allegedly expressive work with the images of the plaintiff to discern if the defendant's work contributes significantly distinctive and expressive content."  144 Cal. App. 4th at 59.

The court meticulously compared the plaintiff and the video character's features, *id.* at 51-52, 56-57, to conclude there were sufficient dissimilarities such

---

[9] Not only were the plaintiff cartoon characters depicted as giant mutant worms, they were also not musicians, but "vile, depraved, stupid, cowardly, subhuman" gun fighters engaged in "wanton acts of violence, murder and bestiality for pleasure ...."  *Id.* at 886.

that the video character (named "Ulala") was an expressive or transformative

character rather than a literal depiction of the plaintiff:

> First, Ulala is not a literal depiction of Kirby.  As
> discussed above, the two share similarities.  However, they
> also differ quite a bit:  Ulala's extremely tall, slender
> computer-generated physique is dissimilar from Kirby's.
> Evidence also indicated Ulala was based, at least in part,
> on the Japanese style of "anime."  Ulala's typical hairstyle
> and primary costume differ from those worn by Kirby who
> varied her costumes and outfits, and wore her hair in
> several styles.

*Id*. at 59.  *Kirby* also contrasted plaintiff's public depictions with the videogame's

setting for and animation of the Ulala character:

> Moreover, the setting for the game that features Ulala – as
> a space-age reporter in the 25th century – is unlike any
> public depiction of Kirby.  Finally, we agree with the trial
> court that the dance moves performed by Ulala – typically
> short, quick movements of the arms, legs and head – are
> unlike Kirby's movements in any of her music videos.

*Id*.  The court concluded, "[t]aken together, these differences demonstrate Ulala is

'transformative,' and respondents added creative elements to create a new

expression."  *Id*.

This focus on the individual depiction in context conforms to

transformative-use rulings within the "fair use" component of trademark-

infringement claims.  *Cf.* App.Br. at 33-34.  In *Mattel Inc. v. Walking Mountain*

*Prods.*, 353 F.3d 792, 802 (9th Cir. 2003) ("*Walking Mountain*"), this Court ruled

that the context in which Barbie dolls appears in photographs determined the

transformative-use test's application to a trademark-infringement claim.  Similarly, the context in which a defendant reproduced concert posters was transformative in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006), and thumbnail images in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007).

**(c)    EA's contrary view is incorrect**

EA insists that the transformative-use test focuses not on the depiction of the plaintiff in context, but on the entire product.  EA builds its argument on the central question of each decision:  "whether *a product containing a celebrity's likeness is so transformed* that it has become primarily the defendant's own expression rather than the celebrity's likeness."  App.Br. at 25 (quoting *Comedy III*, 25 Cal. 4th at 406; emphasis added by EA).  But EA disregards the answer in each decision.  In each, the depiction of the celebrity and related setting in the product was dispositive.  The courts were unconcerned with the product's other, unrelated elements.

*Kirby*, for example, ignored the many other characters populating the video-game at issue.  By comparing "the allegedly expressive work with the images of the plaintiff," *Kirby* found that that "Ulala" – not the videogame – "is 'transforma-tive'" and that the Ulala character is the work to which defendants "added creative elements to create a new expression."  *See* 144 Cal. App. 4th at 59, 61.  Indeed,

*Kirby* applies the phrases highlighted by EA (*see* App.Br. at 27-28) specifically to

the Ulala character:

> [A]ny imitation of Kirby's likeness or identity in Ulala is
> not *the sum and substance of that character*. Rather, the
> imitation is part of *the raw material from which the Ulala
> character, and [the videogame], were synthesized*. As in
> *Winter*, Ulala is a "fanciful, creative character" who
> exists in the context of a unique and expressive video
> game. Similar facts distinguished *Winter* from *Comedy
> III*, and the same distinction applies here. [Defendants']
> *portrayal of Ulala* is protected by the First Amendment.

*Id.* at 61 (emphasis and brackets added; original brackets omitted).

Explaining *Kirby*, this Court likewise identified the significant differences

between plaintiff's public images and the Ulala character's appearance, attire,

movements and the setting as rendering Ulala "more of a 'fanciful, creative

character' than an 'imitative character.'" *Hilton*, 599 F.3d at 911. This Court did

not indicate that the videogame's other elements could be relevant.[10]

Examining the greeting card at issue in *Hilton*, this Court similarly did not

look beyond the card's depiction of plaintiff to unrelated features. The Court did

not consider, for example, whether the other character in the illustration (the diner)

or the text and font appearing on the inside of the card were creative or imitative.

The *Winter* court, finding that "plaintiffs are merely part of the raw materials from

---

[10] Nothing in the *Kirby* decision or the *Hilton* Court's explanation of *Kirby*
supports EA's view that "the game's theme music, story lines, and different levels
of difficulty all were relevant to the court's conclusion," *cf.* App.Br. at 28.

which the comic books were synthesized," also examined only the depictions of plaintiffs and their settings, ignoring the comic book's other components, such as the illustrations of other characters and their actions and scripts. 30 Cal. 4th at 890. Indeed, answering the central question of "whether the work is transformative" (*id.* at 891), *Winter* looked *only* to the depictions in context:

> [D]efendants essentially sold … DC Comics depicting fanciful, creative characters, not pictures of the Winter brothers. This makes all the difference. [*Id*. at 892.]

*See also Hilton*, 599 F.3d at 910 (*Winter* "held the cartoon characters were sufficiently transformative to defeat a right of publicity action").[11] As Judge Wilken explained in this case, these courts thus deemed the products at issue to be transformative or imitative based solely on the celebrity depiction and context, not other elements of the products. ER10. Rejecting EA's over-broad view of the test, she concluded, "[t]hese cases show that this Court's focus must be on the depiction of Plaintiff in 'NCAA Football,' not the game's other elements." *Id.*

EA asserts that the transformative-use test, as construed by Judge Wilken and Plaintiff, is inconsistent with *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860 (1979) (Byrd, J, concurring), and would prohibit an array of films, plays, songs and other expressions that incorporate celebrity likenesses. App.Br. at 30-

---

[11] EA admits that *Winter* focused on the "physical transformation of the plaintiffs' likeness," but EA downplays it as "not necessary to the court's holding. App.Br. at 26. To the contrary, the court's conclusion regarding the "fanciful, creative" depictions *was* the decision's holding.

31.  This argument is a red herring.  As EA's own arguments reflect (*see id*. at 46-49), the transformative-use test is not the only gauge of free-speech rights. *Guglielmi* did not mention the test, and the First Amendment can protect an expressive work's use of a public figure's likeness irrespective of whether the particular use is transformative.  See, for example, *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (1993), *discussed infra* at 58.

EA criticizes Judge Wilken for having "failed to address" *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915 (6th Cir. 2003), yet EA's strike motion never cited it.  SER2-6, SER21.  In addition, *ETW* evaluated plaintiff's depiction in context, consistent with Plaintiffs' authorities.  Defendant published limited-production prints of a painting created by a "sports artist" who "created paintings of famous figures in sports and famous sports events."  332 F.3d at 918.  The painting at issue was entitled *The Masters of Augusta* and commemorated plaintiff Tiger Woods' 1997 Masters Tournament victory.  *Id*.  The painting consisted of "a collage of images in addition to Woods's image …," *id*. at 938; *see also id*. at 918, that "combined to describe, in artistic form, a historic event in sports history and to convey a message about the significance of Woods's achievement in that event," *id*. at 938.  But Woods did not, as the collage depicted, play with "famous golfers of the past looking down on" him, *see id*. at 918.  Given this setting, the court found the collage's commemorative context to exhibit "substantial transformative

elements." *Id*. at 938. Here, by contrast, EA replicates Plaintiff and his actual playing environment as precisely as possible, without any such "transformative elements."

> **(d)    EA has not proved that every reasonable juror would find the depictions transformative**

Judge Wilken then applied the properly construed test to find that EA did not meet its burden to show that its depiction of Plaintiff Keller was transformative. EA's depictions of Plaintiff and other NCAA players are "imitative" rather than "fanciful" and "creative," which, at minimum, raises a question of fact whether EA's defense will prevail. Plaintiff Keller was the starting quarterback for Arizona State University in 2005. ER137. His virtual counterpart in EA's *NCAA 2006 Football* videogame was a literal copy of Keller. Like real-life Keller, virtual-Keller:

- plays the same position

- wears the same jersey number

- is the same height

- is the same weight

- has the same skin tone

- has the same hair color

- has the same hair style

- is right-handed

- wears the same equipment

- is from the same state

- has the same facial features, and

- is the starting quarterback for Arizona State University's football

  team.  ER137-39.

EA also animated the virtual Keller to use the same playing style as real-life Keller.  For example, if the computer was controlling virtual-Keller, it would match real-life Keller's preference of throwing from a "pocket" formed by his offensive line after the ball is snapped.  ER137-38.

EA's replication of players also updates the virtual players through successive annual videogame editions to track changes in real-life players' collegiate careers.  ER136-38.  In sum, just as Judge Wilken found, EA's virtual-world characters replicated real-world identities.  *See* ER9-10.

Keller is but one example.  EA's videogames replicate the other players members of the proposed Class with equal accuracy.  *See* ER130-34.  The players' names are the only identity detail missing from EA's videogames as published, but EA even provides for that.  It designed its games to facilitate easy downloading of players' names from third-party sources into the games.  Once downloaded, the names attach to the corresponding virtual player.  The default jerseys in the game

that contain only player numbers are replaced with jerseys that contain both the player's actual name and number; in-game announcers then refer to players by their real names.[12]  ER134-36.

Comparing these facts to the Ulala character in the videogame at issue in *Kirby* demonstrates why a reasonable juror could conclude that EA's virtual players are imitative rather than transformative.  In *Kirby*, Ulala and plaintiff shared some physical similarities, but "they also differ[ed] quite a bit …."  144 Cal. App. 4th at 59; *see also Hilton*, 599 F.3d at 911.  One was tall and slender, one was not.  *Kirby*, 144 Cal. App. 4th at 59.  Ulala's hairstyle and primary costume differed from those worn by Kirby.  Ulala was animated very differently from Kirby's movements in her music videos.  *Id.* at 57, 59.  In contrast, virtual-Keller mimics real-life Keller in all material respects, in appearance, reported size, history and playing ability and style.  EA does not try to identify meaningful differences.

Likewise, in *Kirby* "the setting for the game that features Ulala – as a space-age reporter in the 25th century – is unlike any public depiction of Kirby."  *Id.* at 59.  But here, hardly the "unique and expressive video game" presented in *Kirby*, *id.* at 61, the virtual world in which virtual-Keller plays reproduces Keller's actual

---

[12] EA did not dispute these allegations below or now.  *See* App.Br. at 37-39; SER7.

playing environment to the fullest extent possible.  The virtual uniform, field,

logos, stadiums and mascots purposefully and exactly match their real-world

counterparts.  ER129.  Indeed, EA spends millions each year to ensure the realism

of the games, and advertises this realism in promoting its products.  *Id.*  EA freely

admits that its videogames' replication of actual football and basketball players,

teams and game environments is the heart of their attraction to videogamers,

distinguishes EA's NCAA/NFL/NBA video-games from their competitors, and

translates directly into increased sales and more money for EA.  *See supra* at 9-10;

ER129.  Judge Wilken thus found:

> EA does not depict Plaintiff in a different form; he is
> represented as he what he was …. Further,… the game's
> setting is identical to where the public found Plaintiff
> during his collegiate career:  on the football field.
> [ER10.]

ER's literal depiction of Keller and other players, and placing them in a

virtual environment that copies their actual playing environments, is the same sort

of "literal, conventional depictions" of a public figure as the sketch in *Comedy III*,

25 Cal. 4th at 409.  The misappropriation is also for the same reason – to exploit

the public figure's fame – where realistic replication of players sells more EA

videogames.  ER129.  EA can little assert First Amendment protection because the

value of its NCAA videogames "derive primarily from the celebrity's fame."  *See*

*Hilton*, 599 F.3d at 909 (quoting *Comedy III*, 25 Cal. 4th at 407).  As in *Comedy*

*III*, the balance of competing rights denies EA First Amendment protection for exploiting Keller's image for economic gain.  More to the point, EA's literal and lucrative depictions raises doubt, as in *Hilton*, whether a reasonable juror would necessarily find that virtual-Keller and the rest of the virtual players are transformative, not imitative.  This doubt compels denying EA's motion.  The district court did not err.

EA nonetheless insists its videogames are significantly transformative to merit First Amendment protection.  Conceding by silence that its games digitally replicate players and their playing environments, EA points to *other, unrelated elements* of the games, to "graphics, videos, sound effects, and game scenarios" as its evidence of transformative creativity.  App.Br. at 36-37, 37-38.  But as already shown, the transformative-use test examines the product's depiction of the celebrity and related setting; unrelated features, like the rendering of the second character on the greeting card in *Hilton* or peripheral characters populating the videogame in *Kirby* or the comic book in *Winter*, were immaterial.  *See supra* at 33-37.  Indeed, *Kirby* considered a videogame that certainly also employed "graphics, videos, sound effects, and game scenarios."  But to the extent these features were unrelated to the game's depiction of the plaintiff in context, they were outside the court's analysis.

It is likewise immaterial that virtual-Keller is "only a single player among thousands ...." App.Br. at 38.  In any event, EA violates the publicity rights of every one of those thousands of players, all of whom are members of the class as alleged.  ER141.  A reasonable juror could find that these thousands of replicated virtual players collectively are the EA games' predominant feature.  *Cf. Winter*, 30 Cal. 4th. at 889; *Comedy III*, 25 Cal. 4th at 407.

EA also touts that its games are interactive, allowing users "to become the storyteller by directing strategy decisions and controlling individual athlete's movements."  *Id*. at 37.  But the videogame in *Kirby* was similarly interactive, allowing the player to control aspects of the Ulala character.  *See, e.g.,* 144 Cal. App. 4th at 52 ("[t]he player attempts to have Ulala match the dance moves of the other characters").  This feature had no bearing on the court's analysis.  Nor should it here.  Just as Judge Wilken concluded, EA failed to plead and substantiate that its First Amendment defense will prevail as a matter of law.

Plaintiff's right-of-publicity claim thus has at least minimal merit.  The district court properly denied EA's anti-SLAPP motion.

> **(2)    There is no general public-interest exception for sports creating a right to pirate players' identities**

Judge Wilken also properly rejected EA's assertion of a separate public-interest test to invoke First Amendment protection for pirating players' likenesses. ER46-49.  Under California law, no cause of action will lie for publishing matters

in the public interest, "which rests on the right of the public to know and the freedom of the press to tell it.'" *Hilton*, 580 F.3d at 892; ER10.

EA insists there is an "anything about sports" public-interest rule that trumps athletes' publicity rights by granting EA free use of those identities. But EA undercuts its First Amendment public-interest argument by purchasing rights from the NFL Players Union for its NFL games. *See generally Parrish v. National Football League Players, Inc.*, 2009 U.S. Dist. LEXIS 4239, at *11 (N.D. Cal. Jan. 13, 2009) (recognizing that active players in the National Football League are paid "massive dollars" for the license to use their names and likenesses in EA videogames). EA annually pays $35 million to the NFL Players Union to use NFL players' images in the same kind of videogame. ER136. Similarly, it buys rights from the NCAA to replicate game environments and team images in its NCAA games. *See generally Gridiron.Com, Inc. v. NFL*, 106 F. Supp. 2d 1309, 1315 (S.D. Fla. 2000) (rejecting argument that "the [NFL player] information the websites produce are entitled to Free Speech protection" in part because the websites' publisher "actively sought out and obtained over 150 NFL Player's [*sic*] publicity rights").

More to the point, EA's "anything about sports" public-interest rule does not exist. The right of publicity yields to free use of a public figure's name and likeness only to the extent reasonably required to *report* information to the public.

The *Hilton* Court revisited the public-interest exception, confirming that it applies only to such factual reporting:

> The case that established the defense explicitly linked it to the publication of newsworthy items…. Later opinions confirm the impression that it is about such publication or reporting….
>
> We must conclude that Hallmark cannot employ the "public interest" defense because its birthday card does not publish or report information.

599 F.3d at 912 (citations omitted). *See also Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (quoting *Eastwood v. Superior Ct.*, 149 Cal. App. 3d 409, 422 (1983)).  The exception thus does not reach to EA's replicating players' identities for video-gaming purposes.

The right to report on any particular matter of public interest stems from a balancing of competing rights:  (i) "the right to be protected from unauthorized publicity" and (ii) "the public interest in the dissemination of news and information consistent with the democratic processes under the constitutional guaranties of freedom of speech and of the press."  *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 409 (2001).  In sports contexts, courts find that this balance allows *reporting of an athlete's statistics and image* to the public, as EA's authorities show.  In *Gionfriddo*, former baseball players sued defendants association, licensing agent, and television producer, claiming that including the players' statistics and names in programs and websites were unauthorized and violated their

publicity rights.  But the challenged uses consisted of "factual data concerning the players, their performance statistics, and verbal descriptions and video depictions of their play," which the court characterized "simply making historical facts available to the public through game programs, Web sites and video clips."  94 Cal. App. 4th at 410-11.  Given the public interest in baseball, this interest extends to publishing "factual data" about player accomplishments and other baseball news.  *Id.* at 411.  *See also id.* at 415-16; ER11 (explaining *Gionfriddo*).

EA's federal authorities, *C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 823-24 (8th Cir. 2007), and *CBS Interactive, Inc. v. NFL Players Ass'n*, 2009 U.S. Dist. LEXIS 36800, 2009 WL 1151982 (D. Minn. Apr. 28, 2009), similarly permitted reporting of publicly available sports data.  Both decisions addressed fantasy sports games that imported player performance statistics from the public domain.  In *C.B.C.*, the Eighth Circuit focused on the kind of information at issue, which was "all readily available in the public domain."  505 F.3d at 823.  The court reasoned "it would be strange law that a person would not have a first amendment right to use information that is available to everyone."  *Id*.  The court adopted *Gionfriddo*'s conclusion that reporting and discussing "factual data concerning the athletic performance" of professional baseball players is protected expression.  *Id*. at 823-24.

As in *C.B.C.*, the fantasy-sport product at issue in *CBS Interactive* compiled public information about professional ball players and reported them to gamers via games and websites. 2009 U.S. Dist. LEXIS 36800, at *6-7. Even as to the product's websites, which reported biographical information about the players that went beyond their actual statistics, the use of this information was "akin to newspapers and magazines …." *Id.* at *62.

These decisions are distinguishable, however, because they did *not* concern an effort to appropriate athletes' identities separate and apart from reporting past performance data. While fantasy-sports products allow gamers to create fantasy teams comprised of the current statistics of real players chosen by the gamers, any such fantasy team's performance "depends on the actual performance of the fantasy team's players on their respective actual teams during the course of the major league baseball season." *C.B.C.*, 505 F.3d at 820-21; ER12. The fantasy-sports products are thus essentially databases of reported statistics that, as they update over the course of a playing season, determine the outcome of gamers' choices. The court hence analogized the case to *Gionfriddo*, holding that the use of players' information in the game was a "recitation and discussion" of the players' information. *C.B.C.*, 505 F.3d at 823-24; ER13 (explaining *C.B.C.*).

But EA's games are very different. EA videogames digitally replicate NCAA players for gamers to manipulate. *See supra* at 8-9, 37-39. But EA games

do not report real-life statistics or provide a database of player performance. Unlike fantasy-sports products' use of player statistics and other historical facts from the public domain to mirror the real players, EA videogames digitally replicate the players for gamers to control independently and prospectively. EA's games, while accurately depicting and animating players' digital replicants, thus do not report publicly available sports information, thereby distinguishing *Gionfriddo*, *C.B.C.* and *CBS*. *See Gridiron.Com*, 106 F. Supp. 2d at 1315 (First Amendment must defer to right of publicity for unauthorized uses of player images that "go way beyond merely conveying the news"). And as Judge Wilken reasoned, *C.B.C.* is also inapposite also because "[s]uccess in 'NCAA Football' does not depend on updated reports of the real-life players' progress during the college football season." ER13. The district court properly concluded that "EA's use of Plaintiff's likeness goes far beyond what the court considered in *C.B.C. Distribution*." *Id*.

EA's other authorities also concern reporting of newsworthy sporting events. EA cites *Montana v. San Jose Mercury News*, 34 Cal. App. 4th 790 (1995), which held that quarterback Joe Montana's leading "his team to four Super Bowl championships in a single decade" was "clearly a newsworthy event," and that posters depicting this success thus enjoyed First Amendment protection. *Id*. at 795. There, plaintiff conceded that the First Amendment protected the original newspaper accounts of these championships, but challenged reproducing them as

posters. *Id*. at 794. The court held that the posters were entitled to the same First Amendment protection as the original news stories. *Id.*; ER11-12. EA fails to identify any similarly "newsworthy event" that could possibly protect its misappropriating Plaintiff's image. Further, *Montana* did *not* find there was sufficient public interest in all sports-related information to invoke universal First Amendment protection.

Finally, to the extent any of EA's remaining authorities (App.Br. at 19 n.42) address the public's interest in college sports at all, they do not involve disputes arising from the reporting of game or player information.

**(3)     The *Rogers* test is inapplicable**

**(a)     There is no error because EA did not ask the district court to employ the *Rogers* test**

EA protests that Judge Wilken erred by not adopting a test employed in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). Misrepresenting that it "raised *Rogers* as a defense below," App.Br. at 39 n.63, EA urges this Court to adopt the *Rogers* test here. But EA never asked Judge Wilken to adopt *Rogers*, leaving EA no basis to assert error. EA's motion to strike advanced the First Amendment as an affirmative defense, based on the transformative-use and public-interest tests *only*. *See* SER17, incorporated by reference at SER24. The strike motion cited *Rogers* just once (ER125; *see also* SER3), but EA did *not* ask Judge Wilken to adopt *Rogers*' relatedness test. EA cited *Rogers* only to support the proposition

that "publicity rights claims traditionally have succeeded … where the challenge is directed towards the use of a person's name or likeness in an advertisement or endorsement to promote an unrelated product."  ER124-25.  EA cited "[t]he line of authority restricting the use of a celebrity's likeness in commercial advertising," and described the "relatedness" test used in *Rogers* as examining whether the challenged use is "simply a disguised commercial advertisement for the sale of goods or services."  ER125.  EA noted, correctly, that "[t]his is not the case here." *Id.*[13]

　　EA's argument that *Rogers* offers the proper First Amendment test in this case thus appears for the first time on this appeal.  But as the appellant complaining of error at the district court, EA cannot raise new issues on appeal.  This Court's precedent is clear:  absent exceptional circumstances, the Court will not consider an issue raised for the first time on appeal.  The argument must have been raised sufficiently for the trial court to rule on it.  *See, e.g., Gieg v. DRR, Inc.*, 407 F.3d 1038, 1046 n.10 (9th Cir. 2005) (holding that appellees had waived argument not raised below); *Moore v. Czerniak*, 574 F.3d 1092, 1116 (9th Cir. 2009) (waiver extends to arguments, facts and legal theories).  It was not, and the Court should not hear the new argument in these circumstances.

---

[13] EA's reply brief did not cite *Rogers*.  SER21-22.

### (b)    Judge Wilken did not err also because the *Rogers'* test is inapplicable

Additionally, Judge Wilken did not err because the *Rogers* test applies only to allegations of infringing use in titles and advertising, but not here.  The *Rogers* test as applied to certain right-of-publicity claims modified a related test applying to Lanham Act claims.  *Rogers* "requires courts to construe the Lanham Act 'to apply to artistic works *only* where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression.'"  *Walking Mountain*, 353 F.3d at 807 (emphasis in original) (quoting *Rogers*, 875 F.2d at 999).  The *Rogers* test as it applies to Lanham Act claims contains two prongs.  An artistic work's use of a trademark that otherwise would violate the Lanham Act is not actionable "'unless the [use of the mark] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [it] explicitly misleads as to the source or the content of the work.'"  *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) ("*MCA*") (quoting *Rogers*, 875 F.2d at 999).  This test is tailored to Lanham Act's central purpose of preventing consumer confusion in the marketplace by allowing a trademark owner to "prevent[] others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner."  *See Walking Mountain*, 353 F.3d at 806-07; *MCA*, 296 F.3d at 900.  While the test originally applied only to use of a trademark in an artistic work's title, the test's focus on consumer confusion led courts to extend its

reach into infringing trademark use within the body of the work.  *See E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008).

But a right-of-publicity claim differs from a Lanham Act claim in a crucial respect:  a right-of-publicity claim requires no evidence of consumer confusion. *Rogers*, 875 F.3d at 1004; *Parks v. LaFace Records*, 329 F.3d 437, 460 (6th Cir. 2003).  As a result, the *Rogers* test as applied to a right-of-publicity claim is different.  It eliminates the consumer-confusion prong and asks instead whether the infringing use is "a disguised commercial advertisement" or "solely to attract attention."  *See id*. at 461; *Rogers*, 875 F.3d at 1004-05.

Given the prong's focus on infringing use as disguised advertising, the test applies only to right-of-publicity claims arising from unauthorized use of celebrity names and/or likenesses in titles, advertising or other promotions.  In *Rogers*, plaintiff Ginger Rogers' right-of-publicity claim arose from allegations of unauthorized use of her name for advertising purposes.  875 F.2d at 997; *id.* at 1005 (Griesa, J. concurring).  The only issues raised by Rogers on appeal related to the infringing use in the film's title and advertising, and the majority opinion only addressed the use in the title.  *Id*.  The court held, "the title 'Ginger and Fred' is clearly related to the content of the movie and is not a disguised advertisement for the sale of goods or services or a collateral commercial product."  *Id*. at 1004-05.

Likewise, in *Parks v. LaFace Records*, plaintiff Rosa Parks asserted a similar claim arising from the unauthorized use of her name in a song title. 329 F.3d at 443-44. *Parks* held, "a title that uses a celebrity's name will be protected by the First Amendment unless the title is 'wholly unrelated' to the content of the work or was 'simply a disguised commercial advertisement for the sale of goods or services.'" *Parks*, 329 F.3d at 460 (quoting *Rogers*). Finding the existence of a factual dispute, the *Parks* court rejected automatic First Amendment protection "when it comes to naming and advertising" an artistic work. *Id*. at 447. In *Elvis Presley Enters. v. Capece*, 950 F. Supp. 783, 802 (S.D. Tex. 1996), *rev'd on other grounds*, 141 F.3d 188 (5th Cir. 1998), in applying *Rogers* to test whether a restaurant name, "the Velvet Elvis," was actionable, the court likewise tied the *Rogers* test to product promotion, explaining that it applies to determine whether "book, movie, or song titles using celebrities names are not violative of publicity rights and are protected speech under the First Amendment …." *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 336-38 (E.D. Pa. 1996), also applied *Rogers* only to disguised commercial advertising allegations. The decision cited *Rogers* for plaintiff's right-of-publicity claim arising from use of his name and likeness on the cover of a musical CD/cassette, but declined to cite it relating to right-of-publicity claim for use within the expression. *Id.* at 336-37, 340. *See also Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 971-76

(10th Cir. 1996) (while citing *Rogers* for other purposes, does not apply *Rogers'* test to right-of-publicity claim challenging the substance of defendant's expression).

EA's authority, *Romantics v. Activision Publ'g, Inc.*, 574 F. Supp. 2d 758 (E.D. Mich. 2008), is similar. Plaintiff band members contended that defendants' use in a videogame of a song made famous by the band constituted false endorsement. Specifically, asserting a Michigan right-of-publicity claim, they claimed that the song had been "frequently used in commercials and films," and thus many consumers of the videogame were likely confused or deceived about whether the band sponsored or endorsed the game. *Id.* at 762-63. In dismissing the claim, the court interpreted Michigan's right-of-publicity law as arising from a celebrity's interest in protecting from exploitation the value of a celebrity's identity "in the *promotion of products*." *Id.* at 764 (emphasis in original) (quoting *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 835 (6th Cir. 1983)). The court thus applied *Rogers* to dismiss under the First Amendment because, under the facts of that case, the song "cannot be 'a disguised commercial advertisement.'" *Id.* at 766. But unlike Michigan law, California's right-of-publicity law is not confined to wrongful-promotion claims. See, for example, CAL. CIV. CODE

¶ 3344(a); *Comedy III*; *Winter*; *Hilton*. *Romantics* thus does not counsel for applying the *Rogers* test here.[14]

EA's two other authorities are not contrary; neither addressed a state-law right-of-publicity claim. Plaintiff in *E.S.S.* asserted no right-of-publicity claim at all. *See* 547 F.3d at 1097. The decision thus says nothing about how *Rogers* applies to such claims and does not support applying the *Rogers* test to right-of-publicity claims not involving a product title or advertising. EA's reliance on *Brown v. Electronic Arts*, Case No. 09-56675, Slip Op. (C.D. Cal. Sept. 23, 2009), fails because *Brown*, like *E.S.S*, did not apply *Rogers* to a right-of-publicity claim. Plaintiff Brown alleged liability "under a theory of false endorsement." *See* Slip op. at 3:3, 4:25-26, 5:1-12. The court thus identified the "relevant inquiry" as "whether people playing *Madden NFL* would be misled into thinking that Brown is somehow behind the game or sponsors the product." *Id.* at 8:15-17 (citing *E.S.S.*, 547 F.3d at 1100). The court answered in the negative, and dismissed plaintiff's Lanham Act claim. *Id*. at 9. It then declined to exercise supplemental jurisdiction

---

[14] *Romantics* is also unpersuasive to the extent it applies *Rogers* to a right-of-publicity claim not based on wrongful promotion, which would make *Romantics* the only ruling to do so. Yet *Romantics* applied *Rogers* without a thought whether it was appropriate. *See* 574 F. Supp. 2d at 765. And again without analysis, *Romantics* is the only right-of-publicity decision to apply *Rogers* to the body of an expression. It is, as such conclusory, contrary to all authority, and should be rejected. As all other authorities recognize, the *Rogers* test applies only to instances of infringing use in a product title or advertising.

over the state-law claims and dismissed them *without* considering their merits. *Id.*
*Brown* and *E.S.S.* are thus poor authority that Judge Wilken erred by not adopting
the *Rogers* test here.

Keller does not allege EA used his name or likeness as a disguised advertise-
ment. His argument is that EA used his likeness in its videogames without
permission. Accordingly, the two *Rogers* factors, whether use of the plaintiff's
identity in a product title or promotions is (i) "wholly unrelated" to the content of
the work or (ii) "simply a disguised commercial advertisement for the sale of
goods," are meaningless here. The transformative-use and public-interest tests
easily accommodate the circumstances of the present case. Judge Wilken properly
did not try to contort *Rogers* to fit this case.

### (c) Even if *Rogers* applies, EA cannot demonstrate that Plaintiffs have no probability of prevailing

Further, even if the Court applies *Rogers*, EA clearly uses players'
likenesses to advertise and promote its games. EA claims that its use of Plaintiff's
likeness escapes liability under the *Rogers* test because EA "never used Keller in
any advertising, and … his alleged likeness appeared only as one of thousands of
virtual players." App.Br. at 6. EA submitted no evidence that it never used
Keller's likeness in its marketing materials, and in fact, EA clearly uses player
likenesses to promote the game. For example, EA's website is loaded with

videogame clips and videogame screen shots that use actual players' likenesses and are clearly designed to promote the game.  ER134-35.[15]

Further, if the Court were to ignore EA's marketing materials but deem *Rogers* to encompass infringing uses within the videogames, EA's use of player likenesses constitutes "disguised advertising."  EA spends millions of dollars every year to achieve the "almost photographic realism" of its games, and "advertises this realism in the promotion of its products."  ER129.  Plaintiff alleged, and EA never contested, that EA bases its entire marketing strategy on this "photographic realism" – which "translates directly into increased sales, and therefore increased revenues" from the games.  *Id*.  It specifically uses slogans like "You're in the game!" to boast about the painstaking detail in which it has replicated both playing environments and player likenesses.  EA thus clearly uses player names and likenesses to promote and advertise its NCAA-brand videogames.

Moreover, Plaintiff has alleged sufficient facts to present a factual question of whether EA's use of player likenesses would confuse consumers.  The bulk of EA's argument regarding the *Rogers* test cites language from the *Rogers* court's test for Lanham Act claims of false endorsement, not from its right of publicity test, which it incorrectly claims is "nearly identical."  App.Br. at 40.  But even if

---

[15] Had EA actually requested that Judge Wilken apply the *Rogers* test, Plaintiff could have submitted many other examples of EA's use of player names and likenesses in print, web and other advertisements.

the Court decided to apply the "false endorsement" prong of the *Rogers* test to Plaintiff's claims, the facts alleged in the complaint clearly could support a finding that the use of NCAA player likenesses confuses consumers as to whether or not the players had "approved" EA's games by licensing their likenesses. As Plaintiff alleged, EA spends millions of dollars in licensing fees in order to use professional player likenesses, as well as team and league trademarks. ER129, ER136. As a result, the likelihood that consumers would presume that NCAA players also have approved of the use of their likenesses precludes EA from proving its defense here as a matter of law. *See*, *e.g., National Football League Prop., Inc. v. Wichita Falls Sportswear, Inc.*, 532 F. Supp. 651, 659 (W.D. Wash. 1982) (finding a likelihood of confusion where a substantial percentage of the public was likely to "believe[] that the manufacturer was required to obtain authorization from the NFL or one of the member clubs in order to manufacture [its product]").

### d.  EA's use of players' likenesses does not fall within California Civil Code § 3344(d)'s public-affairs exemption

EA asserts a sweeping, but incorrect, view of § 3344's exception for reporting of "public affairs." Section 3344(d) of the California Civil Code provides: "*For purposes of this section*, a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports *broadcast or account*, or any political campaign, shall not constitute a use for which consent is required under subdivision (a)." (Emphasis added.) First, on its

face, the exception applies, at most, only to Plaintiff's § 3344 claim, ER144.  *See generally Montana*, 34 Cal. App. 4th at 793-94 ("the statutory cause of action specifically exempts from liability …").

Second, this public-affairs "broadcast or account" exemption is similar to (but not identical, *see* ER13-14) the exception developed under the common law tort for reporting of matters of "public interest."  *See, e.g., Montana*, 34 Cal. App. 4th at 793-94; *Stewart*, 181 Cal. App. 4th at 680.  It exempts broadcasts and accounts of events involving news, public affairs or sports.  As the *Montana* court explains, "[l]ike the common law cause of action, the statutory cause of action specifically exempts from liability the use of a name or likeness in connection with the *reporting* of a matter in the public interest."  34 Cal. App. 4th at 793-94 (emphasis added; citing § 3344(d)); ER15 (quoting *Montana*).

Accordingly, EA's authorities (and every decision Plaintiff has found) applying § 3344(d) to dismiss a § 3344 claim involved some sort of factual reporting.  *Montana* considered posters of newsworthy photographs reprinted from the defendant's newspaper.  *Gionfriddo* examined websites, documentaries and day-of-game programs.

*Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (1993), involved plaintiff's name and likeness used in a surfing documentary that chronicled "a certain time and place in California history and, indeed, in American legend."  *Id.*

at 543.  The plaintiff's contribution to the development of the surf life-style and his influence on the sport was "the point of the program."  *Id.*  As one district court explained, *Dora* addressed an exercise of "journalism."  *Chapman v. Journal Concepts, Inc.*, 528 F. Supp. 2d 1081, 1097 (D. Haw. 2007).  *See also Dyer v. Childress*, 147 Cal. App. 4th 1273, 1281 (2007) (describing the documentary in *Dora* as "an account of the biographical events of [the] life [of a legendary figure in surfing lore, which] depicted a time and place in California history").  But *Dora* did not find a public interest in surfing generally that grants a *carte blanche* right to appropriate images of surfers for commercial purposes.  *See Downing*, 265 F.3d at 1002.  The *Downy* Court distinguished *Dora* because the sales catalog at issue used surfer images but did not report facts:  "Abercrombie used Appellants' photograph essentially as window-dressing to advance the catalog's surf-theme."  *Id*.

The court in *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 754 (N.D. Cal. 1993), looked at a television news-magazine program.  The plaintiff in *Maheu v. CBS*, 201 Cal. App. 3d 662 (1988), challenged defendants' reporting in a book and magazine articles.  *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 310 (9th Cir. 1992), involved "news accounts" and the reporting of related information, as did *Eastwood v. Superior Ct.*, 149 Cal. App. 3d 409, 421-22 (1983), on which *New Kids* relied.

EA's games, by contrast, do not constitute factual reporting.  *See supra* at 46-47.  Judge Wilken thus correctly found that EA's appropriation of Keller's identity hence is not within § 3344(d):  "EA is not entitled to the statutory defense because its use of Plaintiff's image and likeness extends beyond reporting information about him."  ER15.

### e. Judge Wilken properly refused to strike Plaintiff's ancillary claims

Because EA failed to prove any of its defenses beyond reasonable doubt, the district court properly refused to strike any of Plaintiff's claims.

## VII.  CONCLUSION

For the reasons set for above, the Court should affirm Judge Wilken's denial of EA's motion to strike.

Dated:  October 29, 2010

HAGENS BERMAN SOBOL SHAPIRO LP


By _____s/Robert B. Carey_____
        ROBERT B. CAREY
        Leonard W. Aragon
        HAGENS BERMAN SOBOL
        SHAPIRO LLP
        2425 East Camelback Road, Suite 650
        Phoenix, Arizona 85016
        Telephone: (602) 840-5900
        Facsimile: (602) 840-3012
        rcarey@hbsslaw.com
        leonard@hbsslaw.com

Steve W. Berman
Erin K. Flory
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@smplegal.com

*Attorneys for Plaintiff*

<h1 style="text-align:center">CERTIFICATE OF COMPLIANCE</h1>

I certify under Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1 that the opening brief is proportionally spaced, has a typeface of 14 points and contains 13,950 words (excluding the cover page, table of contents, table of authorities, certificate of service, and certificate of compliance).

DATED:  October 29, 2010

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____s/ Robert B. Carey_____
        ROBERT B. CAREY
        Leonard W. Aragon
        HAGENS BERMAN SOBOL
        SHAPIRO LLP
        2425 East Camelback Road, Suite 650
        Phoenix, Arizona 85016
        Telephone: (602) 840-5900
        Facsimile: (602) 840-3012
        rcarey@hbsslaw.com
        leonard@hbsslaw.com

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Plaintiff-Appellee notifies the Court that the appeal in *Brown v. Electronic Arts, Inc.* (No. 09-56675) is related to this appeal and, by Order of this Court dated April 30, 2010, the two appeals "will be assigned to the same panel, if practicable." ER23.

DATED:  November 2, 2010

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____ s/ Robert B. Carey _____

  ROBERT B. CAREY
  Leonard W. Aragon
  HAGENS BERMAN SOBOL
  SHAPIRO LLP
  2425 East Camelback Road, Suite 650
  Phoenix, Arizona 85016
  Telephone: (602) 840-5900
  Facsimile: (602) 840-3012
  rcarey@hbsslaw.com
  leonard@hbsslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 29, 2010.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

**SEE ATTACHED SERVICE LIST**

          s/ Robert B. Carey
            Robert B. Carey

United States Court of Appeals for the Ninth Circuit
Case No. 10-15387

**SERVICE LIST**

| | |
|---|---|
| Bryan Clobes<br>CAFFERTY FAUCHER LLP<br>1717 Arch Street, Suite 3610<br>Philadelphia, PA 19103<br><br>**VIA U.S. MAIL** | Donald Scott Macrae<br>STEYER LOWENTHAL BOODROOKAS<br>ALVAREZ & SMITH LLP<br>One California Street, Suite 2500<br>Philadelphia, PA 19103<br><br>**VIA U.S. MAIL** |
| Joe Sibley<br>KIWI ALEJANDRO DANAO CAMARA<br>CAMARA & SIBLEY LLP<br>2339 University Blvd.<br>Houston, TX 70005<br><br>**VIA U.S. MAIL** | |