No.  10-15387
N.D. Cal. No. 3:09-CV-01967-VRW

**IN THE UNITED STATES COURT OF**

**APPEALS FOR THE NINTH CIRCUIT**

_____

SAMUEL MICHAEL KELLER,

Plaintiff and Appellee,

v.

ELECTRONIC ARTS, INC.,

Defendant and Appellant

_____

**BRIEF FOR AMICI CURIAE IN SUPPORT OF
APPELLEE BY THE NATIONAL FOOTBALL
LEAGUE PLAYERS ASSOCIATION, THE
MAJOR LEAGUE BASEBALL PLAYERS
ASSOCIATION, THE NATIONAL
BASKETBALL PLAYERS ASSOCIATION,
THE NATIONAL HOCKEY LEAGUE
PLAYERS' ASSOCIATION, AND THE MAJOR
LEAGUE SOCCER PLAYERS UNION**

AMY E. MARGOLIN (No. 168192)
BIEN & SUMMERS
P.O. Box 410990 #536
San Francisco, CA 94141-0990
Tel: (415) 553-8744
Fax: (415) 898-1922

Attorneys for Amici

## CORPORATE DISCLOSURE STATEMENT

The National Football League Players Association and the National Basketball Players Association are corporations that do not issue stock and have no parent corporations.  The Major League Baseball Players Association, the National Hockey League Players' Association, and the Major League Soccer Players Union are unincorporated associations.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.............................................1

INTEREST OF AMICI .............................................................................1

INTRODUCTION....................................................................................2

ARGUMENT ..........................................................................................4

      A.    State Laws Protecting Publicity Rights, Including California's Law, Are Content-Neutral Regulations Of Conduct, Not Speech. .......................................................4

      B.    The Depiction Of Actual Athletes In Videogames Designed And Marketed To Enable Users To Participate In Lifelike Simulations Of Sports Is Not Expression Protected By The First Amendment. ........................................................10

            1.    EA's Videogames Are Not Pure Expression. ........................11

            2.    These Games Are Not Expressive Conduct Under The *Spence* Test. .......................................................20

      C.    Any Minimal Expressive Content In EA's Sports-Simulation Videogames Is Outweighed By Athletes' Legitimate Rights To Prevent The Unauthorized Commercial Exploitation of Their Identities.............................................22

CONCLUSION .......................................................................................28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allendale Leasing, Inc. v. Stone*, 614 F. Supp. 1440 (D.R.I. 1985), *aff'd*, 788 F.2d 803 (1st Cir. 1980) ............................................... 17, 18

*American Amusement Machine Ass'n v. Kendrik*, 244 F.3d 572 (7th Cir. 2001) ................................................................... 14, 15, 20

*America's Best Family Showplace Corp. v. City of New York*, 536 F. Supp. 170  (E.D.N.Y. 1982) ........................................... 13, 20

*Anderson v. City of Hermosa Beach*, No. 08-56914, 2010 WL 3504298 (9th Cir. 2010) .............................................. 11, 19, 20, 21

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ............................................. 7

*Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005) ...................... 12

*Caswell v. Licensing Comm'n for Brockton*, 444 N.E.2d 922 (Mass. 1983) ...................................................................... 14

*C.B.C. Distribution and Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818 (8th Cir. 2007) ............................. 15, 25

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) .................................... 6

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) .................. 6, 10

*Cohen v. California*, 403 U.S. 15 (1971) ............................................. 7

*Dallas v. Stanglin*, 490 U.S. 19 (1989) ............................................. 11

*Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003) ......................... 9

*Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001) ..................... 5

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) .................................................................. 6

*Dryer v. National Football League*, 689 F. Supp. 2d 1113 (D. Minn. 2010) ...................................................................... 15

*DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864 (2003) ...................................................................... 8

*E.S.S. Entm't v. Rock Star Videos, Inc.*, 547 F. 3d 1095 (9th Cir. 2008) ................................................................................. 10

*Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2nd Cir. 1953) ......................................................................... 25

*Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33 (2nd Cir. 1983) ........................................................................................ 18

*Harper & Rowe, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ....................................................................................... 8

*Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010) ............................ 21, 27

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995) ................................................. 11, 12, 21

*Interactive Digital Software Ass'n v. St. Louis County, Missouri*, 329 F.3d 954 (8th Cir. 2003) .................................... 14, 15

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) ................... 14, 15, 17

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ............................ 10, 12, 19

*Kirby v. Sega of America, Inc.*, 144 Cal. App. 4th 47 (2006) ............................ 14

*Lamle v. City of Santa Monica*, No. CV 04-6355-GHK (SH), 2010 WL 3734868 (C.D. Cal. 2010) ................................................ 19

*Malden Amusement Co., Inc. v. City of Malden*, 582 F. Supp. 297 (D. Mass. 1983) ....................................................................... 14

*Mastrovincenzo v. City of New York*, 435 F.3d 78 (2nd Cir. 2006) ........................................................................................ 18

*Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573 (2nd Cir. 2000) ......................................................................................... 13

*Nat'l A-1 Advertising, Inc. v. Network Solutions, Inc.*, 121 F. Supp. 2d 156 (D.N.H. 2000) ............................................................ 13

*Nissan Motor Co. v. Nissan Computer Corp.*, 378 F. 3d 1002 (9th Cir. 2004) ................................................................................... 26

*OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176 (W.D.N.Y. 2000) ................................................................................. 13

*People v. Saul*, 776 N.Y.S.2d 189 (N.Y. Crim. Ct. 2004) ................................. 18

*Romantics v. Activision Publ'g*, 574 F. Supp. 2d 758 (E.D. Mich. 2006) ................................................................................. 17

*Rother v. City of Chicago*, 929 F.2d 297 (7th Cir. 1991) ............................ 16, 20

*San Francisco Arts & Athletics v. United States Olympic Committee*, 483 U.S. 522 (1987) ................................... 7, 8, 22, 23, 24, 25, 26

*Spence v. Washington*, 418 U.S. 405 (1974) ......................................... 13, 20, 21

*Tenafly v. Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144 (3rd Cir. 2002) ....................................................................... 12

*There to Care, Inc. v. Comm'r of Indiana Dep't of Revenue*, 19 F.3d 1165 (7th Cir. 1994) ................................................................. 18

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010) ....................................................................... 13

*United States v. Elcom, Ltd.*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002) ........................................................................................... 6

*United States v. O'Brien*, 391 U.S. 367 (1968) ..................................... 4, 5, 7, 24

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ........................................................... 14, 16, 20

*Video Software Dealers Ass'n v. Schwarzenegger*, 566 F.3d 950 (9th Cir. 2010), *cert. granted sub nom.*, *Schwarzenegger v. Entm't Merchants Ass'n*, 120 S. Ct. 2398 (2010) ...................................................................... 10

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ......................................... 12

*White v. City of Sparks*, 500 F.3d 953 (9th Cir. 2007) ..................................... 12

*Wilson v. Midway Games, Inc.*, 198 F. Supp.2d 167 (D. Conn. 2002) ........................................................................... 14, 16, 20

*Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977)............... 8, 23, 25

## STATUTES

Cal. Civ. Code §3344(d) ........................................................................... 3

## OTHER AUTHORITIES

Electronic Arts, Inc., *Annual Report* (Form 10-k) (May 28, 2010) ........................................................................................ 27

Gamespot.com, August 9, 2010 review of Madden NFL 11, http://www.gamespot.com/xbox360/sports/maddennfl11/ review.html?om_act=convert&om_clk=gssummary&tag=su mmary;read-review&page=2 (last visited October 29, 2010) ....................... 21

Gamespot.com, September 7, 2010 review of NHL 11, http://www.gamespot.com/xbox360/sports/nhl11/review.ht ml?om_act=convert&om_clk=gssummary&tag=summary;r ead-review (last visited October 29, 2010) .................................... 21

Gamespot.com, October 1, 2010 review of FIFA 11, http://www.gamespot.com/xbox360/sports/fifasoccer11/revi ew.html (last visited October 29, 2010) ........................................... 21

Gamespot.com, October 6, 2010 review of NBA 2K11, http://www.gamespot.com/xbox360/sports/nba2k11/ review.html?om_act=convert&om_clk=gssummary&tag=su mmary;read-review (last visited October 29, 2010) ...................................... 21

Hasbro.com,      http://www.hasbro.com/monopoly/enUS/shop /browse.cfm (last visited October 23, 2010) ............................................ 17, 18

Ari Levy, *Zynga Outpaces Electronic Arts*, S.F. Chronicle, October 27, 2010, at C1 .................................................................... 25

1 J. Thomas McCarthy, *The Rights of Publicity & Privacy*, ch. 2 (2d ed. 2010) ............................................................................ 8

Michael T. Morley, Comment, *Exceedingly Vexed and Difficult: Games and The First Amendment*, 112 Yale L. J. 361 (2002) ............................................................................... 19

NFLShop.com,    http://www.nflshop.com/search/index.jsp?kw CatId=&kw=monopoly&origkw=monopoly&f=Taxonomy/ NFL/2429790&sr=1 (last visited October 30, 2010) ................................... 18

USAopoly.com,      http://www.usaopoly.com/ttc/Sports/cPath/ 11_27.html (last visited October 30, 2010) .................................... 18

Wikipedia, EA Sports, http://en.wikipedia.org/wiki/EA_Sports # cite_note-2 (last visited October 31, 2010) ................................. 20

## INTEREST OF AMICI

The National Football League Players Association ("NFLPA"), the Major League Baseball Players Association ("MLBPA"), the National Hockey League Players' Association ("NHLPA"), the National Basketball Players Association ("NBPA") and the Major League Soccer Players Union ("MLSPU") represent players in collective bargaining in, respectively, the National Football League, Major League Baseball, the National Hockey League, the National Basketball Association and Major League Soccer (collectively, the "Associations" or "Amici"). In addition, the professional athletes who are their members execute agreements assigning their group licensing rights to the Associations; and the Associations, either directly or through further licensing agreements, represent players in the licensing and enforcement of their group publicity rights. Through these activities, numerous companies throughout the United States and the world have been licensed to use aspects of these group-licensing rights in connection with commercial products, including collectibles, trading cards and electronic games.

The Associations and the athletes whom they represent exercise control over the commercial use of players' identities so that players (i) are not associated with or perceived to promote products they would not choose to support, (ii) can prevent the dilution of the commercial value of their identities, and (iii) can reap the benefits of their labor, skills and achievements. These are

the precise interests protected by the California publicity rights statute at issue here. Indeed, for decades, in reliance on such statutes and the common law, Amici, like other holders of publicity rights, have entered into licensing agreements that authorize the use of their identities and related information for commercial purposes. Professional athletes, other publicity rights holders, and numerous businesses thus have developed settled expectations and practices based on the licensing of publicity rights.

In this case, however, Electronic Arts, Inc. ("EA") contends that the First Amendment bars enforcement of California's publicity rights law against its *NCAA Football* electronic games, which are attractive to consumers because they use the likenesses of collegiate players and the identifying features of colleges and college venues. This Court's analysis of that argument is likely to have significant implications for the ability of the Associations and their members to license and enforce group publicity rights, particularly with respect to electronic games. Thus, Amici and their members have a substantial interest in this case.

This brief is submitted with the parties' consent.

## INTRODUCTION

As Appellee Samuel Keller showed, the First Amendment issue in this case arose in the context of a motion to strike his publicity rights claim under California's Anti-SLAPP statute. Appellee's Brief 11–18. To prevail, EA must demonstrate that Keller's publicity-rights claim is barred as a matter of law

under the First Amendment or the public-affairs exception to liability for violations of publicity rights. *See* Cal. Civ. Code §3344(d). Amici adopt Keller's demonstration that EA did not carry its burden, that EA's use of athletes' identities in its games was not "transformative," and that EA is not entitled to either a First Amendment defense or the public-affairs exception. *See* Appellee's Brief 25–60. EA could not reasonably contend that it has transformed the athletes' identities; the commercial value of its games lies in the verisimilitude of its portrayals. If the Court agrees with Keller and Amici on this point, it need proceed no further.

This brief will not address those questions. Instead, Amici first demonstrate that state publicity-rights laws are content-neutral regulations of commercial conduct, not of speech, that are subject to only intermediate scrutiny because they serve legitimate government purposes. At most, enforcement of these laws may have an incidental effect on speech. Such effects are constitutional unless they are greater than necessary to further the government interests supporting publicity rights.

Second, the Associations demonstrate that EA cannot make the required showing here. EA argues that sports-simulation videogames are protected expression under the First Amendment (Appellant's Opening Brief ("AOB") 16–18); but it is wrong. While the First Amendment may protect some videogames, it does not protect those that do nothing more than simulate, as realistically as possible, actual sporting events populated by real athletes. The

creator of such games is not engaged in expressive activity. The games do not communicate anything. Any communicative elements (such as graphics, sound or player interactivity) are purely incidental, as they are in a game of Monopoly or bingo. At best, the games' expressive content is marginal and does not outweigh the state's interest in enforcing its publicity-rights laws.

## ARGUMENT

### A. State Laws Protecting Publicity Rights, Including California's Law, Are Content-Neutral Regulations Of Conduct, Not Speech.

Many laws that regulate conduct may incidentally restrict speech when applied to individuals who wish to engage in the prohibited conduct for expressive purposes. For example, laws against destruction of property prevent activists from defacing buildings to convey a political message, and laws against trespassing prevent an artist from creating an artistic work in your front yard. Such laws are subject only to intermediate scrutiny because they serve important government purposes and do not target expression.

The seminal case is *United States v. O'Brien*, 391 U.S. 367 (1968), in which the Supreme Court upheld a law prohibiting destruction of draft cards against facial and as-applied challenges brought by a person who had burned his draft card to protest the draft. The Court held that the statute was a facially content-neutral regulation of conduct because destroying a draft card is not "necessarily expressive" and the law did "not punish only destruction engaged in for the purpose of expressing views." *Id*. at 375. Even as applied to

expressive conduct, the law was constitutional because it served important purposes unrelated to the suppression of expression. As the Court explained, "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id*. at 376.

Contrary to EA's amici (*see* Media Companies' Brief 21; Motion Picture Ass'n Brief 16–18), state laws governing publicity rights regulate conduct, not speech, and are therefore subject to intermediate scrutiny under *O'Brien*. Publicity rights do not target expression.[1] Although a celebrity's identity *can* be put to expressive use (as in some of the films, books and other works EA cites (AOB 31)), using a celebrity's name or likeness in connection with a commercial product is not *necessarily* expressive. Celebrity merchandise proves the point. There is nothing inherently expressive about a Kobe Bryant jersey, a baseball imprinted with Derek Jeter's signature, or a mug with a picture of Peyton Manning. The seller or manufacturer of such merchandise does not intend to convey any message, but instead to enhance the product's commercial value by exploiting the goodwill created by the celebrity. The celebrity's identity is used for purely commercial purposes. Publicity rights are facially content-neutral regulations of commercial

---

[1] An analogous principle has been recognized in the context of copyright preemption. *See, e.g.*, *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003-04 (9th Cir. 2001).

conduct because they seek to protect an individual's identity without regard to whether the use of that identity is expressive.[2]  *Cf. Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 n.11 (9th Cir. 1997) ( "[t]he prohibition of the Lanham Act is content neutral. . . .") (internal quotation marks omitted); *United States v. Elcom, Ltd.*, 203 F. Supp. 2d 1111, 1127–28 (N.D. Cal. 2002) (speech restrictions in Digital Millennium Copyright Act held content-neutral).

EA's amici argue that Keller's publicity rights claims constitute content-based speech restrictions because they are "defined by reference to specific content in EA's video games."  Media Companies' Brief 21; s*ee also* Motion Picture Ass'n Brief 16.  This reflects a misunderstanding of the meaning of content-neutrality.  A statutory or common law right is content-neutral if it is not directed at the content of speech, but is intended instead to regulate conduct.  For example, enforcing publicity rights, trademark rights, and copyrights may have some effect on the "content" of a commercial product because it prevents the use of another's intellectual property in the product.  Nonetheless, those rights are content-neutral because they are designed to prevent the unauthorized use of intellectual property without regard to whether the use sends any message at all or the content of the

---

[2]*Cf. City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (plurality) (law prohibiting public nudity was content-neutral regulation of conduct because "[b]eing 'in a state of nudity' is not an inherently expressive condition"); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 n.7 (1984) (regulation prohibiting sleeping in parks was content-neutral regulation of conduct because sleeping in parks is "ordinarily nonexpressive").

message (*i.e.*, they are "justified without reference to the content of the regulated speech," *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001)).

When a law is facially content-neutral, particular applications of the law may receive additional scrutiny if "the conduct triggering coverage under the statute consists of communicating a message." *See Cohen v. California*, 403 U.S. 15, 18 (1971) (facially content-neutral breach-of-peace law could not be applied to jacket stating "F*$k the Draft" because the "only 'conduct' which the State sought to punish [was] the fact of communication"). But this additional scrutiny applies only when the law is triggered *because of* the message the expression conveys. That is not true of laws recognizing publicity rights. They are violated by the unauthorized use of the celebrity's name or likeness for commercial purposes, regardless of what message, if any, that use conveys. The harm the state seeks to prevent flows from the misappropriation of the commercial value associated with the celebrity's identity, not its communicative impact. As in *O'Brien*, the state seeks to regulate only the "nonspeech" element of the defendant's conduct (the commercial misappropriation), not the "speech" element (the message conveyed). Any impact on expression is merely incidental. *See also San Francisco Arts & Athletics v. United States Olympic Committee*, 483 U.S. 522, 536 (1987) (upholding statute granting U.S. Olympic Committee (USOC) the exclusive right to use the word "Olympics" for commercial purposes and concluding that any "restrictions on expressive speech properly [were] characterized as incidental to the primary congressional purpose of

encouraging and rewarding the USOC's activities"); *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 877–80 (2003) (trade secrets injunction held content-neutral).

Accordingly, in any case claiming that enforcing publicity rights violates the First Amendment, the "appropriate inquiry is whether the incidental restrictions on First Amendment freedoms are greater than necessary to further a substantial government interest." *San Francisco Arts & Athletics*, 483 U.S. at 536–37. This test "require[s] a balance between the governmental interest and the magnitude of the speech restriction." *Id*. at 537 n.16.

Publicity rights undoubtedly further substantial government interests. Chief among them are the state's interests in rewarding individuals for the time and effort invested in creating a marketable image, providing appropriate economic incentives for people to undertake socially beneficial activities in the public eye, and preventing dilution of the commercial value associated with a person's identity through overuse. *See* 1 J. Thomas McCarthy, *The Rights of Publicity & Privacy*, ch. 2 (2d ed. 2010). The Supreme Court has repeatedly recognized that these kinds of government interests, which are analogous to those underlying copyright and trademark law, can justify incidental restrictions on speech.[3] Most states now recognize publicity rights; and the interests they serve are clearly sufficient to

---

[3]*See San Francisco Arts & Athletics*, 483 U.S. at 537–41; *Harper & Rowe, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 555–60 (1985); *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 573–78 (1977).

constitute a "substantial government interest."  Finally, and critically, the purposes served by publicity rights are unrelated to the suppression of expression.

Thus, the question here—as in other First Amendment challenges to the enforcement of publicity rights—is whether enforcing publicity rights restricts more expression than is necessary to further these legitimate interests.[4]  It does not.  EA uses the identities of college football players primarily for commercial purposes (*i.e.*, to attract attention to, and enhance the value of, EA's product by associating it with realistic, detailed depictions of the celebrity), not for expressive purposes (*i.e.*, to communicate a message or achieve an aesthetic purpose).  When a celebrity's identity is used primarily for commercial purposes, preventing its misappropriation or misuse by enforcing publicity rights has only a minimal or "incidental" impact on expression.  And EA's commercial conduct involves the production and sale of merchandise—electronic games—not a traditionally expressive activity such as reporting, commentary or parody.

As noted, Keller demonstrated that under the transformative test, EA's games do not involve transformation of the college athletes' identities.  That alone is a sufficient basis for affirming the decision below.  In the sections that follow, however, Amici also show that the enforcement of players' publicity rights does

---

[4]Amici believe that the predominant-purpose test best captures the intermediate scrutiny test of relevant First Amendment jurisprudence. *See*, *e.g.*, *Doe v. TCI Cablevision*, 110 S.W.3d 363, 373–74 (Mo. 2003).  Amici recognize, however, that California courts have applied the transformative test, and that the parties and the court below agreed that it governs this case.  Amici adopt Keller's demonstration that under that test, EA's appropriation of players' publicity rights is not protected by the First Amendment.

not suppress expression because EA's sports-simulation games are not expressive. Moreover, even if the Court decided that EA's sports-simulation games should receive First Amendment protection, at most, the enforcement of publicity rights here would have an incidental effect on conduct that has limited expressive content.

### B. The Depiction Of Actual Athletes In Videogames Designed And Marketed To Enable Users To Participate In Lifelike Simulations Of Sports Is Not Expression Protected By The First Amendment.

EA maintains that its videogames are "expressive works entitled to full First Amendment protection." AOB 18. This Court has never decided whether any particular videogame content constitutes First Amendment expression.[5] Every form of media "tends to present its own peculiar problems" under the First Amendment. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952). The burden rests with the party claiming First Amendment protection to show that its conduct expresses some idea or thought. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n. 5 (1984). EA cannot carry this burden.

As this Court recently reaffirmed, "[t]he First Amendment clearly includes pure speech, but not everything that communicates an idea counts as 'speech'

---

[5] *Cf. Video Software Dealers Ass'n v. Schwarzenegger*, 566 F.3d 950, 958 (9th Cir. 2010) (state did not contest that violent videogames are a form of expression), *cert. granted sub nom.*, *Schwarzenegger v. Entm't Merchants Ass'n*, 120 S. Ct. 2398 (2010); *E.S.S. Entm't v. Rock Star Videos, Inc.*, 547 F. 3d 1095, 1099-1100 (9th Cir. 2008) (Lanham Act plaintiff "concede[s] that the [videogame] is artistic and that therefore the *Rogers* test applies").

for First Amendment purposes." *Anderson v. City of Hermosa Beach*, No. 08-56914, 2010 WL 3504298, at \*4 (9th Cir. 2010).  Although "'[i]t is possible to find some kernel of expression in almost every activity a person undertakes, . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).  The First Amendment thus distinguishes between "purely expressive activity" and "conduct that merely contains an expressive component."  *See Anderson*, 2010 WL 3504298, \*4.  EA's videogames are neither purely expressive nor conduct possessing an expressive component.

### 1.    EA's Videogames Are Not Pure Expression.

Athletic-simulation videogames are not inherently expressive.  Although they undoubtedly contain words, sounds and imagery, they are unlike other media that the law treats as forms of pure expression.

### a.    Videogames Receive First Amendment Protection Only When Their Expressive Elements Are Not Incidental.

Pure speech does not require "a narrow, succinctly articulable message," *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995), but it must reflect an intention to communicate *something*.  Movies do not receive First Amendment protection because they contain words and images; parades are not expressive because their participants use words or imagery; music is not protected because it consists of sound; and an artist's

painting is not protected because it is graphic.  These media receive First Amendment protection because, inherently, they communicate ideas.  *See*, *e.g.*, *Hurley*, 515 U.S. at 569–70 (parades); *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) (music); *Joseph Burstyn*, 343 U.S. at 501 (movies).

For example, in holding that original works of painting are inherently expressive, this Court in *White v. City of Sparks*, 500 F.3d 953 (9th Cir. 2007), stressed that "[s]o long as it is an artist's self-expression, a painting will be protected under the First Amendment, because it expresses the artist's perspective."  *Id.* at 956.  Yet the Court did not hold that all paintings are protected speech.  It reserved the question whether "copies of another artist's work," or "paintings done in an art factory setting where the works are mass-produced by the artist or others" are entitled to First Amendment protection.  *Id.* at 956 n.4.  Accordingly, this Court understood that visual imagery is not by itself communicative; what matters is its context.  *See, e.g., Tenafly v. Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 161–62 (3rd Cir. 2002) (visual representation of physical boundaries held functional equivalent of a fence, not speech).

Similarly, internet domain names are not presumptively entitled to First Amendment protection although they use words or letters.  They "per se are neither automatically entitled to nor excluded from the protections of the First Amendment, and the appropriate inquiry is one that fully addresses [the] particular circumstances. . . ."  *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672,

682 (9th Cir. 2005) (citing *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 585 (2nd Cir. 2000)).  Those that lack expressive content receive no First Amendment protection (s*ee Name.Space, Inc.*, 202 F.2d at 585), such as domain names used merely to identify or attract traffic to a website.  *Compare, e.g., Nat'l A-1 Advertising, Inc. v. Network Solutions, Inc.*, 121 F. Supp. 2d 156, 169–71 (D.N.H. 2000) (vulgar domain names); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 197–98 (W.D.N.Y. 2000) (misleading ones) *with Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1180 (9th Cir. 2010) (domain names that "communicate the nature of the service or product offered" at website).  The protections of the First Amendment depend on "whether the mix of functionality and expression is 'sufficiently imbued with the elements of communication.'"  *See Name.Space, Inc.*, 202 at 585 (citing *Spence v. Washington*, 418 U.S. 405, 409–10 (1974)).

The same fact-specific analysis is necessary to determine whether and the extent to which a videogame is expressive.  Before videogame technology evolved to facilitate the introduction of substantial expressive elements such as original characters and storylines, courts often held that they were not protected by the First Amendment.  Rejecting analogies to movies and other media, these decisions held that the more appropriate analogy was to *non-digital games and sports*.  For example, the court in *America's Best Family Showplace Corp. v. City of New York*, 536 F. Supp. 170  (E.D.N.Y. 1982) explained:

> In no sense can it be said that video games are meant to inform.
> Rather, a video game, like a pinball game, a game of chess, *or a*

> *game of baseball*, is pure entertainment with no informational element. That some of these games "talk" to the participant, play music, or have written instructions does not provide the missing element of "information." (*Id*. at 173–74 (emphasis added))

*Accord Malden Amusement Co., Inc. v. City of Malden*, 582 F. Supp. 297, 299 (D. Mass. 1983). Massachusetts' highest court concluded that even games alleged to have rudimentary plots or themes, like the videogame "Space Invaders," were not protected speech because "any communication or expression of ideas" was "purely consequential." *Caswell v. Licensing Comm'n for Brockton*, 444 N.E.2d 922, 927 (Mass. 1983). That videogames "are more technologically advanced games than pinball or chess," it reasoned, "does not impart First Amendment status to what is an otherwise unprotected game." *Id*.

As game technology evolved, courts found that certain videogames involve protected speech because of their resemblance to movies and books. *See, e.g., American Amusement Machine Ass'n v. Kendrik*, 244 F.3d 572, 578–81 (7th Cir. 2001) (Posner, J.); *Interactive Digital Software Ass'n v. St. Louis County, Missouri*, 329 F.3d 954, 957 (8th Cir. 2003); *James v. Meow Media, Inc*., 300 F.3d 683, 696 (6th Cir. 2002); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1184 (W.D. Wash. 2004); *Wilson v. Midway Games, Inc.*, 198 F. Supp.2d 167, 181–82 (D. Conn. 2002); *Kirby v. Sega of America, Inc.*, 144 Cal. App. 4th 47, 58 (2006) (following *Interactive Digital Software* and *Maleng*). But many courts appropriately recognized that "the inquiry must be context-specific." *Wilson*, 198 F. Supp.2d at 181.

For example, in *Kendrik*, Judge Posner emphasized the "literary" character of the violent videogames there at issue, explaining that they involved "stories," "age-old themes of literature," and even "ideology." *See* 244 F.3d at 577–79. He cautioned that games that "lacked any story line and were merely animated shooting galleries" might well "survive a constitutional challenge." *Id.* at 580. Similarly, in *Interactive Digital Software*, the Eighth Circuit held that certain graphically violent videogames were protected speech for much the same reasons, and observed that, unlike here, "it [was] telling that the County seeks to restrict access to these video games precisely because their content purportedly affects the thought or behavior of those who play them."[6]  329 F.3d at 957.

Likewise, in *James v. Meow Media, Inc*., the Sixth Circuit held that the First Amendment protected violent videogames in a case where they allegedly "communicated . . . a disregard for human life and an endorsement of violence" that drove a student to commit murder.  300 F.3d at 696.  But echoing Judge Posner, the Court cautioned that "[e]xtending First Amendment protection to

---

[6]In *C.B.C. Distribution and Marketing, Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818 (8th Cir. 2007), the Eight Circuit cited *Interactive Digital Software* in concluding that the use of professional baseball players' names and statistical information in an online fantasy baseball game was expressive. *See* 505 F.3d at 823.  Amici contend that *C.B.C.* is incorrectly decided.  That use of player identities was not expressive, and any incidental effect of enforcing the players' publicity rights on expressive conduct was plainly outweighed by the state interests in enforcing the law.  In any event, *C.B.C.* did not involve the use of players' images in a simulation videogame, but the use of publicly available statistical information that users applied to determine their score in a game. *See id*. at 820-21, 823; *see also Dryer v. National Football League*, 689 F. Supp. 2d 1113, 1118 (D. Minn. 2010) (distinguishing *C.B.C.*).

video games certainly presents some thorny issues," because "there are features of video games which are not terribly communicative, such as the manner in which the player controls the game." *Id.* at 696; *see also Rother v. City of Chicago*, 929 F.2d 297, 302–3 (7th Cir. 1991) ("we cannot tell whether [violent videogames] are simply modern day pinball machines or whether they are more sophisticated presentations involving storyline and plot that convey to the user a significant artistic message protected by the First Amendment. . . [or] may be considered works of art").

And in *Wilson*, the court concluded that the First Amendment protected the portrayal of violence in a particular videogame, because the tort claims there (arising from another teen death) targeted the game's "expressive elements." 198 F. Supp. 2d at 181. What was challenged "as having warped [the teen's] mind is not a pinball machine, board game or sport; rather, it is a gratuitously violent cross between a comic book and a Saturday morning cartoon . . . ." *Id.* The court stressed that "the label 'video game' is not talismanic, automatically" invoking (or defying) the First Amendment. *Id.* It explained that "[w]hile video games that are merely digitized pinball machines are not protected speech, those that are analytically indistinguishable from other protected media, such as motion pictures or books, which convey information or evoke emotions by imagery, are protected under the First Amendment." *Id. See also Maleng*, 325 F. Supp. 2d at 1184 (video games that were "little more than electronic board

games or computerized races" may have "lacked the requisite expressive element").

In asserting that its games are expressive works, EA relies heavily on *Romantics v. Activision Publishing*, 574 F. Supp. 2d 758, 766 (E.D. Mich. 2006) (AOB 17–18), which extended First Amendment protection to *Guitar Hero*, a rock band simulation videogame in which players select and customize a character and may progress toward more challenging venues. *See* 574 F. Supp. 2d at 766. Amici submit that *Romantics* erroneously conflated technology and elements of game-play with expression. "[T]he manner in which [a] player controls the [video] game" is "not terribly communicative." *James*, 300 F.3d at 696. What was said in *Romantics* is equally true of a game of live bingo: it too "may involve interaction and communication" (between runners and participants), but "any such communication is singularly in furtherance of the game; it is totally divorced from a purpose of expressing ideas, impressions, feelings, or information unrelated to the game itself." *Allendale Leasing, Inc. v. Stone*, 614 F. Supp. 1440, 1454 (D.R.I. 1985), *aff'd*, 788 F.2d 803 (1st Cir. 1980) (per curiam).

Apart from its digital medium, there is little difference between the *Guitar Hero* videogame and Monopoly. Monopoly allows players to "[i]ndulge in a property shopping spree" to "become a respected real-estate mogul."[7]  Although

---

[7]*See* Hasbro.com, http://www.hasbro.com/monopoly/en_US/shop/browse .cfm (last visited October 23, 2010), describing "Monopoly Property Trading
(continued . . . )

not as technologically complex, Monopoly too has graphics, and allows players to assume a "character," and advance toward progressively larger real estate holdings, like a fictitious Donald Trump. More elaborate versions let players customize their game board, putting players "in control of [their] own game."[8] There are now sports-themed versions, officially licensed by some Amici, allowing players to buy and trade hockey, baseball or football players to create teams.[9] Monopoly and similar board games are not entitled to First Amendment protection; neither their creators nor players are engaged in any expression (or, at best, any expression is incidental). Games such as *Guitar Hero* and *NCAA Football* are no different even though they are played electronically.

While some games may contain substantial expressive content (*see, e.g.*, *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 34 (2nd Cir. 1983)), many do not. Sometimes, a game is just a game—even if it uses words (*see There to Care, Inc. v. Comm'r of Indiana Dep't of Revenue*, 19 F.3d 1165, 1167 (7th Cir. 1994); *Allendale Leasing*, 614 F. Supp. at 1454–55)), images (*see Mastrovincenzo v. City of New York*, 435 F.3d 78, 94 (2nd Cir. 2006) (discussing *People v. Saul*, 776 N.Y.S.2d 189, 192–93 (N.Y. Crim. Ct. 2004)),

---

( . . . continued)
Game."

[8] *See id.*, describing "U-Build Monopoly."

[9] *See* products at USAopoly.com, http://www.usaopoly.com/ttc/Sports/cPath/11_27.html (last visited October 30, 2010)) and NFLShop.com, http://www.nflshop.com/search/index.jsp?kwCatId=&kw=monopoly&origkw=monopoly&f=Taxonomy/NFL/2429790&sr=1 (last visited October 30, 2010).

or reflects some creativity (s*ee Lamle v. City of Santa Monica*, No. CV 04-6355-GHK (SH), 2010 WL 3734868, at *8–10 (C.D. Cal. 2010)).  *See also* Michael T. Morley, Comment, *Exceedingly Vexed and Difficult: Games and The First Amendment*, 112 Yale L. J. 361, 366 (2002) (arguing that "simply being a game is not sufficient to bring either traditional games, or videogames, under the [First Amendment]'s protection").

In short, only videogames that contain substantial traditional expressive content should receive First Amendment protection.  Technological innovation is not itself inherently expressive.

### b.    A Sports-Simulation Videogame Is A Medium For Playing Sports, Not For Expression.

The videogames at issue contain few, if any, expressive attributes, and the game maker is not trying to communicate any message.  Unlike movies, parades, songs or tattoos, a sports-simulation videogame does not self-evidently have the capacity to express any message, much less "a countless variety." *Anderson*, 2010 WL 3504298 at *6.  Unlike videogames in which expressive elements predominate, a sports-simulation videogame does not stimulate the "subtle shaping of thought which characterizes all artistic expression" (*Joseph Burstyn*, 343 U.S. at 501) any more than a game of chess or poker does.  Indeed, has EA never argued that its games express anything about the athletic contests they depict.  On the contrary, EA's avowed—and only—purpose is to *replicate* the experience of playing collegiate sports, by making the virtual game as life-

like as possible.  EA's former slogan said it best: "If it's in the game, it's in the game."  *See* Wikipedia, EA Sports, at http://en.wikipedia.org/wiki/EA_Sports# cite_note-2 (last visited October 31, 2010).  Creative expression is not the game developer's goal but its nemesis.

EA's games thus resemble the digitized simulations of pinball games or other games that courts have considered outside the First Amendment.  *See Kendrik*, 244 F.3d at 580; *Rother*, 929 F.2d at 302–3; *Maleng*, 325 F. Supp. 2d at 1184; *Wilson*, 198 F. Supp. 2d at 181; s*ee also America's Best Family Showplace*, 536 F. Supp. at 173 ("a game of baseball is pure entertainment with no informational element") (internal punctuation omitted).  They are not expressive works.

### 2.    These Games Are Not Expressive Conduct Under The *Spence* Test.

As demonstrated, EA's games are not purely expressive.  Nor are they conduct that is "'sufficiently imbued with elements of communication'" to merit First Amendment protection.  *See Anderson*, 2010 WL 3504298, at *4 (citing *Spence*, 418 U.S. at 409).  To satisfy this standard, EA must possess an "'intent to convey a particularized message'" and show that "'the likelihood is great that the message will be understood by those who view it.'"    *Id.* (internal

punctuation omitted); *see also Hilton v. Hallmark Cards*, 599 F.3d 894, 904 (9th Cir. 2010) (applying *Spence* standard to greeting card).[10]

EA has never argued that its videogames satisfy the *Spence* standard and they do not. EA does not assert that its games are intended to communicate any specific theme or message. On the contrary, its games do nothing more than provide virtual sports arenas populated by virtual renditions of actual athletes, to allow players to simulate playing sports. Nor do users who play these games understand them to impart any particular message. As a casual perusal of online reviews confirms, gamers' remarks focus on one topic: the degree to which EA's sports-simulation games achieve realistic game-play.[11]

EA's videogames are surely the product of time, labor and skill. But so too are the real games in the stadiums, ice rinks and ball fields in which the virtual

---

[10]In *Anderson*, this Court differentiated between "purely expressive activity" and "conduct that merely contains an expressive component." *See* 2010 WL 3504298, *4. It analyzed the former under *Hurley* (*see id.* at *6) and the latter under *Spence*. *See id.* at *7.

[11]*See, e.g.*:

•Gamespot.com, August 9, 2010 review of Madden NFL 11, http://www.gamespot.com/xbox360/sports/maddennfl11/review.html?om_act=convert&om_clk=gssummary&tag=summary;read-review&page=2 (last visited October 29, 2010);

•Gamespot.com, October 6, 2010 review of NBA 2K11, http://www.gamespot.com/xbox360/sports/nba2k11/review.html?om_act=convert&om_clk=gssummary&tag=summary;read-review (last visited October 29, 2010);

•Gamespot.com, September 7, 2010 review of NHL 11, http://www.gamespot.com/xbox360/sports/nhl11/review.html?om_act=convert&om_clk=gssummary&tag=summary;read-review (last visited October 29, 2010);

•Gamespot.com, October 1, 2010 review of FIFA 11, http://www.gamespot.com/xbox360/sports/fifasoccer11/review.html (last visited October 29, 2010).

players' real-life counterparts perform. And like EA's virtual games, the real sports stadiums entertain fans, play music and utilize elaborate graphics. They also no doubt evoke real emotion. But neither EA's virtual games nor the real ones are expressive. Neither communicates any message, idea or aesthetic vision.

EA's games do not have any significant expressive component. They are digitized sporting events; expertly rendered, enormously popular, but communicating nothing.

### C. Any Minimal Expressive Content In EA's Sports-Simulation Videogames Is Outweighed By Athletes' Legitimate Rights To Prevent The Unauthorized Commercial Exploitation of Their Identities.

As demonstrated, if sports-simulation videogames contain any expressive element(s) entitled to First Amendment protection, their expressive content is marginal at best. As next explained, therefore, any incidental impact that the enforcement of publicity rights would have on such expressive content would not be sufficient to override the state's interest in enforcing publicity rights. What might pass First Amendment muster as a literal depiction in a book, a movie or a newscast (*see* AOB 31) cannot dictate the constitutional calculus in this context.

The most directly relevant precedent is *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522 (1987). There, the Supreme Court held that Congress' grant of the exclusive right to certain

commercial and promotional uses of the word "Olympic" did not violate the First Amendment rights of a non-profit athletic association seeking to sponsor and promote an athletic event paralleling the Olympic Games, called the "Gay Olympic Games." *See id*. at 540–41. The entity, SFAA, sought to sell merchandise carrying the title "Gay Olympic Games." *Id*. at 539. It argued that its use of the word "Olympic" was intended to convey a political statement about the status of gay men and lesbians in society. *Id*. at 535 & n.13.

Citing *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 575 (1977), the seminal right of publicity decision, the Court reasoned that Congress could legitimately grant exclusive rights to the word "Olympic" to the United States Olympic Committee, because "Congress reasonably could conclude that the commercial and promotional value of the word 'Olympic' was the product of the USOC's 'own talents and energy, the end result of much time, effort, and expense.'" *Id*. at 532–33. It found "no basis in the record to believe that the [statute] will be interpreted or applied to infringe *significantly* on noncommercial speech rights" and concluded that the statute "on its face, . . . applies primarily to commercial speech." *Id*. at 536 n.15 (emphasis added). It therefore found that the statute had only an "incidental" impact on expressive speech, and so applied intermediate scrutiny:

> By prohibiting the use of one word for particular purposes, neither Congress nor the USOC has prohibited the SFAA from conveying its message. The SFAA held its athletic event in its planned format under the names "Gay Games I" and "Gay Games II" in 1982 and 1986, respectively. . . . Nor is it clear that §110 restricts purely expressive uses of the word "Olympic." *Section 110 restricts only*

*the manner in which the SFAA may convey its message. The restrictions on expressive speech properly are characterized as incidental to the primary congressional purpose of encouraging and rewarding the USOC's activities.* The appropriate inquiry is thus whether the incidental restrictions on First Amendment freedoms are greater than necessary to further a substantial governmental interest. (*Id*. at 536 (citing *O'Brien*, 391 U.S. at 377) (internal footnotes omitted; emphasis added))

Judged by that standard, the statute was constitutional. *Id*. at 539–41. The Court reasoned that the statute furthered two substantial interests. The first, "as with other trademarks, [was] to ensure that the USOC receives the benefit of its own efforts so that the USOC will have an incentive to continue to produce a 'quality product' that, in turn benefits the public." *Id*. at 537 (citation omitted). The second was Congress' "broader public interest" in promoting, through the USOC's activities, the participation of amateur athletes in the Olympic Games. *Id*. at 537–38.

The Court concluded by stressing that SFAA was exploiting the USOC's intellectual property in the setting that posed the greatest threat to the USOC's interests:

The image the SFAA sought to invoke was *exactly the image carefully cultivated by the USOC*. The SFAA's expressive use of the word cannot be divorced from the value the USOC's efforts have given to it. *The mere fact that the SFAA claims an expressive, as opposed to a purely commercial, purpose does not give it a First Amendment right to appropriate to itself the harvest of those who have sown*. The USOC's right to prohibit use of the word "Olympic" in the promotion of athletic events is at the core of its legitimate property right. (*Id*. at 541 (citation and internal punctuation omitted; emphases added))

- 24 -

*San Francisco Arts & Athletics* is directly applicable here.  Just as the USOC's exclusive rights to the word "Olympic" did not "infringe significantly on noncommercial speech rights" because they applied principally—but not exclusively—to noncommercial speech (*id.* at  536 n.15), here enforcement of Keller's rights of publicity would not significantly infringe expressive speech because the videogame products are not themselves expressive or communicative.  Indeed, the expressive content of the political speech at issue in *San Francisco Art & Athletics* is far more obvious than the alleged expressive content of EA's videogames.  Furthermore, as in that case, any burden that enforcement of the property right may impose on expressive speech is incidental to the government's primary purpose (here, to encourage and reward athletes in their pursuits).[12]  *See Zacchini*, 433 U.S. at 573, 576.  Finally, upholding the

----

[12]In *C.B.C.*, the Eighth Circuit incorrectly suggested the First Amendment outweighed professional baseball players' rights of publicity in part because the players "are rewarded, and handsomely too, for their participation in games and can earn additional large sums from endorsements and sponsorship arrangements."  505 F.3d at 824.  The relevant question is not whether professional athletes have other sources of income, but who should receive the value added to a game by the use of players' publicity rights: athletes or game maker.  Put differently, the dispute in these cases is not between a fan playing the videogame and an athlete; the dispute is between EA—a $5.22 billion corporation (Ari Levy, *Zynga Outpaces Electronic Arts*, S.F. Chronicle, October 27, 2010, at C1)—and the athletes whose likeness add value to its games.  Moreover,  "[n]o social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *Zacchini*, 433 U.S. at 576 (citation omitted).  States recognize the right of publicity in part to create incentives for entertainment.  *See id.* at 573.  Creating an exemption for highly-paid performers or athletes would chill these incentives for everyone (and embroil the courts in unworkable line-drawing to determine who is highly compensated).  Indeed, the right of publicity has its modern *origins* in professional sports.  *See Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2nd Cir. 1953).

grant of "Olympic" exclusivity in *San Francisco Arts & Athletics* did not prevent gay athletes from expressing their message. 483 U.S. at 536. So here, enforcing publicity rights in sports-simulation games would not prevent EA from expressing whatever message, if any, it wants to convey.[13]

Finally, the question presented here is different than that presented by a literal depiction of a celebrity or athlete in a book, song, movie, or documentary. *See* AOB 31; Media Companies' Brief 3–4. Unlike sports-simulation videogames, the predominant purpose of movies, books and songs is expressive. The communication of ideas, messages, themes or emotions (whether artistic or political) is not incidental but an artist's or author's central objective. Prohibiting commercial exploitation of an athlete's likeness in sports-simulation

---

[13]In *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F. 3d 1002 (9th Cir. 2004), a registered trademark holder (Nissan Motor) argued that it was entitled to a permanent injunction barring Nissan Computer's website from including links to sites with disparaging comments about Nissan Motor's products. This Court concluded that this constituted content-based viewpoint discrimination (*see id.* at 1016), and that extending an injunction against trademark dilution that far would violate the First Amendment. *See id.* at 1016-1018. This Court declined to apply *San Francisco Arts & Athletics* to protect Nissan Motor's property interest in the mark, noting that the property interests at stake in *San Francisco Arts & Athletics*, *i.e.*, Congress' interest in promoting amateur athletics, were "broader" than the interests protected by registered trademarks. *Nissan,* 378 F.3d at 1018-19.

Here, EA does not and could not argue that its use of players' identities reflects a viewpoint or expresses an opinion about those players; instead, its games portray players as accurately as possible to capture the value their identities adds to the games. Moreover, like the government's interest in enforcing the Olympic mark, the government's interest in protecting athletes' publicity rights promotes and encourages sports activities. *San Francisco Arts & Athletics* is fully applicable.

videogames poses no danger of suppressing works like *Frost-Nixon*, *Ray* or *Ghandi*.

Nor would doing so foster uncertainty in these other entertainment media. While there may be some gray areas, the creators of commercial content ordinarily know when they are using a celebrity name or likeness principally to exploit its commercial value. EA certainly does. It discloses to investors that it licenses rights from major sports leagues and players' associations to gain a competitive edge:

> Competition for these [and other] licenses is intense. If we are unable to maintain these [and other] licenses and rights or obtain additional licenses or rights with significant commercial value, our revenues, profitability and cash flows will decline significantly. (Electronic Arts, Inc., *Annual Report* (Form 10-k), at 19 (May 28, 2010)).

*See also* Appellee's Brief 9–10 (quoting EA amicus brief).

EA may populate its digitized stadiums with unidentifiable players and capture the full economic value of its own work. But without consent, it cannot populate its games with literal depictions of athletes, substantially enhancing the value of its games and commercially exploiting their identities for free. The right of publicity at its "core" prevents such merchandising of their images without consent. *Hilton*, 599 F.3d at 910. These protections do not offend the First Amendment. *See id.*

## CONCLUSION

For the foregoing reasons and those in the Appellee's Brief, this Court should affirm the decision below.

DATED:  November 5, 2010

Respectfully,

BIEN & SUMMERS

By:  s/ Amy E. Margolin
        Amy E. Margolin

*Attorneys For Amici Curiae*
*National Football League Players*
*Association, Major League Baseball*
*Players Association, National*
*Hockey League Players'*
*Association, National Basketball*
*Players Association, and Major*
*League Soccer Players Union*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Rule 29(d) of the Federal Rules of Appellate Procedure, because it contains 6,931 words, excluding those parts of the brief that the Rule exempts from the word-count limitation.

I also certify that this brief complies with the typeface and type style requirements of Rule 32(a)(5) and (6) because it is prepared in a proportionally spaced typeface with a 14.5 point font.

/s Amy E. Margolin
AMY E. MARGOLIN

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 5, 2010.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participants:

| | |
|---|---|
| Bryan Clobes<br>CAFFERTY FAUCHER LLP<br>1717 Arch Street, Suite 3610<br>Philadelphia, PA 19103 | Donald Scott Macrae<br>STEYER LOWENTHAL BOODROOKAS<br>ALVAREZ & SMITH LLP<br>One California St., Suite 300<br>San Francisco, CA 94111 |
| Joe Sibley<br>Kiwi Alejandro Danao Camara<br>CAMARA & SIBLEY LLP<br>2339 University Blvd.<br>Houston, TX 70005 | |

/s Amy E. Margolin

AMY E. MARGOLIN

- 30 -