No. 10-15387

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SAMUEL MICHAEL KELLER,

PLAINTIFF AND APPELLEE,

v.

ELECTRONIC ARTS, INC.,

DEFENDANT AND APPELLANT.

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## BRIEF OF *AMICI CURIAE* IN SUPPORT OF APPELLEE BY SCREEN ACTORS GUILD, INC., AMERICAN FEDERATION OF TELEVISION & RADIO ARTISTS, AFL-CIO, WRITERS GUILD OF AMERICA, WEST, INC., CREATIVE PROPERTY RIGHTS ALLIANCE, FIFTY SIX HOPE ROAD MUSIC LTD., LUMINARY GROUP LLC, THOMAS STEINBECK AND GAIL KNIGHT STEINBECK

THOMAS R. CARPENTER
PURVI PATEL
AMERICAN FEDERATION OF TELEVISION
& RADIO ARTISTS, AFL-CIO
260 Madison Ave., 7th Fl.
New York, NY 10016
Tel.: (212) 532-0800
Facsimile (212)532-2242

DUNCAN CRABTREE-IRELAND
DANIELLE S. VAN LIER
SCREEN ACTORS GUILD, INC.
5757 Wilshire Blvd., 7th Fl.
Los Angeles, CA 90036
Telephone: (323) 549-6627
Facsimile: (323) 549-6624

*Counsel for Amici*

*(Additional Counsel listed on following page)*

*Of Counsel*:

Anthony R. Segall
Rothner, Segall & Greenstone
510 S. Marengo Avenue
Pasadena, CA  91101
*Counsel for Writers Guild of America West, Inc.*

Erach Screwvala
Screwvala LLC
244 Fifth Avenue, #E-241
New York, NY 10001
*Counsel for Creative Property Rights Alliance,*
*Gail Steinbeck, and Thomas Steinbeck*

Terri L. DiPaolo
Fifty Six Hope Road Music Ltd.
c/o Berdon LLP
360 Madison Ave.
New York, NY 10017
*Counsel for Fifty Six Hope Road Music Ltd.*

Jonathan Faber
Luminary Group LLC
2150 Intelliplex Drive, Suite 100
Shelbyville, IN  46176
*Counsel for Luminary Group LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

CORPORATE DISCLOSURE STATEMENT................................................. vi

INTEREST OF THE *AMICI CURIAE* ...............................................1

SUMMARY OF ARGUMENT ..........................................................3

ARGUMENT ...........................................................................4

A.  For Over a Century, Courts Have Consistently Recognized That a Balance Must Exist Between an Individual's Property Interest in His Persona and Protections afforded Speech Under the First Amendment. 4

    1.  Since the Nineteenth Century, Federal and State Courts Have Recognized an Individual's Proprietary Right in His Identity.......6

    2.  The Supreme Court Recognized a Property Right in One's Persona Setting Precedent For Subsequent State and Federal Decisions. ..............................................................9

B.  The District Court Correctly Held that EA Did Not Satisfy Its Burden Under the Transformative Use Defense     11

    1.  The Transformative Use Defense Respects the Careful Balance Between an Individual's Intellectual Property Rights and Free Expression ......................................................11

    2.  The Transformative Use Defense Focuses On Depictions of the Individual, Not the Work as a Whole.............................13

    3.  EA Cites Examples of Several Works That Are Not Properly Analyzed Under the Transformative Test ......................17

C.  The *Rogers* Artistic Relevance Test Would Eviscerate the Right of Publicity     18

1.      The *Rogers* Test Was Established to Address Titles of Works.....19

2.      The Right of Publicity Protects an Interest Different from Trademark Law and Importation of a Test Like Rogers Does Not Properly Address These Interests......................................................20

D.    The District Court Correctly Held That EA Did Not Satisfy Its Burden Under Either the Public Interest Defense or the Public Affairs Exemption  24

1.      EA's Products Do Not Provide Information About Sports And Therefore Do Not Satisfy The Public Interest Defense..................24

2.      EA's Products Are Not Public Affairs Nor Sports Broadcasts or Accounts Exempt Under California's Right-of-publicity Statute 25

E.    Public Policy Dictates That the Right of Publicity Be Protected From the Kind of Theft at Issue In This Case     27

CONCLUSION.........................................................................................29

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Allison v. Vintage Sports Plaques*,
　　136 F.3d 1443 (11th Cir. 1998) ....................................................................12

*American Economy Insurance Co. v. Reboans, Inc*,
　　852 F. Supp. 875 (N.D. Cal. 1994)......................................................... 11, 23

*American Needle, Inc. v. NFL*,
　　No. 08-661, 2008 U.S. Briefs 661 (Nov. 24, 2009) ......................................24

*C.B.C. Distribution & Marketing v. Major League Baseball Advanced Media*,
　　505 F.3d 818 (8th Cir. 2007) .........................................................................26

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
　　95 F.3d 959 (10th Cir. 1996) ..........................................................................11

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*,
　　25 Cal. 4th 387 (2001) .......................................................................... passim

*Corlis v. E. W. Walker Co*,
　　64 F. 280 (1894) ...............................................................................................7

Dora v. Frontline Video,
　　15 Cal.App.4th 536 (1993) .............................................................................28

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
　　*547 F.3d 1095 (9th Cir. 2008)*.......................................................................24

*ETW Corp. v. Jireh Pub., Inc.*,
　　332 F.3d 915 (6th Cir. 2003) .........................................................................12

*Gionfriddo v. Major League Baseball*,
　　94 Cal.App.4th 400 (2001) ....................................................................... 26, 28

*Haelan Laboratories, Inc. v. Topps Chewing Gum*,
　　202 F.2d 866 (2nd Cir. 1953) ...........................................................................6

*Hilton v. Hallmark Cards*,
　　*580 F.3d 874 (9th Cir. 2009)*................................................................. 10, 14

*Kirby v. Sega of America, Inc.*,

    144 Cal.App.4th 47 (2006) ..........................................................................16

*KNB Enters. v. Matthews*,

    78 Cal. App. 4th 362  (2000) .........................................................................4

*Mattel, Inc. v. MCA Records, Inc.*,

    296 F.3d 894 (9th Cir. 2002); ............................................... 22, 23

*Mattel, Inc. v. Walking Mountain Productions*,

    353 F.3d 792 (9th Cir. 2003) .........................................................................22

*Michaels v. Internet Entertainment Group*,

    5 F.Supp.2d 823 (C.D. Cal. 1998) ...............................................................11

*Montana v. San Jose Mercury News, Inc.*,

    34 Cal. App. 4th 790 (1995) .........................................................................28

*Munden v. Harris*,

    134 S.W. 1076 (Mo. 1911) ........................................................................8, 9

*New Kids on the Block v. News. Am. Publ'g, Inc.*,

    971 F.2d 302 (9th Cir 1992) ............................................................ 22, 28

*O'Brien v. Pabst Sales Co.*,

    124 F.2d 167 (5th Cir. 1941) .........................................................................9

*Parks v. Laface Records*,

    329 F.3d 437 (2003) .....................................................................................20

*Pavesich v. New England Life Ins. Co.*,

    50 S.E. 68 (1905) .......................................................................................5, 8

*Roberson v Rochester Folding Box Co*,

    64 N.E. 442, 450 (N.Y. 1902) ......................................................................7

*Rogers v. Grimaldi*,

    875 F.2d 994 (2d Cir. 1989) ........................................................ 19, 20, 21

*Waits v. Frito-Lay, Inc.*,

    978 F.2d 1093 (9th Cir. 1992) .....................................................................10

*Winter v. DC Comics*,

30 Cal. 4th 881 ( 2003) ............................................................... 14, 15, 16

*Zacchini v. Scripps-Howard Broadcasting Co.*,

    433 U.S. 562 (1977) ....................................................... 9, 10, 24, 30

**Statutes**

Cal. Civ. Code §3344(a) ............................................................................23

Cal. Civ. Code §3344(d) ............................................................................27

**Treatises**

Thomas J. McCarthy, *The Rights of Publicity & Privacy*, §§ 8:39 (2010) .............30

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rules 26.1 and 29(c) of the Federal Rules of Appellate Procedure, *Amici* provide the following disclosures of corporate identity:

*Amicus* Screen Actors Guild ("SAG") is the nation's largest labor union representing working actors. Established in 1933, SAG represents over 120,000 performers who work in film and digital television, industrials, commercials, video games, music videos and all other new media formats. SAG exists to enhance actors' working conditions, compensation and benefits and to be a powerful, unified voice on behalf of artists' rights. Screen Actors Guild, Inc. certifies that it is a non-profit corporation; it does not offer stock; and it has no parent corporation.

*Amicus* American Federation of Television and Radio Artists ("AFTRA") represents actors, singers, journalists, dancers, announcers, comedians, disc jockeys and other performers in television, radio, cable, sound recordings, music videos, commercials, audio books, non-broadcast industrials, interactive games and all formats of digital media. Founded in 1937, AFTRA today provides its more than 70,000 members nationally a forum for bargaining strong wages, benefits and working conditions and the tools and upward mobility to pursue their careers with security and dignity. American Federation of Television and Radio Artists certifies that it is a non-profit corporation; it does not offer stock; and it has no parent corporation.

*Amicus* Writers Guild of America, West, Inc. ("WGAW"), whose predecessor organization was also founded in 1933, is a labor organization and the collective bargaining representative for approximately 11,000 professional writers in the motion picture, television, video game and new media industries. Writers Guild of America, West, Inc. certifies that it is a non-profit corporation; it does not offer stock; and it has no parent corporation.

*Amicus* Creative Property Rights Alliance ("CPRA"), is an unincorporated association founded by Gail Knight Steinbeck. CPRA is a group of individuals from the creative community, including but not limited to performing artists, authors, athletes, and musicians, whose primary purpose is to secure federal legislation to protect against unauthorized commercial exploitation of an individuals' identity. CPRA certifies that it does not offer stock and it has no parent corporation.

*Amicus* Fifty Six Hope Road Music Ltd. ("Hope Road") is a Bahamian corporation. Hope Road owns and/or controls the rights held by the late Robert Nesta Marley ("Bob Marley"). Hope Road certifies that it has no parent corporations and no publicly held corporation owns 10% or more of its stock.

*Amicus* Luminary Group LLC is a licensing, consulting and intellectual property management company that represents iconic personalities such as Vince Lombardi, Jesse Owens, Sam Snead, Johnny Unitas, Cy Young, Joe DiMaggio,

Buddy Holly, among others.  Jonathan Faber of Luminary Group  is a professor of Right of Publicity at Indiana University School of Law—Indianapolis and Licensing Intellectual Property at Indiana University Maurer School of Law, Bloomington, and often serves as an expert witness in litigation throughout the United States. Luminary Group maintains the official Internet sites for its clientele as well as the online right-of-publicity resource, www.RightOfPublicity.com. Luminary Group certifies that it has no parent corporations and no publicly held corporation owns 10% or more of its stock.

## INTEREST OF THE *AMICI CURIAE*

*Amici* represent entertainment and sports industry professionals, including, among others, actors, recording artists, writers, and athletes.. The professionals represented by the *Amici* invest considerable time, effort, and even money in developing, maintaining, and protecting the value in their personas.

SAG, AFTRA, and WGAW (collectively, the "Unions") collectively bargain the wages, hours, and working conditions of the Unions' members in video games, as well as motion pictures, television productions, sound recordings, commercials, music videos and online productions.

The professionals represented by *Amici* invest their entire lives in building their professional careers. While most may never be "famous," in their names, voices, images or likenesses – their very persona – have or will attain commercial value. For some, this commercial value will continue long after their death, providing an important source of income for their families and beneficiaries. These individuals and their beneficiaries rely on laws, such as California's statutory and common law right-of-publicity laws, to protect and prevent misappropriation of one of their greatest assets – their persona.

SAG and AFTRA have long fought to preserve the rights of performers and others in their personas, including through nationwide legislative efforts. They strongly supported the enactment of and amendments to California's right-of-

1

publicity statute, Civil Code Section 3344, as well as its companion statute

protecting publicity rights of deceased individuals, Civil Code Section 3344.1.

SAG and AFTRA have also filed amicus briefs in other right-of-publicity cases,

such as *Christoff v. Nestlé, USA, Inc*., 47 Cal.4th 468 (2009).

Although this case involves athletes, not performers, *Amici* and the

individuals they represent are nevertheless potentially affected by its outcome.

EA's infringing use of the athletes' personas is tantamount to stealing, and opens

the door for others to freely circumvent the statutory and common law right of

publicity of any individual in the future.  The result can be ruinous to a performers'

career and financial interests, as well as to their families'. *Amici* therefore have a

fundamental interest in ensuring these rights are not eroded.

The district court recognized that there needs to be a careful balance drawn

between the right of publicity and the First Amendment such that the latter does

not render the former moot. Any contrary outcome in this case could have

devastating consequences, not just for the affected student athletes but, for the

countless professionals who rely upon the right of publicity to protect their

personas from unauthorized exploitation.

Accordingly, *Amici* have an interest in this litigation.  This brief is submitted

with the parties' consent.

## SUMMARY OF ARGUMENT

At any point in time, there are tens, if not hundreds, of thousands of individuals, making, or working toward, a career and living through the use of their personas.  One cornerstone of their careers is their ability to exploit, and to control the exploitation of, their rights in these intangible but valuable assets. Critical to this are the protections embodied in rights of publicity laws which ensure that these public figures have the sole right to control how their rights are exploited.

The right of publicity is a form of intellectual property that society deems to have social utility and represents the inherent right of every individual to control the commercial use of his identity. *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001). For over a century, courts, including the United States Supreme Court, have carefully balanced this property right with the protections accorded speakers under the First Amendment.

Consistent with over a century of precedent, the district court correctly balanced the competing interests between Samuel Keller's right of publicity and the protections afforded Electronic Arts' products under the First Amendment. The court below determined that Electronic Arts ("EA") misappropriated Mr. Keller's persona and those of thousands of other student athletes. In reaching its conclusion, the court correctly rejected EA's transformative use, public interest, and statutory public affairs defenses finding that EA did not transform the students' likenesses

used in its products nor did the game serve the public interest by providing information about sports.

As explained herein, the district court reached the proper decision regarding EA's misappropriation of Mr. Keller's persona and those of thousands of other student athletes. Additionally, contrary to the claims of EA and its *amici*, existing balancing tests are adequate and neither a categorical exemption nor an artistic relevance defense is necessary or proper.

## ARGUMENT

### A.    For Over a Century, Courts Have Consistently Recognized That a Balance Must Exist Between an Individual's Property Interest in His Persona and Protections afforded Speech Under the First Amendment.

The right of publicity is a form of intellectual property that society deems to have some social utility and rests in the inherent right of every human being to control the commercial use of his or her identity. *Comedy III*, 25 Cal. 4th 387. Although derived originally from laws protecting one's privacy, the right of publicity has evolved into a form of intellectual property. *See, e.g., Comedy III*, 25 Cal. 4th 387; *KNB Enters. v. Matthews*, 78 Cal. App. 4th 362  (2000). In many instances, the courts have analogized its nature and goals to those of other intellectual property rights.

4

For over a century, courts have wrestled with the interplay between this property right and the First Amendment. As media evolved, the courts resolved the consequential intrusions on individual rights, by striking a careful balance between the competing interests. In *Pavesich v. New England Life Ins. Co*., 50 S.E. 68 (Ga. 1905), the Supreme Court of Georgia wrestled with this issue and summed it up as follows:

> "Liberty of speech and of the press is and has been a useful instrument to keep the individual within limits of lawful, decent, and proper conduct; and the right of privacy may be well used within its proper limits to keep those who speak and write and print within the legitimate bounds of the constitutional guaranties of such rights. One may be used as a check upon the other; but neither can be lawfully used for the other's destruction."

> *Pavesich*, 50 S.E. at 74.

Today, 105 years later, EA and its *amici* ask this court to cast aside these long-standing checks and balances and render the First Amendment a weapon to categorically defeat any individual rights of publicity. EA seeks for free something that has market value and for which it would normally pay, namely, the property interest in Mr. Keller's persona.

EA's supporters go even farther and ask this court to grant them a categorical license to freely use any individual's persona they deem has "artistic relevance" to their products. They suggest this court declare that all expressive works are categorically exempt from liability for misappropriation of individuals'

5

personas. But over a century of jurisprudence confirms, that while there exists an inherent tension between the protected property right in one's persona and the principles embodied within the First Amendment, that tension reflects a proper and necessary balance between two important Constitutional rights – those protected by the First Amendment and the property rights in one's persona that are the fruits of his endeavors.

1.    Since the Nineteenth Century, Federal and State Courts Have Recognized an Individual's Proprietary Right in His Identity.

In 1953, the Second Circuit formally coined the term, "right of publicity" recognizing an economic and publicity value exists in one's photograph "in addition to and independent of [the] right of privacy." *Haelan Laboratories, Inc. v. Topps Chewing Gum*, 202 F.2d 866, 868 (2nd Cir. 1953).   While many trace the right of publicity's origin to this case, the concept significantly predates it. Majority and dissenting opinions in both federal and state courts have acknowledged the idea of an economic and property interest in an individual's persona for over a century.

In 1894, a Massachusetts federal court, in discussing the present-day "right of publicity," declared "the law to be that a private individual has a right to be protected in the representation of his portrait in any form; that this is a property as well as a personal right; and that it belongs to the same class of rights which forbids the reproduction of a private manuscript or painting..." *Corlis v. E. W.*

6

*Walker Co*, 64 F. 280 (1894)  (holding that the protection exists but the publication of a photograph in connection with the biography of a deceased famous inventor did not violate it).  In 1902, Judge Gray's dissenting opinion in *Roberson v Rochester Folding Box Co*, 64 N.E. 442, 450 (N.Y. 1902) (Gray, J. dissenting)[1], advocated for the expansion of this right stating that an individual "should be afforded… protection… against the display and use [of her likeness] for another's commercial purposes or gain."  Judge Gray further articulated "that this plaintiff has the same property in the right to be protected against the use of her face for defendants' commercial purposes as she would have if they were publishing her literary compositions… the value is hers exclusively; until the use be granted away to the public.'" *Id.*

Thereafter, in 1905, the Supreme Court of Georgia expressly adopted Judge Gray's reasoning in a unanimous opinion. [2] *Pavesich*, 50 S.E. at 79. In recognizing the tension between the First Amendment and the property right in one's persona, the majority emphasized that "[t]he constitutional right to speak and print does not

---

[1] In *Roberson*, which pre-dated the passage of New York's right of privacy statute, the Appellate Division of the Supreme Court of New York determined that the use of a woman's picture on ads for flour manufactured and sold by the defendant was not a cognizable claim under the common law. *Roberson*, 64 N.E. 442, 447.

[2] The *Pavesich* Court also notes the 1890 case of *Manola v. Stevens*, as referenced in an article by Samuel D. Warren and Lewis D. Brandeis, in which a Broadway actress sought and obtained an injunction restraining the use of a photograph of her performance.  *Pavesich*, 50 S.E. at 74 (citation omitted).

necessarily carry with it the right to reproduce the form and features of an individual." *Id.* Citing to an earlier Supreme Court of Michigan opinion, the *Pavesich* court rejected the argument "that the man who makes himself useful to mankind surrenders any right to privacy thereby, or that [by permitting] his picture to be published by one person, and for one purpose, … [he] is forever thereafter precluded from enjoying any of his rights." *Id.* at 80 (quoting *Atkinson v. Doherty*, 80 N.W. 285 (Mich. 1899)).

In 1911, the Missouri appellate court considered, "[i]f there is value in [one's likeness], sufficient to excite the cupidity of another, why is it not the property of him who gives it the value and from whom the value springs?" *Munden v. Harris*, 134 S.W. 1076, 1078 (Mo. 1911).  The court positively confirmed that it is "a property right of value" exclusive to the individual. *Id.* at 1079. Three decades later, in his dissent in *O'Brien v. Pabst Sales Co.*, 124 F.2d 167, 170 (5th Cir. 1941) (Holmes, C.J. dissenting), Circuit Judge Holmes recognized the right to control the commercial use of one's persona "is a property right that belongs to everyone; it may have much or little, or only nominal, value; but it is a personal right, which may not be violated with impunity."

**2.    The Supreme Court Recognized a Property Right in One's Persona Setting Precedent For Subsequent State and Federal Decisions.**

The Supreme Court confirmed the right of publicity is an individual's proprietary right in his persona over three decades ago. In *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 573 (1977), the Court expressed that the right of publicity "protect[s] the proprietary interest of the individual" and is "closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation." The "rationale for [protecting the right of publicity] is the straightforward one of preventing unjust enrichment by the theft of goodwill. No social purpose is served by having a defendant get free some aspect of the plaintiff that would have market value for which he would normally pay." *Id*. at 576 (quoting Kalven, *Privacy in Tort Law – Were Warren and Brandeis Wrong?*, 31 Law & Contemp. Prob. 326, 331 (1966)).

Over eight decades of precedent make clear that *Zacchini* is not an anomaly. Recognizing the significance of an individual's right of publicity, the Court proclaimed that the infringement at issue – "the appropriation of the very activity by which the entertainer acquired his reputation in the first place" – presented "what may be the strongest case for a 'right of publicity'." *Id*. at 576. Nor was its analogy to copyright and patent unusual. As illustrated *supra*, federal and state

courts around the country had previously used similar analogies in equating the right of publicity to copyright law.

Following *Zacchini*, the right of publicity continued to evolve with courts around the country recognizing a property interest in an individual's persona. This court's own precedent is clear on that point. *See, e.g., Hilton v. Hallmark Cards, 580 F.3d 874, 889 fn.12, (9th Cir. 2009), amended, 599 F.3d 894(9ᵗʰ Cir. 2010)* ("The cousinage between copyright liability and the right to publicity has long been recognized."); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1100 (9th Cir. 1992) ("Waits' voice misappropriation claim is one for invasion of a personal property right: his right of publicity to control the use of his identity as embodied in his voice") (emphasis added). Additionally, federal and state courts in California have made clear that the right of publicity is a property right. *See, e.g., Michaels v. Internet Entertainment Group*, 5 F.Supp.2d 823, 838 (C.D. Cal. 1998) (recognizing that "a celebrity's property interest in his name and likeness is unique ... "); *American Economy Insurance Co. v. Reboans, Inc*, 852 F. Supp. 875, 879-80 (N.D. Cal. 1994), *reconsidered on different grounds*, 900 F. Supp. 1246 (N.D. Cal. 1994) (stating that dilution and right of publicity claims involved property rights); *Comedy III,* 25 Cal. 4th at 399 ("The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility"). Federal courts in other circuits have also expressly recognized that the right of

publicity is a form of property.[3]  Thus courts must duly balance this property right

against the protections afforded by First Amendment.

**B.    The District Court Correctly Held that EA Did Not Satisfy Its Burden Under the Transformative Use Defense[4]**

### 1.    The Transformative Use Defense Respects the Careful Balance Between an Individual's Intellectual Property Rights and Free Expression

In *Comedy III*, in line with a century of well established precedent, the

California Supreme Court sought a way to carefully balance the intellectual

property rights in one's persona with the free expression rights of content creators.

---

[3]  For example the Tenth Circuit noted that the right of publicity is an "intellectual property right" and that, "[l]ike trademark and copyright, the right of publicity involves a cognizable property interest". *Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959, 967 (10th Cir. 1996) (holding that where trading cards parodied baseball players, balance between the right of publicity and First Amendment tipped in favor of the card manufacturers) .  Additionally, in *Allison v. Vintage Sports Plaques*, 136 F.3d 1443 (11th Cir. 1998), the Eleventh Circuit recognized the intellectual property nature of the right of publicity in applying the "first-sale doctrine" to a right-of-publicity claim.  More recently, in *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 928 (6th Cir. 2003), the Sixth Circuit held that "[t]he right of publicity is an intellectual property right of recent origin which has been defined as the inherent right of every human being to control the commercial use of his or her identity."

[4]    EA's amici complain that the transformative-use test is inadequate and unpredictable.  MPAA Br. (DktEntry25) at 3, 14-21; Publishers Br. (DktEntry26-2) at 3, 7-11. This argument lacks relevance because EA raised this defense and asked this Court and the district court to apply it. It is therefore beyond the scope of this appeal whether the Court should reject the test. Cf., *Hilton*, 599 F.3d 894, 909 n.11 (9th Cir. 2010) ("[w]e address only defenses that Hallmark raised, and leave for another day the question of whether the First Amendment furnishes a defense to misappropriation of publicity that is broader than the transformative use or public interest defenses")

Recognizing some similar goals between copyright and the right of publicity in protecting the fruits of intellectual and artistic labor, the court looked to copyright law's fair use test. *Comedy III,* 25 Cal. 4th at 404.  While the fair use factors do not directly correlate, the court found that the first factor "the purpose and character of the use … seem[ed] particularly pertinent to the task of reconciling the rights of free expression and publicity." *Id.* at 404 (citing 17 U.S.C. §107(1)).  In formulating and applying this test, the court's aim was not to arm "the right of publicity holder [with] a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame…" *Id.* at 403.

The *Comedy III* court thereby formulated a test that balances the equities between the artist and the individual depicted, granting the artist protection when the art does conflict with the economic value in the individual's persona. *Id.* at 391 ("We formulate instead what is essentially a balancing test between the First Amendment and the right of publicity…"). The court recognized that "when a work contains significant transformative elements… it is also less likely to interfere with the economic interest protected by the right of publicity." *Id.*  at 405. It further observed that "distortions of the celebrity figure are not… good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets… that the right of publicity is designed to protect." *Id.*

12

Such is not the case in the instant matter.  EA's products directly threaten the market the right of publicity is designed to protect. By entering the market for video games depicting Mr. Keller and thousands of others, EA has effectively robbed them of some part of the economic value in their likenesses.

Two years after creating the transformative test, the California Supreme Court revisited it and again emphasized, that only "some… uses of celebrity likenesses are entitled to First Amendment protection."  *Winter v. DC Comics*, 30 Cal. 4th 881, 888 ( 2003). In doing so, it reiterated that it intended the test to grant First Amendment protection to "alternative versions of celebrity images that are iconoclastic, irreverent, or otherwise attempt to redefine the [person's] meaning," not literal depictions of the type for which the individual would normally be compensated. *Id*. (citing *Comedy III*, 25 Cal. 4th at 405). The court underscored the rationale for the test – that "[t]he right of publicity derived from public prominence does not confer a shield to ward off *caricature, parody and satire*. Rather, prominence invites *creative comment*." *Id*. at 887(citing *Comedy III*, 25 Cal. 4th at 397(emphasis added).

### 2.    The Transformative Use Defense Focuses On Depictions of the Individual, Not the Work as a Whole

As this court recently noted, "*Comedy III* and *Winter*… bookend the spectrum" of cases applying the transformative test. *Hilton, 580 F.3d at 890.* Most

13

uses fall somewhere along that spectrum. While courts have often made reference to whether a "work" is transformative, each court's analysis has clearly focused on the depiction of the *individual* within the work. Any other interpretation would defeat its very purpose.

In *Comedy III*, the court considered portraits of the Three Stooges and found that, despite the artist's "undeniable skill," that skill was "manifestly subordinated to the overall goal of creating literal, conventional depictions." *Comedy III*, 25 Cal. 4th at 409. Across the spectrum, the *Winter* Court noted that, "[t]o the extent the drawings of the [characters] *resemble plaintiffs* at all, they are *distorted for purposes of lampoon, parody, or caricature* [a]nd the Autumn brothers are but *cartoon characters* – half-human and half-worm – in a larger story, which itself is quite expressive." *Winter*, 30 Cal. 4th at 890 (emphasis added). The court went on to further clarify that "[t]he *characters and their portrayals* do not greatly threaten plaintiffs' right of publicity. Plaintiffs' fans who want to purchase pictures of them would find *the drawings of the Autumn brothers* unsatisfactory as a substitute for conventional depictions." *Id*. Further emphasizing this point, the court compared the comic books to the "trading cards *caricaturing and parodying* prominent baseball players that have received First Amendment Protection" in the *Cardtoons* case. *Id*. (citation omitted) (emphasis added). The court pointed out that they "are

no less protected because they provide humorous rather than serious *commentary*."
*Id*. (emphasis added).

Only one California case has addressed the application of the transformative test to a video game character. In *Kirby v. Sega of America, Inc.*, 144 Cal.App.4th 47 (2006), a singer sued a video game distributor over the use of a character that she claimed was similar to her in certain respects. The court devoted three full paragraphs of its opinion to comparing the similarities and differences between Ms. Kirby and the character alleged to depict her. Applying the transformative test, however, the court concluded that "notwithstanding certain similarities, [the character of] *Ulala* is *more than a mere likeness or literal depiction* of Kirby [and] contains sufficient expressive content to constitute a 'transformative work' under the test…" *Id.* at 59 (emphasis added). The court then continued to describe several ways in which the *character* was transformative. *Id.* Similarly, the district court here properly focused its analysis on the characters in EA's game.

Even if, as EA argues, the transformative test is to be applied to the work as a whole, EA's games still fail under the test. EA's *amici* claim that "the District Court specifically declined to consider the expressive context …." MPAA Br. 8; see also *Id*. at 13. But the district court expressly did consider the context in which EA used Plaintiff's likeness. Excerpts of Record ("ER") 10 ("[U]nlike in Kirby, the game's setting is identical to where the public found Plaintiff during his

collegiate career: on the football field.") EA's video games feature true and precise depictions of the individual players and the settings, namely the football stadiums, in which they play. EA's own game designers corroborate this, explaining that, the game settings – the stadiums in which the virtual games are played – are designed using photographs and schematics of the real stadiums in which the teams play.[5] All of this is done to ensure realism, not to transform the environments. These are not the outer space fantasy worlds of *Kirby* or the phantasmagorical setting of *Winters*, they are realistic depictions of amateur football.

Publicity rights inure in individuals, not in works, and thus transforming the media in which the individual is depicted is not a transformative use. The instant matter clearly illustrates why this analysis must focus on the individual and not the work as a whole. Any other interpretation would eradicate the careful balance the transformative use defense was intended to recognize, rendering claims for all but the most egregious infringements moot. An infringer would only need to add a minimal amount of creative expression to avoid liability, even in the case of a painstakingly literal depiction of the individual. Under this formulation, by simply adding a decorative background, even Mr. Saderup could have escaped liability.

---

[5] *See, e.g.,* NCAA Football 10: Creating the University of Minnesota Stadium, available at http://insideblog.easports.com/archive/2009/09/23/ncaa-football-10-creating-the-university-of-minnesota-stadium.aspx (last visited November 4, 2010).

3.    **EA Cites Examples of Several Works That Are Not Properly Analyzed Under the Transformative Test**

Like its virtual football players, EA attempts to run a fake play to distract the court from the central issue. To devalue the transformative use test, EA argues that "[d]ocumentarians, biographers, filmmakers, novelists, photographers, songwriters, and many others do exactly what the district court said is not protected: they create expressive works that realistically depict individuals and/or refer to them by their actual names." Appellant's Opening Brief ("AOB") at 31. It claims that several famous works would not be protected under the transformative use defense. *Id.* EA's *amici* also argue that the transformative-use test "would lead to absurd results" in many cases, referencing an unauthorized biography of Mr. Keller as an example. *E.g.,* MPAA Br. 11.

It may be true that these works are not protected under the transformative use defense. What EA and its *amici* fail to acknowledge is that, if the transformative-use test is inappropriate in a particular case, a different test may apply. The MPAA, in fact, cites as examples numerous authorities that did not employ the transformative-use and public-interest tests. MPAA Br. 11-12. When appropriate, works may be protected under other recognized defenses, such as the common law "public interest" defense or the statutory "public affairs" exception. Just as there is precedent protecting the proprietary interest in one's persona, there

17

is precedent holding that the scales may tip in favor of the First Amendment where a work satisfies a public interest in its subject matter.

## C.    The *Rogers* Artistic Relevance Test Would Eviscerate the Right of Publicity

EA and its amici suggest that this court apply the two-part test from *Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989), which, it claims "provides a more straightforward and more predictable test for determining whether the First Amendment defeats right-of publicity claims." AOB 5; *see, also,* MPAA Br. 4, 21-25; Publishers Br. 2, 12.  This argument is improper as EA did not ask the district to adopt *Rogers*, so any argument to adopt it here is untimely.  Appellee Br. at 48-49.  Even if it could raise the argument, the *Rogers* test would be inappropriate. The *Rogers* test arose out of a unique set of circumstances[6], bearing criticism even from the court that created it, and is not suited for expansion to right-of-publicity claims, particularly where the wholesale misappropriation of an individual's likeness is alleged. Under the *Rogers* test, it is nearly impossible to prove that a use of one's persona does not have artistic relevance when a content creator has made a choice to include it.

---

[6] The *Rogers* Court addressed the title of the motion picture "Ginger and Fred," about a fictional pair of dancers. The motion picture's lead characters were known in Italy as "Ginger and Fred" because they imitated the dance style of Ginger Rogers and Fred Astaire. *Rogers*, 875 F.2d 994, 996-997.

**1.     The *Rogers* Test Was Established to Address Titles of Works**

The *Rogers* artistic relevance defense arose in response to a claim under the Lanham Act, and the court focused its analysis squarely on the title of the work.[7] The court concluded that, "[w]here a *title* with at least some artistic relevance to the work is not explicitly misleading as to the content of the work, it is not *false advertising* under the *Lanham Act*." *Rogers*, 875 F.2d at 1000. In a concurring opinion, Judge Griesa cautioned that "this unique case would seem to be an inappropriate vehicle for fashioning a general rule." *Id.* at 1006 (Griesa, D.J., concurring). Griesa further advised that the test was not well founded and "[i]t should be left to future courts… to determine if there are to be exceptions to the First Amendment protection which would seem to be generally afforded to artistically relevant *titles*." *Id.* at 1007.

---

[7] While the court also applied a variation of the test to Rogers' right-of-publicity claim, it was a fact scenario quite distinct from the instant matter. The *Rogers* Court was only addressing the use of Ms. Rogers' first name in the work's title. It was not a misappropriation of Ms. Roger's persona in the context that made her famous. The court "conclude[d] that Oregon [common] law … would not bar the use of a celebrity's *name* in a movie *title* unless the *title* was 'wholly unrelated' to the movie or was 'simply a disguised commercial advertisement for the sale of goods or services.'" *Rogers,* 875 F.2d at 1005 (emphasis added). Few courts have followed the *Rogers* court in applying this test to the right of publicity. The most notable case, *Parks v. Laface Records*, 329 F.3d 437 (6th Cir. 2003), dealt with an issue similar to Rogers – the use of Ms. Parks name in a song's title – and reached the opposite conclusion.

The *Rogers* test, as EA notes, has gained prominence in balancing the Lanham Act and the First Amendment, particularly when addressing a work's title.[8] "[T]he expressive element of *titles* requires more protection than the *labeling* of ordinary commercial products." AOB 40 (citing *Rogers*, 875 F.2d at 998 (emphasis added)] "'Because overextension of *Lanham Act* restrictions in the area of *titles* might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict,' and allow *Lanham Act* claims to proceed 'only where the public interest in avoiding *consumer confusion* oughtweighs the public interest in free expression." *Id.* (emphasis added). The "balance … must favor the First Amendment 'unless the *title* has no artistic relevance to the *underlying work* … or ... unless the *title* explicitly misleads as to the source or the content of the work.'" *Id.* (emphasis added).

## 2. The Right of Publicity Protects an Interest Different from Trademark Law and Importation of a Test Like Rogers Does Not Properly Address These Interests

The *Rogers* test is sensible in relation to the interest protected by the Lanham Act. A trademark is a limited property right in a particular word, phrase or

---

[8] EA makes attempts throughout its brief to equate this case to *Brown v. Electronic Arts*, No. 09-56675, claiming the cases are virtually indistinguishable. AOB 1. The district court granted EA's motion to dismiss Mr. Brown's Lanham Act claim, *Brown v. Electronic Arts*, No. 2:09-cv-1598 FMC (RZx) (C.D. Cal. Sept. 23 2009), based largely upon the *Rogers* test. But the cases are far from identical – *Brown* was decided under the Lanham Act which protects a very different interest than the right of publicity.

symbol that identifies the manufacturer or sponsor of a product or the provider of a service. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002); *New Kids on the Block v. News. Am. Publ'g, Inc.*, 971 F.2d 302, 305 (9th Cir 1992). The Lanham Act's limited purpose is to "'avoid confusion in the marketplace' by 'prevent[ing]… others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner.'" *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 806 (9th Cir. 2003) (quoting *MCA Records*, 296 F.3d at 900). When "[l]imited to this core purpose – avoiding confusion in the marketplace – a trademark owner's property rights play well with the First Amendment" because First Amendment rights in using another's trademark "'are easily outweighed by the buyer's interest in not being fooled….'" *MCA Records*, 296 F.3d at 900 (quoting *Trademarks Unplugged*, 68 N.Y.U.L. Rev. 960, 973 (1993)).

But the interest protected by the right of publicity is quite different from that protected under the Lanham Act, rendering the *Rogers* test an inappropriate standard that would likely be improperly applied in a majority of right-of-publicity cases. Indeed, EA and its amici's repeated citations to Restatement of Unfair Competition to support applying *Rogers* here highlights its inapplicability.  Unlike Lanham Act claims and some right-of-publicity claims, Mr. Keller's claims do not allege any sort of unfair competition, like consumer confusion or wrongful

21

promotion.  The right of publicity, and California's statute in particular, explicitly extends beyond such claims. *See* Cal. Civ. Code §3344(a).

Unlike a trademark, which designates the source and origin of a good or service, the right of publicity protects the value of an individual's entire persona. "[A] celebrity's persona is his or her product, so that taking a celebrity's persona and using it for commercial gain is little different from stealing a manufacturer's product and selling it, whether or not there is actual confusion as to sponsorship." *American Economy*, 852 F. Supp. at 880. The Supreme Court as many courts before it, analogized it to patent and copyright, recognizing "the right of the individual to reap the reward of his endeavors and having little to do with protecting… reputation." *Zacchini*, 433 U.S. at 573.

EA attempts to compare its misappropriation of Mr. Keller's *exact* likeness with the inclusion of an *altered* trademark in a video game's "artistic attempt 'to develop a cartoon-style parody of East Los Angeles'".  AOB  42 (citation omitted). In *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.,547 F.3d 1095 (9th Cir. 2008)*, the owner of a strip club called the "*Play* Pen" sued over the inclusion of a virtual strip club called the "*Pig* Pen" in *Grand Theft Auto: San Andreas*. The game's designers "did not seek to re-creat[e] a realistic depiction of Los Angeles; rather [they] were creating 'Los Santos,' a fictional city that lampooned the seedy underbelly of Los Angeles." *E.S.S*, 547 F.3d at 1097. While the "Pig Pen" may

22

have drawn inspiration from the "Play Pen," the designers also "used photographs of other East Los Angeles locations to design other aspects of it" and it "lack[ed] certain characteristics of the Play Pen building." *Id.* at 1097 - 1098. In contrast, EA strives for realism and authenticity in its games.[9] As the district court found, Mr. Keller's avatar in the game "wears the same jersey number, is the same height and weight, and hails from the same state." ER 10. Mr. Keller "is represented as what he was: the starting quarterback for Arizona State University [and] the game's setting is identical to where the public found [him] during his collegiate career: on the football field." *Id.*

Application of the *Rogers* test to appropriations of an individual's persona would take us down a slippery slope, exposing individuals to exploitation not only by manufacturer's of products disguised by the veil of "artistic expression" but also to purveyors of pornography or other exploitive works. For example, individuals with editing software could easily transpose images of celebrities with those of unclothed models and make them available on the Internet.   As technology improves and its costs decrease, this could progress beyond still photographs to motion pictures or video games.  As the courts have been loath to

---

[9] EA acknowledges the attempt to develop realism in the context of its professional sports games. See, *American Needle, Inc. v. NFL*, No. 08-661, 2008 U.S. Briefs 661, at *2 (Nov. 24, 2009) (cited in Appellee's Brief 9-10).

declare any but the most obscene works unprotected under the First Amendment, it would be virtually impossible for a plaintiff to overcome the two prongs of the *Rogers* test, even for these uses.

**D.    The District Court Correctly Held That EA Did Not Satisfy Its Burden Under Either the Public Interest Defense or the Public Affairs Exemption**

   **1.    EA's Products Do Not Provide Information About Sports And Therefore Do Not Satisfy The Public Interest Defense**

EA unsuccessfully argues that its products satisfy the public interest in information about sports and athletes such that they are entitled to full First Amendment protection. In doing so, it compared its product to works ranging from baseball programs to fantasy sports games, which have previously been accorded protection.  EA's attempt to compare its games with a laundry list of works is specious, at best.

While it is hardly in dispute that sports are in the public interest, EA's products do not attempt to report on sports; they do not comment on it or parody it; they do not provide updated statistics or video highlights. Unlike the cases cited by EA, such as *Gionfriddo* and *C.B.C.*, where professional baseball players' names and statistics were used on promotional materials and in fantasy football games, respectively, the district court correctly found EA's game does far more than merely reporting statistics on players or allowing players to track statistics in a

24

fantasy league.  ER 11-13 (citing *Gionfriddo v. Major League Baseball*, 94 Cal.App.4th 400 (2001) and *C.B.C. Distribution & Marketing v. Major League Baseball Advanced Media,* 505 F.3d 818 (8th Cir. 2007)). Rather, EA's game "offers a depiction of the student athletes' physical characteristics and… enables consumers to control…virtual players on a simulated football field."  ER 13.

 If this use was sufficient under the public interest defense, it would create absurd results where few uses of an individual's persona would fall outside the public interest. The mere inclusion of limited factual data about an individual on a product bearing his likeness would be sufficient to avoid liability. Under EA's formulation a manufacturer who creates t-shirts bearing the image of an actor or musician, showing even less creativity than those rejected in *Comedy III*, would be accorded protection under this defense by simply adding some limited factual information.  Such a formulation of the public interest defense would upset the very balance it is intended to maintain by tipping the scales too far in favor of those who seek to take for free and profit from the value of another's persona.

### 2.    EA's Products Are Not Public Affairs Nor Sports Broadcasts or Accounts Exempt Under California's Right-of-publicity Statute

EA further attempts to convince the court that its use of the players' personas in its products falls under the public affairs exemption in California's right-of-publicity statute. Cal. Civ. Code §3344(d). Although it cites several

examples of cases in which the exemption has been applied and cites policy reasons for liberally construing the exemption, its argument is unfounded as to why this exemption applies to its particular use of athletes' personas.

As the district court correctly noted, the public affairs exemption in Civil Code 3344(d) provides protection for uses of individuals' personas in connection with the factual reporting on or of matters in the public interest.[10]  The authority cited by EA is consistent with the district court's interpretation.  *See, New Kids on the Block*, 971 F.2d 302 (use of popular band's and its members' names for a phone poll about the band's popularity in connection with articles about the band); *Gionfriddo,* 94 Cal.App.4th 400 (use of former baseball players' personas in connection with website containing historical content about baseball); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790 (1995) (use of football player's likeness on posters that were reproduction of front page of newspaper after newsworthy Super Bowl win); *Dora v. Frontline Video*,15 Cal.App.4th 536 (1993) (use of famed surfer's name and likeness in documentary about surfing).  While there is no dispute that college sports are "public affairs," unlike the examples given in EA's brief, EA's products do not attempt to inform the public or otherwise

---

[10] MPAA wrongly characterizes the district court's decision as limiting these exceptions strictly to "traditional reporting."  Rather, the court – citing this Court's *Hilton* decision – interpreted these exceptions to reach to "publication or reporting," ER 12, and "reporting information," ER 15.

report on college sports. Rather, EA uses players' personas to enhance the realism of the games, and thereby gain a competitive advantage over its competitors.

**E.    Public Policy Dictates That the Right of Publicity Be Protected From the Kind of Theft at Issue In This Case**

The video game industry is a highly profitable enterprise. There is an inherent market value in the use of performer and athlete personas in video games, which is exploited by industry to continue the commercial success and viability of their products. Understanding this commercial value and seeking to minimize the costs associated with it, EA and its supporters now come to this court requesting a categorical license to appropriate these personal property rights in a way that ultimately eviscerates an individual's right of publicity altogether.

In gaming terms, EA and its amici, like many gamers who purchase their products, want to find an easy way to conquer the game. They ask this court to give them the "cheat codes" to misappropriate the valuable property of others, which could not otherwise be obtained without playing the game fairly. In this case, they seek to use the First Amendment as both a shield and a sword to pilfer the treasure in individuals' personas.

But this is not one of their games and the continuing battle between the right of publicity and the First Amendment is not a battle of good versus evil that can easily be bypassed with a few keystrokes. As one prominent commentator opined:

> In some cases of media use of human identity, there is indeed a conflict with the First Amendment. It is real. It will not go away. Finding the proper balance is sometimes a very difficult job. There is no neatly packaged general rule that can be waved like a magic wand to make the solution any easier. The balance must be laboriously hacked out case by case.
>
> Thomas J. McCarthy, *The Rights of Publicity & Privacy*, §§ 8:39 (2010)

Accordingly, there can be no categorical exemption where an individual's rights are concerned as each individual, each form of media, and each use is truly unique. The use of Mr. Keller's persona in the instant matter differs from Mr. Montana's or Mr. Gionfriddo's, despite the fact that they are all athletes. Thus, in light of the unique nature of the individual, the medium, and the use being made, each case warrants review on its own merit.

As the Supreme Court expressed, an individual's right of publicity is worthy of protection from theft because "[n]o social purpose is served by having a defendant get free some aspect of the plaintiff that [has] market value for which he would normally pay." *Zacchini,* 433 U.S. at 576. For over a century, courts have found ways to strike a fair balance between these competing interests, without resorting to categorical exemptions or weighing artistic relevance. Public policy and precedent mandate they continue to do so.

28

## **CONCLUSION**

For the foregoing reasons and those in the Appellee's Brief, this Court should affirm the decision below.

DATED: November 5, 2010                    Respectfully submitted,

                                           By: /s/ Duncan Crabtree-Ireland
                                           DUNCAN CRABTREE-IRELAND
                                           DANIELLE S. VAN LIER
                                           SCREEN ACTORS GUILD, INC.
                                           5757 Wilshire Blvd., 7th Fl.
                                           Los Angeles, CA 90036
                                           Telephone.: (323) 549-6627
                                           Facsimile: (323) 549-6624
                                           *Counsel for Amici*

29

## <u>CERTIFICATE OF COMPLIANCE.</u>

I certify pursuant to Federal Rules of Appellate Procedure 32(a)(7)(C) that the

attached brief is proportionately spaced, has a typeface of 14 points, and contains

6,966  words, excluding those parts of the brief that the Rule exempts from the

word-count limitation, which is less than the 7,000 words permitted by Fed. R.

App. P. 29(d).

DATE: November 5, 2010                    By: <u>/s/ Duncan Crabtree-Ireland   </u>
                                          DUNCAN CRABTREE-IRELAND

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 5, 2010.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have caused to be mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participants:

Bryan Clobes
CAFFERTY FAUCHER LLP
1717 Arch Street, Suite 3610
Philadelphia, PA 19103

Joe Sibley
Kiwi Alejandro Danao Camara
CAMARA & SIBLEY LLP
2339 University Blvd.
Houston, TX 70005

Donald Scott Macrae
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California St., Suite 300
San Francisco, CA 94111

/s/ Duncan Crabtree-Ireland
DUNCAN CRABTREE-IRELAND