10-15387

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SAMUEL MICHAEL KELLER,

*Plaintiff and Appellee*,

v.

ELECTRONIC ARTS INC.,

*Defendant and Appellant*.

On Appeal from an Order of the United States District Court
for the Northern District of California,
The Honorable Claudia A. Wilken
Case No. 3:09-CV-01967-CAW

### APPELLANT'S REPLY BRIEF

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER - #120162
ALONZO WICKERS IV - #169454
ANNA R. BUONO - #232753
LISA J. KOHN - #260236
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST - #84065
STEVEN A. HIRSCH - #171825
R. JAMES SLAUGHTER - #193813
710 Sansome Street
San Francisco, California 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant/Appellant
Electronic Arts Inc.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ...................................................................................1

II.    KELLER CANNOT SHOW A PROBABILITY OF
       PREVAILING ON HIS CLAIMS. .......................................................3

      A.     Keller Did Not Meet His Evidentiary Burden To
              Establish That EA Waived Its First Amendment Defense...................3

            1.     Under The Anti-SLAPP Statute, Keller Had The
                     Burden Of Adducing Evidence To Negate EA's
                     First Amendment Defense. ........................................................3

            2.     Keller Failed To Present Any Evidence To
                     Substantiate His Waiver Argument. ..........................................7

      B.     The First Amendment Bars Keller's Claims As A Matter
              Of Law...............................................................................................9

            1.     The Transformative-Use Test ...................................................9

            2.     The Public-Interest Test..........................................................13

            3.     Civil Code Section 3344(d) .....................................................16

            4.     The *Rogers*/Restatement Test .................................................17

                  a.     This Court May, And Should, Apply The *Rogers* Test..17

                  b.     *Rogers* Mandates Dismissal Of Keller's Claims. ...........21

III.   THE COURT SHOULD REJECT THE NOVEL POSITIONS
       ADVANCED BY AMICI PLAYERS ASSOCIATIONS............................24

      A.     EA's Video Games Enjoy The Same Constitutional
              Protections As Other Expressive Works. .............................................24

      B.     The Court Should Not Adopt A Less Protective
              Constitutional Test For Right-Of-Publicity Claims. ...........................28

            1.     Applied To Expressive Works, Right-Of-Publicity
                     Laws Are A Content-Based Regulation Of Speech.................28

DWT 16278844v4 0058278-000014

2.      The Players' Alternative Tests Do Not Adequately
Protect Expression........................................................................31

IV.     CONCLUSION...................................................................................34

DWT 16278844v4 0058278-000014

# TABLE OF AUTHORITIES

Page(s)

### CASES

*America's Best Family Showplace Corp. v. City of New York*,
    536 F. Supp. 170 (E.D.N.Y. 1982) ..............................................25, 26

*American Amusement Machine Ass'n v. Kendrick*,
    244 F.3d 572 (7th Cir. 2001) (Posner, J.) .........................................15

*Anderson v. City of Hermosa Beach*,
    621 F.3d 1051 (9th Cir. 2010) ....................................................26, 29

*Arkansas Writers' Project v. Ragland*,
    481 U.S. 221 (1987).....................................................................29, 30

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)...........................................................................29

*Braun v. Chronicle Publ'g*,
    52 Cal. App. 4th 1036 (1997) ............................................................8

*C.B.C. Distribution v. Major League Baseball Advanced Media*,
    505 F.3d 818 (8th Cir. 2003) ....................................................passim

*Campbell v. Acuff-Rose Music*,
    510 U.S. 569 (1994)...........................................................................15

*Cardtoons v. Major League Baseball Players Ass'n*,
    95 F.3d 959 (10th Cir. 1996) ......................................14, 16, 28, 33

*Caswell v. Licensing Comm'n for Brockton*,
    444 N.E.2d 922 (Mass. 1983) ...........................................................25

*Cher v. Forum Int'l*,
    692 F.2d 634 (9th Cir. 1982) ...........................................................24

*Christoffersen v. Washington State Air Nat'l Guard*,
    855 F.2d 1437 (1988)........................................................................19

iii

*City of Erie v. Pap's A.M.*,
   529 U.S. 277 (2000)................................................................28

*Clark v. Cmty. for Creative Non-Violence*,
   468 U.S. 288 (1984)................................................................28

*Comedy III Prods. v. Gary Saderup, Inc.*,
   25 Cal. 4th 387 (2001) .......................................................passim

*Curtis Publ'g v. Butts*,
   388 U.S. 130 (1967)..................................................................7

*DaimlerChrysler v. Lew Williams, Inc.*,
   142 Cal. App. 4th 344 (2006) ..........................................4, 5, 8

*Dallas Cowboys Cheerleaders v. Pussycat Cinema*,
   604 F.2d 200 (2d Cir.1979) .................................................30

*Doe v. TCI Cablevision*,
   110 S.W.3d 363 (Mo. 2003) .................................................31

*Dora v. Frontline Video*,
   15 Cal. App. 4th 536 (1993) ..........................................14, 17

*Dr. Seuss Enters. v. Penguin Books*,
   109 F.3d 1394 (9th Cir. 1997) .............................................30

*E.S.S. Entertainment 2000 v. Rock Star Videos*
   547 F.3d 1095 (9th Cir. 2008) .............................................23

*Erie Telecommunications v. City of Erie*,
   853 F.2d 1084 (3d Cir. 1988) .............................................7, 8

*ETW Corp. v Jireh Publ'g.*,
   332 F.3d 915 (6th Cir. 2003) ..........................................passim

*Fuentes v. Shevin*,
   407 U.S. 67 (1972).....................................................................7

*Gionfriddo v. Major League Baseball*,
   94 Cal. App. 4th 400 (2001) .......................................14, 16, 17

*Guglielmi v. Spelling-Goldberg Prods.*,
   25 Cal. 3d 860 (1979) .......................................3, 12, 24, 31

iv

*Hicks v. Casablanca Records,*
 464 F. Supp. 426 (S.D.N.Y. 1978) ....................................................11

*Hilton v. Hallmark Cards,*
 599 F.3d 894 (9th Cir. 2010) .......................................................6, 10

*Hoepker v. Kruger,*
 200 F. Supp. 2d 340 (S.D.N.Y. 2002) ............................................11

*Honolulu Rapid Transit Co. v. Dolim,*
 459 F.2d 551 (9th Cir. 1972) ............................................................8

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,*
 515 U.S. 557 (1995)..................................................................26, 27

*In re Mercury Interactive Corp. Securities Litig.,*
 618 F.3d 988 (9th Cir. 2010) ..........................................................18

*Kirby v. Sega America,*
 144 Cal. App. 4th 47 (2006) ....................................................passim

*L.L. Bean v. Drake Publishers,*
 811 F.2d 26 (1st Cir. 1987)...............................................................33

*Leonard v. Clark,*
 12 F.3d 885 (9th Cir. 1993) ...............................................................8

*Ludwig v. Superior Court,*
 37 Cal. App. 4th 8 (1995) ..................................................................6

*Malden Amusement Co. v. City of Malden,*
 582 F. Supp. 297 (D. Mass. 1983)...................................................25

*Mattel v. MCA Records,*
 296 F.3d 894 (9th Cir. 2002) ("*MCA Records*") .........................19, 22

*Mattel v. Walking Mountain Prods.,*
 353 F.3d 792 (9th Cir. 2003) ...........................................................30

*Matthews v. Wozencraft,*
 15 F.3d 432 (5th Cir. 1994) .............................................................11

*Mindy's Cosmetics v. Dakar,*
 611 F.3d 590 (9th Cir. 2010) .............................................................7

v

*Navellier v. Sletten,*
  29 Cal. 4th 82 (2002) ..........................................................................4

*New Kids on the Block v. News America Publ'g,*
  971 F.2d 302 (9th Cir. 1992) ...........................................................17

*Paragould Cablevision v. City of Paragould,*
  930 F.2d 1310 (8th Cir. 1991) .............................................................8

*Parks v. LaFace Records,*
  329 F.3d 437 (6th Cir. 2003) ..............................................22, 30, 32

*Paulus v. Bob Lynch Ford,*
  139 Cal. App. 4th 659 (2006) ..............................................................6

*Pleasant Grove City, Utah v. Summum,*
  129 S. Ct. 1125 (2009).......................................................................30

*Polydoros v. Twentieth Century Fox Film Corp.,*
  67 Cal. App. 4th 318 (1997) ..............................................................15

*Premier Medical Mgmt Sys. v. California Ins. Guar. Ass'n,*
  136 Cal. App. 4th 464 (2006) ..............................................................5

*Robertson v. Rodriguez,*
  36 Cal. App. 4th 347 (1995) ................................................................5

*Romantics v. Activision Publ'g,*
  574 F. Supp. 2d 758 (E.D. Mich. 2008) ................................16, 20, 23

*Ruffin-Steinback v. dePasse,*
  82 F. Supp. 2d 723 (E.D. Mich. 2000), *aff'd*, 267 F.3d 457 (6th Cir.
  2001) ...................................................................................................11

*San Francisco Arts & Athletics v. U.S. Olympic Cmte.,*
  483 U.S. 522 (1987) ("*SFAA*")....................................................31, 32

*Seale v. Gramercy Pictures,*
  949 F. Supp. 331 (E.D. Pa. 1997)................................................passim

*Simpson-Strong-Tie v. Gore,*
  49 Cal. 4th 12 (2010) ...........................................................................6

vi

*Spence v. Washington*,
   418 U.S. 405 (1974)...............................................................................28

*Stewart v. Rolling Stone LLC*,
   181 Cal. App. 4th 664 (2010) ...............................................................6

*Tyne v. Time Warner Entm't*,
   901 So. 2d 802 (Fla. 2005) ...........................................................12, 20

*U.S. v. O'Brien*,
   391 U.S. 367 (1968)...............................................................................28

*Valentine v. CBS*,
   698 F.2d 430 (11th Cir. 1983) .............................................................11

*Westchester Media v. PRL Holding USA*,
   214 F.3d 658 (5th Cir. 2000) ...............................................................33

*Winter v. DC Comics*,
   30 Cal. 4th 881 (2003) ...................................................................passim

## CONSTITUTIONAL PROVISIONS

United States Constitution, First Amendment .....................................passim

## STATUTES

36 U.S.C. § 380.........................................................................................32

California Civil Code § 3344....................................................................16

California Civil Code § 3344(d) ...................................................2, 16, 17

California Code of Civil Procedure § 425.16 ...........................................5

California Code of Civil Procedure § 425.16(g).......................................8

## TREATISES

Restatement (Third) of Unfair Competition, § 47 .............................21, 23

DWT 16278844v4 0058278-000014

**OTHER AUTHORITIES**

Cotter, Thomas F. and Irina Y. Dmitrieva, *Integrating the Right of Publicity with First Amendment and Copyright Preemption Analysis*, 33 Colum. J.L. & Arts 165, 206 (2010) ................................................................32

Dougherty, Jay, *All the World's Not a Stooge: The 'Transformativeness' Test for Analyzing a First Amendment Defense to a Right of Publicity Claim Against Distribution of a Work of Art*, 27 Colum. J. L. & Arts 1, 45 (2003). ................................................................................................1

Volokh, E., *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903 (2003) ..............................................................................................30

Welkowitz, D. and T. Ochoa, *The Terminator as Eraser: How Arnold Schwarzenegger Used the Right of Publicity to Terminate Non-Defamatory Political Speech*, 45 Santa Clara L. Rev. 651 (2005) ...............11, 31

Zimmerman, D., *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503 (2009) ........................32

## I.    INTRODUCTION

EA's opening brief showed that the district court should have granted EA's anti-SLAPP motion because EA established a First Amendment defense to each of Keller's claims.  In response, Keller asks this Court to place artificial restrictions on the constitutional tests that protect expressive works from the chilling effect of right-of-publicity claims.

Keller argues that the transformative-use test protects only works that distort a person's name or likeness and place him in a fantastical setting.[1]  But no authority supports this view, which mistakenly treats *one* form of creative transformation as the *only* form worthy of First Amendment protection.  Keller's interpretation would incorrectly deny the protection of the transformative-use test not only to EA's video games, but also to many other works that feature realistic depictions of actual people – films like *The Social Network* and *The Hours*, novels like *Ragtime* and *Gravity's Rainbow*, and plays like *Copenhagen* and *Picasso at the Lapin Agile*.

Recognizing that all of these works are constitutionally protected against right-of-publicity claims, Keller notes that "the transformative-use test is not the only gauge of free-speech rights."[2]  Yet, he then proposes unsupportable limitations on those other constitutional tests.  He argues that the public-interest test protects only "factual reporting" of "newsworthy events."[3]  In fact, this test

---

[1]  Appellee's Brief ("AB") 25-27; Excerpts of Record ("ER") 9-10.

[2]  AB 36.

[3]  AB 47, 58-59; ER 12-15.

1

(and the public-affairs exemption under Civil Code Section 3344(d)) protect works that entertain as well as inform, as long as they relate to matters of public interest or public affairs, broadly defined.

Keller tries to dodge the *Rogers*/Restatement test[4] by asserting that in right-of-publicity cases (but not in Lanham Act cases), the test applies only to the use of names or likenesses in titles, but not to uses within an expressive work.[5]  No case so holds, and no policy supports such a distinction.  The *Rogers*/Restatement test protects the use of a name or likeness within an expressive work unless the use is wholly unrelated to the work's content or is a disguised commercial advertisement for something other than the work itself.  Had that test been applied here, as it was in *Brown*, the court should have reached the same result and stricken Keller's claims.

The flaws in each of Keller's arguments become even more glaring when they are considered together.  As interpreted by Keller, the transformative-use, public-interest, and *Rogers*/Restatement tests collectively would permit the use of real-life individuals' names or likenesses *only* in fantastical works, factual reporting, and some titles.  Under his view, numerous other expressive works – including docudramas, novels, plays, songs, and realistic video games – never could include a real-life person's name or likeness without being subject to a right-of-publicity claim.

---

[4] *Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989).

[5] AB 51.

2

To prevent this result and its chilling effect on expression, courts have held, "often … as a matter of law,"[6] that the First Amendment bars right-of-publicity claims that target such works.[7]  The Court should do the same here, and should strike Keller's claims against EA.

## II.  KELLER CANNOT SHOW A PROBABILITY OF PREVAILING ON HIS CLAIMS.

Keller acknowledges that EA satisfied its initial burden under the anti-SLAPP statute of showing that his claims arise from EA's constitutionally protected speech about an issue of public interest, and that "[t]his appeal focuses on the second step" of the two-part anti-SLAPP inquiry.[8]  The second step requires Keller "to demonstrate a probability of prevailing on the challenged claims"[9] by presenting competent, admissible evidence.  Because he did not do so, his claims against EA must be stricken.

### A.  Keller Did Not Meet His Evidentiary Burden To Establish That EA Waived Its First Amendment Defense.

#### 1.  Under The Anti-SLAPP Statute, Keller Had The Burden Of Adducing Evidence To Negate EA's First Amendment Defense.

Keller correctly observes that EA bears the burden of substantiating its First Amendment defense.[10]  EA unequivocally did so, by presenting the district court and this Court with the relevant editions of its *NCAA Football* and *NCAA*

---

[6] *Winter v. DC Comics*, 30 Cal. 4th 881, 891 (2003).  *See also Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 872 (1979).

[7] *See, e.g.,* cases cited at note 26, *infra.*

[8] AB 12.

[9] AB 12.

[10] AB 15.

*Basketball/March Madness* video games, which are the only evidence needed to adjudicate EA's First Amendment defense. *Winter*, 30 Cal. 4th at 891 ("courts can often resolve the question [of whether the First Amendment bars a right-of-publicity claim] as a matter of law simply by viewing the work in question"). *See also Kirby v. Sega America*, 144 Cal. App. 4th 47, 61 n.6 (2006) (same). With the games properly before it, the Court can determine whether the First Amendment affords EA a complete defense to Keller's claims under any applicable constitutional test.

Keller responds by *arguing* (without any supporting evidence) that EA waived its constitutional defense.[11] He contends that by making this bare allegation, he shifted the burden back to EA to prove that it did not waive its First Amendment rights.[12] But no authority supports Keller's burden-shifting theory, and two cases that he cites – *Navellier v. Sletten*[13] and *DaimlerChrysler v. Lew Williams, Inc.*[14] – expressly reject it.

In *Navellier*, the California Supreme Court discussed the burdens that apply in anti-SLAPP cases when the plaintiff contends that the defendant contractually waived its First Amendment rights. 29 Cal. 4th at 94. The court noted that "[a]ny such action presumably would involve at a minimum the pleading *and proof* of the alleged agreement." *Id.* (emphasis added). "To require that plaintiffs **substantiate** speech-burdening claims at the outset ... *by appending the alleged agreement to an*

---

[11] AB 129-130

[12] AB 19.

[13] 29 Cal. 4th 82 (2002).

[14] 142 Cal. App. 4th 344 (2006).

DWT 16278844v4 0058278-000014

*affidavit stating the facts upon which the defendant's liability is based*, as the anti-SLAPP statute provides, hardly seems excessive." *Id.* (emphases added; citations omitted).

The California Court of Appeal reaffirmed this requirement in *DaimlerChrysler*, where a car manufacturer sued a dealer for breaching an agreement waiving the right to protest the opening of another dealership. 142 Cal. App. 4th at 350-351. In response to the dealer's anti-SLAPP motion, the manufacturer argued that it could show a probability of prevailing on its claims because the dealer "breached the Letter Agreement by filing protests after expressly agreeing … not to do so." *Id.* at 352. The court unambiguously held that "*it is the plaintiff's burden to* **substantiate** *defendant breached a valid waiver to protest*"; a mere allegation of waiver is insufficient. *Id.* at 351 (emphasis added).

*Navellier* and *DaimlerChrysler* are consistent with the rule that the plaintiff opposing an anti-SLAPP motion bears an *evidentiary* burden to negate the defendant's affirmative defenses. *See, e.g., Robertson v. Rodriguez*, 36 Cal. App. 4th 347, 359 (1995) (Section 425.16 "calls upon the plaintiff to meet the defendant's constitutional defenses"; "this burden is met in the same manner the plaintiff meets the burden of demonstrating the merits of its causes of action: by showing the defendant's purported constitutional defenses are not applicable to the case as a matter of law or by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses") (citations and internal quotation marks omitted); *Premier Medical Mgmt Sys. v. California Ins. Guar. Ass'n*, 136 Cal. App. 4th 464, 479 (2006) (granting anti-SLAPP motion where plaintiffs

5

*"present no evidence establishing"* the applicability of a statutory exemption to the anti-SLAPP statute); *Simpson-Strong-Tie v. Gore*, 49 Cal. 4th 12, 23 (2010) (addressing burden-shifting under an exemption to the anti-SLAPP statute; "'[w]hen a proviso ... carves an exception out of the body of a statute or contract those who set up such exception must prove it'") (citations omitted). Regardless of how one characterizes Keller's burden (whether as a summary-judgment standard[15] or a minimal-merit standard[16]), it remains an *evidentiary* burden – one that he could meet only be adducing competent, admissible evidence. *See, e.g., Paulus v. Bob Lynch Ford*, 139 Cal. App. 4th 659, 672-673 (2006) ("plaintiff may not rely solely on its complaint, even if verified," to defeat an anti-SLAPP motion).

Indeed, the purpose of the anti-SLAPP statute is to pierce the pleadings. It would turn the statute on its head to permit a plaintiff to defeat an anti-SLAPP motion by simply pointing to an allegation in his complaint. This would subvert the Legislature's intent to discourage lawsuits that target free speech by "requir[ing] a plaintiff to marshal facts sufficient to show the viability of the action before filing a SLAPP suit." *Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 15 (1995).

---

[15] *See Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 679 (2010)

[16] *See Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2010). Keller is wrong when he states that EA "cite[d] the earlier, unamended decision" in *Hilton*. AB 17 n.3. Each mention of *Hilton* in EA's opening brief ("OB") cites to the modified opinion. OB 4, 5, 15-18, 20.

### 2.     Keller Failed To Present Any Evidence To Substantiate His Waiver Argument.

Keller's entire waiver argument rests on a single line from his complaint – the unsubstantiated allegation that "the licensing agreements between Electronic Arts and the CLC explicitly prohibit the use of NCAA athlete names and/or likenesses in NCAA branded videogames."[17]  But Keller bears the burden of establishing his argument with competent, admissible evidence.  Because the bare allegation from his complaint is not evidence, it cannot be used to meet his burden.  *See, e.g., Mindy's Cosmetics v. Dakar*, 611 F.3d 590, 599 (9th Cir. 2010) (plaintiff opposing anti-SLAPP statute must adduce "competent, admissible evidence") (citations omitted).  On that basis alone, Keller's waiver argument fails.

Even if the Court gave evidentiary weight to Keller's *pleading* allegation, however, it would not establish that EA waived its First Amendment rights.  Because of the paramount importance of free speech, a court may find that a litigant waived its First Amendment rights only where the evidence is "clear and compelling."  *Curtis Publ'g v. Butts*, 388 U.S. 130, 145 (1967).  A court "need not concern [itself] with the involuntariness or unintelligence of a waiver when the contractual language relied upon does not, on its face, even amount to a waiver."  *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972).  *See also Erie Telecommunications v. City of Erie*, 853 F.2d 1084, 1095 (3d Cir. 1988) (courts must "indulge in every reasonable presumption against waiver of fundamental constitutional rights and not [] presume acquiescence in the loss of such rights.") (citation omitted).

---

[17] ER 130.

Tellingly, in each case Keller cites, the contract itself and the facts necessary to establish a waiver were before the court, furnishing "clear and convincing evidence that the waiver [was] knowing, voluntary and intelligent." *Leonard v. Clark*, 12 F.3d 885, 886, 889-890 (9th Cir. 1993). *See also Erie Telecommunications*, 853 F.2d at 1085, 1094-1095; *Honolulu Rapid Transit v. Dolim*, 459 F.2d 551, 553 (9th Cir. 1972); *Paragould Cablevision v. City of Paragould*, 930 F.2d 1310, 1314-1315 (8th Cir. 1991); *DaimlerChrysler*, 142 Cal. App. 4th at 348-350.

In contrast, Keller offered no evidence – certainly not clear and convincing evidence – to support his waiver argument. While he had the opportunity under the anti-SLAPP statute to seek discovery, he chose to rely on a single allegation in his complaint about a purported term of an agreement that is not in the record.[18] If that were enough to negate EA's constitutional defense, then the anti-SLAPP statute would be eviscerated. To discourage meritless claims that target speech and to spare defendants the burden and expense of litigating such claims, the statute requires the plaintiff to present *evidence* to establish his claim. *Braun v. Chronicle Publ'g,* 52 Cal. App. 4th 1036, 1042 (1997). Otherwise, a plaintiff always could defeat an anti-SLAPP motion merely by relying on unsubstantiated allegations. That is all that Keller has offered here, and it is not remotely sufficient to meet his evidentiary burden of showing that EA waived its First Amendment defense.

---

[18] Keller fails to mention that his attorneys have a copy of the license agreement from other litigation with EA. *See Pecover et al. v. Electronic Arts Inc.*, Case No. 3:08-CV-02820-VRW (Docket Nos. 75, 84, 87). Had they believed that the license agreement substantiated Keller's waiver argument, they had the opportunity to submit it to the district court.

8

**B.    The First Amendment Bars Keller's Claims As A Matter Of Law.**

**1.    The Transformative-Use Test**

Keller correctly states that "the central question" under the transformative-use test is whether a "product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness."[19]  *Winter*, 30 Cal. 4th at 888.  In other words, a court must examine "whether the celebrity likeness is one of the 'raw materials' *from which an original work is synthesized*, or whether the depiction or imitation of the celebrity is *the very sum and substance of the work* in question."  *Comedy III Prods. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 406 (2001) (emphases added).

Keller nevertheless insists that the transformative-use test protects only those works that physically distort the plaintiff's likeness.[20]  Echoing that view, the Screen Actors Guild amici argue that the test is limited to works of "caricature and parody."[21]  That collective characterization, which essentially becomes nothing more than an "altered-likeness" test, is untenable.  As this Court recently explained, "[t]he potential reach of the transformative use defense is broad.  The form of the expression to which it applies '[is] not confined to parody and can take many forms[.]'"  *Hilton*, 599 F.3d at 908 (quoting *Comedy III*, 25 Cal. 4th at 406).  The California Supreme Court has made clear that transformative uses may include, but are not limited to, "factual reporting," "fictionalized portrayal,"

---

[19] AB 33.

[20] AB 30-32.

[21] Screen Actors Guild *Amici* Brief ("SAG") 13-14 (emphasis omitted).

"heavy-handed lampooning," and "subtle social criticism." *Comedy III*, 25 Cal. 4th at 406; *Winter*, 30 Cal. 4th at 888. To underscore that point, the court specifically noted that the transformative-use test would protect works that use a real-life person's actual name or literal image, including a biography of Howard Hughes and a television docudrama about Rudolph Valentino. *Comedy III*, 25 Cal. 4th at 406 (citations omitted). Keller and SAG's contrary view cannot be reconciled with this authority.

Their narrow view of transformative-use turns on the specific facts of *Winter* and *Kirby*.[22] Because the musician-plaintiffs in *Winter* were depicted as "half-worm, half-human offspring" of a supernatural creature,[23] and the singer-plaintiff in *Kirby* was depicted as a 25th century intergalactic journalist,[24] Keller assumes that the transformative-use test applies *only* where the plaintiff's likeness is dramatically altered and placed in a counterfactual setting. But expressive works that realistically depict their subjects also may be transformative as a matter of law. *E.g.*, *ETW Corp. v Jireh Publ'g.*, 332 F.3d 915, 937-938 (6th Cir. 2003). *See also Comedy III*, 25 Cal. 4th at 406 (transformative-use test extends to works that realistically depict their subjects). The "grotesque transformation in *Winter*" and *Kirby* is just one "edge[]" of the transformative-use test.[25]

---

[22] AB 30-35, 39.

[23] *Winter*, 30 Cal. 4th at 886.

[24] *Kirby*, 144 Cal. App. 4th at 52.

[25] D. Welkowitz and T. Ochoa, *The Terminator as Eraser: How Arnold Schwarzenegger Used the Right of Publicity to Terminate Non-Defamatory Political Speech*, 45 Santa Clara L. Rev. 651, 668-670 (2005) ("Welkowitz and Ochoa").

Indeed, nothing in First Amendment law suggests that using an individual's likeness to inject realism into an expressive work removes the work from the protections of the First Amendment. If injecting verisimilitude into a highly creative video game causes the game to lose First Amendment protection, then it also could strip protection from countless other creative works, including films like *The Social Network*, *Forrest Gump*, and *All the President's Men*, novels like E.L. Doctorow's *Ragtime*, Thomas Pynchon's *Gravity's Rainbow*, and Don DeLillo's *Libra*, songs like Elton John's *Candle in the Wind* and Simon and Garfunkel's *Mrs. Robinson*, and plays like Steve Martin's *Picasso at the Lapin Agile*, all of which feature the names or likenesses of real-life individuals. This result would contravene a long line of cases recognizing that the First Amendment protects the use of real-life figures in an array of creative works,[26] and cannot be squared with the California Supreme Court's instruction that the transformative-use test will – "often" and "as a matter of law" – protect works that realistically depict celebrities. *Winter*, 30 Cal. 4th at 891; *Comedy III*, 25 Cal. 4th at 406.

*ETW* demonstrates how the transformative-use test should be applied to works, like EA's video games, that include realistic likenesses. The work at issue in *ETW* was a painting (which was sold as a lithograph) featuring a literal likeness

---

[26] *See, e.g.*, *ETW*, 332 F.3d at 937-938 (painting); *Matthews v. Wozencraft*, 15 F.3d 432, 439-440 (5th Cir. 1994) (biographical novel); *Valentine v. CBS*, 698 F.2d 430, 433 (11th Cir. 1983) (song); *Hoepker v. Kruger*, 200 F. Supp. 2d 340, 349 (S.D.N.Y. 2002) (visual art); *Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723, 730-731 (E.D. Mich. 2000) (television miniseries), *aff'd*, 267 F.3d 457, 461-462 (6th Cir. 2001); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1997) (docudrama and book); *Hicks v. Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978) (docudrama and novel); *Tyne v. Time Warner Entm't*, 901 So. 2d 802, 810 (Fla. 2005) (docudrama); *Guglielmi*, 25 Cal. 3d at 866-868 (docudrama).

11

of Tiger Woods playing golf at The Masters, with several former champions in the background.  332 F.3d at 918.  Under Keller's view of the transformative-use test, the fact that Woods was depicted literally (same facial features, hitting the ball right-handed, and wearing his familiar black pants, red shirt, and cap) and in a setting where he appeared in real life (The Masters) would dictate that the use was not protected.  *Compare id*. at 918, 936 *with* AB 36-37.[27]  Yet, the Sixth Circuit found "that [the defendant's] work does contain significant transformative elements which make it especially worthy of First Amendment protection."  332 F.3d at 938.  Even though the foreground of the painting was dominated by Woods' realistic image, the court held that the work "consist[ed] of much more than a mere literal likeness of Woods."  *Id.*  "Unlike the unadorned, nearly photographic reproduction of the faces of The Three Stooges in *Comedy III*," the court explained that the "work does not capitalize solely on a literal depiction of Woods.  Rather, [the] work consists of a collage of images in addition to Woods' image which are combined to describe, in artistic form, a historic event in sports history[.]"  *Id.*  Notably, the "collage of images" consisted of realistic portraits of other professional golfers.  *Id.*

EA's *NCAA Football* and *NCAA Basketball/March Madness* works are even more transformative than the painting in *ETW*.  Woods' image is closer to the "sum and substance" of the painting than Keller's alleged image could be described as the "sum and substance" of *NCAA Football*.  EA's game includes thousands of other creative elements, including original graphics, videos, music, and sound

---

[27] *See also* AB 28; ER 9-10.

effects; game scenarios, audiovisual, software, and engineering components; hundreds of teams and thousands of virtual players; information about teams; and an interactive environment that allows users not only to simulate the feel of college football, but also to create their own narratives for a collegiate football program or the arc of an athlete's college career.[28]  Most of these elements alone, in another medium, would enjoy First Amendment protection.  Together, they clearly do, and they support a finding, as a matter of law, that EA's games are transformative.  For that reason, the First Amendment defeats Keller's claims.

### 2.    The Public-Interest Test

Keller also construes the constitutional public-interest test much too narrowly.  This defense is not restricted to traditional "reporting;"[29] it applies equally to the dissemination of information through a variety of media, ranging from online fantasy sports games[30] and parody trading cards[31] to baseball-game programs and web features.[32]  Nor does this defense protect only the dissemination of "news";[33] it applies equally to works that entertain, as well as inform.  In *Gionfriddo*, the court reaffirmed that "[e]ntertainment features receive the same constitutional protection [against right-of-publicity claims] as factual news

---

[28] ER 63-73, 89-99.

[29] ER 12.  *See also* AB 47.

[30] *C.B.C. Distribution v. Major League Baseball Advanced Media*, 505 F.3d 818, 823 (8th Cir. 2003).

[31] *Cardtoons v. Major League Baseball Players Ass'n*, 95 F.3d 959, 969 (10th Cir. 1996).

[32] *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 410-411 (2001).

[33] ER 12; AB 43-47.

13

reports."  94 Cal. App. 4th at 410.  The Tenth Circuit echoed this principle in
*Cardtoons*, making clear that "[s]peech that entertains, like speech that informs, is
protected by the First Amendment because 'the line between informing and
entertaining is too elusive for the protection of that basic right.'"  95 F.3d at 969
(citations omitted).  The defense exists as long as the communication concerns a
matter of "public interest," as that term has been broadly defined.  *Dora v.
Frontline Video*, 15 Cal. App. 4th 536, 1543 (1993).  Thus, courts have extended
the defense to works that communicated "mere bits of baseball's history" and
"fragments from baseball's mosaic."  *Gionfriddo*, 94 Cal. App. 4th at 410.

      To distinguish *C.B.C.*, *Cardtoons*, and *Gionfriddo*, Keller presents three
unpersuasive arguments.  First, he asserts that EA's license with the NFL Players
Association concerning a different work, *Madden NFL*, "undercuts its First
Amendment public-interest argument[.]"[34]  Keller confuses business decisions
with legal obligations.  As a business matter, EA derives significant benefits –
including promotional cooperation and access to players – from its partnership
with the NFLPA.  But that license does not affect EA's First Amendment rights
here, as *C.B.C.* confirms.  There, a fantasy-baseball operator entered into a license
with the players association to use players' names, likenesses, and biographical
information in its games.  505 F.3d at 821.  After the players association refused to
extend the license, the company won a declaratory judgment that it had a First

---

[34] AB 43.

Amendment right to use the same information without a license.  *Id.* at 823.[35]

Second, Keller states that "EA videogames digitally replicate NCAA players for gamers to manipulate" and "to control independently[.]"[36]  But Keller offers no authority that interactivity affects the public-interest defense.  In fact, the Eighth Circuit rejected this argument in *C.B.C.*  The court acknowledged that the fantasy baseball operator used the players' names, likeness, and other information "*in an interactive form*," but nonetheless concluded that "[t]his use [wa]s no less expressive" than other works and no less protected by the First Amendment.  505 F.3d at 823 (emphasis added).  *See also American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J.) (rejecting the "superficial" and "erroneous" argument that video games' interactivity justified curtailing their constitutional protections).

Third, Keller insists that the public-interest defense does not apply because EA's games, unlike a fantasy game, trading card, or web feature, do not communicate information.[37]  He is mistaken.  Indeed, the in-game virtual player profiles that Keller alleges are actionable communicate the same information as baseball-game programs, which are protected by the public-interest defense.  *See*

---

[35] *See also Campbell v. Acuff-Rose Music*, 510 U.S. 569, 586 n.18 (1994) (prior licensing efforts have no bearing on whether a defendant is entitled to fair-use protections)*; Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 326 (1997) ("the industry custom of obtaining 'clearance' establishes nothing, other than the unfortunate reality that many filmmakers may deem it wise to pay a small sum up front for a written consent to avoid later having to spend a small fortune to defend unmeritorious lawsuits").

[36] AB 46-47.

[37] AB 47.

15

*Gionfriddo*, 94 Cal. App. 4th 400.  These virtual profiles contain information that would be included in trading cards or fantasy games, such as an athlete's college, class year, position, uniform number, height, and weight.[38]

Under the First Amendment, EA's games are no different from the fantasy games in *C.B.C.*, the game programs and web features in *Gionfriddo*, or the trading cards in *Cardtoons* – all of which "convey information about their subject [college sports] and therefore constitute an important means of expression that deserves First Amendment protection" against right-of-publicity claims.  *Cardtoons*, 95 F.3d at 969.

### 3.     Civil Code Section 3344(d)

Keller's interpretation of Section 3344(d) is similarly flawed.  First, he is wrong that it "applies, at most, only to [his] § 3344 claim."[39]  This statutory exemption affords "a complete defense to both [the statutory and common-law right-of-publicity] claims if [the plaintiff's name or likeness was used] 'in connection with any news, public affairs, or sports broadcast or account.'"  *New Kids on the Block v. News America Publ'g*, 971 F.2d 302, 310 (9th Cir. 1992).  Second, Keller erroneously argues that Section 3344(d) protects only "journalism" or "factual reporting."[40]  This argument defies the statute's plain language, which exempts from liability any publication relating to "news" *or* "public affairs" (Cal.

---

[38] ER 130-134, 139.  The editions of the game that EA submitted to the district court convey a host of other information about college football and college basketball, such as teams' fight songs, mascots, and team colors.  ER 63-73, 89-99.

[39] ER 128-129.

[40] AB 58-59.

16

Civ. Code § 3344(d)), and the statute's intent, which is "to avoid First Amendment questions in the area of misappropriation by providing *extra breathing space* for the use of a person's name in connection with matters of public interest" (*New Kids*, 971 F.2d at 310 n.10 (emphasis added)).  As the case law demonstrates, Section 3344(d) broadly protects works that communicate information about sports.[41]  As explained above in Section II.B.2, EA's *NCAA Football* and *NCAA Basketball/March Madness* concern matters of public affairs and thus fall within the protections of Section 3344(d).

### 4. The *Rogers*/Restatement Test

EA should prevail under the transformative-use or public-interest tests.  But because those tests have proven difficult to apply, EA submits that this Court should adopt the *Rogers*/Restatement test, which provides more predictable protection for speech, while preserving right-of-publicity claims when (1) the use of a person's name or likeness is wholly unrelated to an expressive work, or (2) the use is a disguised commercial advertisement for something other than the work itself.  *Rogers*, 875 F.2d at 1004.

### a. This Court May, And Should, Apply The *Rogers* Test.

Contrary to Keller's argument, EA preserved the *Rogers* test for appeal.[42] The gravamen of EA's anti-SLAPP motion is that the First Amendment bars Keller's claims.[43]  EA focused its motion on the transformative-use and public-

---

[41] *See, e.g., Gionfriddo*, 94 Cal. App. 4th at 416; *Dora*, 15 Cal. App. 4th at 546; *Montana*, 34 Cal. App. 4th at 796.

[42] AB 48.

[43] ER 6-10, 124-125.

DWT 16278844v4 0058278-000014

interest tests, because they have been applied in this Circuit and in California courts. But EA did not limit itself to those tests. Instead, EA identified the *Rogers*/Restatement test as an alternative formulation of the First Amendment defense. Citing *Rogers*, EA explained that "the 'relatedness test' … affords First Amendment [p]rotection to the use of a person's name or likeness as long as the use is 'related' to the content of the work and is not 'simply a disguised commercial advertisement for the sale of goods or services.'"[44]

In any event, this Court on its own may consider whether *Rogers* provides the proper First Amendment protection for expressive works. The Court "may consider issues not presented to the district court … when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *In re Mercury Interactive Corp. Securities Litig.*, 618 F.3d 988, 992 (9th Cir. 2010). Whether the *Rogers* test applies in this Circuit is an issue of law,[45] and determining whether it bars Keller's claims does not require the development of any additional factual record. Like the other tests, *Rogers* turns on a review of the relevant editions of EA's works, which are before the Court.

---

[44] ER 125. Neither case that Keller cites supports his position that EA waived its *Rogers* argument. In *Gieg v. DDR, Inc.*, 407 F.3d 1038, 1046 n.10 (9th Cir. 2005), the Court held that the appellees failed to raise a *factual* issue below and that they could not raise this issue "for the first time on appeal." And in *Moore v. Czerniak*, 574 F.3d 1092, 1116 (9th Cir. 2009), the state "doubly forfeited" an issue by failing to raise it in the district court and again failing to raise it on appeal. *Id.*

[45] *See, e.g., Christoffersen v. Washington State Air Nat'l Guard*, 855 F.2d 1437, 1443 (1988) ("[w]hether speech is constitutionally protected is an issue of law"). *See also Mattel v. MCA Records*, 296 F.3d 894, 902 (9th Cir. 2002) ("*MCA Records*") (adopting *Rogers* test for Lanham Act claims).

18

Keller offers no persuasive reason why this Court should not adopt the *Rogers* test in right-of-publicity actions. He acknowledges that this Court has adopted the analogous *Rogers* test in Lanham Act cases, and has extended that test to the use of marks within expressive works.[46] Yet, he maintains that the *Rogers* test "applies only to right-of-publicity claims arising from unauthorized use of celebrity names and/or likenesses in *titles, advertising and other promotions*," not within expressive works.[47] The only purported justification that Keller offers for this distinction is that the second prong of the *Rogers* right-of-publicity test "focus[es] on … disguised advertising."[48] But he does not explain why the use of a person's name or likeness within an expressive work could not qualify as a disguised commercial advertisement (imagine, for example, if McDonald's commissioned an unauthorized painting of Keller eating a Big Mac and hung it inside a restaurant).

Conspicuously, Keller cites no case law refusing to apply *Rogers* to a right-of-publicity claim arising from the use of a person's name or likeness within an expressive work, and the courts in *Romantics* and *Seale* applied the test to precisely such uses. In *Romantics*, the court applied the *Rogers* test to dismiss a right-of-publicity claim arising from the use of the plaintiff-bandmembers' allegedly distinctive sound in the video game *Guitar Hero*. 574 F. Supp. 2d at 764. Similarly, in *Seale*, the court applied the Restatement's relatedness test – which is

---

[46] AB 50-51.

[47] AB 51 (emphasis added).

[48] AB 51.

19

virtually identical to the *Rogers* test – to a right-of-publicity claim arising from the use of the name and likeness of a co-founder of the Blank Panther Party in a docudrama and book.  949 F. Supp. at 337.  Echoing *Rogers*, the court concluded that the defendants were "entitled to judgment as a matter of law as to Plaintiff's right of publicity claim insofar as it relates to [the] use of Plaintiff's name and likeness in the film, pictorial history book, and on the cover of the home video." *Id.  See also Tyne*, 901 So. 2d at 810 (citing *Seale* and Restatement; holding that docudrama featuring real-life individuals was constitutionally protected and exempt from liability under right-of-publicity statute).

Nor does Keller address the Restatement's endorsement of this test for cases involving the use of a name or likeness within an expressive work.  The Restatement explains that "the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses" ordinarily is not actionable under the right of publicity. Restatement (Third) of Unfair Competition ("Restatement"), § 47.  The authors note that the "right of publicity … is fundamentally constrained by the public and constitutional interest in freedom of expression," and that this constraint extends to uses in "entertainment and other creative works[.]"  *Id.*, cmt. c.  The only exception to this rule parallels *Rogers*:  such uses are not protected "[i]f the name or likeness is used solely to attract attention to a work that is not related to the identified person[.]"  *Id*.

In the end, Keller makes the inconsistent and untenable argument that *Rogers* should apply to uses of a person's name or likeness within expressive

20

works in Lanham Act cases, but only to titular or advertising uses in right-of-publicity cases.  That argument would subject right-of-publicity claims to a lower level of constitutional scrutiny than Lanham Act claims – an argument that no court has embraced, especially because "a right-of-publicity claim requires no evidence of consumer confusion."[49]  If anything, that distinction underscores the need to afford expressive works *greater* constitutional protection against right-of-publicity claims.  *Rogers*, 875 F.2d at 1004 (citing this distinction as the "reason [that] courts delineating the right of publicity, more frequently than in applying the Lanham Act, have recognized the need to limit the right to accommodate First Amendment concerns"); *ETW*, 332 F.3d at 930 ("[t]he rationales underlying recognition of a right of publicity are generally *less compelling* than those that justify rights in trademarks") (citation omitted; emphasis added).  Under these circumstances, the Court should apply the *Rogers* test to Keller's claims.[50]

### b.  *Rogers* Mandates Dismissal Of Keller's Claims.

Keller's real objection to the *Rogers* test is that its application compels striking his claims.  Keller does not dispute that EA's alleged use of his likeness is related to *NCAA Football*.  Instead, he focuses on the "disguised commercial advertisement" prong of the *Rogers* test.[51]  According to Keller, if the Court were

---

[49] *Id.*

[50] *Rogers* would not defeat every right-of-publicity claim that targets an expressive work.  *See*, *e.g.*, *Seale*, 949 F. Supp. at 337 (finding triable issue of fact as to the use of plaintiff's likeness on the cover of an unrelated compact disc); *Parks v. LaFace Records*, 329 F.3d 437, 461 (6th Cir. 2003) (applying *Rogers* and finding a triable issue of fact).

[51] AB 55-57.

21

to "deem *Rogers* to encompass infringing uses [of his likeness] within the videogames, EA's use of player likenesses" – standing alone – would "constitute[] 'disguised advertising'" and defeat EA's First Amendment defense.[52]  But if the mere use of a plaintiff's name or likeness within an expressive work were enough to create a factual dispute on the "disguised commercial advertisement" prong, then the defense never could be sustained without trial, since a right-of-publicity claim necessarily involves a use of the plaintiff's likeness.  Thus, Keller's argument, if accepted, would make the *Rogers* test meaningless.

This Court already rejected the very same argument when it adopted the *Rogers* test for Lanham Act claims that target expressive works.  In *MCA Records*, the Court noted that "[t]he only indication that Mattel might be associated with the song is the use of Barbie in the title; if this were enough to satisfy th[e second] prong of the *Rogers* test [for Lanham Act claims], it would render *Rogers* a nullity."  296 F.3d at 902.  In *E.S.S. Entertainment 2000 v. Rock Star Videos*, this Court reiterated that "the mere use of a trademark alone cannot suffice to make such use explicitly misleading" under *Rogers*.  547 F.3d 1095, 1101 (9th Cir. 2008).  The Court explained that "a trademark infringement claim presupposes a use of the mark.  If that necessary element in every trademark case vitiated a First Amendment defense, the First Amendment would provide no defense at all."  *Id.* at 1099.

Also without merit is Keller's argument that the alleged "photographic realism" of EA's games implies a "disguised commercial advertisement,"

---

[52] AB 56.

satisfying the second prong of *Rogers*.[53]  Predictably, Keller offers no legal

authority to support this argument; whether a use is realistic or fanciful has no

bearing on whether it appears to be a disguised commercial advertisement for

something other than the defendant's work.  In *Seale*, for example, where the

defendants' film and book used the plaintiff's realistic likeness, the court held that

those works were protected by the First Amendment as a matter of law.  949 F.

Supp. at 337.  Likewise, in *Romantics*, where the defendants' video game used the

plaintiff-bandmembers' realistic sound, the court found that the First Amendment

barred their right-of-publicity claim.  *See also* Restatement, § 47 and cmt. c.

      Finally, Keller is mistaken when he claims that EA's supposed use on its

website of virtual athletes' likenesses in "clips" and "screenshots" from *NCAA

Football* constitutes a disguised commercial advertisement.[54]  Even assuming that

such clips and screenshots exist (and Plaintiff offered no such evidence in

opposition to EA's anti-SLAPP motion), they contain images from within the

game itself.  Thus, even interpreting Keller's allegations in the most favorable light

for him, such uses do not represent disguised commercial advertisements, but

rather ancillary material that promotes the game's actual content.  Any such use

would be fully protected by the First Amendment.  *See, e.g., Guglielmi*, 25 Cal. 3d

at 873 ("[s]ince the use of Valentino's name and likeness in the film was not an

actionable infringement of Valentino's right of publicity, the use of his identity in

advertisements for the film is similarly not actionable"); *Cher v. Forum Int'l*, 692

---

[53] AB 56.

[54] AB 55-56.

F.2d 634, 639 (9th Cir. 1982) (First Amendment protects "advertising which is merely an adjunct of the protected publication").

Because EA's alleged use of Keller's likeness is not "wholly unrelated" to its video game and is not a "disguised commercial advertisement" for unrelated goods or services, the *Rogers* test defeats Keller's claims.

### III. THE COURT SHOULD REJECT THE NOVEL POSITIONS ADVANCED BY AMICI PLAYERS ASSOCIATIONS.

### A. EA's Video Games Enjoy The Same Constitutional Protections As Other Expressive Works.

Going even further than Keller, amici Players Associations ("Players") urge the Court to categorically deny First Amendment protections to realistic sports video games. While Keller acknowledges that EA's games are constitutionally protected expressive works,[55] the Players assert that the "First Amendment does not protect [video games] that do nothing more than simulate, as realistically as possible, actual sporting events populated by real athletes."[56] This argument mischaracterizes EA's games and misstates First Amendment law.

First, EA's games do not merely "simulate … actual sporting events."[57] Their purpose is not for users to re-enact actual games, play-by-play, so that their virtual competition ends with the same result as an actual game between two schools. In *NCAA Football*, for example, users may play a virtual game between

---

[55] AB 26-27. Even the district court – and the *Brown* court – recognized that EA's games are expressive works protected by the First Amendment, as that determination is a prerequisite to considering EA's First Amendment defense.

[56] PA 3.

[57] PA 3.

two schools, regardless of whether those schools would play each other during an actual football season. The users' play-calling, manipulation of the game controllers, and other actions determine the outcome of each virtual contest, and the game contains other functions that allow users to control a school's football program or a single virtual athlete's development over several seasons.[58]

These elements of EA's video games, along with their countless artistic audio and visual elements, contrast starkly with the rudimentary electronic games at issue in the older cases cited by the Players. *E.g.*, *Malden Amusement v. City of Malden*, 582 F. Supp. 297, 299 (D. Mass. 1983); *America's Best Family Showplace v. City of New York*, 536 F. Supp. 170, 173 (E.D.N.Y. 1982); *Caswell v. Licensing Comm'n for Brockton*, 444 N.E.2d 922, 927 (Mass. 1983). In those cases from nearly 30 years ago, courts declined to extend First Amendment protection to pinball-style electronic arcade games. *America's Best*, 536 F. Supp. at 173. Thirty years is a very long time in terms of video-game development, however, and every recent decision has held that the First Amendment protects video games.[59]

Second, the Players err in suggesting that EA's games are not entitled to constitutional protection on the theory that they "do not communicate anything."[60] As the Players themselves concede, "a narrow succinctly articulable message is not a condition of constitutional protection." *Hurley v. Irish-American Gay, Lesbian*

---

[58] ER 63-73, 89-99.

[59] *See* EA's Opening Brief ("EA") 16-17 and n.40.

[60] PA 10-20.

*and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995). The Supreme Court has explained that "if confined to expressions conveying a 'particularized message,'" the First Amendment "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id.* The California Court of Appeal reiterated this principle in *Kirby*, declaring that the defendant's video game "need not convey any 'meaning or message'" to qualify for First Amendment protection. 144 Cal. App. 4th at 60.

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060-1063 (9th Cir. 2010), is instructive. Emphasizing that constitutional speech protections do not attach only to expression with a particular message, the Court declared that "[w]e have never seriously questioned that the processes of writing words on paper, painting a picture, or playing an instrument are expressive." *Id.* at 1062. The Court went on to hold that not only tattoos, but also tattooing – including the "the tattooing process" and "the business of tattooing" – are "purely expressive activity fully protected by the First Amendment." *Id.* at 1060.

This is not the first time that the Players have argued that works incorporating athletes' names, likenesses, and biographical information are not protected speech. And in those previous cases, the Eighth and Tenth Circuits expressly rejected the Players' argument. *Cardtoons*, 95 F.3d at 969 (trading cards); *C.B.C.*, 505 F.3d at 823 (fantasy football games). The Players' argument fares no better here. A work need not convey a political or social message, or even information, to qualify for constitutional protection. *Hurley*, 515 U.S. at 569. But even crediting the Players' dubious claim that speech is protected only if it

26

"reflect[s] an intention to communicate something,"[61] EA's games easily would meet that standard. *NCAA Football* and *NCAA Basketball/March Madness* convey information about colleges' football and basketball programs, coaching staffs, stadiums, uniforms, and – accepting Keller's allegations – about athletes' "physical appearances," "playing styles," and "equipment preferences."[62]

The problems with the Players' attempt to deny First Amendment protection to EA's sports games become clearer if one considers other historically-based video games. EA doubts that the Players would argue that the First Amendment does not protect the video game *President Forever 2008*, which allows users to simulate presidential general elections and primaries of the past half-century and includes figures ranging from Al Gore to Rudy Giuliani, or *Theater of War 2: Africa 1943*, which allows users to simulate part of the Battle of North Africa and includes figures ranging from Field Marshall Erwin Rommel to General Dwight Eisenhower. That EA's games concern college athletics, rather than political or military history, does not in any way diminish their constitutional protections against right-of-publicity claims. *See, e.g., C.B.C.*, 505 F.3d at 823; *Cardtoons*, 95 F.3d at 969.

---

[61] PA 11.

[62] *See, e.g.,* ER 6-8, 11-13; AB 37-38.

27

**B.     The Court Should Not Adopt A Less Protective Constitutional Test For Right-Of-Publicity Claims.**

**1.     Applied To Expressive Works, Right-Of-Publicity Laws Are A Content-Based Regulation Of Speech.**

There are two fundamental flaws in the Players' argument that right-of-publicity laws "are content-neutral" restrictions that are "subject to intermediate scrutiny[.]"[63]  First, they mistakenly assert that "state laws governing publicity rights regulate conduct, not speech."[64]  Not surprisingly, the cases that the Players cite to support this argument are inapposite.  *See Spence v. Washington*, 418 U.S. 405 (1974), *U.S. v. O'Brien*, 391 U.S. 367 (1968), *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984), and *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000).  In each of those cases, the Supreme Court discussed the level of scrutiny that applied to a regulation of *conduct* that incidentally burdened symbolic speech: defacing a flag (*Spence*, 418 U.S. at 410-414); burning a draft card (*O'Brien*, 391 U.S. at 376-377); camping in a public park (*Clark*, 468 U.S. at 293-294), and dancing nude (*City of Erie*, 529 U.S. at 289-290).  These symbolic-speech cases do not apply where, as here, a regulation targets purely expressive activity.  *Anderson*, 621 F.3d at 1061.

Second, the Players argue that right-of-publicity laws are content-neutral because they apply "regardless of what message, if any," the defendant's work conveys.[65]  But their focus on the speaker's message conflates content neutrality

---

[63] PA 3.

[64] PA 5.

[65] PA 6-7.

with viewpoint neutrality.  Even if a regulation is viewpoint-neutral – that is, it does not target a work based on its particular opinion or message – it still may be content-based, and trigger heightened constitutional scrutiny.

A regulation is content-based when it cannot be "justified without reference to the content of the speech."  *Bartnicki v. Vopper*, 532 U.S. 514, 521 (2001).  In determining that an Arkansas tax on certain magazines was content-based, the Supreme Court observed that "enforcement authorities must necessarily examine the content" of the publication.  *Arkansas Writers' Project v. Ragland*, 481 U.S. 221, 230 (1987).  To underscore the distinction between content neutrality and viewpoint neutrality, the Court emphasized that "Arkansas' system of selective taxation does not evade the strictures of the First Amendment merely because it does not burden the expression of particular views by specific magazines."  *Id.* "[T]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."  *Id.* (internal citations and quotation marks omitted).

Right-of-publicity regulations that target the use of a person's name or likeness in an expressive work are inherently content-based.  The essence of such a right-of-publicity claim is the defendant's unauthorized use of the plaintiff's name, likeness, or other attribute within the defendant's work – here, for example, EA's alleged use of Keller's likeness in its *NCAA Football* video game.[66]  Like the tax at issue in *Arkansas Writers' Project*, right-of-publicity law necessarily requires the court to examine the content of the defendant's work to determine whether it is

---

[66] ER 130-137.

actionable. *See, e.g., Rogers*, 875 F.2d at 1004 (examining "content" of defendant's motion picture to adjudicate right-of-publicity claim); *ETW*, 332 F.3d at 937 (same; painting); *Seale*, 949 F. Supp. at 337 (examining "the content of the [defendants'] book and film" to adjudicate right-of-publicity claim). As Professor Volokh has observed, "[t]he right of publicity is clearly content-based: It prohibits the unlicensed use of particular content (people's name or likenesses)." E. Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903, 912 n.35 (2003).[67]

Because right-of-publicity law is content-based, it should be subject to strict constitutional scrutiny, not the lower intermediate scrutiny proposed by the Players. *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1127 (2009) ("content-based restrictions must satisfy strict scrutiny"). As the California Supreme Court declared in *Guglielmi*, speech should be "free of government restraint … unless there is a compelling reason to the contrary." 25 Cal. 3d at 866.

---

[67] The Players point to no right-of-publicity case to support their argument that such laws are content-neutral. Instead, they rely on dictum from a single Lanham Act case, *Dr. Seuss Enters. v. Penguin Books*, 109 F.3d 1394, 1403 n.11 (9th Cir. 1997), where this Court quoted a passage from *Dallas Cowboys Cheerleaders v. Pussycat Cinema*, 604 F.2d 200, 206 (2d Cir.1979), stating that "[t]he prohibition of the Lanham Act is content neutral[.]" PA 6. But "the Second Circuit all but retracted its *Dallas Cowboys* decision in *Rogers [v. Grimaldi]*." *Parks*, 329 F.3d at 450. Moreover, this Court's more recent Lanham Act cases involving expressive works have applied a far more protective First Amendment test than *Dr. Seuss* did. *See, e.g., E.S.S.*, 547 F.3d at 1098-1101; *Mattel v. Walking Mountain Prods.*, 353 F.3d 792, 798 (9th Cir. 2003).

## 2.     The Players' Alternative Tests Do Not Adequately Protect Expression.

Neither alternative test proposed by the Players – the predominant-purpose test[68] or the alternative-means test[69] – satisfies the required heightened standard of constitutional scrutiny.[70]

The Missouri Supreme Court's predominant-purpose test is dangerously elastic; under this formulation, "[i]f a product is being sold that predominantly exploits the commercial value of an individual's identity, that product should be held to violate the right of publicity and not be protected by the First Amendment, even if there is some 'expressive' content in it that might qualify as 'speech' in other circumstances."  *Doe*, 110 S.W.3d at 374.  This test leaves courts (or jurors) to make a highly subjective determination as to the "predominant" reason that a person's name or likeness was included in an expressive work.  It "is even more flawed than the [transformative-use] standard," in that it "would in effect give a court carte blanche to censor speech at the behest of a celebrity, based solely on the court's personal view of the relative value of the speech."  Welkowitz and Ochoa, 45 Santa Clara L. Rev. at 668-670.  Biographies, for example, focus on a single

---

[68] *Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003).

[69] *San Francisco Arts & Athletics v. U.S. Olympic Cmte.*, 483 U.S. 522 (1987) ("*SFAA*").

[70] Indeed, numerous scholars have argued that the transformative-use test does not satisfy strict scrutiny.  *See*, *e.g.*, Thomas F. Cotter and Irina Y. Dmitrieva, *Integrating the Right of Publicity with First Amendment and Copyright Preemption Analysis*, 33 Colum. J.L. & Arts 165, 206 (2010); Welkowitz and Ochoa, 45 Santa Clara L. Rev. at 666; Jay Dougherty, *All the World's Not a Stooge: The 'Transformativeness' Test for Analyzing a First Amendment Defense to a Right of Publicity Claim Against Distribution of a Work of Art*, 27 Colum. J. L. & Arts 1, 45 (2003).

31

real-life individual, and are sold for a profit.  If the subject of a biography were a well-known entertainer or athlete whose identity had commercial value, how would a court determine whether the work's predominant purpose was scholarship or exploitation of the subject's popularity?  The predominant-purpose test is dangerously "open-ended" and apparently leaves that determination to the tastes of the judge or jury.  D. Zimmerman, *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503, 1507-1510 (2009) (criticizing test as "extreme").  This explains why other courts have rejected the test.[71]

The alternative-means test that the Players take from *SFAA* also has been widely rejected.  *SFAA* interpreted a statute, 36 U.S.C. § 380, that exempted the "Olympics" mark from certain defenses available under the Lanham Act.  483 U.S. at 526, 530.  The Supreme Court emphasized that the statute "applie[d] primarily to commercial speech" – in that case, the use of the word "Olympics" in the name of the petitioner's athletic competition and on related merchandise.  *Id.* at 537 n.15.[72]

Courts consistently have refused to adopt this test for right-of-publicity or Lanham Act claims that target expressive works.  In *Rogers*, for example, the Second Circuit held that the alternative-means test "does not sufficiently accommodate the public's interest in free expression."  875 F.2d at 999.  The Sixth Circuit in *Parks* likewise "reject[ed] the alternative avenues test" because it does

---

[71] *See C.B.C.*, 443 F. Supp. 2d at 1096; *Kirby*, 144 Cal. App. 4th at 58.

[72] *See* EA's Appellee's Brief in *Brown* at 29-31.

not "accord[] adequate weight to the First Amendment[.]" *Id.* at 444-446. The court explained that the test was "derived from real property law[,]" and "is premised on the notion that, just as a real property owner may exclude a speaker from a shopping mall so long as other locations exist for the speaker to deliver his message, a celebrity may prohibit use of his or her name so long as alternative ways exist for the artist to communicate his or her idea." *Id.* at 445. But the court made clear that "[t]o suggest that other words can be used as well to express an author's or composer's message is not a proper test for weighing First Amendment rights." *Id.* at 445-446.[73]

Because the two widely-criticized alternative tests proposed by the Players do not provide the necessary heightened level of constitutional scrutiny, this Court, too, should decline to adopt them.

---

[73] *See also Cardtoons*, 95 F.3d at 971 (finding that the "'no adequate alternative avenues' test does not sufficiently accommodate the public's interest in free expression"; declining to apply it to right-of-publicity claim); *ETW*, 332 F.3d at 927 (same; refusing to apply alternative-means test to Lanham Act claim); *Westchester Media v. PRL Holding*, 214 F.3d 658, 672 (5th Cir. 2000) (same); *L.L. Bean v. Drake Publishers*, 811 F.2d 26, 29 (1st Cir. 1987) (same).

## IV.  CONCLUSION

This Court should find that the First Amendment defeats Keller's claims, should reverse the district court's order denying EA's anti-SLAPP motion, and should strike Keller's claims against EA.

Respectfully submitted,
DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ALONZO WICKERS IV
ANNA R. BUONO
LISA J. KOHN

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST
STEVEN A. HIRSCH
R. JAMES SLAUGHTER

By: _____/s/_____
      Kelli L. Sager

Attorneys for Defendant/Appellant
ELECTRONIC ARTS INC.

34

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1, I certify that the attached Appellant's Reply Brief is proportionately spaced in 14-point Times New Roman typeface and contains 8,650 words (as calculated by Microsoft Word 2003), excluding the Table of Contents, Table of Authorities, signature blocks, caption page, and this Certificate of Compliance.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ALONZO WICKERS IV
ANNA R. BUONO
LISA J. KOHN

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST
STEVEN A. HIRSCH
R. JAMES SLAUGHTER


By: _____/s/_____
        Kelli L. Sager

Attorneys for Defendant/Appellee
ELECTRONIC ARTS INC.

35

9th Circuit Case Number: 10-15387

CERTIFICATE OF SERVICE When All Case Participants are Registered for the Appellate
CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United
States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on

_____.

I certify that all participants in the case are registered CM/ECF users and that service will be
accomplished by the appellate CM/ECF system.

Signature _____

*****************************************************************

CERTIFICATE OF SERVICE When Not All Case Participants are Registered for the Appellate
CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United
States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January
12, 2011.

Participants in the case who are registered CM/ECF users will be served by the appellate
CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have
mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a
third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF
participants:

**SEE ATTACHED SERVICE LIST**

Signature _____

| Case Number: 10-15387 | ECF Filing Status |
|---|---|
| Bryan Clobes, Esq.<br>Cafferty Faucher LLP<br>1717 Arch Street<br>Suite 3610<br>Philadelphia, PA 19103 | Not Registered |
| Donald Scott Macrae, Esq.<br>Steyer Lowenthal Boodrookas<br>  Alvarez & Smith LLP<br>Suite 300<br>One California St<br>San Francisco, CA 94111 | Not Registered |
| Joe Sibley, Esq.<br>Kiwi Alejandro Danao Camara<br>  Camara & Sibley LLP<br>2339 University Blvd.<br>Houston, TX 70005 | Not Registered |